UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY C. CUTONE and
ANTHONY CUTONE,

              Plaintiffs,

        v.

ELI LILLY AND COMPANY,

              Defendant.

CIVIL ACTION No. 04-CV-12725 (JLT)

## DEFENDANT ELI LILLY AND COMPANY'S
## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Eli Lilly and Company ("Lilly") submits this Memorandum of Points and

Authorities in Support of its Motion for Summary Judgment. Lilly is entitled to summary

judgment on all claims because Plaintiffs Kimberly Cutone and her husband Anthony Cutone[1]

("Plaintiffs") have not come forward with competent evidence to identify Lilly as the

manufacturer of the drug to which Kimberly was allegedly exposed. At least 60 manufacturers

produced diethylstilbestrol ("DES") in 1969 and early 1970 when the drug was allegedly

ingested. Plaintiffs, however, seek to prove that a Lilly product was used based only on an

inconclusive physical description of a pill taken 36 years ago -- a description that fits the product

of one manufacturer known to have sold the drug that year and may fit the products of many

others whose descriptions are simply not known. Nothing about the utilitarian description given

-- white, round, and scored -- is unique or particularly exotic. There is no reason why other

---

[1] Anthony Cutone asserts a claim for loss of consortium.

companies could not have made similar pills.  This evidence is insufficient to meet Plaintiffs'

burden of proving that a drug manufactured by Lilly caused their injuries.

## STATEMENT OF UNDISPUTED FACTS[2]

1.      Plaintiff Kimberly Cutone was born in Cambridge, Massachusetts in August,

1970.  Plaintiffs' Responses to Defendants' Amended Uniform Preliminary Requests for

Information ("Interrog.") No. 1 (copy attached as Exhibit 1 to Affidavit of Lauren E. Dwyer

("Dwyer Aff.")).

2.      Plaintiff is unable to identify the particular manufacturer of DES to which she was

exposed.  Interrog. No. 7.

3.      Plaintiff Kimberly Cutone's mother, Virginia Camporesi, testified that she took

DES during her pregnancy with Kimberly and that it was in the form of a "round, white pill with

a cross."  Transcript of Deposition of Virginia Camporesi ("Camporesi Tr.") at 33, 44 (excerpts

attached as Exhibit 2 to Dwyer Aff.).  She also testified that the pill was smooth, flat, hard, and

uncoated, without other markings.  *Id.* at 54-55.

4.      Ms. Camporesi could not recall what dosage of DES she was prescribed.  *Id.* at

38.

5.      Ms. Camporesi obtained the DES from Bayard Pharmacy.  *Id.* at 40-41.

6.      There is no evidence that Bayard Pharmacy carried Lilly's DES.

7.      In 1969 and 1970, DES was manufactured by more than 60 different companies.

*See* 1969 Red Book (excerpt attached as Exhibit 3 to Dwyer Aff.); 1970 Red Book (excerpt

attached as Exhibit 4 to Dwyer Aff.); 1969 Blue Book (excerpt attached as Exhibit 5 to Dwyer

Aff.); 1970 Blue Book (excerpt attached as Exhibit 6 to Dwyer Aff.).

---

[2] Lilly accepts these facts as undisputed for purposes of this summary judgment motion only and reserves the right to contest any of these facts at trial.

8.      Bristol-Myers Squibb Company made and sold diethylstilbestrol as a white, cross-scored pill under the brand name Stilbetin. *See* John J. Hefferon, *Description of the Identification Guide*, 182 JAMA 1146, 1195 (1962) (attached as Ex. 7 to Dwyer Aff.).

9.      There is no information about the physical description of the great majority of the DES pills available in 1969 and 1970; there is no evidence that Lilly's product was the only one to meet the description given by Plaintiffs.

10.     Plaintiffs have not produced any prenatal medical records indicating that Ms. Camporesi was prescribed Lilly's diethylstilbestrol.

11.     Plaintiffs have not produced any prescription slips or pharmacy records concerning any drug prescribed to Ms. Camporesi during the pregnancy that resulted in Mrs. Cutone's birth.

## ARGUMENT

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002). Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial. *Carroll*, 294 F.3d at 236. Neither "conclusory allegations [nor] improbable inferences" are sufficient to defeat summary judgment. To withstand a properly supported motion for summary judgment, the opposing party must present "enough competent evidence" to enable a fact finder to decide in its favor on the disputed claims. *Id.* at 236-37 (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)) (citations omitted).

## II.    PLAINTIFFS CANNOT PROVE THAT LILLY MANUFACTURED THE DRUG TO WHICH MRS. CUTONE WAS ALLEGEDLY EXPOSED

Under applicable Massachusetts law, Plaintiffs must identify Lilly as the manufacturer of the pill Mrs. Camporesi allegedly ingested. Plaintiffs have only identified the pill as round, white, smooth, flat, hard, uncoated, with a cross. Rather than meeting their burden, Plaintiffs are asking that a jury be allowed to identify Lilly based on a physical description that is not shown to be exclusive to Lilly. It is as if a plaintiff had been injured by a man with a mustache. No court could allow any man with a mustache to be held liable unless evidence showed he was the only mustached man in the vicinity at the time of the injury.

### A.    The Substantive Law of Massachusetts Governs Plaintiffs' Claims.

Massachusetts substantive law governs this action because all of the operative events related to the prescription and use of diethylstilbestrol occurred there. *Boston Co. Real Estate Counsel v. Home Ins. Co.*, 887 F. Supp. 369, 372 (D. Mass. 1995) (holding that in Massachusetts, "the law of the jurisdiction with the 'most significant relationship' to the transaction governs the dispute"). Mrs. Cutone's alleged exposure to DES took place in Massachusetts, where she was born, where her mother lived during her pregnancy, where her mother allegedly was prescribed DES and filled her prescription for DES, and where she currently resides. Interrog. Nos. 1, 3, 4, 5, 13 (Dwyer Aff., Ex. 1).

### B.    Plaintiffs Cannot Prove That Lilly Manufactured the Drug to Which Mrs. Cutone Claims She Was Exposed.

Plaintiffs' claims must fail because, under Massachusetts law, "a plaintiff in a products liability action must show that the injury is attributable to the defendant's negligence." *Gurski v. Wyeth-Ayerst Div. Of Am. Home Prods. Corp.*, 953 F. Supp. 412, 418 (D. Mass. 1997) (citing *Smith v. Ariens Co.*, 377 N.E.2d 954, 958 (Mass. 1978)). "Identification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action."

*Payton v. Abbott Labs.*, 437 N.E.2d 171, 188 (Mass. 1982).  Plaintiffs cannot meet their product

identification burden by establishing mere mathematical probabilities; rather, Plaintiffs must

submit evidence that would allow a reasonable juror to conclude that it is "more probable than

not" that their injuries were caused by a particular defendant's actions.  *Spencer v. Baxter Int'l,*

*Inc.*, 163 F. Supp. 2d 74, 78 (D. Mass. 2001) (granting summary judgment to defendants where

plaintiffs showed it was more likely than not that they contracted HIV virus from one of two

blood products -- Alpha or Baxter AHF -- but could not identify Alpha or Baxter AHF as the

specific cause of their injuries).

    The issue of product identification is particularly important in DES cases because literally

hundreds of companies manufactured diethylstilbestrol.[3]  Lilly made a diethylstilbestrol pill in

1969 and 1970 that fits Mrs. Keller's description.  At least one other company made pills fitting

that description at various times.  No one can say how many of the other companies producing

DES in 1969 and 1970 did so in the form of small, white, pills with a cross.  A jury verdict for

Plaintiffs based on this evidence would be rejected by a Massachusetts court as mere conjecture.

    Such a verdict would be akin to allowing recovery under the facts of *Smith v. Rapid*

*Transit, Inc.*, best known in Massachusetts as the "Blue Bus" case.[4]  58 N.E.2d 754, 755 (Mass.

1945).  Imagine that a woman is hit by a white car while crossing the street, sustaining serious

---

[3] *See e.g., Sutowski v. Eli Lilly & Co.,* 696 N.E.2d 187, 188 (Ohio 1998) ("Because DES was not patented, some
two hundred to three hundred drug companies produced DES in the years it was widely prescribed for use during
pregnancy.");  *Smith v. Eli Lilly & Co.,* 560 N.E.2d 324, 329 (Ill. 1990) (noting that "as many as 300 companies"
manufactured DES at some point prior to 1971); 1969 and 1970 Red Book; 1969 and 1970 Blue Book (Dwyer Aff.,
Exs. 3-6) (listing at least 60 manufacturers of diethylstilbestrol in the year Mrs. Cutone was allegedly exposed).

[4] *See generally* Nesson, *The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts*, 98 HARV.
L. REV. 1357 (1985).  Nesson poses the following hypothetical.  While driving late at night on a dark, two-laned
road, a person confronts an oncoming bus speeding down the centerline of the road in the opposite direction.  In the
glare of the headlights, the person sees that the vehicle is a bus, but cannot otherwise identify it.  He swerves to
avoid a collision, and his car hits a tree.  The bus speeds past without stopping.  The injured person later sues the
Blue Bus Company.  He proves, in addition to the facts stated above, that the Blue Bus Company owns and operates
80% of the buses that run on the road where the accident occurred.  Can he win?  Of the course the correct answer is
"no", not without evidence that would exclude the other 20% of the buses.

injuries. She sues the owner of a white car that was driving on the same street on the same day that she was hit. During discovery, it comes to light that the street was actually full of cars of varying descriptions that day. To recover in these circumstances, on the basis of a physical description, a plaintiff would have to prove that none of the other cars on the street was white. If one or more other cars were white, it would be just guessing to say that one white car rather than another caused the injury. If the color of the other cars was not known, it would equally be just a guess to *assume* that none of them were white. A verdict cannot rest on such "conjecture." *See Rapid Transit, Inc.*, 58 N.E.2d at 755.

Here, Plaintiffs cannot meet their burden by eliminating other DES manufacturers as potential tortfeasors. Plaintiffs are trying to identify Lilly as the manufacturer of the drug ingested by Ms. Camporesi based on nothing more than a pill description that fits at least one other known manufacturer. During her deposition, Ms. Camporesi described the DES she allegedly ingested as a round, smooth, flat, hard, uncoated, white pill with a cross and no other markings. Camporesi Tr. at 33, 44 (Dwyer Aff., Ex. 2). Plaintiffs have offered no evidence that Ms. Camporesi's description identifies Lilly and excludes all other possibilities, nor have they established that Lilly was the only manufacturer to offer a DES pill fitting that description. In fact, it is clear that Lilly was not the only company to produce such DES pills. Bristol-Myers Squibb Company made and sold diethylstilbestrol as a white, cross-scored pill under the brand name Stilbetin. *See* John J. Hefferon, *Description of the Identification Guide*, 182 JAMA 1146, 1195 (1962) (Dwyer Aff., Ex. 7). For the great majority of the other 60-plus companies who manufactured DES in 1969 to 1970, there is no information or evidence concerning the appearance of their pills. Plaintiffs have not, and personally cannot, adduce evidence that no other company produced a pill fitting Ms. Camporesi's description. Without more, Ms.

Camporesi's description does not make it more likely than not that Lilly, as opposed to Bristol-Myers Squibb or some other unidentified drug company, manufactured the DES to which Mrs. Cutone was exposed.

This situation is very similar to a recent case in the District of Columbia where the court granted Lilly summary judgment because plaintiff's identification of a small, round, white pill with a cross and no other markings failed to exclude all other DES pills. *See Galvin v. Eli Lilly & Co.*, No. 03-1797, slip op. (D.D.C. June 10, 2005). In subsequently denying the Galvin plaintiff's Motion to Alter or Amend Judgment, the court emphasized that testimony regarding another manufacturer's pill that met plaintiff's mother's description was not offered to show that this pill was actually stocked by the pharmacy used by the plaintiff's mother (and thus presumably dispensed to plaintiff's mother) but, rather, to show that the plaintiff could not eliminate the possibility based on her mother's unexceptional pill description. *See Galvin v. Eli Lilly & Co.*, No. 03-1797, slip op., pp. 7-8 (D.D.C. September 12, 2005); *see also Bortell v. Eli Lilly & Co.*, No. 04-0954, slip op., p. 18 (D.D.C. October 19, 2005)(holding pill description that matched both Lilly's pills and those of another manufacturer who distributed in the area insufficient to prove causation)(decisions attached as Exs. 9-11 to Dwyer Aff.).

Other courts in the District of Columbia have allowed a plaintiff to avoid summary judgment using a vague pill description to identify the manufacturer only when the plaintiff also produced evidence that her mother's pharmacy dispensed Lilly's DES. *See Clayton v. Eli Lilly & Co.*, No. 04-1363, slip op., pp. 6-9 (D.D.C. March 16, 2006)(relying on description of small white cross-scored pill <u>and</u> statement by buyer for pharmacy chain that relevant pharmacy would have dispensed Lilly's DES); *Gassmann v. Eli Lilly & Co.*, No. 03-02592, slip op., p. 15-16 (D.D.C. December 29, 2005)(relying on description of a small white pill <u>and</u> statement by

witness that Lilly was the exclusive brand stocked by the pharmacy);  *Dunseth v. Eli Lilly & Co.*,

No. 03-02123, slip op., pp. 8-9 (D.D.C. September 16, 2005)(holding description of small white

pill with a cross on it and no other writing would not alone suffice to identify the defendant's

product, but coupled with statement by area pharmacist identifying Lilly was sufficient to

withstand summary judgment)(decisions attached as Exs. 12-13 to Dwyer Aff.).  Unlike these

cases, Plaintiffs here have not provided any information about the dispensing pharmacy, despite

knowing its identity.  Rather, after noticing the deposition of the dispensing pharmacist's wife

and son, who were allegedly employed at the store, Plaintiffs cancelled and declined to

reschedule the depositions.[5]

Discovery in this case is now closed, and Plaintiffs have not satisfied and cannot satisfy

their burden of establishing that it is more likely than not that Lilly manufactured the DES to

which Mrs. Cutone was allegedly exposed.  The only admissible evidence offered by Plaintiffs --

the testimony of Ms. Camporesi -- fails to identify Lilly.  For this reason, Lilly is entitled to

summary judgment on each of Plaintiffs' claims.

## III.    Summary Judgment On Mr. Cutone's Loss of Consortium Claim Is Mandated Because Mrs. Cutone Cannot Maintain Her Claims.

Mr. Cutone cannot prevail on his loss of consortium claim because Mrs. Cutone has

failed to meet her burden to show that Lilly caused her injuries.  Although Massachusetts

recognizes loss of consortium as an independent tort, *Olsen v. Bell Labs., Inc.*, 388 Mass. 171,

176 (1983), such a claim cannot be maintained without proof of a tortuous act that caused

personal injury to the claimant's spouse.  *Sena v. Massachusetts*, 417 Mass. 250, 264 (1994)

---

[5] To the extent that Plaintiffs attempt to rely on Ms. Camporesi's deposition testimony regarding statements made by Mrs. Edith Port, who worked at Bayard Pharmacy, such statements are inadmissible hearsay.  See F.R.E. 802. Moreover, given that Plaintiffs failed to depose Mrs. Port given the opportunity, they should not be able to introduce such unreliable statements.

("Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, we have not repudiated the implicit prerequisite that the injured spouse have a viable claim") (internal citation omitted); *see also Brazinskos v. A.S. Fawcett, Inc.*, 318 Mass. 263, 267 (1945) ("The Plaintiff's husband could not recover for consequential damages if she had no cause of action"); *Pearl v. Wm. Filene's Sons Co.,* 317 Mass. 529, 532 (1945) (holding that a husband cannot recover for consequential damages arising from his wife's personal injury unless he proves that she had a viable cause of action).[6]

Because Mrs. Cutone cannot meet her burden of establishing that Lilly's DES caused her injuries, by necessity, Mr. Cutone's loss of consortium claim fails as well. Lilly is therefore entitled to summary judgment on Mr. Cutone's loss of consortium claims.

## CONCLUSION

Lilly is entitled to summary judgment on all claims asserted by Plaintiffs Kimberly Cutone and Anthony Cutone because they cannot prove that Lilly manufactured the diethylstilbestrol to which Mrs. Cutone was allegedly exposed.

Respectfully submitted,

FOLEY HOAG LLP

/s/ James J. Dillon
James J. Dillon (BBO # 124660)
Brian L. Henninger (BBO # 657926)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02111-2600
(617) 832-1000

Dated: May 1, 2006

---

[6] In addition, under Massachusetts law a spouse cannot recover for loss of consortium unless the marital relationship existed at the time the tort was committed. *Feliciano v. Rosemar Silver Co.*, 401 Mass. 141 (1987); *see also Anderson v. Eli Lilly & Co.,* 588 N.E.2d 66 (N.Y. 1991).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

KIMBERLY C. CUTONE and
ANTHONY CUTONE,

        Plaintiffs,

      v.

ELI LILLY AND COMPANY,

        Defendant.

---

CIVIL ACTION No. 04-CV-12725 (JLT)

## [PROPOSED] ORDER

After consideration of the arguments of counsel for Defendant Eli Lilly and Company

("Lilly") and Plaintiffs Kimberly and Anthony Cutone, and after consideration of all memoranda

and exhibits that have been filed with the Court, the Court rules that Lilly's Motion For

Summary Judgment as to the Claims of Plaintiffs is GRANTED.


_____
Date

_____
Hon. Joseph L. Tauro
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY C. CUTONE and
ANTHONY CUTONE,

        Plaintiffs,

        v.                                      CIVIL ACTION No. 04-CV-12725 (JLT)

ELI LILLY AND COMPANY,

        Defendant.

**AFFIDAVIT OF LAUREN E. DWYER**
**IN SUPPORT OF ELI LILLY AND COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**

I, Lauren E. Dwyer, being first sworn on oath, say that the following is true and correct:

1.     I am an attorney at Foley Hoag LLP, counsel for Eli Lilly and Company ("Lilly")

in this action. I am duly admitted to practice in the District of Massachusetts.

2.     Attached as Exhibit 1 are redacted excerpts from a true copy of Plaintiffs'

Responses to Defendants' Amended Uniform Preliminary Requests for Information.

3.     Attached as Exhibit 2 are excerpts from a true copy of the transcript of the

deposition in this action of Virginia Camporesi.

4.     Attached as Exhibit 3 are excerpts from a true copy of the 1969 Drug Topics Red

Book.

5.     Attached as Exhibit 4 are excerpts from a true copy of the 1970 Drug Topics Red

Book.

6.     Attached as Exhibit 5 are excerpts from a true copy of the 1969 American

Druggist Blue Book.

B3196590.1

7.     Attached as Exhibit 6 are excerpts from a true copy of the 1970 American Druggist Blue Book.

8.     Attached as Exhibit 7 is an excerpt from a true copy of John J. Hefferon, *Description of the Identification Guide*, 182 JAMA 1146, 1195 (1962).

9.     Attached as Exhibit 8 is a true copy of the slip opinion granting Lilly's motion for summary judgment in *Galvin v. Eli Lilly and Co.*, No. 03-1797, slip op. (D.D.C. June 10, 2005).

10.    Attached as Exhibit 9 is a true copy of the slip opinion denying Plaintiffs' Motion to Alter or Amend Judgment in *Galvin v. Eli Lilly and Co.*, No. 03-1797, slip op. (D.D.C. September 12, 2005).

11.    Attached as Exhibit 10 is a true copy of the slip opinion granting Lilly's motion for summary judgment in *Bortell v. Eli Lilly and Co.*, No. 04-0954, slip op. (D.D.C. October 19, 2005).

12.    Attached as Exhibit 11 is a true copy of the slip opinion denying Lilly's motion for summary judgment in *Clayton v. Eli Lilly and Co.*, No. 04-1363, slip op. (D.D.C. March 16, 2006).

13.    Attached as Exhibit 12 is a true copy of the slip opinion denying Lilly's motion for summary judgment in *Gassmann v. Eli Lilly and Co.*, No. 03-02592, slip op. (D.D.C. December 29, 2005).

14.    Attached as Exhibit 13 is a true copy of the slip opinion denying Lilly's motion for summary judgment in *Dunseth v. Eli Lilly and Co.*, No. 03-12123, slip op. (D.D.C. September 16, 2005).

Dated:  May 1, 2006

Lauren E. Dwyer

Sworn before me this 1st day of May, 2006.

Notary Public

My commission expires: 12/21/2012

JESSICA LEIGH CUSHMAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 21, 2012

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KIMBERLY C. CUTONE and          ]
ANTHONY CUTONE,                 ]
                                ]
        Plaintiffs,             ]
                                ]
    v.                          ]       CIVIL ACTION NO.: 04-CV-1365 (GK)
                                ]
ELI LILLY AND COMPANY, et al.,  ]
                                ]
        Defendants.             ]

**PLAINTIFF'S RESPONSES TO DEFENDANTS' AMENDED UNIFORM
PRELIMINARY REQUESTS FOR INFORMATION**

I.    GENERAL AS TO EACH PLAINTIFF

1.    State the full name, address, social security number, and date and place of birth of
each plaintiff.

**RESPONSE:**    a.    Kimberly C. Cutone; Address: 54 Gould Street, W. Roxbury, MA
                       02132; ███████████; DOB: 8/██70; Place of Birth:
                       Cambridge Hospital, Cambridge, MA

                 b.    Anthony Cutone; Address: 54 Gould Street, W. Roxbury, MA
                       02132; ███████████; DOB: ███71; Place of Birth: St.
                       Elizabeth's Hospital, Brighton, MA

2.    Identify each individual who the Complaint alleges was exposed to DES in utero
(the "exposed person").

**RESPONSE:**    a.    Kimberly C. Cutone

3.    State separately the full name, current residential address, and social security
number of the natural mother ("DES mother") and natural father of each exposed person.
Identify any deceased parent, the date, place, and cause of death.

**RESPONSE:**    a.    Mother: Virginia Camporesi

                       i.    2 Rena Street, Allston, MA 02134

      ii.    SSN: Unknown

   b.    Father: Gilbert Machado (deceased)

      i.    SSN: Unknown

      ii.    Date of Death: 9/19/00

      iii.    Place of Death: Revere, MA

      iv.    Cause of Death: Metastatic Adenocarcinoma of Unknown Primary

4.    State separately for each DES mother and exposed person all previous addresses, the dates and with whom each person resided at those addresses.

**RESPONSE:**    <u>Prior addresses for Plaintiff Kimberly C. Cutone:</u>

   a.    2 Rena Street
        Allston, MA 02134
        (1970 - 1989)

   b.    19 Hooker Street
        Allston, MA 02134
        (1989 - 1992)

   c.    Tremont Street
        Brighton, MA 02134
        (1992 - 1993)

   d.    18 Hopedale Street
        Allston, MA 02134
        (1993 - 1995)

   e.    190 Paris Street #3
        E. Boston, MA 02128
        (1995 - 9/98)

   f.    7 Lake Shore Court, 2B
        Brighton, MA 02135
        (9/98 - 12/02)

   g.    54 Gould Street
        W. Roxbury, MA 02132
        (12/02 - present)

Prior addresses for Virginia Camporesi:

    a.    2 Rena Street
           Allston, MA 02134
           (1965 - present)

## II.    AS TO ALLEGATIONS OF INGESTION

As to the DES ingested by or administered to the DES mother during her pregnancy with an exposed person:

5.    State the name and last-known address of each pharmacy or other person or facility from which the DES was obtained. If obtained from a pharmacy, state the name of each pharmacist who sold or provided the DES.

**RESPONSE:**    The mother's initial recollection of the facts surrounding product

identification is that the DES in question may have been purchased from Bayard Pharmacy in

Allston, MA. Plaintiff reserves the right to supplement this response as discovery progresses.

6.    If the name of the specific pharmacy or other person or place who sold the DES is unknown, set forth the name and the last known address of each pharmacy or pharmacist with whom the person who purchased the DES dealt during the time period of the gestation of the exposed person.

**RESPONSE:**    Not applicable.

7.    Identify the source of the DES including, without limitation, the manufacturer or supplier. State the facts which form the basis of this knowledge and identify all documents upon which these facts are based.

**RESPONSE:**    Plaintiff is unable to identify the particular manufacturer of the DES to

which she was exposed at this time. Plaintiff reserves the right to supplement this response as

discovery progresses.

8.    State the trade and/or generic name of the DES administered to or ingested by the DES mother.

**RESPONSE:**    Diethylstilbestrol.

9.    Describe in detail the physical appearance of the DES administered to or ingested by the DES mother, including its form, shape, color, size, dosage and markings.

**RESPONSE:**      Pill form. Dosage unknown. Plaintiff reserves the right to supplement

this response as discovery progresses.

      10.    Describe in detail the container and packaging in which the DES was contained, including the kind, shape, color and size.

**RESPONSE:**      Plaintiff is unable to describe in detail the container and packaging in

which the DES was contained.

      11.    Describe any labeling affixed to the container or packaging holding the DES and the matter printed, written or typed thereon, including instructions for use, if any, and the locations and dates when any notations and writings were made thereon.

**RESPONSE:**      Plaintiff is unable to describe any labeling affixed to the container or

packaging holding the DES and the matter printed, written or typed thereon, and the locations

and dates when any notations and writings were made thereon.

      12.    State the name and last known address of each medical professional who treated, examined or otherwise rendered professional services to the DES mother during her pregnancy with the exposed person. Specify each professional who prescribed, administered and/or provided the DES.

**RESPONSE:**      a.    Philip McGovern, Sr., M.D.

                     b.    Last known address: Cambridge Street, Cambridge, MA

      13.    State how the DES mother obtained the DES, including whether she did so on the authorization of a physician's prescription. If so, identify the physician.

**RESPONSE:**      Plaintiff's mother obtained the DES on the authorization of Dr.

McGovern's prescription. See Statement of Philip McGovern, Jr., M.D. attached hereto as

Appendix No. 1.

      14.    If a prescription for DES was received, identify all words, numerals, symbols, notations and other markings appearing on the prescription.

**RESPONSE:**      Plaintiff is unable to identify all words, numerals, symbols, notations

and other markings appearing on the prescription for DES.

15. State the dates on which (or, if unknown, the approximate period, week, month or trimester of the DES mother's pregnancy with the exposed person during which) the prescription was made.

**RESPONSE:**    Early in pregnancy.

16. State the complaints and purpose for which the drug was allegedly prescribed.

**RESPONSE:**    DES was prescribed to plaintiff's mother for the prevention of miscarriage.

17. Describe the written or non-written instructions for use given by the prescribing practitioner on each prescription (written or otherwise) including the regimen to be followed. Identify the custodian(s) and location(s) of the instructions. If available, attach copies thereof.

**RESPONSE:**    Unknown. Custodian and location of instructions unknown.

18. Identify each prescribing practitioner who authorized any respective prescription to be refilled and the date of each authorization.

**RESPONSE:**    See Plaintiff's Response to Request Nos. 12 and 13.

19. State the number of times, and, if known, the dates on which (or, if unknown, the approximate period, week, month or trimester of the DES mother's pregnancy with the exposed person during which) each prescription was filled and/or refilled.

**RESPONSE:**    See Plaintiff's Response to Request No. 15. Plaintiff does not know the number of times the prescription was refilled.

20. State the dates on which (or, if unknown, the approximate period, week, month or trimester of the DES mother's pregnancy with the exposed person during which) the drug was ingested by or administered to the DES mother.

**RESPONSE:**    DES was ingested by Plaintiff's mother early in the pregnancy.

21. State the name and last known address of each person who purchased or obtained the drug for use by the DES mother.

**RESPONSE:**    DES was obtained by Virginia Camporesi.

22. State, both as to the prescription of DES, and the administration or ingestion of DES, the: (a) dosage strength of each unit; (b) daily regimen; (c) means of administration; and (d) number of days of ingestion.

The information contained in these requests as well as the word usage, sentence structure and opinions, are not solely that of the declarant, rather they are the product of counsel in preparation with declarant.

I SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THE FOREGOING AMENDED UNIFORM PRELIMINARY REQUESTS FOR INFORMATION ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Dated: 10 -7-04

KIMBERLY C. CUTONE, Declarant

ANTHONY CUTONE, Declarant

AARON M. LEVINE & ASSOCIATES

Aaron M. Levine, #7864
1320 19th Street, N.W.
Suite 500
Washington, D.C. 20036
(202) 833-8040

Counsel for Plaintiffs

**EXHIBIT 2**

00001

1                          Volume: I

2                          Pages: 1 to 76

3                          Exhibits: None

4         IN THE UNITED STATES DISTRICT COURT

5             FOR THE DISTRICT OF COLUMBIA

6

7    -------------------------------

8  KIMBERLY C. CUTONE and          )

9  ANTHONY CUTONE,              ) CIVIL ACTION NO.:

10         Plaintiffs,     ) 04-CV-1365 (GK)

11  vs.                  )

12  ELI LILLY AND COMPANY, et al.,  )

13         Defendants.     )

14   -------------------------------

15

16         DEPOSITION OF VIRGINIA CAMPORESI

17         Thursday, October 27, 2005

18               1:12 p.m.

19               Held at:

20             Foley Hoag, LLP

21         Seaport World Trade Center West

22         155 Seaport Boulevard, 13th Floor

23            Boston, MA  02210-2600

24         Reporter:  Kathryn L. Santo

00002
1 A P P E A R A N C E S:

2

3    AARON M. LEVINE & ASSOCIATES

4    By Brandon J. Levine, Esquire

5    1320 19th Street, NW #500

6    Washington, D.C.  20036

7    (202) 833-8040

8    on behalf of the Plaintiffs

9

10    FOLEY HOAG, LLP

11    By Lauren Dwyer, Esquire

12    Seaport World Trade Center West

13    155 Seaport Boulevard

14    Boston, MA  02210-2600

15    (617) 832-3084

16    ldwyer@foleyhoag.com

17    on behalf of the Defendant

18    Eli Lilly and Company

19

20

21

22

23

24

00033

1    Q.  Did you have any other illnesses while

2  you were pregnant with Kimberly?

3    A.  No.

4    Q.  Any other complications while you were

5  pregnant with Kimberly?

6    A.  No.

7    Q.  Did you have any headaches while you were

8  pregnant with Kimberly?

9    A.  No.

10    Q.  Apart from when you gave birth, were you

11  ever hospitalized when you were pregnant with

12  Kimberly?

13    A.  No.

14    Q.  What medicines did you take during your

15  pregnancy with Kimberly?

16    A.  The one the doctor prescribed,

17  diethylstilbestrol.

18    Q.  How do you spell that?

19    A.  Oh, my goodness.  I'm not sure.

20    Q.  Did you take any other medications when

21  you were pregnant with Kimberly?

22    A.  Medicines, no.

23    Q.  Any prescription drugs?

24    A.  No.

00038

1    Q.  How did you take diethylstilbestrol?

2    A.  By mouth.

3        MR. LEVINE:  She means -- I don't think

4    that's what you meant, but -- I don't know what you

5    meant.

6    Q.  Did you take a pill?

7    A.  A pill.

8        MR. LEVINE:  That's what she meant.

9        THE WITNESS:  I'm sorry.

10   Q.  You mentioned that Dr. McGovern gave you

11   a prescription for diethylstilbestrol; is that

12   right?

13   A.  Yes.

14   Q.  What did the prescription look like?

15   A.  White piece of paper, and he wrote down

16   the name of the medicine, my name, the strength.

17   Q.  What was the name that he wrote down on

18   the prescription?

19   A.  Diethylstilbestrol.

20   Q.  What was the strength that he wrote down

21   on the prescription?

22   A.  That, I don't remember.

23   Q.  Was it a renewable prescription?

24   A.  Yes.

00041

1    A.  In Allston on Long Avenue.

2    Q.  On Longwood Avenue?

3    A.  Long.  Just Long.

4    Q.  Long Avenue.  How did you come to track

5  her down there?

6    A.  I've known her for many years.

7    Q.  How long have you known her?

8    A.  Since I used her pharmacy going back in

9  the '60s.

10    Q.  What was the name of her pharmacy?

11    A.  Bayard.

12    Q.  Could you spell the name?

13    A.  B-A-Y-A-R-D.

14    Q.  When did you first go to that pharmacy?

15    A.  In the '60s when I first lived there in

16  that neighborhood.

17    Q.  When you first lived in Allston?

18    A.  Yes.

19    Q.  Who usually took your prescriptions to be

20  filled at the pharmacy?

21    A.  Myself.

22    Q.  You took it yourself?

23    A.  Yes.

24    Q.  Did you ever go to another pharmacy in

00044
1  well?

2      A.  No.

3      Q.  Did you ever have any discussions with

4  either Mr. Port or his son about the

5  diethylstilbestrol?

6      A.  No.

7      Q.  What did the diethylstilbestrol look

8  like?

9      A.  It was a round, white pill with a cross.

10     Q.  How do you remember that that's what the

11  pill looked like?

12     A.  It stuck in my head.

13     Q.  When did you first remember that that is

14  what the pill looked like?

15     A.  I always remembered it.

16     Q.  Have you ever consulted with your

17  doctor's attorney regarding what the pill looked

18  like?

19         MR. LEVINE:  You mean your "daughter's"

20  attorney.

21     Q.  I'm sorry.  Your daughter's attorney.

22  I'll ask it again --

23     A.  Repeat it, please.

24     Q.  -- because I started out poorly.  Have

00054

1 conversation?

2    A.  No.

3    Q.  When was the next time that you talked to

4 someone from Mr. Levine's office?

5    A.  Today.

6    Q.  Who did you talk to today?

7    A.  Mr. Brandon right here.

8    Q.  What did you talk about today?

9    A.  The same subject, diethylstilbestrol that

10 I took and about, you know, what's happening.

11    Q.  Did you talk about anything else than

12 what you talked about in previous conversations?

13    A.  Well, how my daughter is having a problem

14 getting pregnant.

15    Q.  Who told you that your daughter was

16 having a problem getting pregnant?

17    A.  I knew that.

18    Q.  You knew that your daughter was having a

19 problem getting pregnant now or in the past?

20    A.  When she lost a baby.

21    Q.  Okay.  Going back to the description of

22 the pill.  What was the texture of the pill that

23 you took?

24    A.  Just smooth, round, flat.  I don't know

**Camporesi, Virginia 10/27/05**          **Page 54**

00055

1  how you describe texture.

2    Q.  Was the pill hard or soft?

3    A.  Hard.

4    Q.  Was it coated like an M&M or not coated?

5    A.  No.  No coating.

6    Q.  Were there any markings on the pill or

7  imprints?

8    A.  No.

9      MR. LEVINE:  Other than what you've

10  previously described.

11      THE WITNESS:  Right.

12    A.  The cross.

13    Q.  What did the bottle containing the

14  diethylstilbestrol look like?

15    A.  Just a brown bottle, brown prescription

16  bottle.

17    Q.  It was a brown prescription bottle from

18  the pharmacy?  Their bottle?

19    A.  Yes.

20    Q.  What did the label on the pharmacy bottle

21  say?

22    A.  It said the name of the medication,

23  diethylstilbestrol.  It had my name on it.  I'm not

24  sure of the -- the strength of the pill.

**Camporesi, Virginia 10/27/05**          **Page 55**

00075

1      C E R T I F I C A T E

2 COMMONWEALTH OF MASSACHUSETTS}

3      I, Kathryn L. Santo, Professional Court

4 Reporter, a Notary Public in and for the

5 Commonwealth of Massachusetts, do hereby certify

6 that the witness was duly sworn by me as to the

7 truth of the matters attested to and contained

8 therein; that the testimony of said witness was

9 taken by me in stenotype and thereafter reduced to

10 typewritten form by me or under my direction and

11 supervision; that the foregoing transcript is a

12 true and accurate record of the testimony given to

13 the best of my understanding and ability.

14      I FURTHER CERTIFY that I am neither

15 counsel for, related to, nor employed by any of the

16 parties to the action in which this deposition was

17 taken, nor financially or otherwise interested in

18 the outcome of this action.

19

20 _____

21 Kathryn L. Santo

22 Notary Public

23

24 My commission expires: December 15, 2006

00076

1  PLEASE ATTACH TO THE DEPOSITION OF:

2  VIRGINIA CAMPORESI

3  DATE TAKEN:  Thursday, 10/27/05

4  CASE:  Cutone, et al. V

5     Eli Lilly and Company, et al.

6            ERRATA SHEET

7  PAGE   LINE   CHANGE          REASON

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15     I have read the foregoing transcript of

16  my deposition, and except for any corrections or

17  changes noted above, I hereby subscribe to the

18  transcript as an accurate record of the statements

19  made by me.

20

21  Executed this _____ day of _____, 2005.

22

23  _____

24  VIRGINIA CAMPORESI

**EXHIBIT 3**

# DRUG TOPICS

# Red Book

ESTABLISHED 1897

PUBLISHED ANNUALLY BY THE TOPICS PUBLISHING CO., INC. — 330 WEST 34th STREET, NEW YORK, N.Y. 10001

## PRODUCT INFORMATION
Alphabetical Listings of all Drug Store
Products, Their Prices, and Sizes

## PRODUCT DESCRIPTIONS
Give detailed information on products:
What they are, their uses, how administered
Dosage, precautions, how supplied

## MANUFACTURERS' CATALOGS
Complete Manufacturer's Catalogs are included
in this one convenient reference

## PHARMACISTS' REFERENCE
Timely and practical pharmacy facts including
reference tables, Recommended Minimum
Standards of Rx Department Equipment
and Books for Pharmacists

Comprehensive List DACA Drugs

## LIST OF MANUFACTURERS
With Names, Addresses and Zip Codes

1969

The only price directory in the drug field
that keeps up-to-date with supplements.

## PRODUCT INFORMATION

• Drugs or products which bear this symbol • Cannot Federal law pro-
§ hibits dispensing without a prescription• are identified by the symbol [R]    **145**    *Derma-Fresh—Desferal*

*Dick—Diethyl.* | **152** | Narcotic drugs or products which are subject to the Harrison Narcotic Act are identified by the letter [N] | **1969 DRUG TOPICS RED BOOK** | PROD

### DICK TEST
*See Scarlet Fever Streptococcus Toxin*

### DICKEY EYE WATER (VA 24)
Drops, 15 cc. vial .......... .39   5.20

### John R. Dickey's Old Reliable EYE WASH

For the relief of minor irritations caused by strain, exposure to wind, dust and glare. Brings comfort to irritated eyes.

See prices below.

DICKEY DRUG CO.
Bristol, Va.

### DICKEY'S JOHN R. (DI 16)
Old Reliable Eye Wash
Regular, 3 oz. .............. .85   6.80
Large, 1 oz. .............. 1.25  10.00
Plastic, 12 cc. ........... .35   4.00
Old Reliable Refill, ½ oz. ... .50   4.00

### As a facial astringent and as a compress for tired eyes.

Tops for sunburn, bites, stings, poison ivy and after shaving.

Relieves muscular stiffness, soreness after physical exertion.

4 oz.
8 oz.
16 oz.
32 oz.
Gallons

THE E. E. DICKINSON CO.
Essex, Conn.

### T. N. DICKINSON'S WITCH HAZEL
*"The Original"*
Household Extract
Since 1866
Processed For Purity
By Ultra Violet Rays
East Hampton, Conn. 06424

---

## DIENESTROL
### Cream

**Composition:** Dienestrol Cream contains 0.01% of the synthetic estrogen, dienestrol, compounded with glyceryl monostearate, peanut oil, glycerin, benzoic acid, glutamic acid and water.

**Indications:** Indicated in the treatment of senile vaginitis in postmenopausal women, atrophic vaginitis, pruritis vulvae caused by atrophic changes in the vulval epithelium, dyspareunia associated with atrophic vaginal epithelium, and prior to plastic pelvic surgery in menopausal cases.

**Contraindications:** Malignancies or precarcinomatous lesions of the vagina or vulva.

**Precautions:** In pruritis vulvae due to infectious conditions, the organism responsible for the infection should be treated with a specific agent.

**Dosage:** One or two applicatorsful per day for one or two weeks, then gradually reduced to one-half initial dosage for a similar period. A maintenance dosage of one applicatorful, one to three times a week may be used after restoration of the vaginal mucosa has been achieved.

**Packaging:** 78 Gm tube with or without the OR-THO® Measured-Dose Applicator.

ORTHO PHARMACEUTICAL CORPORATION
Raritan, New Jersey 08869

---

ARMOUR THYROID
high sales...high profits...high physician preference

# PRODUCT INFORMATION

Drugs or products which bear this statement: "Caution: Federal law prohibits dispensing without a prescription" are identified by the symbol [R]    **153**

Diethyl.—

Case 1:04-cv-12725-MBB Document 67-6 Filed 05/01/2006 Page 6 of 7

*Diethyl.—Digitalis* 154 Narcotic drugs or products which are subject to the Harrison Narcotic Act are identified by the letter [N] 1969 DRUG TOPICS RED BOOK

*1st Col.—Selling price to consumer *denotes fair trade minimum.*
*2nd Col.—(a) wholesale cost price to retailer per doz.*
*or (b) if unit price, that is shown*
*or (c) price to retailer on direct order from mfr. shown by ▼ above cost price of product*
*Number in ( ) is mfrs. catalog code.*

**DIETHYLSTILBESTROL** *(Continued)*
Richlyn [℞] (RI 23P)
Tablets, 0.5 mg., 1000s
ea. (4662) .. ... 1.40
E.C., 1000s
ea. (4676) .. ... 2.10
1 mg., 1000s
ea. (4663) .. ... 1.60
E.C., 1000s
ea. (4677) .. ... 2.50
5 mg., 1000s
ea. (4666) .. ... 2.50
E.C., 1000s
ea. (4680) .. ... 3.30
25 mg., 1000s
ea. (4669) .. ... 7.00
E.C., 1000s
ea. (4682) .. ... 7.90
Robinson [℞] (RO 27)
Tablets, 0.5 mg. (603)
100s, ea. ..... ... .50
1000s, ea. .... ... 2.60
E.C. (604)
100s, ea. ..... ... .70
1000s, ea. .... ... 3.90
1 mg. (605)
100s, ea. ..... ... .60
1000s, ea. .... ... 3.00
E.C. (606)
100s, ea. ..... ... .75
1000s, ea. .... ... 4.20
5 mg. (607)
100s, ea. ..... ... .70
1000s, ea. .... ... 3.70
E.C. (608)
100s, ea. ..... ... .80
1000s, ea. .... ... 4.20
25 mg., Scored (992)
100s, ea. ..... ... 1.25
1000s, ea. .... ... 9.00
E.C. (610)
100s, ea. ..... ... 1.60
1000s, ea. .... ... 12.20
100 mg. (612)
100s, ea. ..... ... 3.00
1000s, ea. .... ... 29.00
Rondex [℞] (RO 65)
Tablets, 1 mg.
100s, ea. ..... ... .30
1000s, ea. .... ... 1.50
E.C., 100s, ea. .. ... .40
1000s, ea. .... ... 1.60
5 mg., 100s, ea. ... ... .60
1000s, ea. .... ... 3.95
E.C., 100s, ea. .. ... .70
1000s, ea. .... ... 4.50
25 mg., 100s, ea. .. ... 1.00
1000s, ea. .... ... 7.45
E.C., 100s, ea. .. ... 1.10
1000s, ea. .... ... 8.45
Spencer-Mead [℞] (SP 37T)
Parenteral, In Oil, Vials
5 mg./cc.
30 cc., ea. .... ... .68
25 mg./cc.
10 cc., ea. .... ... .47
30 cc., ea. .... ... 1.00
Tablets, 0.5 mg.
1000s, ea. .... ... 1.40
E.C., 1000s, ea. . ... 1.90
1 mg., 1000s, ea. .. ... 1.45
E.C., 1000s, ea. . ... 2.00
5 mg., 1000s, ea. .. ... 2.00
E.C., 1000s, ea. . ... 2.25
25 mg., 1000s, ea. . ... 4.70
E.C., 1000s, ea. . ... 4.95
Squibb Pharm. (SQ 11)
*See Stilbetin*
Stanlabs [℞] (ST 38)
Tablets, 0.1 mg. (920)
100s, ea. ..... ... .50
1000s, ea. .... ... 2.10
E.C. (921)
100s, ea. ..... ... .55
1000s, ea. .... ... 3.50
0.25 mg. (883)
100s, ea. ..... ... .50
1000s, ea. .... ... 2.25
E.C. (922)
100s, ea. ..... ... .65
1000s, ea. .... ... 3.75
0.5 mg. (884)
100s, ea. ..... ... .50
1000s, ea. .... ... 2.50
E.C. (889)
100s, ea. ..... ... .70
1000s, ea. .... ... 4.00
1 mg. (885)
100s, ea. ..... ... .55
1000s, ea. .... ... 2.75
E.C. (890)
100s, ea. ..... ... .75
1000s, ea. .... ... 4.25
5 mg. (886)
100s, ea. ..... ... .70
1000s, ea. .... ... 3.75
E.C. (891)
100s, ea. ..... ... .80
1000s, ea. .... ... 4.50
25 mg. (887)
100s, ea. ..... ... 1.25
1000s, ea. .... ... 8.95
E.C. (892)
100s, ea. ..... ... 1.65
100 mg. (888)
100s, ea. ..... ... 3.00
Stayner [℞] (ST 49)
Tablets, 1 mg. (48)
100s, ea. ..... ... .45
1000s, ea. .... ... 1.90
E.C. (125)
100s, ea. ..... ... .55
1000s, ea. .... ... 2.60
5 mg. (49)
100s, ea. ..... ... .70
1000s, ea. .... ... 3.70
E.C. (126)
100s, ea. ..... ... .80
1000s, ea. .... ... 4.25
25 mg. (50)
100s, ea. ..... ... 1.25
500s, ea. ..... ... 4.35
1000s, ea. .... ... 8.50
Strong Cobb Arner [℞] (ST 89)
Tablets, 1 mg.
100s, ea. ..... ... .50
1000s, ea. .... ... 2.40
E.C., 100s, ea. .. ... .65
1000s, ea. .... ... 3.40
5 mg., 100s, ea. ... ... .65
1000s, ea. .... ... 2.95
E.C., 100s, ea. .. ... .70
1000s, ea. .... ... 3.60
Superior Pharm. [℞] (SU 43E)
Tablets, E.C.
0.5 mg., 1000s, ea. . ... 1.35
1 mg., 1000s, ea. .. ... 1.95
5 mg., 1000s, ea. .. ... 4.25
Supreme [℞] (SU 45R)
Tablets, 5 mg., 100s
ea. (S153) .. ... .60
1000s
ea. (S154) .. ... 4.20
E.C., 100s
ea. (S155) .. ... .70
1000s
ea. (S156) .. ... 4.95
25 mg., 100s
ea. (S157) .. ... .99
1000s
ea. (S158) .. ... 7.99
TMCO Pharm. [℞] (T 9M)
Parenteral, Vial
25 mg./cc.
10 cc., ea. ...... ... 2.00
Tablets
1 mg., 1000s, ea. .. ... 3.65
E.C., 1000s, ea. . ... 3.00
5 mg., 1000s, ea. .. ... 4.00
E.C., 1000s, ea. . ... 4.95
25 mg., 1000s, ea. . ... 9.00
E.C., 1000s, ea. . ... 8.75
Torigian [℞] (TO 27E)
Parenteral, In Oil, Ampuls
5 mg., 1 cc. (361)
12s, ea. ........ ... 1.15
25s, ea. ........ ... 2.34
100s, ea. ........ ... 7.65
Towne, Paulsen [℞] (TO 39)
Tablets
1 mg., 1000s, ea. .. ... 3.00
E.C., 1000s, ea. . ... 4.50
5 mg., 100s, ea. ... ... 1.00
1000s, ea. .... ... 4.00
E.C., 100s, ea. .. ... 1.25
1000s, ea. .... ... 4.50
Upjohn [℞] (UP 10)
Perles, 1 mg., Blue
500s, ea. (190) .. ... ▼4.41
1000s, ea. ...... ... 8.28
5000s, per 1000 . ... 6.87
5.0 mg., Purple
500s, ea. (194) .. ... 9.30
1000s, ea. ...... ... 16.95
5000s, per 1000 . ... 14.10
VRC [℞] (VI 56D)
Tablets, 0.5 mg., E.C. (240)
100s, ea. ..... ... .40
1000s, ea. .... ... 2.25
1 mg. (237)
100s, ea. ..... ... .33
1000s, ea. .... ... 1.65
E.C. (241)
100s, ea. ..... ... .44
1000s, ea. .... ... 2.48
5 mg. (238)
100s, ea. ..... ... .61
1000s, ea. .... ... 3.58
E.C. (242)
100s, ea. ..... ... .66
1000s, ea. .... ... 4.40
25 mg. (239)
100s, ea. ..... ... 1.51
1000s, ea. .... ... 10.80
E.C. (243)
100s, ea. ..... ... 1.65
1000s, ea. .... ... 11.20
Vita-Fore [℞] (VI 49)
Tablets
0.5 mg., 100s, ea. . ... .35
1000s, ea. .... ... 1.25
E.C., 100s, ea. .. ... .45
500s, ea. ..... ... .75
1000s, ea. .... ... 1.50
1 mg., 100s, ea. ... ... .40
500s, ea. ..... ... .85
1000s, ea. .... ... 1.75
E.C., 100s, ea. .. ... .50
500s, ea. ..... ... 1.50
1000s, ea. .... ... 2.45
5 mg., 100s, ea. ... ... .75
500s, ea. ..... ... 1.25
1000s, ea. .... ... 2.45
E.C., 100s, ea. .. ... .70
500s, ea. ..... ... 2.15
1000s, ea. .... ... 3.75
25 mg., 100s, ea. .. ... 1.00
500s, ea. ..... ... 4.25
1000s, ea. .... ... 5.95
E.C., 100s, ea. .. ... 1.00
500s, ea. ..... ... 4.25
1000s, ea. .... ... 6.50
Vitarine [℞] (VI 60)
Tablets, 5 mg. (4213)
1000s, ea. .... ... 5.00
E.C. (4216)
1000s, ea. .... ... 5.60
West-ward [℞] (WE 51)
Tablets, 1 mg. (1660)
1000s, ea. .... ... 1.15
5000s
per 1000 ... ... 1.10
E.C. (2210)
1000s, ea. .... ... 2.50
5000s
per 1000 ... ... 2.30
5 mg. (1665)
100s, ea. ..... ... .60
1000s, ea. .... ... 2.35
5000s
per 1000 ... ... 2.25
E.C. (2215)
100s, ea. ..... ... .70
1000s, ea. .... ... 4.40
5000s
per 1000 ... ... 4.20
25 mg. (1670)
100s, ea. ..... ... .95
1000s, ea. .... ... 5.30
5000s
per 1000 ... ... 5.00
E.C. (2220)
100s, ea. ..... ... 1.10
1000s, ea. .... ... 7.90
Winsale [℞] (WI 55S)
Tablets
0.5 mg., 100s, ea. . ... .35
1000s, ea. .... ... 2.50
E.C., 100s, ea. .. ... .50
1000s, ea. .... ... 3.00
1 mg., 100s, ea. ... ... .40
1000s, ea. .... ... 2.65
E.C., 100s, ea. .. ... .55
1000s, ea. .... ... 3.25
5 mg., 100s, ea. ... ... .55
1000s, ea. .... ... 3.45
E.C., 100s, ea. .. ... .75
1000s, ea. .... ... 4.50
25 mg., 100s, ea. .. ... .90
1000s, ea. .... ... 6.50
E.C., 100s, ea. .. ... 1.10
1000s, ea. .... ... 7.00
Wyeth [℞] (WY 14)
Tablets, 5 mg.
Box, 100s, Redipak
ea. (1A740) ... 1.47
1 to 39 boxes
per box ............ ▼1.29
40 to 99 boxes
per box ............ ▼1.19
100 to 249 boxes
per box ............ ▼1.13
250 or more boxes
per box ............ ▼1.07
*▼Price to Retailer on*
*$50 Minimum Direct Order*
*See Catalog under W*

**DIETHYLSTILBESTROL-TESTOSTERONE** [℞]
Noyes (NO 79)
Tablets, 0.5 mg.-5 mg. (0715)
100s, ea. ........ ... 3.00
1000s, ea. ....... ... 20.00

**DIETHYLSTILBESTROL VETERINARY**
Anchor Serum (AN 17)
Injectable, Vials
4 mg./cc.
10 cc. ........ ... ...
50 cc. ........ ... ...
25 mg./cc.
50 cc. ........ ... ...
Repository
100 cc. ........ ... ...
250 cc. ........ ... ...
Central Pharm. (CE 30)
In Oil, Vials (1034)
30 ml., ea. ...... ... 1.00
100 ml., ea. ..... ... 2.50
Medical Chem. (ME 24B)
In Oil, Vial
25 mg./cc.
30 cc., ea. ...... ... 1.30
Repository, Vials
25 mg./cc.
30 cc., ea. ...... ... 1.30
250 cc., ea. ..... ... 4.60
Philadelphia Pharm. (PH 27L)
Repository, Vial
250 cc., ea. (3061) ... 1.60

**DIETHYLSTILBESTROL DIPROPIONATE**
Bluline [℞] (BL 49)
Tablets, 1 mg. (149)
100s, ea. ..... ... 1.25
1000s, ea. .... ... 8.50
E.C. (207)
100s, ea. ..... ... 1.25
1000s, ea. .... ... 8.50
5 mg. (150)
100s, ea. ..... ... 3.00
1000s, ea. .... ... 21.00
Foy Labs. [℞] (FO 70)
Tablets, 0.5 mg.
100s, ea. ........ ... 2.45
1.0 mg., 100s, ea. . ... 2.75
5.0 mg., 100s, ea. . ... 3.50

**DIETROL** (AM 36)
Tablets, 30s, ea. ....... 2.00 1.25
60s, ea. ............. 3.50 2.00
90s, ea. ............. 5.50 3.00

**DI-ETTES** (MA 68E)
Crystals, ⅓ oz., ea. ...... .98 .75
1 oz., ea. ............ 2.50 1.67

**DIET-TRIM**
Pharmex (PH 22E)
Tablets, 21s ........... .98 6.00
90s .................. 2.98 18.00

**DIET-TUSS** (AP 15)
Cough Syrup, 4 oz. ...... 1.50 8.80

**DI-FACTOR** (SU 55)
Prenatal Tablets (CT 1376)
100s, ea. ............ ... 1.35
1000s, ea. ........... ... 8.70

**DI-FEN** [℞]
Kay Pharm. (KA 62E)
Capsules, 1½ gr. (C-7)
100s, ea. .......... ... 1.35
1000s, ea. ......... ... 9.72

**DIFEREX** [℞] (DI 38)
Tablets (232)
100s, ea. ........... ... 2.70
500s, ea. ........... ... 8.80
1000s, ea. .......... ... 16.00

**DI-FERRIN** [℞]
Ulmer (UL 12)
Vial, 10 cc., ea. (2060) . ... 3.50

**DIFLOR** [℞] (DI 38)
Tablets (233-A)
100s, ea. ........... ... 2.20
500s, ea. ........... ... 7.15
1000s, ea. .......... ... 13.00

**DIFOLAGEN** [℞] (AT 25P)
Vial, 10 cc., ea. (215) ... ... 1.70

**DIFURON** [℞] (DI 38)
Tablets (242)
500s, ea. ........... ... 3.50
1000s, ea. .......... ... 6.50

**DI-GAS** (CH 51)
Flakes, 2 oz. ........... .35 2.52
4½ oz. .............. .69 4.97

**DIGASTROGEN**
Bowman (BO 85E)
Tablets (265)
100s, ea. ........... ... 1.20
1000s, ea. .......... ... 5.40

**DI-GEL**, Plough (PL 26)
Liquid, 6 oz. ........... 1.09* 9.16
12 oz. .............. 1.79* 15.04
Tablets, 8s ............. .25* 2.10
30s ................. .79* 6.64
56s ................. 1.29* 10.84
100s ................ 1.79* 15.04

**DI-GENIK** [℞] (SA 65E)
Vial, 10 cc., ea. (100) .. ... 2.88

**DIGENTERIC** [℞] (JA 10)
Tablets, 100s ........... ... 15.00

**DIGENZYMES**
Maurry (MA 91V)
Tablets, 100s, ea. ....... 3.85 2.31
1000s, ea. ............. 33.20 19.92

**DIGERATONE** [℞] (DI 38)
Tablets (105-A)
500s, ea. ........... ... 7.50
1000s, ea. .......... ... 14.50

**DIGESTAIDS** (FR 51)
Tablets, 25s ............ 1.25* 10.00
100s ................ 3.00* 24.00

**DIGESTA-LAX** (FI 9)
Tablets (35)
50s, ea. .............. 2.00 1.20
100s, ea. ............. 3.50 2.10
250s, ea. ............. 8.00 4.80
500s, ea. ............. 15.00 9.00
1000s, ea. ............ 28.00 16.80

**DIGESTAMIC** [℞] (ME 66)
Liquid
8 oz., ea. .......... ... 3.50
Gal., ea. ........... ... 45.00
Tablets, 50s, ea. ....... ... 3.75
500s, ea. ........... ... 33.75
No. 2, 50s, ea. ...... ... 2.80
500s, ea. ........... ... 26.50

**DIGESTANS** [℞] (PH 26)
Capsules, 100s, ea. ..... ... 1.90

**DIGESTANT**
Canright (CA 43)
Tablets, 100s, ea. ...... 5.50* 3.30
1000s, ea. ............ 49.50* 29.70

**DIGESTANT-M**
(AL 67S) (FI 9)
Tablets (34)
50s, ea. .............. 1.40 .84
100s, ea. ............. 2.50 1.50
250s, ea. ............. 5.50 3.30
500s, ea. ............. 10.00 6.00
1000s, ea. ............ 18.00 10.80

**DIGESTESE** (AM 36)
Tablets, 20s ............ 1.00* 6.00

**DIGESTIVEL** (CO 81)
Tablets (507)
100s, ea. ........... ... .70
1000s, ea. .......... ... 6.00

**DIGESTOSAL**
Purepac (PU 19)
Antacid Powder
5 oz. (017) ......... 1.19 7.20

**DIGESTOSAN** (HE 37)
Herbs, 4 oz. ............ 2.50 ...

**DIGESTOZYME**
Richlyn (RI 23P)
Tablets
1000s, ea. (3250) .. ... 15.90
Spencer-Mead (SP 37T)
Tablets, 1000s, ea. ... ... 9.95
Wesley [℞] (WE 47)
Tablets, 50s, ea. ..... ... 3.50

**DIGESTULES** [℞] (CA 21L)
Timekaps (2385)
100s, ea. ........... ... 2.08
1000s, ea. .......... ... 15.86

**DIGICARDALIS** [℞] (WE 58)
Tablets, 100s, ea. ...... ... .95

**DIGIFORTIS** [℞]
Parke, Davis (PA 47K)
Ampuls, 1 Unit/cc., 1 cc.
10s, ea. (3-173-10) .. ... ▼3.06
Kapseals, 1 Unit
100s, ea. (15-351-4) . ... 1.29
500s, ea. (15-351-8) . ... 5.10
5000s, ea. (15-351-13) ... 39.90
Tablets, 1 Unit
50s, ea. (25-687-50) . ... .43
1000s, ea. (25-687-11) ... 7.98

**DIGIGLUSIN** [℞]
Lilly (LI 27)
Ampuls, 1 cc., 6s, ea. ... ... 2.16
100s, ea. .......... ... 27.30
Tablets, 1 U.S.P. Unit
S.C., Green
100s, ea. .......... ... 1.35
500s, ea. .......... ... 4.83
5000s, ea. ......... ... 41.55

**DIGIKOTE** [℞] (CA 40)
Capsules, T.D.
0.15 mg. (810)
100s, ea. .......... 6.25 3.75
500s, ea. .......... 28.12 16.87
1000s, ea. ......... 53.12 31.87
0.3 mg. (801)
100s, ea. .......... 6.59 3.95
500s, ea. .......... 29.62 17.77
1000s, ea. ......... 55.95 33.57

**DIGITALINE NATIVELLE** [℞]
Fougera (FO 57)
Ampuls, 0.2 mg./ml.
Intramuscular or Intravenous
1 ml., 6s, ea. ..... [illegible]
50s, ea. .......... [illegible]
2 ml., 6s, ea. ..... [illegible]
50s, ea. .......... 13.75
Elixir, Pediatric
0.05 mg./ml.
55 ml., ea. ........ [illegible]
Solution, Oral, 1:1000
10 ml. bot., ea. ... 1.50
Tablets, 0.1 mg.
40s, ea. .......... [illegible]
100s, ea. ......... 1.85
250s, ea. ......... 4.50
1000s, ea. ........ 13.50
0.15 mg., 40s, ea. .. .90
250s, ea. ......... 5.80
0.2 mg., 40s, ea. ... 1.00
100s, ea. ......... 2.34
250s, ea. ......... 5.50
1000s, ea. ........ 16.50

**DIGITALIS**
A B A Pharm. [℞] (A 10)
Tablets, 1½ gr.
1000s, ea. ........ 1.60
E.C., 1000s, ea. .. 2.30
Allen's [℞] (RA 57E)
Capsules, 1 gr.
100s, ea. ......... 1.25
1000s, ea. ........ 8.00
1½ gr., 100s, ea. .. 1.50
1000s, ea. ........ 9.80
Tablets, 1½ gr.
100s, ea. ......... 1.25
1000s, ea. ........ 4.95
Amer. Drug Prods. [℞] (AM 28G)
Tablets, 1½ gr. (2201)
1000s, ea. ........ 2.65
E.C. (2202)
1000s, ea. ........ 3.25
Amer. Quinine [℞] (AM 47)
Tablets, 0.1 Gm.
1000s, ea. ........ ▼[illegible]
Approved Pharm. [℞] (AP 15)
Tablets, 1½ gr.
100s, ea. ......... [illegible]
1000s, ea. ........ [illegible]
E.C., 100s, ea. ... [illegible]
1000s, ea. ........ 3.60
Arcum [℞] (AR 27L)
Tablets, 1½ gr.
1000s, ea. ........ 3.00
Arnar-Stone [℞] (AR 47L)
Tablets
100s, ea. (6270) . [illegible]
500s, ea. (6271) . [illegible]
1000s, ea. (6272) . [illegible]
5000s, ea. (6273) . [illegible]
Barry-Martin [℞] (BA 62)
Tablets, 1½ gr.
1000s, ea. ........ 3.00
Bell Pharm. [℞] (BE 35P)
Tablets, 1½ gr.
1000s, ea. ........ [illegible]
E.C., 1000s, ea. .. [illegible]
Bowman [℞] (BO 85E)
Capsules, 1½ gr. (581)
100s, ea. ......... [illegible]
1000s, ea. ........ [illegible]
Bundy [℞] (BU 29)
Tablets, ½ gr.
100s, ea. ......... .47 [illegible]
1000s, ea. ........ 3.00 [illegible]
E.C., 100s, ea. ... .62 [illegible]
1000s, ea. ........ 4.00 [illegible]
1½ gr., 100s, ea. .. .55 [illegible]
1000s, ea. ........ 3.50 [illegible]
E.C., 100s, ea. ... .77 [illegible]
1000s, ea ......... 5.00 [illegible]

ARMOUR THYROID high sales...high profits...high physician preference

**STEADIFEED**

The Nipple that
"B-R-E-A-T-H-E-S"

SHARER RUBBER COMPANY
Akron, Ohio 44304 U.S.A.

**HANKSCRAFT**
Bottle Sterilizers
and
Formula Sets

- Automatic electric and non-electric sterilizer and formula sets. Six popular models. See full-page display ad, page 227.

HANKSCRAFT COMPANY
Reedsburg, Wisconsin

**STILLMAN'S**
Freckle Cream

Not only a freckle cream but also used to make skin lighter, softer and smoother. National magazine advertising.

STILLMAN COMPANY
Aurora, Illinois

reference

**EXHIBIT 4**

# DRUG TOPICS

# Red Book

ESTABLISHED 1897

PUBLISHED ANNUALLY BY THE TOPICS PUBLISHING CO., INC. • 330 WEST 34th STREET, NEW YORK, N.Y. 10001

## AVERAGE WHOLESALE PRICES

RED BOOK reports these Average Wholesale Prices (AWP) for those drug products where the manufacturer has not suggested a price to be charged by Wholesalers to in-direct purchasing retailers.

## MANUFACTURERS' CATALOGS

Complete Manufacturers' Catalogs are in-cluded in this one convenient reference.

## LIST OF MANUFACTURERS

With their Names, Addresses and Zip Codes

## PRODUCT INFORMATION

Alphabetical Listings of all Drug Store Prod-ucts, their Prices, and Sizes.

## PRODUCT DESCRIPTIONS

Give detailed information on products: What they are, their uses, how administered dosage, precautions, how supplied.

## PHARMACISTS REFERENCE

Timely and practical pharmacy facts and reference tables.

℞ A Comprehensive List of DACA Drugs

# 1970

The only price directory in the drug field that shows Average Wholesale Prices and keeps up-to-date with supplements.

*(This page is a dense, multi-column pharmaceutical product price index running alphabetically from "Dermaseptic" through "Desox-Am." Entries list product names with dosage/package sizes and prices in columns. The individual entries are too small and degraded to transcribe reliably.)*


**ACE** elastic bandage... the bandage they ask for by name   **B·D**

ACE and B·D are trademarks

Narcotics are identified by the symbol [N]
Prescription only drugs have the symbol [R]

1st Col.—Selling price to consumer
*denotes fair trade minimum.
2nd Col.—(a) wholesale cost price to retailer per doz.
or (b) if unit price, that is shown
or (c) price to retailer on direct
order from mfr. shown by ▼
above cost price of product.
Number in ( ) is mfrs. catalog code.

**DICOHIST** (WE 47)
Liquid, gal. ea. .......... 15.50

**DICOL** [R] (LA 26U)
Liquid, pt. ea. .......... 4.00

**DI-COLD** (NA 24P)
Tablets, 100s, ea. .......... 2.40
1000s, ea. .......... 21.00

**DICOLE** (NA 33)
Capsules, 100 mg. (G-1075)
100s, ea. .......... 9.00

**DICOMAL** (NA 20)
Liquid, 4 oz., ea. .......... .25
16 oz., ea. .......... 2.80

**DICORT** [R] (HI 12)
Cream
14 oz., ea. (175) .......... 2.40
Suppositories
12s, ea. (176) .......... 2.60

**DICORVIN** [R] (AM 60)
Tablets, 50s, ea. .......... 10.00
100s, ea. .......... 18.00
500s, ea. .......... 78.00

**DICOSED** [R] (DA 57)
Liquid, 16 oz., ea. .......... 3.25
Gal., ea. .......... 15.65

**DICO-TUSS** (PH 295)
Syrup, 4 oz. .......... 1.50
16 oz. .......... 2.69

*See Dicumoral*

**DICUMARIN**
See Dicumoral

**DICUMARIN,**
Abbott [B] (AB 11)
Tablets, 25 mg. (3794)

---

**DIENESTROL** [B]
Cream

● **Composition:** Dienestrol
Cream contains 0.01% of the
synthetic estrogen, dienes-
trol, compounded with gly-
ceryl monostearate, peanut
oil, glycerin, benzoic acid,
glutamic acid and water.

● **Indications:** Indicated in
the treatment of senile vagi-
nitis in postmenopausal
women, atrophic vaginitis,
pruritis vulvae caused by
atrophic changes in the vul-
var epithelium, dyspareunia
associated with atrophic
vaginal epithelium, and prior
to plastic pelvic surgery in
menopausal cases.

● **Contraindications:** Malig-
nancies or precarcinomatous
lesions of the vagina or
vulva.

● **Precautions:** In pruritis
vulvae due to infectious con-
ditions, the organism respon-
sible for the infection should
be treated with a specific
agent.

● **Dosage:** One or two ap-
plicatorsful per day for one
or two weeks, then gradually
reduced to one-half initial
dosage for a similar period.
A maintenance dosage of one
applicatorful or two to three
times a week may be used
after restoration of the vagi-
nal mucosa has been
achieved.

● **Packaging:** 78 g. tubes
with or without the OR-
THO® Measured-Dose Ap-
plicator.

**ORTHO PHARMACEUTICAL
CORPORATION**
Raritan, New Jersey 08869

*For prices and sizes
-see next column*

---

**ARMOUR THYROID**    high sales...high profits...high physician preference

# PRODUCT INFORMATION

RED BOOK

*(This page consists of dense multi-column product and pricing listings for Diethylstilbestrol and related products from numerous manufacturers, including dosage forms, pack sizes, NDC/pricing entries. The fine-print numeric price data is largely illegible at this resolution.)*

Representative manufacturer/heading entries visible include:

- E.C.
- Scored or Unscored
- Massengill [B] (MA 85E) — Parenteral, in Oil, Vial
- Merck [B] — 25 mg./cc.
- North Amer. Pharm. [B] (NO 41N)
- Faraday [B] (FA 39)
- Kasar [B] (KA 4B)
- Klickman [B] (KI 41M)
- Pasadena Research [B] (PA 63C)
- Penhurst [B] (PE 85M)
- Pharma [B] (PH 22E)
- Prema [B] (PR 22)
- Enretic, 5 mg.
- G & W Labs. [B] (G 19)
- Gedham [B] (GO 62)
- Klup Labs. [B] (KL 24E)
- Lannett (LA 56N)
- Harvey Labs. [B] (HA 72R)
- Lilly [B] (LI 27)
- Nance Bros. & White [B] (HA 41)
- Horton & Converse [B] (HO 85)
- Jan Labs. [B] (JA 28L)
- Purepac Pharm. [B] (PU 19E)
- Rawsy [B] (RA 4N)
- Reiss Williams [B] (RE 49E)
- Richlyn [B] (RI 23P)
- Robinson [B] (RO 27)
- Supreme [B] (SU 45R)
- Towne, Paulsen [B] (TO 29)
- Spencer-Mead [B] (SP 37T)
- Squibb Pharm. [B]
- Stanlabs [B] (ST 34B)
- Strong Cobb Arner [B] (ST 89)
- Stayner [B] (ST 49)
- Superior Pharm. [B] (SU 43E)
- TMCO Pharm. [B] (T 9M)
- Upjohn [B] (UP 10)
- Vita-Fore [B] (VI 49)
- Vitarine [B] (VI 60)
- West-ward [B] (WE 51)
- Wyeth [B] (WY 14)
- Winsale [B] (WI 55)
- Zemmer [B] (ZE 15)
- DIETHYLSTILBESTROL TESTOSTERONE [N]
- DIETHYLSTILBESTROL VETERINARY — Central Pharm. (CE 50)

(continued on next page)

PLASTIPAK insulin syringe • sterile • disposable • ready to use—at home or away    B·D and PLASTIPAK are trademarks    40 or 80 scale    **B-D**

ference

Diethyl.—Digitoxin    **156**    Narcotics are identified by the symbol [N]   Prescription only drugs have the symbol [B]    **1970 DRUG TOPICS RED BOOK**    PRODU

1st Col—Selling price to consumer denotes fair trade minimum.
2nd Col—(a) wholesale cost price to retailer per doz. or (b) if unit price, that is shown or (c) price to retailer on direct order from mfr. shown by ▼ above cost price of product.
Number in ( ) is mfr. catalog code

**DIETHYLSTILBESTROL. VET. (Cont.)**
Elkins-Sinn [EL 29]
In Oil, Vial
10 mg./cc. (VE51)
30 cc. ea. ............... .60
Medical Chem. (ME 24B)
In Oil, Vial
25 mg./cc.
30 cc. ea. ............... 1.50
Repository, Vials
25 mg./cc.
30 cc. ea. ............... 1.50
250 cc., ea. ............ 5.14
North Amer. Pharm. (NO 41H)
Aqueous, Vial
25 mg./cc. (535V)
100 cc., ea. ............ 1.50
In Oil, Vial
50 mg./cc. (16VV)
60 cc., ea. ............. 3.95

**DIETHYLSTILBESTROL DIPROPIONATE**
Bluline [BL (BL 49)
Tablets, 1 mg. (149)
1000s, ea. ............. 8.50
E.C. (207)
1000s, ea. ............. 8.50
5 mg. (150)
1000s, ea. ............ 21.00
Foy Labs. [B] (FO 70)
Tablets, 0.5 mg.
100s, ea. ............... 6.05
1.0 mg., 100s, ea. ..... 2.45
5.0 mg., 100s, ea. ..... 3.50

**DIETRIL** [AM 36]
Tablets, 30s, ea. ....... 2.00   1.25
60s, ea. ............... 3.50   2.00
1000s, ea. ............ 5.50   3.00

**DI-ET-TES** [MA 68E]
Tablets, 50 mg., ea. ... .98
Diz 2 AL, ea. .......... 2.59   1.47

**DIET-TRIM**
— Pharmer (PH 22E)
Tablets, 231 ......... .98   6.00
90s ........... 2.98   18.00

**DIET-TUSS** [AP 15]
Cough Syrup, 4 oz. ..... .63

**DI-FACTOR** [CU 55]
Prenatal Tablets [CT 1376]
100s, ea. ............ 1.45
1000s, ea. ........... 9.70

**DI-FEN** [BI 34]
Kay Pharm. [KA 62E]
Capsules, 3½ gr. [C-7)
100s, ea. ............. 1.35
1000s, ea. ............ 9.72

**DIFEREX** [B] (DI 38)
Tablets [232]
100s, ea. ............. 3.75
500s, ea. ............. 9.75
1000s, ea. ........... 17.50

**DI-FERRIN** [B]
Elmer [UL 12]
Vial, 10 cc. ea. (2060) .. 3.50

**DIFLOR** [B] (DI 38)
Tablets [233-A]
100s, ea. ............. 3.20
1000s, ea. .......... 13.00

**DIFOLAGEN** [B] [AT 25P]
Tablets, 60 cc. ea. (115) .. 1.90

**DIFURON** [B] (DI 38)
Tablets [242]
100s, ea. ............. 3.50
1000s, ea. ............ 5.75

**DI-GAS** [CH 51]
Flakes, 2 oz. .......... .35   2.52
4 oz. .......... .69   4.97

**DI-GEL.** Plough [PL 26]
Liquid, 6 oz. ......... 1.15*  .66
12 oz. ......... 1.85*  10.54
Tablets, 8s .......... .35*   2.10
30s ........ .69*   7.14
96s ........ 1.35*  13.54
100s ....... 1.85*  16.54

**DI-GENIN** [B] [SA 65E]
Vial, 10 cc. ea. (100) .. 3.04

**DIGENZYMES**
Maurry [MA 91V]
Tablets, 100s, ea. ..... 2.31
1000s, ea. .......... 19.92

**DIGERATONE** [B] (DI 38)
Tablets [105-A]
500s, ea. .............. 7.50
1000s, ea. ........... 14.50

**DIGESTADED** [FR 51]
Tablets, 25s ...... 1.25*  10.00
3.00*  24.00

**DIGESTA-LAX** [FI 9]
Tablets (75)
50s, ea. .............. 2.00
100s, ea. ............. 3.50
250s, ea. ............. 4.80
1000s, ea. ........... 15.00
16.80*  28.00

**DIGESTALIN** (NO 41H)
Tablets (628)
1000s, ea. ........... 10.95

---

**DIGESTAMIC** [B] (ME 66)
Liquid, 8 oz., ea. ....... 3.50
16 oz., ea. ......... 45.00
Tablets, 50s, ea. ....... 3.75
500s, ea. .......... 33.75
No. 2, 50s, ea. ........ 2.80
1000s, ea. ......... 26.50

**DIGESTANS** [B] (PH 26)
Capsules, 100s, ea. ..... 1.00

**DIGESTANT**
Cenvite (CA 43)
Tablets, 100s, ea. .. 5.84   3.90
1000s, ea. ...... 52.50   31.50

**DIGESTANT-M**
(Al. 6751) (FI 9)
Tablets (34)
50s, ea. ............. 1.40   .84
100s, ea. ............ 2.50   1.50
250s, ea. ............ 3.90   3.30
500s, ea. ............ 10.00   6.00
1000s, ea. .......... 18.00   10.80

**DIGESTESE** [AM 36]
Tablets, 100s ...... 1.00*  6.00

**DIGESTEX** [FA 63C]
Tablets (294)
100s, ea. ............ 5.00   3.00
1000s, ea. .......... 45.00   27.00

**DIGESTIVOL** [CO 83]
Tablets (507)
100s, ea. .............. .70
1000s, ea. ............. 6.00

**DIGESTOAL**
Parex. [PU 19]
Antacid Powder
4 oz. (017) ......... 1.19   7.20

**DIGESTOSAN** [HE 37]
Herbs, 4s, ea. ........ 2.50

**DIGESTYME** [B]
Rhelyn (RE 23P)
Tablets
100s, ea. ............. (3250)  15.90
Spencer-Mead (SP 37T)
Tablets, 1000s, ea. ..... 9.95
Wertey [B] (WE 47)
Tablets, 50s, ea. ....... 3.50

**DIGESTUALS** [B] [CA 21L]
Tablets (2385)
100s, ea. ............. 2.00
1000s, ea. ........... 15.86

**DIGIFORTIS** [B]
Parke, Davis [PA 47X)
Ampuls, 1 Unit/cc., 1 cc. ..
1cc. ea. (15-173-10) .... 9.50

Kapseals, 1 Unit
100s, ea. (15-351-4) ....
1000s, ea. (15-351-8) ....
5000s, ea. (15-351-13) ..

Tablets, 1 Unit
50s, ea. (25-687-50) ...
1000s, ea. (25-687-11) ..

**DIGIGLUSIN** [B]
Lilly (LI 27)
Tablets, 1 U.S.P. Unit
S.C. Grex
100s, ea. ...............

**DIGIKOTE** [B] (CA 40)
Capsules, 1 D.
0.15 mg. (810)
100s, ea. ............. 6.25  3.75
500s, ea. .......... 28.12  16.87
1000s, ea. ......... 53.12  31.87
0.3 mg. (802)
100s, ea. ............. 6.59  3.95
500s, ea. .......... 29.62  17.77
1000s, ea. ......... 57.75  33.57

**DIGITALINE NATIVELLE** [B]
Fougera (FO 57)
Ampuls, 0.2 mg./ml.
Intramuscular
1 ml., 6s. ea. ......... 1.50
50s, ea. ............. 2.05
2 ml., 6s. ea. ......... 1.50
Elixir, Pediatric
Solution 1:20,000
55 ml., ea. ........... 1.50
Solution, Oral, 1:1000
10 ml. bot., ea. ...... 1.50
Tablets, 0.1 mg.
100s, ea. .............. .80
1000s, ea. ........... 4.50
0.15 mg., 40s, ea. ..... .50
250s, ea. ............. 1.00
0.2 mg., 40s, ea. ...... 1.00
500s, ea. ............. 3.00
1000s, ea. ........... 5.00
See Catalog, page 199

**DIGITALIS**
Amer. Drug Prods. [B] (AM 28G)
Tablets, 1½ gr. (E201)
1000s, ea. ............ 2.45
E.C. (E202)
1000s, ea. ............ 3.25
Amer. Quinine [B] (AM 47)
Tablets, 0 U. Gals.
1 gr., 1000s, ea. ....... 3.75
Approved Pharm. [B] (AP 15)
Tablets, 1½ gr.
100s, ea. .............. .53
1000s, ea. ............ 2.95

---

E.C., 100s, ea. .......... .60
Arcum [B] (AR 27L)
Tablets, 1½ gr.
1000s, ea. ............ 3.60
Arnar-Stone [B] (AR 47L)
Tablets
100s, ea. (6270) ....... 1.00
1000s, ea. (6271) ...... 4.50
10000s, ea. (6272) .... 40.00
Bell Pharm. [B] (BE 35P)
Tablets, 1½ gr.
100s, ea. .............. 3.00
E.C., 100s, ea. ........ 3.00
Bowman [B] (BO 85E)
Capsules, 1½ gr. (581)
100s, ea. .............. 1.50
1000s, ea. ............ 8.95
Buody [B] (BU 29)
Tablets, 1½ gr.
E.C., 100s, ea. ......... .65
1½ gr., 100s, ea. ...... 3.24
E.C., 100s, ea. ........ 1.25
1000s, ea. ............ 4.80
CMC [B] (CO 58)
Tablets, 1¼ gr. (0820)
100s, ea. .............. .55
1000s, ea. ............ 5.90
E.C. (0821)
100s, ea. .............. .75
1000s, ea. ............ 2.75
Carroll [B] (CA 64N)
Tablets, 1½ gr.
E.C. (1301)
1000s, ea. ............ 3.00
Cervit Pharm. [B] (CO 61)
Tablets, 1½ gr. (510)
1000s, ea. ............. .23
E.C., 1000s, ea. ....... .52

1000s, ea.
(4472-34) .......... 3.12
AWP ........ 3.30
1000s, ea.
(4472-37) ...... 14.11
AWP ....... 14.91

Lilly [B] (LI 27)
Pulvules (Leaves)
1½ gr.
100s, ea. ............. 1.06
1000s, ea. ............ 8.51
Tincture, N.F.
Amer. Quinine [B] (AM 47)
Parenteral, Ampuls
0.1 mg., 1 cc.
25s, ea. ............... 4.00
1000s, ea. ............ 4.48
E.C., 100s ............ 2.68
1000s, ea. ............ 5.48
1000s, ea. ............ 3.56
Merck Sharp & Dohme [B] (ME 52)
Tablets, 1½ gr. (1435)
1000s, ea. ............ 2.08
AWP ........ 2.18
See Catalog, pages 304-305
Moore Kirk [B] (MO 44K)
Tablets, 1¼ gr.
1000s, ea. (2950) ...... 1.95
Noyes [B] (NO 79)
Tablets, 1½ gr. (0750)
1000s, ea. ............ 3.50
E.C. (0760)
1000s, ea. ............ 4.75
Penhurst [B] (PE 35N)
Tablets, 1½ gr. (124)
1000s, ea. ............ 3.60
Pharmer [B] (PH 22E)
Tablets, 1½ gr.
100s, ea. .............. .65
1000s, ea. ............ 4.75
Richlyn [B] (RI 19P)
Tablets, 1½ gr.
1000s, ea. (3260) ...... 2.50
Robinson [B] (RO 27)
Tablets, 1½ gr. (644)
100s, ea. .............. .75
1000s, ea. ............ 3.25
E.C. (645)
1000s, ea. ............ 4.75
Spencer-Mead [B] (SP 37T)
Tablets, 1½ gr.
1000s, ea. ............ 1.20
Standard Pharm. [B] (ST 27S)
Tablets, E.C., 1½ gr.
1000s, ea. ............ 7.50
Stanlabs [B] (ST 30)
Tablets, 1½ gr. (910)
1000s, ea. ............ 3.25
Stayner [B] (ST 49P)
Tablets, 1½ gr. (395)
1000s, ea. ............. .55
Tablets, 1 mg.
100s, ea. (726) ........ 3.25
1000s, ea. ............ 3.00
Velter [B] (VE 52)
Tablets, 1½ gr.
100s, ea. .............. .75
1000s, ea. ........... 10.39
Wendt-Bristol [B] (WE 41L)
Tablets, E.C., 1½ gr.
100s, ea. ............. 1.70
West-ward [B] (WE 45)
Tablets, 1½ gr. (1227)
1000s, ea. ............ 2.40
1000s, ea. ............ 2.35

**DIGITONE** [NE 60]
For Athlete's Foot
Ointment, 2 oz., ea. .... 1.50   2.00

**DIGITONIN**
City Chem. (CI 23)
100s, ea. ............. 6.00

**DIGITORA** [B]
Oxford [B] (OX 10)
Tablets, 0.85 mg.
40s, ea. (5024) ....... .75
500s, ea. (5025) ...... 2.10
1000s, ea. (5026) ..... 3.45
5000s, ea. (5027) ..... 2.88

**DIGITOXIN**
A.P.C. [B] (AM 46)
Tablets, 0.1 mg.
1000s, ea. ............ 1.70
0.2 mg., 1000s, ea. .... 1.60
(174W)
Abbott [B] (AB 1)
Tablets, 0.1 mg. (4359)
1000s, ea. ............. .75
0.2 mg. (4369)
1000s, ea. .............. 2.80

---

**for Digitalis U.S.P. see**
**PIL-DIGIS®**
DAVIES ROSE HOYT
Pharmaceutical Division
The Kendall Company
Needham, Mass. 02194
[Kendall logo]

---

0.2 mg. (3340)
100s, ea. .............
AWP

Columbia M...
100s, ea. .
Eli Lilly...

Amer. Drug Prods. [B] (AM 28G)
Tablets
0.1 mg. (2302)
1000s, ea. .
0.2 mg. (2303)
1000s, ea. .
Amer. Quinine [B] (AM 47)
Parenteral, Ampuls
0.1 mg., 1 cc.
25s, ea. .
1000s, ea.
0.2 mg., 1 cc.
25s, ea. .
1000s, ea.
Approved Pharm. [B] (AP 15)
0.1 mg.
1000s, ea.
0.2 mg.
1000s, ea.
Arcum [B] (AR 21L)
Tablets
0.2 mg.
1000s, ea.
Atlas Pharm. [B] (AT 25P)
Parenteral, Ampuls
0.2 mg., 1 cc.
Auburn Labs. [B] (AU 15)
Tablets, 0.2 mg. (T-49)
1000s, ea.
Barry-Martin [B] (BA 62)
Tablets
0.1 mg.
1000s, ea.
0.2 mg.
1000s, ea.
Bell Pharm. [B] (BE 35P)
Parenteral, Ampuls
0.2 mg., 1 cc.
Blue Cross [B] (HA 33)
0.1 mg. (T-584)
1000s, ea.
0.2 mg. (T-593)
1000s, ea.
Bowman [B] (BO 85E)
Tablets, 0.1 mg. (724)
1000s, ea.
0.2 mg. (725)
1000s, ea.
Bundy [B] (BU 29)
Tablets, 0.1 mg.
1000s, ea.
0.2 mg.
1000s, ea.
Burrough Bros. [B] (BU 61)
Tablets, 0.1 mg. (T-138)
1000s, ea.
CMC [B] (CO 58)
Parenteral, Ampuls
0.1 mg., 1 cc. (P-460)
100s, ea.
0.2 mg. (P-461)
100s, ea.
Tablets, 0.1 mg. (0840)
1000s, ea.
0.2 mg. (0841)
1000s, ea.
Carroll [B] (CA 64N)
Tablets, 0.1 mg. (1083)
1000s, ea.
0.2 mg. (1085)
1000s, ea.
0.1 mg. (1086)
1000s, ea.
0.2 mg.

---

[ARMOUR THYROID logo] **ARMOUR THYROID**  high sales...high profits...high physician preference

**STEADIFEED**
The Nipple that
"B-R-E-A-T-H-E-S"
SEARER RUBBER COMPANY
Akron, Ohio 44304 U. S. A.

**HANKSCRAFT Bottle Sterilizers and Formula Sets**

● Automatic electric and non-electric sterilizer and formula sets. Six popular models. See full-page display ad, page 233.

HANKSCRAFT COMPANY
Reedsburg, Wisconsin

**STILLMAN'S Freckle Cream**

Not only a freckle cream but also used to make skin lighter, softer and smoother. National magazine advertising.

STILLMAN COMPANY
Aurora, Illinois

**ARMOUR THYROID** — high sales...high profits...high physician preference

**EXHIBIT 5**

# AMERICAN DRUGGIST

# 1969

# BLUE BOOK

MARCH 1969 TO MARCH 1970

## EXCLUSIVE: KEY FACTS ABOUT STATE WELFARE DRUG PROGRAMS

For the first time anywhere, this issue of the Blue Book presents a state-by-state report on welfare drug programs — with the details every pharmacist needs to know: Who is covered . . . what drugs are covered . . . basis for figuring costs and fees . . . policies regarding generics, quantities, and refills.

**INCLUDING**

- Drugs subject to Drug Abuse Control Act
- List of sugar-free liquids
- The catalogs of 101 manufacturers
- Poison control centers — with phone numbers
- Requirements for examination & registration
- Data on accredited colleges of pharmacy
- Requirements for reciprocal licensure
- A directory of equipment manufacturers

ELI LILLY & CO
DEPT. NO. M 789

DERAFEN (American Medical Corp.)
DERGIN ㉟
DERIIS (Franco Laboratory)
DERYIDE (H. A. C. Daniels)
DES (Amity-Grant)
DESACHAR ㉟ (Maitland Co.)
DESADERM (Research Pharmacal Lab.)
DESA-MIST ㉟ (Desert Drug)
DESA-NEST AT ㉟ (Desert Drug)
DESA-NEST H ㉟ (Desert Drug)
DESA-NEST PF ㉟ (Desert Drug)
DESA-NEST TZ ㉟ (Desert Drug)
DESAMINE ㉟ (Starr Pharmacal)
DESAMYCIN ㉟ (Desert Drug)
de-SAM (de Leon Labs.)
DESAPHEN ㉟ (Vortus, Inc.)
DESAREX ㉟ (Desert Drug)
DESAREX-A ㉟ (Desert Drug)
DESATAB ㉟ (Marvin Labs.)
DESATAB-A ㉟ (Marvin Labs.)
DESATAB-TS ㉟ (Marvin Labs.)
DESATOL ㉟ (Owipak, R.E. & Co.)
DESATRATE ㉟ (Desert Drug)
DESATRIX ㉟ (Desert Drug)

DESITAL ㉟ (Abbott Labs.)
DESIRAL 16 ㉟ (Abbott Labs.)
DESIRAL 25 ㉟ (Abbott Labs.)
DESCILIN ㉟ (Desert Drug)
DESENEX ㉟ (Pharmacraft Div.)
DESENZOID ㉟ (Starr)
de SERPA ㉟ (de Leon Labs.)
DESITIN (Leeming/Pacquin Divisions, Chas. Pfizer & Co.)
DESITHE SUPPOSITORY W/NG ㉟
DESL-VITE (County Pharmaceuticals)
DESLANOSIDE
DESLEAUX BISMUTH (Fougera)
DESOBEZ ㉟ (Deviand Pharm.)
DESO-CREME ㉟ (Columbia Medical)
DESODORM ㉟ (Kay Pharm. Co.)
DESOID PR ㉟ (Schlesing Drug Co., Inc.)
DESON ㉟ (Desert Drug)
DESOPHEN ㉟ (Starr Pharmacal)
DESOPID ㉟ (Aztec Pharm., Inc.)
DESO-TAB-Z (Columbia Medical)
DES-DXA-R ㉟ (Walmar Corp. & Co.)
DESOXEDRIN (Camet Pharmaceutical Co.)
DESOXETS ㉟ (Abbott)
DESOXO-D ㉟ (Sci UN & Case Co.)
DESUNHID FORMULAS, 1, 2 & 3 ㉟
DESOXY-CELL PLUS ㉟

Desi 60, Superitan
DESET 10 (Semi-Tensin Pharmacal Co., Inc.)
DESPITAN ㉟ (Diu)
DESICA, ㉟ (Parke, Davis)
DESIGNER (E. Fredericia, Inc.)
DESITAL ㉟ (Canoni J. Dower Co.)
DESITAL NO. 2 ㉟ (Caldwell & Bloor Co.)

**DESOXYCHOLIC ACID ▥**
(Any Chemical Corp.)

Fellows-Testagar
Roy

**DESOXYCORTI-COSTERONE ACETATE**
CIBA
PERCORTEN® ACETATE
(See Under Trade Name)

**DESOXYCORTICOSTERONE ACETATE ▥**
Ciba
(See Under Trade Name)
Caldwell & Bloor Co.
Gotham Pharmaceutical Co., Inc.
Robinson
(See Catalog Under Robinson Lab.)
St. Louis Pharmacal
To Gil
Schering Corp.
Upjohn
**DESOXYCORTISONE ACETATE**
Deca Acetate (See Under Trade Name)
**4-DESOXYEPHEDRINE HCL ▥**
Gotham Pharmaceutical Co., Inc.

# KEY FACTS ABOUT

# STATE WELFARE

# PROGRAMS

See Pages 12 to 15

**B-D Fever Thermometers** • ASEPTO • RED FLASH • MEDICAL CENTER    ASEPTO, B-D, MEDICAL CENTER and RED FLASH are trademarks   

To Retailer: ★ Price On Direct Basis—Per dz., ea., or as specified.



ARMOUR THYROID   high sales...high profits...high physician preference

Prices are listed in this order: ● Retail FTM; Retail Price; Whole. Price
To Retailer: ★ Price On Direct Basis—Per dz., ea., or as specified.

## Dienestrol ℞
### Cream

**Composition:** Dienestrol Cream contains 0.01% of the synthetic estrogen, dienestrol, compounded with glyceryl monostearate, peanut oil, glycerin, benzoic acid, glutamic acid and water.

**Indications:** Indicated in the treatment of senile vaginitis in postmenopausal women, atrophic vaginitis, pruritus vulvae caused by atrophic changes in the vulval epithelium, dyspareunia associated with atrophic vaginal epithelium, and prior to plastic pelvic surgery in menopausal cases.

**Contraindications:** Malignancies or precarcinomatous lesions of the vagina or vulva.

**Precautions:** In pruritis vulvae due to infectious conditions, the organism responsible for the infection should be treated with a specific agent.

**Dosage:** One or two applicatorsful per day for one or two weeks, then gradually reduced to one-half initial dosage for a similar period. A maintenance dosage of one applicatorful, one to three times a week, may be used after restoration of the vaginal mucosa has been achieved.

**Packaging:** 78g tubes with or without the ORTHO® Measured-Dose Applicator.

ⓞrtho

### ORTHO PHARMACEUTICAL CORPORATION
### RARITAN, NEW JERSEY 08869

*For prices and sizes see previous column*

▲ ARMOUR THYROID  high sales...high profits...high physician preference

**"THE EASY-TO-READ PRICE BOOK"**    [1234] cat. #: B. B only; A, refrigerate; ●, narcotic; ◆, narcotic (oral B a.k.); ◇, exempt narcotic; ⊗, dated products; Ⓝ, Subject to DACA.    **Pg. 193    Die-Dig**

for
Digitalis U.S.P.
see
**PIL-DIGIS®**
DAVIES ROSE HOYT

for
Digitoxin U.S.P.
see
**MYODIGIN®**
DAVIES ROSE HOYT

*(Continued on Next Page)*



**PLASTIPAK** insulin syringe • sterile • disposable • ready to use—at home or away



[redacted]

69 Blue Book

"THE EASY-TO-READ PRICE BOOK" [1234] cat. #; ℞, ℞ only: ▲, refrigerate; ●, narcotic; ◆, narcotic (oral ℞ o.k.); ©, exempt narcotic; ◉, dated products; ■, Subject to DACA. Pg. 531 Ste-S

STEAPSIN (Continued)
Penick, N.Y.Q., Chemical Division
Lumps (Triple Pressed)
1 lb. ea. .... 1.44
5 lb. ea. .... 5.60
Powder (Triple Pressed)
1 lb. ea. .... 1.38
5 lb. ea. .... 5.55
Pfanstiehl Laboratories, Inc.
Powder, 500 Gm. ea. .... 25.00

STEARIC ACID
Aero Chemical Corporation
Triple Pressed, 200 Gm. ea. .... 2.50
International Chemical Labs. ℞
16 oz. .... 24.00
5 lbs. .... 96.00
Merck & Co.
U.S.P. Powder,
1 lb. [#04281] ea. .... 1.60
Penick, N. Y. Q., Chemical Division
Powder, 1 lb. ea. .... 1.65
5 lb. ea. .... 6.75

STEARNS' ELECTRIC (Stearns')
Paste, 2 oz. tube .59 4.55

STEARYL ALCOHOL
Aero Chemical Corporation
100 Gm. ea. .... 2.50
City Chemical
[#S899] 1 lb. ea. .... 1.80
5 lb. ea. .... 7.00
International Chemical Labs. ℞
4 oz. .... 10.00
16 oz. .... 36.00
Pfaltz & Bauer, Inc.
1 lb. ea. .... 2.25

STECLIN ℞ (Squibb Pharmaceutical)
Capsule, 250 mg.
100s [#8335] ea. .... ★4.25
Unimatic, 100s [#83352] ea. .... ★4.50
Intramuscular
250 mg., Vial [#8994] ea. .... ★1.15
Intravenous, Vials,
250 mg., [#8834] ea. .... ★1.15
500 mg., [#8835] ea. .... ★2.04

STEEMAID (Wheeler Chemical Co.)
Liquid, 2 oz. ●.69 5.50

STEEM-EZE (Sacramento Pharmacal Co.)
Liquid, 4 oz. ●1.00 ....

STEEM MIST (Prak-T-Kal Corp.)
Inhalant, 2 oz. .69 5.52
4 oz. .98 7.84
6 oz. 1.39 11.12

STEEM-UP (Lake Products)
Powder, 5 Gm. ●.25 1.80
32 Gm. ●.90 7.06

STEEMY (Park-T-Kal Corp.)
Vaporizer
Choo-Choo [#4C] 12.95 103.60
Humpty-Dumpty [#2H] 12.95 103.60
Turtle [#3T] 12.95 103.60

STEINBERG'S SOLUTION
(Campbell Pharm.)
Keramin Injection (See Under Trade Name)

STELAZINE ℞ (Smith Kline & French)
(See Catalog Under Smith Kline & French)
Concentrate, 10 mg./cc.
2 oz., 1s [#715-01] ea. .... 11.70
12s [#715-05] ea. .... 112.00
Injection, Multiple Dose Vial
2 mg./cc., 10 cc.
1s [#717-01] ea. .... 4.00
20s [#717-05] ea. .... 68.00
Tablets,
1 mg.,
100s [#723-12] ea. .... 6.06
1000s [#723-13] ea. .... 57.58
2 mg.,
100s [#723-02] ea. .... 7.86
1000s [#723-07] ea. .... 74.68
5 mg.,
100s [#723-22] ea. .... 10.26
1000s [#723-23] ea. .... 88.25
10 mg.,
100s [#723-42] ea. .... 13.56
1000s [#723-44] ea. .... 116.60

STEMS (Thermide, Inc.)
Capsule, 30s 2.63 18.90

STEMUTROLIN ℞ (Lincoln Labs.)
Vial, 10 cc. [#LCS-5V10] ea. .... 8.00

STEMZ-IT (Arpee Drug Prods.)
Liquid, 6 oz. 1.00 8.00

STENEDIOL ℞ (Organon)
(See Catalog Under Organon, Inc.)
Tablet,
Oral,
10 mg., 100s [#662R] ea. .... 8.15
25 mg., 100s [#643R] ea. .... 20.40
Sublingual,
10 mg., 100s [#672R] ea. .... 8.15
25 mg., 100s [#673R] ea. .... 20.40
Vial, 25 mg./cc.,
10 cc. [#6530] ea. .... 3.25
50 mg./cc.,
10 cc. [#6540] ea. .... 5.60

STENISONE ℞ (Organon)
(See Catalog Under Organon)
Tablet, [illegible] ea. .... 5.90
100s ea. .... 18.30

STENTAL ■ (Robins, A. H., Co.)
(See Catalog Under A. H. Robins)
Extentabs [#690] 100s ea. .... 2.00
500s ea. .... 9.20

STEPHAN (The Stephan Company)
Aftershave,
Alpine, 6 oz. 1.00 8.00
Hi-Spice, 6 oz. 1.00 8.00
Butch Wax, Jar, 3½ oz. .60 4.80
Stick, 1.6 oz. .50 4.00
Cream Hair Dress, 6 oz. 1.00 8.00
Tube, 3½ oz. 1.00 8.00
Dandruff Remover,
Plain, 6 oz. 1.00 8.00
Oil, 6 oz. 1.00 8.00
Shampoo, For Men, 6 oz. 1.00 8.00
Shave Cream,
Alpine, 10 oz. 1.00 8.00
Wet Spicy, 10 oz. 1.00 8.00
Spray Deodorant, 3½ oz. 1.00 8.00

STEPHEN RILEY COSMETICS
(Div. of Ladco Labs.)
Bubble Bath Refill Powder,
10 oz. ●.79 6.32
Orange Flavored Vit. C.
Tablet, 150s ●1.98 16.00

STEP LIGHTLY (Robert Daniels)
Ointment, 2 oz. 2.00 10.80

STER (Schlick, Inc.)
Tablet, 5 mg., 100s ea. .... 5.00

STERA-FORM ℞ (Mayrand)
Cream, ½ oz. [#253] ea. .... 2.10

STERA-KLEEN (Block Drug Co., Inc.)
Denture Cleanser, Med., 4.5 oz. ●.67 6.00
Lge., 9 oz. ●.98 8.96

STERA-LENS (Barrows Chemical)
Drops, 2 oz. [#3440] ea. .80 ....

STERAMINE ℞ (Mayrand Pharmaceuticals)
Opthalmic, 5 cc. [#249] ea. .... 2.00
Otic, 5 cc. [#248] ea. .... 2.00

STERANE ℞ (Pfizer Laboratories)
(See Catalog Under Pfizer Lab.)
Tablet, 5 mg.,
100s [#3955] ea. .... ★3.25
1000s [#3958] ea. .... ★17.00
Vial, Intra-Articular & Intramuscular,
25 mg./cc.,
5 cc. [#9350] ea. .... ★2.91

STERAPRED ℞ (Mayrand Inc.)
Tablet, [#238] 100s ea. .... 5.60
1000s ea. .... 50.00

STERAPRED-K ℞ (Mayrand)
Tablet [#260] 100s ea. .... 6.60
500s ea. .... 27.50

STERAQ ℞ (Ascher, B. F.)
(See Catalog Under Ascher, B.F. & Co.)
Vials, 10 c.c. ea. .... 2.79

STERASAL-K ℞ (Mayrand Inc.)
Tablet, [#237] 100s ea. .... 6.00
500s ea. 28.00

STERAZOLIDIN ℞⊗ (Geigy Pharmaceuticals)
(See Catalog Under Geigy Pharmaceuticals)
Capsules, 100s ea. .... 7.20
1000s ea. .... 64.80

STERCOHOL (Philips Roxane Labs.)
(See Catalog Under Philips Roxane)
Liquid, 1 gal. [#M-108] ea. .... 9.00

STERI-AMPS (Savage Laboratories, Inc.)
Ampul, 10s [#4002] ea. .... 6.00

STERI-CLEAN (Generic Pharmaceutical Corp.)
32 oz. ea. .79 ....

STERICOL (Berkeley Drug Co.)
Liquid, 16 oz. .84 6.00
32 oz. 1.49 10.80

STERIFOAM (Goodwinol Prods., Inc.)
Liquid, 6 oz. ea. 2.40 1.60

STERIFOAM ℞ (Hill Labs. Inc.)
Liquid, 8 oz. .... 16.55

STERIFOL ℞ (Lawton Labs., Inc.)
Inj., vial, 10 cc. [#120] ea. .... 2.50

STERI-LEN (Mi-Con Laboratories)
(See Catalog Under Contact Lens Solutions)
Soaking solution,
4 oz. [#652] 1.85 13.80

**Bottle Sterilizers and Formula Sets from HANKSCRAFT**

• Automatic electric and non-electric sterilizer and formula sets. Six popular models. See full-page display ad, Page 277.

HANKSCRAFT COMPANY
Reedsburg, Wisconsin

STERILON PRODUCTS (Sterilon Corp.)
(Prices on Request from Mfr.)

STERI-PRED ℞ (Sterimed, Inc.)
Liquid, 5 cc. ea. .... .80

STERISEPTOL (Pharmex, Inc.)
Ampule, 10 cc., 25s ea. .... 14.75

STERISOL (Lactona Products)
7 oz. [#64007] 1.29 10.32

STERI-SPRAY (Mennen Co.)
Instant Antiseptic,
3 oz. 1.29 10.33
4¾ oz. 1.69 13.79

STER-MATE ℞ (Schlicksup Drug Co., Inc.)
Tablets, 100s [#411] ea. .... 8.00

STER-MIN ℞ (Schlicksup Drug Co., Inc.)
Tablets,
5 mg., 100s [#407] ea. .... 3.26
Compound, 100s [#442] ea. .... 2.01
Strong, 100s [#443] ea. .... 3.39

STERN (Bernstein)
Artificial Nails, 10s ea. ●2.50 1.50
Eye Lashes,
Fur Hair, adhesive, pr. ea. ●7.50 4.50
Human Hair, trimmed, pr. ea. ●4.50 2.70
Human Hair, trimmed
Adhesive, pr. ea. ●5.00 3.00
Human Hair, untrimmed
Pr. ea. ●3.00 1.80

STERNEEDLE (Panray)
Cartridges, w/plastic sleeve
Small Pox #3 ea. .... .25
Sterile #6 ea. .... .25
Device ea. .... 40.00
Kit ea. .... 50.00
Sleeves for Cartridges
100s ea. .... 1.00
Tuberculin P.P.D. "Connaught"
Concentrated, 1 cc. ea. .... 3.20

STERNIG'S (N. Sternig & Co.)
Famous Eye Lotion,
2 oz. .60 3.50
4 oz. 1.00 7.50
Famous Sore Throat Mix,
2 oz. .50 3.50
4 oz. .95 7.50

STERNO PRODUCTS (Sterno, Inc.)
Canned heat,
2⅝ oz. [#4006] .25 1.70
7 oz. [#4008] .50 3.40
28 oz. [#4010] .98 7.60
Single burner,
[#33] 1.39 9.80

STEROCAPS ℞ (Gold Leaf Pharmacal)
Capsule, 30s ea. .... 2.70

STEROCORT ℞ (Wilcox Laboratories)
Creme, ½ oz. ea. .... 1.80

STERODERM ℞ (Gold Leaf Pharmacal)
Ointment, 5 Gm. ea. .... 2.50

STEROFORM (Allen Pharmacal Co.)
Cream, 5 Gm. ea. .... .70
20 Gm. ea. .... 1.75

STEROFRIN ℞ ⊗ (Alcon Labs.)
Drop-Tainer
6 cc. [#609] .... 22.80

STEROGEN ℞ (Sunland Pharmacal)
Vial, 10 c.c. ea. .... 3.00

STEROGESIC ℞ (Basic Pharmaceuticals)
Capsule, 100s ea. .... 4.90

STEROGYN (Bell Pharmacal Co.)
10,000 Units, 10 cc. vial ea. .... 6.50

STEROIDEEN ℞ (Spanner)
10 c.c. vials ea. .... 5.50

STEROLONE ℞ (Rowell Labs., Inc.)
Tablets
5 mg., 100s [#96] ea. .... 2.82
500s [#97] ea. .... 13.80
1000s [#97-A] ea. .... 24.00

STERONYL ℞ (Kay Pharmacal Co.)
Tablet, [#T-156] 100s ea. .... 2.25
500s ea. .... 9.37
1000s ea. .... 16.65

STERO PLEX (Firks Pharmaceuticals)
Vial, 10 cc. [#V355] ea. .... 4.50

STEROPTO (K-R Labs.)
Liquid, 2 oz. ●1.25 9.80

STEROPTO 1000 (K-R Labs.)
Liquid, 2 oz. ●1.25 9.60

STEROSAN ℞ (Geigy Pharmaceuticals)
(See Catalog Under Geigy Pharmaceuticals)
Cream, 3%, 30 Gm. ea. .... .90
1 lb. ea. .... 7.50
Ointment, 3%, 30 Gm. ea. .... .90
1 lb. ea. .... 7.50

STEROSAN-HYDROCORTISONE ℞
(Geigy Pharmaceuticals)
(See Catalog Under Geigy Pharmaceuticals)
Cream, 5 Gm. ea. .... [illegible]
20 Gm. ea. .... [illegible]
Ointment, 5 Gm. ea. .... [illegible]
20 Gm. ea. .... 3.75

STEROTATE ℞ (Ulmer)
Aqueous, 100 mg./cc., [#2485]
10 c.c. vial ea. .... 4.25

STERSOL (Canfield, C. R.)
Sterilizing Solution,
Ampul, 10 cc., 10s ea. 11.00 6.60

STER-TABS ℞ (Baylor-Sheryl Labs.)
Tablet, 100s ea. .... 2.75

STET [illegible] (de Leon Labs.)
Tablet, 100s ea. 4.25 [illegible]
500s ea. .... [illegible]
1000s ea. .... [illegible]

STEVENS (Marston Laboratories)
Hair Remover, [illegible] oz. ea. [illegible] [illegible]
16 oz. ea. [illegible] [illegible]

STEVENS PRODUCTS (Stevens, William)
Bubble Bath, Supreme
Liquid, 8 oz. 1.60 10.[illegible]
16 oz. 2.50 18.[illegible]
64 oz. ea. 7.95 4.[illegible]
Dry Skin Care
Liquid, 1 gal. ea. 15.00 9.[illegible]
Grand-Dad's healing lotion
6 oz. 1.45 10.[illegible]
Lyme toilet lotion, 6 oz. 2.00 14.[illegible]
Western cologne, 2 oz. 2.50 18.[illegible]

STEVENS OINTMENT (Kopf Mfg. Co., Inc.)
1 oz. ea. 1.75 1.[illegible]

STEWART'S MARY E (Goldham Pharmacal Co.)
Cone, 12s ●1.50 12.[illegible]
Powder, 5 oz. ●.98 1.00 8.[illegible]
14 oz. ●1.98 2.00 16.[illegible]

S-T FEBRA (Scot-Tussin Pharmacal)
4 oz. .... ....
1 pt. .... ....
1 gal. .... ....
(Prices on Request from Mfr.)

S-T FORTE ℞ (Scot-Tussin Pharmacal)
Regular,
Liquid, 16 oz. ea. .... 4.[illegible]
1 gal. ea. .... 31.[illegible]
Sugar Free, 16 oz. ea. .... 5.[illegible]
1 gal. ea. .... 35.[illegible]

ST-I (Supreme Pharmaceuticals)
Sty Relief,
⅛ oz., 16s [#S177] ea. .... 4.[illegible]

STICKADOOS (Avery Label Co.)
Air Mail Labels [#ST-8] .29 2.[illegible]
Fabric Identity Badges
[#ST-5] .49 3.[illegible]
Foil Bumpers [#ST-6] .49 3.[illegible]
Letters [#ST-4] .39 2.[illegible]
Numbers [#ST-7] .39 2.[illegible]
Parcel Post Labels [#ST-9] .29 2.[illegible]
Photomounts [#ST-1] .49 3.[illegible]
Reinforcements [#ST-2] .29 2.[illegible]

STICKTITE (Kanz Co.)
Denture Adhesive Powder, 2 oz. .75 6.0[illegible]

STICKY (San-Oct Labs.)
Denture Adhesive Cream,
¾ oz. ea. 1.00 [illegible]

STIEFEL MEDICATED SOAP (Stiefel Labs.)
(See Catalog-Insert Under Stiefel)
Polyrat 1.05 8.2[illegible]
Salicylic Acid 1.05 8.2[illegible]
Salicylic Acid & Sulfur 1.05 8.2[illegible]
Sulfur Soap 1.05 8.2[illegible]

STIEGENT
Robin Winters Corp.
Tubes, (Unit of 16) .98 5.7[illegible]

STIGMANOL ℞ (Gold Leaf)
Ampuls,
1:1000, 1 c.c., 100s ea. .... 8.0[illegible]
1:2000, 1 c.c., 100s ea. .... 10.0[illegible]
1:1000, 10 c.c. vial ea. .... .7[illegible]
1:2000, 10 c.c. vial ea. .... .6[illegible]

STIGMASTEROL ℞
Aero Chemical Corporation
1 Gm. ea. .... 4.0[illegible]
City Chemical
M.P. 165-168° [#S1010]
1 Gm. ea. .... 3.0[illegible]

STIK (Truec Labs.)
Antibacterial Tape Adherent,
Aerosol, 6 oz. ea. 1.60 ....
20 oz. ea. 3.00 ....

STIK-VAC (Gland-O-Lac Company)
Vaccine, 100 dose 1.35 .9[illegible]
250 dose 3.00 2.00
500 dose 3.75 2.5[illegible]

STILBEST K ℞ (Keene Pharmacal Co.)
Kenoate, 100s ea. .... 10.00

STILBESTROL (See Diethylstilbestrol)

STILBETIN ℞ (Squibb Pharmaceutical)
Tablets,
5.0 mg.,
100s [#3585] ea. .... ★2.08
E.C., 100s [#3595] ea. .... ★2.15
25.0 mg.,
100s [#3605] ea. .... ★4.65
100.0 mg.,
30s [#3623] ea. .... ★7.45

STILBEX ℞ (Belerose)
(Prices on Request.)

STIL FORTE ℞ (Saron Pharmacal)
Tablet, 100s ea. .... 3.00

STILL (Spenner, E.O.)
Tablets, 30s ea. 5.00 3.25

STILLINGIA ROOT
Sherwood Laboratories
Fluid Extract, N.F. VII
1 pt. ea. .... 5.25
1 gal. ea. .... 31.50
Tincture, [illegible] ea. .... 3.50

STILLMAN'S (Stillman Co.)
Complexion Soap, 4 oz. .35 2.80
Freckle Cream, ¾ oz. jar .80 6.40
2½ oz. jar 1.25 10.00
Medicated Jell
w/Applicator 1 1/7 oz. tube 1.00 6.80
2½ oz. tube 1.50 9.80
Refill, 2½ oz. tube 1.00 6.80

STILPHOSTROL ℞ (Dome Labs.)
(See Catalog Under Dome Labs.)
Ampuls, 5 c.c.
20s [#53120] ea. .... 25.69
Tablets, 50 mg.
50s [#53350] ea. .... 7.70

B-D Fever Thermometers • ASEPTO • RED FLASH • MEDICAL CENTER
ASEPTO, B-D, MEDICAL CENTER and RED FLASH are trademarks
B-D 

# EXHIBIT 6

# AMERICAN DRUGGIST

# BLUE
# BOOK
# 1 9 7 0

## MARCH 1970 TO MARCH 1971

Nine Dollars Per Copy

INCLUDING

- National Drug Code data
- Average wholesale prices
- Key facts about state welfare programs
- Drugs subject to Drug Abuse Control Act
- American Druggist Counterdose Chart
- Poison control centers — with phone numbers
- List of sugar-free liquids
- List of manufacturers' catalogs
- Requirements for examination & registration
- Data on accredited colleges of pharmacy
- Requirements for reciprocal licensure
- A directory of equipment manufacturers

PROPERTY OR
ELI LILLY & CO.
DEPT. NO m789

**DERM-X-OL** (International Chemical Labs.)
Ointment, 1 oz. .... 1.50 12.00
4 oz. .... 4.50 36.00
**DERNGOOD** (M. L. Snyder & Son)
Wooden Shower Sandal, Lg., Med., Sm., Pr. .... .75
**DEROFEN** (American Medicinal Corp.)
Honey Syrup, 3 oz. ea. .... .90
Lozenges, 16s ea. .... 1.00
**DERONIL** ℞ (Schering Corp.) (See Catalog Under Schering Corp.)
Tablets, 0.75 mg., 50s ea. .... 8.10
500s ea. .... 76.95
**DERRIS** (Humco Laboratory)
Powder, 16 oz. .... 11.30
5 lb. .... 49.45
**DERVIDE** (Dr. A. C. Daniels)
Tablets, Vial, 40s .... 1.25 9.00
**DES** (Amfre-Grant)
Tablet,
.05 mg., 100s ea. .... 1.00
.10 mg., 100s ea. .... 1.00
.50 mg., 100s ea. .... 1.00
1 mg., 100s ea. .... 1.00
2 mg., 100s ea. .... 2.00
5 mg., 100s ea. .... 2.50
10 mg., 100s ea. .... 4.40
25 mg., 30s ea. .... 2.50
100s ea. .... 7.50
250s ea. .... 18.00
500s ea. .... 34.00
1000s ea. .... 62.00
50 mg., 30s ea. .... 3.50
100s ea. .... 10.00
100 mg., 30s ea. .... 5.50
100s ea. .... 16.00
**DESABAM** (Desert Drug)
Tablet, 100s ea. .... 4.00
1000s ea. .... 35.00
**DESACHOLINE** ℞ (Mallard Inc.)
Tablet, 100s [#T-542] ea. [#NDC-166-542-11] .... 5.50
1000s [#T-542] ea. [#NDC-166-542-15] .... 28.60
**DESADERM** (Research Pharmacal Lab.)
Ointment, lb. ea. .... 2.50
**DESA-HIST** Ⓢ (Desert Drug)
Syrup, pt. ea. .... 3.50
Gal. ea. .... 25.00
**DESA-HIST AT** ℞ (Desert Drug)
Tablet, 100s ea. .... 9.00
**DESA-HIST 8** ℞ (Desert Drug)
Tablet. 100s ea. .... 3.50
**DESA-HIST PF** ℞ (Desert Drug)
Elixir, pt. ea. .... 2.50
Gal. ea. .... 16.00
**DESA-HIST PF 8** ℞ (Desert Drug)
Capsule, 100s ea. .... 8.00
500s ea. .... 36.00
**DESA-HIST 12** ℞ (Desert Drug)
Tablet, 100s ea. .... 4.50
**DESAMINE** ℞ (Starr Pharmacal)
Capsules, T.D.,
10 mg., 100s ea. .... 3.38
250s ea. .... 7.20
500s ea. .... 12.60
1000s ea. .... 21.60
15 mg., 100s ea. .... 3.83
250s ea. .... 8.10
500s ea. .... 14.40
1000s ea. .... 25.20
Tablets, 5 mg., White or Yellow, 1000s ea. .... 3.00
10 mg., White 1000s ea. .... 5.00
**DESAMYCIN** ℞ (Desert Drug)
Capsule. 100s ea. .... 7.45
**de SAN** (de Leon Labs.)
Liquid, pint ea. .... 3.25
Gal. ea. .... 23.00
**DESAPHEN** ℞ (Veltex, Inc.)
Elixir [#358] Pt. ea. .... 2.20
Gal. ea. .... 12.50
Tablet [#318] 100s ea. .... 1.20
1000s ea. .... 7.00
**DESAREX** ℞ (Desert Drug)
Capsule, No. 1, 100s ea. .... 6.50
500s ea. .... 30.00
No. 2, 100s ea. .... 8.50
500s ea. .... 37.00
**DESAREX-A** ℞ (Desert Drug)
Capsule, No. 1, 100s ea. .... 7.50
500s ea. .... 34.00
No. 2, 100s ea. .... 9.00
500s ea. .... 44.00
**DESATAB** ℞ (Marsin Labs.)
Tablet, (Bl, P & G), 100s ea. .... 2.50
1000s ea. .... 22.00
**DESATAB-6** ℞ (Marsin Labs.)
Tablet, 100s ea. .... 2.00
1000s ea. .... 17.50
**DESATAB-15** ℞ (Marsin Labs.)
Tablet, 100s ea. .... 1.75
1000s ea. .... 15.00
**DESATOL** ℞ (Dwight, R.E. & Co.)
Tablets, 30s ea. .... .75
100s ea. .... 2.00
1000s ea. .... 18.00

**DESATRATE** ℞ (Desert Drug)
Capsule T.D., 30 mg., 100s ea. .... 6.00
1000s ea. .... 47.50
50 mg., 100s ea. .... 7.50
1000s ea. .... 60.00
**DESATRIC H** ℞ (Desert Drug)
Tablet, 100s ea. .... 6.00
1000s ea. .... 54.00
**DESBUTAL** ℞ (Abbott Labs.)
Capsules, [#NDC-074-3991-01] 100s ea. .... *2.50 AWP 3.00
1000s ea. .... *22.50 AWP 27.00
**DESBUTAL 10** ℞ (Abbott Labs.)
Gradumets [#NDC-074-6806-01] 100s ea. .... *6.45 AWP 7.74
500s ea. .... *29.83 AWP 35.80
**DESBUTAL 15** ℞ (Abbott Labs.)
Gradumets [#NDC-074-6814-01] 100s ea. .... *8.14 AWP 9.77
500s ea. .... *37.65 AWP 45.18
**DESCILLIN** ℞ (Desert Drug)
Tablet, 100s ea. .... 1.50
**DESENEX** (WTS-Pharmacraft Div.)
Aerosol, 6.0 oz. [#954] [#NDC-235-0954-64] .. 1.98 15.96
Ointment 0.9 oz. [#955] [#NDC-235-0955-51] .. 1.19 9.60
1.8 oz. [#955] [#NDC-235-0955-63] .. 1.89 15.12
1 lb [#955] ea. [#NDC-235-0955-75] .. 12.00 8.00
Powder 1.5 oz. [#956] [#NDC-235-0956-53] .. 1.19 9.60
3.0 oz. [#956] [#NDC-235-0956-53] .. 1.89 15.12
1 lb. [#956] ea. [#NDC-235-0956-77] .. 9.00 6.00
Soap, cake [#987] [#NDC-235-0987-63] .... .49 3.96
Solution w/Applicator 2.7 oz. [#957] [#NDC-235-0957-62] .. 1.50 12.00
**DESEROID** ℞ (Harvey)
Tablets, No. 1, 1000s ea. .... 4.00
No. 2, 1000s ea. .... 4.00
No. 3, 1000s ea. .... 4.00
**de SERPA** ℞ (de Leon Labs.)
Tablet, 0.25 mg., 100s ea. .... 2.70
500s ea. .... 11.70
1000s ea. .... 20.00
0.5 mg., 100s ea. .... 4.30
500s ea. .... 18.50
1000s ea. .... 32.00
**DESERT DEW** (Haynie Products)
Lotion, 8 oz. .... 1.00 8.00
**DESERT FLOWER** (Shulton)
Bath, Milk Foam, 5¾ oz. [#2727] ea. .... 4.00
Oil, 2 oz. [#1979] ea. .... 2.50
Beauty Bath, 4 oz. [#1708] ea. .... 2.50
Body, Sachet, 1 oz. [#1752] ea. .... 1.50
Talcum, 5¾ oz. [#2728] ea. .... 1.50
Bubble Bath, Crystals [#1740] ea. .... 1.50
Liquid [#1722] ea. .... 1.50
Candle, Scented, 4½ oz. [#1964] ea. .... 4.00
Cologne, Spray, 2 oz. [#2768] ea. .... 2.50
2⅞ oz. [#1862] ea. .... 3.00
Stick [#1737] ea. .... 1.00
Deodorant, Cream [#1760] ea. .... 1.00
Desert Dri, Cream [#1880] ea. .... 1.00
Aerosol [#1900] ea. .... 1.00
Roll-On [#1790] ea. .... 1.00
Hand & Body, 3½ oz. [#1709] ea. .... 1.00
4 oz. [#1719] ea. .... 1.00
8 oz. [#1706] ea. .... 2.00
16 oz. [#1816] ea. .... 4.00
Perfume, ⅓ oz. [#2449] ea. .... 3.00
Lotion, 8 oz. [#2790] ea. .... 2.50
Powder, Dusting, 7 oz. [#1885] ea. .... 2.50
Perfumed Spray 6 oz. [#1903] ea. .... 2.00
Sets, Bath [#2729] ea. .... 3.00
[#2732] ea. .... 6.00
Gift [#1723] ea. .... 3.00
[#1724] ea. .... 4.50
[#1750] ea. .... 2.50
[#1759] ea. .... 1.50
[#1865] ea. .... 3.00
[#1866] ea. .... 2.25
[#1867] ea. .... 2.25
[#1919] ea. .... 2.25
[#1921] ea. .... 2.25
[#1951] ea. .... 5.00
[#1952] ea. .... 2.00
[#2737] ea. .... 10.00
Fragrance Veil, 2½ oz. [#1944] ea. .... 2.00
Toilet Water, Spray Essence 2½ oz. [#1928] ea. .... 3.00
3½ oz. [#1735] ea. .... 2.00
**DESERT MAGIC** (Haynie Products)
Cream, 4 oz. .... 1.25 10.00
**DESERT TAN** (Desert Tan Inc.)
Deal 30, Anti Burn, Liquid, 4 oz. .... 1.10 7.26
Deal 40, Supertan, Liquid, 4 oz. .... 1.00 .60
Deal 50, Anti Burn w/Lanolin, Cream, 3 oz. .... 1.10 7.26
Deal 60, Supertan w/Lanolin, Cream, 3 oz. .... 1.10 7.26
Deal 70, Supertan Aerosol Spray, 6 oz. .... 1.50 9.90
Deal 80, Twin Pack, Anti-Burn 2 oz. & Supertan, 4 oz. .... 1.00 .60
Men's Cologne, Deal 100, Liquid, 8 oz. .... 1.60 .96
After Shave Lotion, Deal 101, Liquid, 8 oz. .... 1.25 .75
Men's Dandruff Remover Shampoo, Deal 102, Liquid, 8 oz. .... 1.25 .75
Men's Hair Dressing, Deal 103, Liquid, 8 oz. .... 1.25 .75
**DESEX 15** (Scot-Tussin Pharmacal Co. Inc.)
Capsule, D.A. 30s ea. .... 2.50
100s ea. .... 7.50
**DESFERAL** ℞ (Ciba)
Ampul, 5 ml. [#3801] ea. .... 14.00
**DESICOL** ℞ (Parke, Davis)
Kapseal, 5 gr., 100s [#15-359-4] [#NDC-71-359-4] ea. .... *1.89 AWP 2.17
1000s [#15-359-11] [#NDC-71-359-11] ea. .... *14.94 AWP 17.93
**DESIGNER** (E. Frederics, Inc.)
Creme Cold Wave, Unit ea. .... 14.95
Hair Spray, 15 oz. .... 9.90
Instant Neutralizer, qt. ea. .... 1.75
**DESIST** (Halsey Drug Co., Inc.)
½ oz. [#HL-86] .... .69 4.50
**DESITAL** ℞ (Caldwell & Bloor Co.)
Tablet [#2087] 100s ea. .... .53
1000s ea. .... 3.00
**DESITAL NO. 2** ℞ (Caldwell & Bloor Co.)
Tablet [#2264] 100s ea. .... .58
1000s ea. .... 3.43
**DESITIN** (Leeming/Pacquin Divisions, Chas. Pfizer & Co., Inc.)
Baby Lotion, 2.5 oz. [#568] .... .60 4.80
6.0 oz. [#569] .... 1.00 8.10
Baby Oil, 2.0 oz. [#573] .... .60 4.80
5.25 oz. [#574] .... 1.00 8.10
Ointment, 1.25 oz. [#068] .... .75 6.00
2.25 oz. [#070] .... 1.09 8.72
4.25 oz. [#071] .... 1.59 12.72
1 lb. [#065] .... 4.49 35.92
Powder, 2.75 oz. [#079] .... .59 4.73
6.5 oz. [#081] .... .98 7.84
10.0 oz. [#147] .... 1.29 10.33
12s [#090] .... 43.20
**DESITIN SUPPOSITORY W/HC** ℞ (Leeming/Pacquin Divisions, Chas. Pfizer & Co., Inc.)
Box, 12s [#0900] .... 43.20
**DESI-VITE** (Cowley Pharmaceuticals)
100s ea. .... 2.50
**DESLANOSIDE**
Sandoz Pharmaceuticals
Cedilanid-D (See Under Trade Name)
**DESLEAUX BISMUTH** (Fougera)
Ea. .... 3.45 2.30
**DESOBEX** ℞ (Neland Pharm.)
Capsules, 100s .... 36.00
**DESO-CREME** ℞ (Columbia Medical) (See Catalog Under Columbia Medical)
Fungicidal Cream 1 oz. .... 4.95
**DESODRIN** ℞ (Kay Pharm. Co.)
Tabs., 10 mg., 100s ea. .... .81
1000s ea. .... 4.50
**DESODRINE** ℞ (Blaine Company)
Dl-Desoxyephedrine HCl 5 mg & Atropine S. 360 gr
Tablet 1000 .... 7.00
**DESOID PB** ℞ (Schlicksup Drug Co., Inc.)
Tablets, 100s [#161] ea. .... 1.00
**DESOL** ℞ (Garde Drug)
Pt. [#4032] ea. .... 4.10
**DESOPHEN** ℞ (Starr Pharmacal)
Capsules, T.D., No. 1, 10 mg./60 mg.,
100s ea. .... 4.05
250s ea. .... 8.20
500s ea. .... 14.40
1000s ea. .... 25.20
No. 3, 15 mg./100 mg.,
100s ea. .... 4.28
250s ea. .... 9.00
500s ea. .... 16.20
1000s ea. .... 28.80
**DESOPID** ℞ (Atlas Pharm. Labs.)
Tablet, 100s ea. .... 3.00

**DESO-TALC** (Columbia Medical) (See Catalog Under Columbia Medical)
Powder, 3½ oz. .... 4.95
**DES-OXA-D** ℞ (Walker Corp. & Co.)
Tablet, 100s ea. .... 1.85
500s ea. .... 3.85
**DESOXEDRIN** (Cabot Pharmaceutical Co.)
100s .... 2.25 16.2[illegible]
1000s ea. .... 11.2[illegible]
**DESOXETS** ℞ (Abbott)
Tablets, S.C. [#C6425] 100s ea. .... 3.25
1000s ea. .... 29.00
**DESOXO-S** ℞ (Sutliff & Case Co.)
Tablet [#CT1372] 100s ea. .... .65
1000s ea. .... 4.31
**DESOXROID FORMULAS, 1, 2 & 3** ℞ (High Chemical)
Tablet, set of 3M, 1M ea. .... 9.3[illegible]
**DESOXY** ℞ (Harvey)
Tablets, No. 10, 1000s ea. .... 5.0[illegible]
**DESOXY-CELL PLUS** ℞ (Quaker City Pharmacal)
Tablet [#5126] 100s ea. .... 2.00
1000s ea. .... 7.5[illegible]
**DESOXYCHOLIC ACID** ℞
City Chemical Corp.
[#D214] 25 gm. ea. .... 2.75
100 gm. ea. .... 9.0[illegible]
Fellows-Testagar
Tablet [#208] 1½ gr., 1000s ea. .... 15.0[illegible]
5000s/M .... 14.75
Foy
Foycholic (See Under Trade Name)
Pfaltz & Bauer, Inc.
25 Gm. ea. .... 5.0[illegible]
Robinson Labs.
Tablet, 1½ gr., C.T. [#290] 100s ea. .... 2.63
1000s ea. .... 19.0[illegible]
**DESOXYCORTICOSTERONE ACETATE** ℞
American Quinine Co., Inc.
Vial, 5 mg./cc., 10 cc. [#VP-955]
Oil, 10s ea. .... [illegible]
50s ea. .... [illegible]
100s ea. .... [illegible]
Ciba
Percorten (See Under Trade Name)
Caldwell & Bloor Co.
5 mg/cc, 10 cc. #1008 ea. .... 1.5[illegible]
Gotham Pharmaceutical Co., Inc.
Aqueous Suspension
Ampule, 5 mg./ml. [#634] 10s ea. .... 2.4[illegible]
25s ea. .... [illegible]
100s ea. .... 14.[illegible]
Vial, 10 ml [#482] ea. .... [illegible]
In sesame oil
Ampule, 5 mg/ml [#635] 10s ea. .... 1.6[illegible]
25s ea. .... 3.[illegible]
100s ea. .... 10.[illegible]
Vial, 10 ml. [#267] ea. .... [illegible]
Robinson
Sterile Vial, 5 mg.
Aqueous, 10 cc. [#1140] ea. .... 1.40
In Oil, 10 cc. [#1130] ea. .... 1.40
St. Louis Pharmacal
Aqueous Suspension, U.S.P., 5 mg/c.c., 10 c.c., 50s/unit ea. .... [illegible]
In Oil, 5 mg/c.c., 10 c.c., 50s/unit ea. .... [illegible]
Schering Corp.
Cortate (See Under Trade Name)
Socorol Labs.
Vial, 5 mg./cc., 10 cc. ea. .... 2.[illegible]
Oil, 5 mg./cc., 10 cc. [#2751] ea. .... 2.00
Upjohn
5 mg. per c.c., Sterile Solution 10 c.c. vial [#7489]
Ea. .... *5.64
**DESOXYCORTISONE ACETATE**
Central Pharmacal Co.
Cortinaq (See Under Trade Name)
Elskin-Sinn, Inc. ℞
Aqueous Solution, Vial, USP 5 mg./cc., 10 cc. [#500]
Ea. .... .52
Oil, 5 mg./cc., 10 cc. [#510]
Ea. .... .54
Organon, Inc.
Doca Acetate (See Under Trade Name)
**d-DESOXYEPHEDRINE HCL** ℞
Atlas Pharm. Inc.
Ampul, 20 mg./cc [#381], 1 cc. ea. .... 5.00 14.7[illegible]
Gotham Pharmaceutical Co., Inc.
Vial, 20 mg. 30 cc. [#820] ea. .... .83
**DESOXYEPHEDRINE HYDROCHLORIDE** ℞
(See also Methamphetamine Hydrochloride)
Academy
5 mg., 100s ea. .... 1.75
Arenol Chemical
dl, powder, 1 lb. ea. .... 7.50

(Continued on Next Page)

ARMOUR THYROID
QUALITY AND DEPENDABILITY FOR ALL THYROID USP RX'S



| | | |
|---|---|---|
| **DESOXYEPHEDRINE HYDROCHLORIDE** | | |
| (Continued) | | |
| Cooley Pharmaceuticals | | |
| Capsule, T.D. | | |
| 10 mg., [#3001] ea. | | 17.50 |
| Graham Pharmaceutical | | |
| Tablet, 5 mg., [#3007] ea. | | 1.00 |
| 10 mg., [#3367] ea. | | 1.27 |
| **di-DESOXYEPHEDRINE** | | |
| Chicago Pharmacal Division | | |
| Oustees (See Under Trade Name) | | |
| Cooley Pharmaceuticals | | |
| 5 mg., 1000s ea. | | 2.30 |
| First Texas | | |
| 20 mg./cc. | | |
| 10 cc. vial ea. | | 1.41 |
| Kleinman | | |
| Tablet | | |
| 2.5 mg., [#1645] 100s ea. | | .35 |
| 1000s ea. | | 2.60 |
| 5 mg., [#1646] 100s ea. | | .40 |
| 1000s ea. | | 3.00 |
| Maferd | | |
| Oxtree (See Under Trade Name) | | |
| McNeil Labs. | | |
| Syndros (See Under Trade Name) | | |
| Robinson Lab. | | |
| Powder, 1 oz., [#492] ea. | | 3.00 |
| Tablet, 6 | | |
| 5 mg. | | |
| [#429] 100s ea. | | .80 |
| 1000s ea. | | 4.00 |
| 10 mg., Double-Scored | | |
| White [#1771], Yellow | | |
| 100s ea. | | 1.00 |
| 1000s ea. | | 6.00 |

*(The remainder of this page consists of dense multi-column pharmaceutical price listings that are not legibly reproducible.)*



**B-D Fever Thermometers**   • ASEPTO   • RED FLASH   • MEDICAL CENTER

ASEPTO, B-D, MEDICAL CENTER and RED FLASH are trademarks



*1970 BLUE BOOK*

[1234] cat. #: B, B only: △ refrigerate: ◉ narcotic: ◄ narcotic (oral B a.); ◐ exempt narcotic; ◉ dated products: ▦, Subject to DACA.

## "THE EASY-TO-READ PRICE BOOK"

**Pg. 207** — **Dic-Die**

**DICO-TUSS (Pharmacy Associates)**
Liquid, 4 oz. ........ 1.50  8.80
8 oz. ........ 2.49  14.40

**DICUMAROL ℞**
(See under Bishydroxycoumarin)
Abbott Labs.
Tablets.
25 mg., [=NDC-074-3794-03]
100s ea. ........ *1.32
AWP *10.29
1000s ea. ........ 12.34
50 mg., [=NDC-074-3773-03]
100s ea. ........ *1.96
AWP 2.28
1000s ea. ........ *16.68
20.02
100 mg., [=NDC-074-3775-03]
100s ea. ........ *3.12
AWP 3.74

In Abbo-Pac
25 mg. [=NDC-074-3794-05-03]
100s ea. ........ *2.12
AWP 2.54
50 mg. [=NDC-074-3773-05-03]
100s ea. ........ *2.76
AWP 3.31
100s ea. ........ *3.42
AWP 4.70

Lilly, Eli Co.
Pulvule
25 mg., [=314]
100s [=NDC-2-F71-2] .... 1.76
1000s [=NDC-2-F71-4] .... 13.96
50 mg., [=291]
100s [=NDC-2-F54-2] .... 2.38
1000s [=NDC-2-F54-4] .... 20.46

**DI...URIN PROCAINE ℞ (Lilly, Eli Co.)**
Ampoules, 2 c.c.
10 cc. [=5817-1]
[=NDC-2-N18-1] ea. ...... 1.30

**✓ CYCLOMINE HYDROCHLORIDE**
Merrell, Wm. S.
Bentyl (See Under Trade Name)

**DIODEX ℞ (Upjohn)**
Tablet, 25 mg. [=50201]
100s [=NDC-9-18-1] ...... *2.37
AWP 2.54
500s [=NDC-9-24-1] ...... *11.25
13.50
1000s [=NDC-9-24-2] ...... *21.96
26.75
50 mg.,
100s [=5012] [=NDC-9-24-1] .. *4.50
5.40
500s [=5013] [=NDC-9-24-2] .. *21.36
AWP 25.63
1000s [=NDC-9-24-3] ...... *41.70
AWP 50.04

**DI-DRI** (Chester Chemical)
Granules, 3½ oz. ........ .69  4.97
**DIEBESTROL, ℞ (Camall Co.)**
Tablet, [=4666] 100s ea. ...... 1.95

**DIELDRIN**
Root.
Liquid, 8 oz. ........ 1.30  .78
Science Products
E.C.-15,
Liq., 4 oz. ........ .85  6.12
8 oz. ........ 1.25  9.03
Pt. ........ 2.25  16.10
Qt. (per ℞) ........ 3.75  13.50
Qt. or set ........ 30.69
5 gal. drum ea. ........ 36.75

**DIENESTROL, ℞**
Central Pharmacal
Restrol (See under Trade Name)
City Chemical
[=08411] 5 Gm. ea. ........ 4.80
25 Gm. ea. ........ 17.00
Ortho Pharmaceutical
Cream, 78 Gm., w/applicator .. 32.64
W/o applicator ........ 29.24
Westerfield Labs.
Tablet, 0.1 mg, 100s ea. ........ .85
0.25 mg, 100s ea. ........ 1.10
0.5 mg, 100s ea. ........ 1.25
5.0 m., 100s ea. ........ 2.10
White Labs.
Synstrol (See Under Trade Name)
**DIENESTROL SOLUTION (Key Pharmacal Co.)**
Vial, 5 mg. cc., 10 cc. ea. ........ 2.10
**DI-EST ℞ (Central Pharmacal Co.)**
10 ml. Vial
[=NDC-131-1024-05]
1s per vial ea. ........ 3.40
12s per vial ea. ........ 3.04
24s per vial ea. ........ 2.84
48s per vial ea. ........ 2.70
96s per vial ea. ........ 2.52

## DIENESTROL ℞
## Cream

**Composition:** Dienestrol Cream contains 0.01 % of the synthetic estrogen, dienestrol, compounded with glyceryl monostearate, peanut oil, glycerin, benzoic acid, glutamic acid and water.

**Indications:** Indicated in the treatment of senile vaginitis in postmenopausal women, atrophic vaginitis, pruritis vulvae caused by atrophic changes in the vulval epithelium, dyspareunia associated with atrophic vaginal epithelium, and prior to plastic pelvic surgery in menopausal cases.

**Contraindications:** Malignancies or precarcinomatous lesions of the vagina or vulva.

**Precautions:** In pruritis vulvae due to infectious conditions, the organism responsible for the infection should be treated with a specific agent.

**Dosage:** One or two applicatorsful per day for one or two weeks, then gradually reduced to one-half initial dosage for a similar period. A maintenance dosage of one applicatorful, one to three times a week may be used after restoration of the vaginal mucosa has been achieved.

**Packaging:** 78g tubes with or without the ORTHO® Measured-Dose Applicator.



ortho

### ORTHO PHARMACEUTICAL CORPORATION

Raritan, New Jersey 08869

*For prices and sizes see previous column*

Depakote Strength, 10 ml.
[=NDC-131-1019-05]
1s per vial ea. ........ 5.25
12s per vial ea. ........ 4.46
24s per vial ea. ........ 4.28
48s per vial ea. ........ 3.94
96s per vial ea. ........ 3.67

**DIESTRAL, ℞ (Caldwell & Bloor Co.)**
Tablet, E.C.
1 mg. [=20931] 100s ea. ........ .50
1000s ea. ........ 3.45
5 mg. [=20941] 100s ea. ........ 1.00
1000s ea. ........ 3.65

**DIET** (Three Products Co.)
Sodium,
100s ea. ........ .75  .50
10 oz. ea. ........ 1.54  1.00
Tablet, 1000s ea. ........ 2.50  1.67

**DIETABS ℞ (Key Pharmaceuticals)**
(See Catalog Under Key Pharmaceuticals)
Sweet A. No. 1, No. 2, & No. 3.
1000s ea. ........ 2.00
10000s ea. ........ 10.00

**DIET AID (Glarda Pharmaceuticals, Inc.)**
100s ea. ........ 2.10
Vial, 30 cc. 20 mo. ........ 14.90

**DIET-A-WAY (Pharm-A-Labs.)**
Tablet,
100s ea. ........ 1.00  4.60
1000s ea. ........ 2.98  14.46

**DIETCAPS ℞ (Blaine Co.)**
Timed Cap, 100s ea. ........ 4.50
1000s ea. ........ 30.20

**DIETEMIC** (Loxton Labs., Inc.)
E.m., 4 oz. ea. ........ 1.00
8 oz. ........ 2.00

**DIETENE** (Doyle Pharmaceutical)
Reducing Formula Powder,
Plain or Chocolate, 1 lb. ea. ........ 2.69  21.60
41½ lb. ea. ........ 9.59  5.99

**DIGITEX ℞ (Gerriet Laboratories)**
Capsule, 30 mg.
100s ea. ........ 8.00
500s ea. ........ 37.20

**DIETEZE (Pharmacy Associates)**
Capsule, 30 Day ........ 2.99  14.22
Tablet, 30 Day. ........ 4.95  36.60

**DI-ETYL-STROB, ℞ (Vincent Christino & Co.)**
Ampoule Suspension.
40 mg. [=5027] ea. ........ 2.45
In Oil, 50 cc. [=1068 ] ea. ........ 1.65

**DIETHYLBARBITURIC ACID ℞**
(See Barbital)

**DIETHYLCARBAMAZINE**
Lederle
Hetrazan (See Under Trade Name)

**DIETHYLENE DISTEARATE**
Fritz & Bauer, Inc.
500 Gm. ea. ........ 9.00

**DIETHYLENE GLYCOL**
International Chemical Labs. ℞
1 lb. ........ 24.00
10 lb. ........ 128.00

**DIETHYLENE GLYCOL**
Fritz & Bauer, Inc.
500 Gm. ea. ........ 3.50

**DIETHYLENE MONOSTEARATE**
International Chemical Labs. ℞
1 oz. ........ 12.00
4 oz. ........ 24.00
Fritz & Bauer, Inc.
500 Gm. ea. ........ 2.50

**DIETHYLPROPION HYDROCHLORIDE**
Merrell, Wm. S.
Tenuate & Tenuate Dospan (See Under Trade Name)

**DIETHYLSTILBESTROL ℞**
Academy
1 mg., 100s ea. ........ .28
1000s ea. ........ 2.35
1 mg., E.C. 100s ea. ........ .25
1000s ea. ........ 1.40
5 mg., 100s ea. ........ .40
1000s ea. ........ 3.22
5 mg., E.C., 100s ea. ........ .40
1000s ea. ........ 2.95
25 mg., 100s ea. ........ 1.20
1000s ea. ........ 8.80
American Pharmaceutical Co.
Tablet, U.S.P.
1 mg.,
1000s [=74W] ea. ........ 1.48
5 mg.,
1000s [=75W] ea. ........ 1.95
E.C.,
100s [=76R] ea. ........ .72
1000s [=76W] ea. ........ 5.38
E.C.,
100s [=77R] ea. ........ .79
1000s [=77W] ea. ........ 5.94
25 mg.,
1000s [=78W] ea. ........ 16.20
E.C.,
1000s [=79W] ea. ........ 17.20

✓ Active-Cream
Bex (See Under Trade Name)
Bowman Pharmaceuticals
1 mg., [=9977] 100s ea. ........ 1.30
5000s ea. ........ 5.40
1000s ea. ........ 29.30
5 mg., [=9981] 100s ea. ........ 1.60
5000s ea. ........ 7.25
1000s ea. ........ 36.25
25 mg., 100s ea. ........ 3.65
5000s ea. ........ 16.60
1000s ea. ........ 4.20

**Columbia Medical Co.**
Tablets, 1 mg., 100s ea. ........ 1.40
5 mg., 100s ea. ........ 2.25
25 mg., 1000s ea. ........ 5.50
E.C., 25 mg., 100s ea. ........ 1.50
5 mg., 1000s ea. ........ 3.50
25 mg., 1000s ea. ........ 5.95

**Cooley Pharm.**
Tablet,
1 mg., 1000s [=423] ........ 2.28
5 mg., 1000s [=424] ........ 3.35
E.C., 5 mg.,
1000s ea. ........ 4.25
25 mg., 100s ea. ........ 2.80

**Eastern Pharmaceutical**
Inj., Vial
1 mg., 5 mg. [=249] ea. ........ .47
5000s ea. ........ .20
Tablet,
1 c.c., [=4452] 1000s ea. ........ 2.73
1000s ea. ........ 6.20
5 mg., [=454] 1000s ea. ........ 13.98
1000s ea. ........ 18.98
25 mg., [=477] 1000s ea. ........ 14.99
5000s ea. ........ 34.99

**Merton & Towers**
Tablets, 1 mg., 100s ea. ........ .26
5 mg., 100s ea. ........ .40
25 mg., 1000s ea. ........ 6.75

E.C., 1.0 oz., 100s ea. ........ .45
5 mg., 100s ea. ........ .60
5000s ea. ........ 4.30

**Lilly Labs.**
Tablet,
0.25 mg., 1000s [=16590] ea. ... 3.20
[=NDC-098-36040-01]
0.50 mg., 1000s [=36401] ea. ... 3.50
[=NDC-098-36420-01]
1.0 mg., 1000s [=1590] ea. ...... 4.50
[=NDC-098-36481-01]
5.0 mg., 1000s [=6621] ea. ...... 5.00
[=NDC-098-36482-01]
25.0 mg., 1000s [=3592] ea. ..... 2.00
[=NDC-098-36521-01]
0.50 mg., 1000s [=2526] ea. ..... 3.30
[=NDC-098-36520-01]
8.50 mg., 1000s [=15273] ea. .... 4.85
[=NDC-098-36527-01]
8.50 mg., 1000s [=15283] ea. .... 4.50
[=NDC-098-3528-01]
5.0 mg., 1000s [=6623] ea. ...... 5.00
[=NDC-098-36581-01]
5.0 mg., 100s [=36961] ea. ...... 4.90
[=NDC-098-16961-01]

**Lilly, Eli**
Ampoules in Oil
5 mg., 1 cc. [=385]
4d f ea/NDC-2-P53-36] ...... 2.22
5 cc.
25s [=NDC-2-P53-25] ........ 1.79

**Encosb**
2.5 mg., [=463]
100s [=NDC-2-A39-2] ........ .67
1000s [=NDC-2-A39-4] ........ 5.25
0.25 mg., [=477]
100s [=NDC-2-A20-2] ........ .77
1000s [=NDC-2-A20-4] ........ 5.94
0.50 mg., [=441]
100s [=NDC-2-A21-2] ........ .88
1000s [=NDC-2-A21-4] ........ 6.77
1 mg., [=49]
100s [=NDC-2-A22-2] ........ 1.20
1000s [=NDC-2-A22-4] ........ 7.56
5 mg., [=85]
100s [=NDC-2-A33-2] ........ 2.30
1000s [=NDC-2-A33-4] ........ 17.28
25 mg., [=90]
100s [=NDC-2-A34-2] ........ 5.25
500s [=NDC-2-A34-3] ........ 21.42

**Sandostrogens**
0.1 mg., [=141]
100s [=NDC-2-S07-16] ........ 1.52
50s [=NDC-2-S07-50] ........ 3.60
0.5 mg., [=213]
100s [=NDC-2-S09-16] ........ 1.79
50s [=NDC-2-S09-50] ........ 9.50

**Saron Pack. White Labs**
3.2 mg., [=1461]
100s [=NDC-2-J49-2] ........ .43
1000s [=NDC-2-J49-4] ........ 3.60
0.25 mg., [=1477]
100s [=NDC-2-J52-2] ........ .57
0.5 mg., [=181]
100s [=NDC-2-J51-21] ........ .66
1000s [=NDC-2-J51-4] ........ 4.95
1 mg., [=1491]
100s [=NDC-2-J52-2] ........ .75
5 mg., [=16653]
100s [=NDC-2-J54-2] ........ 2.73
1000s [=NDC-2-J54-4] ........ 2.30
25 mg., [=17281]
100s [=NDC-2-J56-2] ........ 34.99

**Wassermark, S. E.**
(See Catalog Under Wassermark Products)
In Oil, 0.5 F., 25 mg.,
Vial, 10 cc. [=3651] ea. ........ 2.50

*Continued on Next Pages*

**B-D Fever Thermometers**  • ASEPTO  • RED FLASH  • MEDICAL CENTER

ASEPTO, B-D, MEDICAL CENTER and RED FLASH are trademarks



**DIETHYLSTILBESTROL** (Continued)
Merck & Co.
U.S.P. [#63271]
5 Gm. ea. .... .... 2.15
25 Gm. ea. .... .... 8.00
Rabuisen Lab.
Tablets,
C.T.,
1.0 mg., 100s ea. .... .60
1000s ea. .... 3.00
5.0 mg., 100s ea. .... .70
1000s ea. .... 3.70
25 mg., 100s ea. .... 1.25
1000s ea. .... 9.00
E.C.,
0.5 mg., 100s ea. .... .70
1000s ea. .... 3.90
1.0 mg., 100s ea. .... .75
1000s ea. .... 4.20
5.0 mg., 100s ea. .... .80
1000s ea. .... 4.20
25.0 mg., 100s ea. .... 1.60
1000s ea. .... 12.20
Stayner Corporation
Tablets, 1 mg. [#48]
100s ea. .... .95
1000s ea. .... 2.75
E.C., Yellow, [#125]
100s ea. .... .75
1000s ea. .... 4.25
5 mg., [#49]
100s ea. .... .70
1000s ea. .... 3.70
E.C., Red, [#126]
100s ea. .... .80
1000s ea. .... 4.50
25 mg., [#50]
100s ea. .... 1.25
500s ea. .... 4.35
Sunland Pharm.
Oil, 25 mg., vial, 10 c.c. ea. .... 2.15
TMCO
Injectable, 25 mg./oil, 10 cc. ea. .... 2.00
Towne, Paulsen & Co.
Tablet, 1 mg., 1000s ea. .... 3.15
5 mg., 1000s ea. .... 4.20
EC, 1 mg., 1000s ea. .... 4.73
5 mg., 100s ea. .... 1.21
1000s ea. .... 6.30
Atlas Pharm. Labs.
Vial, [#118] 30 cc. ea. .... 1.75
[#136] 10 cc. ea. .... 2.50
[#135] 30 cc. ea. .... 4.00
E.C., 1 mg., 1000s ea. .... 4.50
5 mg., 100s ea. .... 1.25
1000s ea. .... 4.50
25 mg., 100s ea. .... 1.45
1000s ea. .... 9.50
Upjohn
Perles,
1.0 mg., [=NDC-9-127-1]
[#190] 500s ea. ★4.41 AWP 5.29
1000s ea. ★8.28 AWP 9.94
5.0 mg., [=NDC-9-136-1]
[#194] 500s ea. ★9.30 AWP 11.16
1000s ea. ★16.95 AWP 20.34
Vista Pharmaceuticals, Inc.
Tablet
E.C., 1 mg., 1000s ea. .... 1.35
5 mg., 1000s ea. .... 2.50
25 mg., 1000s ea. .... 5.75
Plain, 1 mg., 1000s ea. .... 1.00
5 mg., 1000s ea. .... 2.00
25 mg., 1000s ea. .... 5.50
Wyeth Labs.
Tablet, 5 mg. [#1A740]
[=NDC-8-286-1]
Redipack box of 100s
1 to 39 bxs. ea. ★1.25 AWP 1.47
40 to 99 bxs. ea. ★1.19 AWP 1.43
100 to 249 bxs. ea. ★1.13 AWP 1.36
250 or more bxs. ea. ★1.07 AWP 1.28

**DIETHYLSTILBESTROL DIPROPIONATE** ℞
Blue Line Chemical Co.
Tablet,
1 mg. [#149] 100s ea. .... 1.25
1000s ea. .... 8.50
5 mg. [#150] 100s ea. .... 3.00
1000s ea. .... 21.00
E. C.,
1 mg. [#207] 100s ea. .... 1.25
1000s ea. .... 8.50

**DIETMASTER** (Drugmaster Inc.)
Capsule, 15s .... 3.95 28.80
30s .... 6.95 50.40
Liquid Sweetener, 4 oz. .... .69 5.04

**DIETROL** ℞ (Phila. Capsule)
Capsule, 100s ea. .... 1.90

**DIETROL** (Unique Products)
Tablet, 30s ea. .... 2.00 1.25
60s ea. .... 3.50 2.00
90s ea. .... 5.50 3.00

**DIET-SNACKS** (Super Products)
1 lb. .... 3.00 12.00

**DI-ETTES** (Marsed Labs.)
Crystals, 1/5 oz. .... .98 7.20
1 oz. .... 2.50 18.00

**DIET-TRIM** (Pharmex, Inc.)
Tablet, 21s .... .98 6.00
90s .... 2.93 18.00

**DIET-TUSS** (Approved Pharm. Corp.)
Cough Syrup, 4 oz. .... 1.50 8.80

**DI-FACTOR** (Sutliff & Case)
Tablets, [#CT1376]
100s ea. .... 1.45
1000s ea. .... 9.70

**DI-FEN** ℞ (Kay Pharm. Co.)
Capsule [#C-7] 100s ea. .... 1.35
1000s ea. .... 9.72

**DIFEREX** (Direct Laboratories)
Tablet [#232] 100s ea. .... 2.65
500s ea. .... 8.65
1000s ea. .... 15.75

**DI-FERRIN** ℞ (Ulmer Pharmacal Co.)
Vial [#2060-10] 10 cc. ea. .... 3.50
6 x 10 cc. .... 2.92

**DIFLOR** (Direct Laboratories)
Tablet [#233-A] 100s ea. .... 2.20
500s ea. .... 7.15
1000s ea. .... 13.00

**DIFOLAGEN** ℞ (Atlas Pharmaceutical Labs.)
Inj., vial, 10 cc. [#115] ea. .... 2.00

**DIFURON** (Direct Laboratories)
Tablet [#242] 500s ea. .... 3.42
1000s ea. .... 6.25

**DIGARTRIAL** ℞ (Hildebrand)
Tablets, 100s ea. .... 3.00

**DI-GAS** (Chester Chemical Corp.)
Mildew Preventive, 4½ oz. .... .69 4.97
Junior, 2 oz. .... .35 2.52

**DIGASTROGEN** (Bowman, Inc.)
Tablet [#265] 100s ea. .... 1.50
1000s ea. .... 6.50
5000s ea. .... 32.50

**DI-GEL** (Plough, Inc.)
Liquid, 6 oz. .... 1.15 9.66
12 oz. .... 1.85 15.54
Tablet, 30s .... .85 7.14
56s .... 1.35 11.34
100s .... 1.85 15.54
Trials, 8s .... .25 2.10

**DI-GENIK** ℞ (Savage Laboratories, Inc.)
Liquid, 10 cc. [#100]
[=NDC-281-5260-16] ea. .... 3.04

**DIGENZYME** ℞ (Cumberland Pharmacal)
Tablet, S.C., 100s ea. .... 3.00

**DIGENZYME** (Maurry Biological Co.)
Tablet, 100s ea. .... 2.31
1000s ea. .... 19.92

**DIGERATONE** (Direct Laboratories)
Tablet [#105-A] 500s ea. .... 7.50
1000s ea. .... 14.50

**DIGESTABS** (Bush Labs.)
Tablet, 1000s [#0421] ea. .... 4.25

**DIGESTAIDS** (Friendly Laboratories)
Tablet, 25s .... 1.25 10.00
100s .... 3.00 24.00

**DIGESTA-LAX** (Fibertone Co.)
Tablet, [#35] 50s ea. .... 2.00 1.20
100s ea. .... 3.50 2.10
250s ea. .... 8.00 4.80
500s ea. .... 15.00 9.00
1000s ea. .... 28.00 16.80

**DIGESTALIN** ℞ (Conal Pharmaceuticals, Inc.)
Tablet, 100s [#2377] ea. .... .65
1000s [#2378] ea. .... 5.00

**DIGESTAMIC** ℞ (Metro Med Inc.)
Liquid, 8 oz. ea. .... 4.90
1 gal. ea. .... 57.00
Tablet, 50s ea. .... 4.00
500s ea. .... 36.00

**DIGESTAMIC NO. 2** ℞ (Metro Med, Inc.)
Tablet, 50s ea. .... 3.50
500s ea. .... 32.00

**DIGESTANS** (Moore Kirk Laboratories)
Elixir, [#E-20] 4 oz. ea. .... .80
Pt. ea. .... 2.15
Gal. ea. .... 11.95

**DIGESTANS** ℞ (Philadelphia Capsule Co.)
Capsule, 100s ea. .... 1.90

**DIGESTANT** ★ (Canright Corp.)
Tablets, 100s ea. .... 6.25 3.75
1000s ea. .... 56.25 33.75

**DIGESTANT-M** (Fibertone Co.)
Tabs., [#34] 50s ea. .... 1.40 .84
100s ea. .... 2.50 1.50
250s ea. .... 5.50 3.30
500s ea. .... 10.00 6.00
1000s ea. .... 18.00 10.80

**DIGESTESE** (Sewan Research)
Tablet, 20s .... 1.00 6.00

**DIGESTEX** (Pasadena Research)
Tablet, 100s [#294] ea. .... 4.50 2.70

**DIGESTIN** (Robinson)
Tablets [#106] 100s ea. .... .95
1000s ea. .... 7.90

**DIGESTIVE** (Cowley Pharmaceuticals)
Tablet, 1000s [#2407] ea. .... 3.30

**DIGESTIVE JR.** (Jenkins Labs., Inc.)
Tablet, 1000s [#J-37] ea. .... 3.50

**DIGESTIVEL** (Corvit Pharm.)
Tablets [#507] 100s ea. .... .70
1000s ea. .... 6.00

**DIGESTOSAL** (Purepac)
Powder, 5 oz. [#017] .... 1.19 7.20

**DIGESTOVAN** (Vanol Chemical Co.)
Tablet, 1000s ea. .... 16.80

**DIGESTOZYME** (Wesley Pharmacal)
Tablet, 50s ea. .... 3.50

**DIGESTULES** ℞ (Caldwell & Bloor Co.)
Tablets [#2385] 100s ea. .... 2.08
1000s ea. .... 15.86

**DIGEX** (Crlame)
4 oz. .... 1.00 7.20

**DIGICARDALIS** ℞ (Westerfield Labs.)
Tablet, 100s ea. .... .95

**DIGIFOLIN** ℞ (Ciba)
Ampuls, 2 ml.
5s ea. .... 1.10
20s ea. .... 3.75
Oral Solution
1 fl. oz. bot. ea. .... 1.20
Tablets, 1½ gr.
50s ea. .... 1.20
500s ea. .... 8.50

**DIGIFORTIS** ℞ (Parke, Davis)
Ampules, 1 c.c.
10s [#3-173-10]
[=NDC-71-1204-10] ea. ★3.54 AWP 4.25
Kapseals,
100s [=15-351-41]
[=NDC-71-351-41] ea. ★1.29 AWP 1.55
500s [=15-351-81]
[=NDC-71-351-81] ea. ★5.10 AWP 6.12
5000s [=15-351-13] ea. ★39.90 AWP 47.88
Tablets,
50s [#25-687-50]
[=NDC-71-687-50] ea. ★.63 AWP .79
1000s [#25-687-11]
[=NDC-71-687-11] ea. ★7.98 AWP 9.58

**DIGIGLUSIN** ℞ (Lilly, Eli)
Tablets,
S.C., [#660]
100s [=NDC-2-C09-2] ea. .... 1.35
500s [=NDC-2-C09-3] ea. .... 4.83

**DIGI-KO** ℞ (Bio-Ko Research Corp., Inc.)
Tablet, 100s ea. .... 4.50

**DIGIKOTE** ℞ (Canfield, C.R.)
Capsule, T.D.
0.15 mg., 100s ea. .... 3.75
500s ea. .... 16.87
1000s ea. .... 31.87
0.3 mg., 100s ea. .... 3.95
500s ea. .... 17.77
1000s ea. .... 33.57

**DIGISINE** (Century Pharmacal Co.)
Liquid, 1 oz. ea. .... 5.00 3.50

**DIGITALINE NATIVELLE** ℞ (Fougera)
(See Catalog Under Fougera)
Injection
Intramuscular, 0.20 mg./cc.
1 ml., 6s ea. .... 1.30
50s ea. .... 7.50
2 ml., 6s ea. .... 1.70
50s ea. .... 11.70
Pediatric Elixir, Solution 1:2000
55 ml., ea. .... 1.80
Oral Solution 1:1000
10 ml. ea. .... 1.50
Tablets, 0.10 mg., 40s ea. .... .70
100s ea. .... 1.60
250s ea. .... 3.80
1000s ea. .... 11.50
0.15 mg., 40s ea. .... .80
250s ea. .... 4.20
0.20 mg., 40s ea. .... .85
100s ea. .... 2.00
250s ea. .... 4.60
1000s ea. .... 14.00

**DIGITALIS** ℞
American Quinine
Tabs., 0.1 gm., 1000s
[=T-822] ea. .... 2.10
Amar-Stone Labs.
Tablet, 100s [#6270] ea. .... 1.00
1000s [#6272] ea. .... 8.00
Bowman Pharmaceuticals
Capsule, 1½ gr.,
100s [#581] ea. .... 1.60
1000s ea. .... 9.95
5000s ea. .... 49.75
Burroughs Wellcome
Tabloid Brand Leaf
Tablets, 1½ gr., 100s ea. .... .69
1000s ea. .... 4.56
Cowley Pharmaceuticals
Tablet, 1½ gr.,
1000s [#420] ea. .... 2.00
E.C., 1000s [#421] ea. .... 3.00
Davies, Rose-Hoyt
Pil-Digis (See Under Trade Name)
First Texas
Tincture, ¼ pt. ea. .... .95
Pt. ea. .... 3.24
Gotham Pharmaceutical
Tablet, 1½ gr.,
1000s [#396] ea. .... 2.20
Don Hall Labs
1½ gr. C.T. Scored
100s ea. .... .75
1000s ea. .... 3.80

for
Digitalis U.S.P.
see
PIL-DIGIS®
DAVIES ROSE HOYT
Pharmaceutical Division
The Kendall Company
Needham, Mass. 02194
Kendall

*For prices and sizes see previous column*

Kirkman Laboratories, Inc.
Tablet
60 mg. [#1815]
100s ea. .... .45
1000s ea. .... 2.40
100 mg. [#1826]
100s ea. .... .50
1000s ea. .... 2.60
Lederle Laboratories
Tablets, 1 Unit
1½ gr.
100s [#4472-23]
[=NDC-5-4472-23] ★1.00 AWP 1.20
1000s [#4472-34]
[=NDC-5-4472-34]
Ea. ★3.74 AWP 4.49
5000s [#4472-37]
[=NDC-5-4472-37]
Ea. ★16.93 AWP 20.32
Tinct. [#36]
¼ pt. ea. .... .81
1 pt. ea. .... 2.76
Lilly, Eli & Co.
Pulvules [#220]
100s [=NDC-2-F32-2]
Ea. .... 1.06
1000s [=NDC-2-F32-4]
Ea. .... 8.51
Tincture, [#36] 4 oz.
[=NDC-2-Y59-58] ea. .... 1.26
Mallard
Digi-Test (See Under Trade Name)
Massengill, S. E.
(See Catalog Under Massengill Products)
Leaves, N.F. 1½ gr.,
Capsule,
1000s [#2615] ea. .... 8.70
Merck Sharp & Dohme
(See Catalog Under Merck Sharp & Dohme)
Tablet, 0.1 Gm. [#1435]
1000s ea. .... ★2.38
Penick, N.Y.O., Chemical Division
Powder, ¼ lb. ea. .... 3.75
Raymer
Tablets, E.C.,
1½ gr., 100s ea. .... 1.25
1000s ea. .... 6.30
Robinson Lab.
Tablets,
C.T., 1½ gr., 100s ea. .... .25
1000s ea. .... 3.20
Roche Labs.
Digalen (See Under Trade Name)
Sandoz
Acylanid, Digilanid (See Under Trade Names)
Stayner Corporation
Tablet, 1½ gr., [#195]
100s ea. .... .45
1000s ea. .... 3.10
Stoddard
Tablets,
1½ gr., 100s ea. .... .70
500s ea. .... 2.20
1000s ea. .... 3.80
1½ gr., E.C., 100s ea. .... .80
500s ea. .... 2.70
1000s ea. .... 4.80
TMCO Pharmaceuticals
Tablet 100 mg.
100s ea. .... 3.25
E.C., 100s ea. .... 4.75
Upjohn
Digitora (See Under Trade Name)

**DIGITALIS LEAVES**
Horton & Converse
Tablet, ½ gr., 100s ea. .... .45
1000s ea. .... 2.25

**DIGITEX** (Cal-U-Dee)
(See Catalog in Display Section)
Fingertip Moistener
Liquid, 2½ oz. ea. .... .75
Pad ea. .... .50

**DIGI-THYROID** ℞ (Endocrine Co.)
Tablet, 1000s ea. .... 3.00

**DIGITONE** (Mertens & Son)
Ointment, 2 oz. .... 1.50 .... 1.00

ARMOUR THYROID
QUALITY AND DEPENDABILITY FOR ALL THYROID USP RX'S

1970

Sti-Str    Pg. 552

Prices are listed in this order: • Retail FTM; Retail Price; Whsle. Price To Retailer; ✸ Price On Direct Basis—Per dz., ea., or as specified.

AMERICAN DRUGGIST BLUE BOOK

## STILLMAN'S
### Freckle Cream

Not only lightens freckles but
also can be used to make skin
lighter, softer and smoother.
National magazine advertising

**STILLMAN COMPANY**
Aurora, Illinois

## STOCKINGS, ELASTIC

See Listing Under
**FUTURO**
Modern
Health Supports



## See
### STIEFEL LABS. CATALOG
Page 551

## See
### STRASENBURGH LABS.
Product and Price Information
Opp. Page 578

---

**ARMOUR THYROID**      QUALITY AND DEPENDABILITY FOR ALL THYROID USP RX'S

**EXHIBIT 7**

*JAMA, Dec 22, 190:*

# Description of the Identification Guide

*John J. Hefferren, PhD, Chicago*

THE NEED to identify an unknown tablet or capsule may occur in many situations, varying from the emergency treatment of a poisoning in a hospital receiving room to the detailed study of the cause of death in a coroner's laboratory. In the emergency situation, the time factor, together with limited quantities of the unknown drug product, make identification difficult and often impossible. Even when the quantity of drug sample and the time factor are favorable, the identification can be a long and difficult task for a laboratory staff skilled in drug identification and possessing extensive physical and chemical information on available drugs.

During the time I worked at the AMA Chemical Laboratory, the development of an identification guide based on the physical characteristics of tablets and capsules, such as shape, color, and size, was undertaken as a possible aid in drug identification. It is hoped that such a guide would act as a screening mechanism to reduce the number of possible identities of an unknown drug product. This reduction in the number of possible identities would make it feasible to achieve positive identification with relatively few laboratory tests. After the screening procedure of the guide, further information could be obtained from simple characteristics, such as taste and odor, eg, for saccharin-and thiamine-containing products. In the instance of a poisoning, the symptoms of the patient, together with the screening of the identities of the causative agents to a relatively few, may be adequate to initiate supportive, if not specific, therapy as a prelude to rapid laboratory confirmation. Such a situation may arise when a suspected barbiturate poisoning occurs, and a possible identity of the unknown drug product is made from the listing in the guide of barbiturate-containing products.

### Pilot Studies

When initial studies with relatively small numbers of drug samples in tablet and capsule form were encouraging, pilot studies were enlarged to include 500 tablets and capsules. These samples were obtained from the drug files at the American Medical Association, from physicians' samples, and from local drugstores. These drug products were not selected according to any use-frequency statistics but were selected on the basis of a representa-tive cross section of the physical characteristics of the tablets and capsules commercially available.

From the experience gained in examining these 500 products, a tablet and capsule dosage-form identification guide was developed. This guide was designed to help in identifying an unknown by selecting appropriate characteristics for the unknown tablet or capsule from the series of categories of physical characteristics. This process of selection would result in the elimination of many individual drug preparations and in the eventual restriction of the remaining possible identities to a relatively few products.

After these pilot studies with the 500 products were successfully completed, the guide was discussed in detail with representatives of various agencies and with specialty groups to determine the feasibility and need for such a guide in their particular areas. These included physicians, personnel in emergency receiving rooms, toxicologists, pharmacists, and medical examiners as well as representatives of government agencies, of poison control centers, of pharmaceutical industry, and of law enforcement agencies.

In all of these areas, there is a problem of drug identification. In each of these groups, the magnitude and frequency of the problem as well as the staff and available equipment varied, but there was a general consensus that such a system would be very valuable in their work. With the success of the pilot studies and the established need and usefulness of the identification guide, the extensive task was begun of gathering and describing the drugs in tablet and capsule form that are on the market.

### Solid Dosage Identification System

The dosage identification guide (Fig 1) was constructed to accommodate all of the individual tablet and capsule preparations then on the market as well as new preparations.[1] The three main categories of the guide are tablets, soft gelatin capsules, and hard gelatin capsules. In each of these three categories is listed a number of terms to describe the individual product characteristics under such headings as coating, shape, type of contents, coloring, markings, scoring, and size. The code number assigned to each product included in the identification guide is composed of the number of the term under each category which best describes the product (Fig 6, 7, and 8).

Director, Division of Chemistry, Council on Dental Therapeutics, American Dental Association.

Case 1:04-cv-12725-MBB     Document 67-10     Filed 05/01/2006     Page 3 of 14



Fig 1.—Dosage identification guide.

When the data on the physical characteristics of tablets and capsules were tabulated each of these terms under each category was assigned a number, indicating the position of the term within that category. The three main types of dosage forms were designated: tablets-1, soft gelatin capsules-2, and hard gelatin capsules-3. Thus, a code number of 11341-1111 for a particular drug product would indicate the following physical characteristics: *main type*—tablet (1); *coating*—uncoated (1); *top view*—round (3); *side view*—flat without bevel (4); *type of coloring*—solid (1); *outside color*—white (1); *markings*—unmarked (1); *number of inside colors*—single (1); *inside color*—white (1); and *scoring*—unscored (1). A tablet with these characteristics could be a typical one-eighth-grain saccharin tablet.

The numerical reference system within and between each category is basic to the identification guide and will be used in subsequent descriptions and discussions. This system has facilitated tabulation of the physical characteristics in data processing systems.

Throughout the various categories of the guide, especially those involving color and markings, there are a number of arbitrary rules for selecting the appropriate term under each category. These rules are described in detail in the following sections. It is important that these rules be carefully followed because, unless the proper characteristics are selected to achieve the code number designation, it will not be possible to correctly utilize the guide.[2]

*Shapes.*—The shapes utilized in the guide to define the physical characteristics of tablets and capsules are illustrated in Fig 2. The outline of the shape indicated by the top view does not differ for uncoated and coated tablets. Differences due to the method of manufacture of these tablets do occur in the side view shapes. Both film coated and sugar coated tablets are prepared by coating an uncoated tablet which then acts as a core of the coated tablet. Since the film coated tablet has a very thin coating, the general shape of the uncoated tablet core is retained. In many such cases, the markings or scoring on the tablet core are designed to be visible through the finished film coating. The coating on the sugar coated tablet is applied in several coating steps. This procedure, involving tumbling the tablet cores in revolving drums, causes all of the ridges of the uncoated tablet core to be rounded. Since cores with side view shapes 1 to 4 (Fig 2B) will be rounded into the biconvex shape by this coating process, most sugar coated tablets are biconvex.

In this particular issue of the guide, tablets which are uncoated but have a core have been grouped with the sugar coated tablets. The inside or core color of these tablets refers to the core only, in spite of the depth of a pressed-powder



A. Uncoated, Film Coated, and Sugar Coated Tablets (TOP VIEW)

1. Hexagonal
2. Elliptical
3. Round
4. Oblong
5. Square
6. Triangular

B. Uncoated and Film Coated Tablets (SIDE VIEW)

1. Flat-Convex
2. Biconvex
3. Flat 3 Bevel
4. Flat a Bevel
5. Round

C. Sugar Coated Tablets (SIDE VIEW)

2. Biconvex
5. Round

D. Soft Gelatin Capsule (SIDE & END VIEWS)

1. Elliptical
2. Oblong
3. Round

E. Hard Gelatin Capsule (SIDE & END VIEWS)

1. Conventional
2. Bullet-like

Fig 2.—Common tablet and capsule shapes.

(uncoated) outside layer or coating. The uncoated tablets grouped with the sugar coated tablets can be recognized by the fact that these tablets will have three discrete measurements. All sugar coated tablet shapes, with the exception of a spherical tablet, have just two discrete measurements.

Some sugar coated tablets are quite similar to soft gelatin capsules. The essential differences are that the soft gelatin capsule has a seam at the point of closure of the two halves (Fig 2D), and the contents can be liquid, paste, or powder. The sugar coated tablet will not have a seam and will have a compressed or solid-like core.

Since the end views of all soft and hard gelatin capsules are essentially round in shape, the side view category for the capsules was eliminated and a transparency category was substituted (Fig 1). This physical characteristic refers to the capsulating material rather than the intact capsule. It is sometimes difficult to determine the type of contents or the transparency, or both, of a particular intact soft or hard gelatin capsule. Thus, it may be necessary to come back to these categories after the other outside characteristics such as color, size, and markings have been determined. The opaque-clear term in the transparency category has been included to describe a capsule with an opaque top half and a clear bottom half, or vice versa.

*Outside Coloring.*—Uncoated tablets are pre-

pared by compressing in a die a mixture of tablet-ing ingredients such as binders, lubricants, dis-integrating agents, etc with the active ingredient. Since most of these tableting ingredients are white or near white, the final color of such a tablet will depend upon the color of the drug. For example, riboflavin tablets would normally be orange in color since riboflavin itself is a deep orange. In most cases, however, the tablet color is due to the addition of a dye to the tableting mixture before compression of the tablet. The final tablet color will depend on the uniformity in the mixing pro-cedures. In the *type of coloring* category, an un-coated tablet will be termed *solid* when a single dye is used in the white tableting mix. Thus, all of the individual variations due to the degree of homogeneity of the dye in the tablet mixture will be purposely avoided, and all such products will be termed *type of coloring*—solid.

The *speckled* term of the *type of coloring* cate-gory is reserved for specific instances in which multiple dyes and purposeful heterogeneous color-ing are present. Examples of uncoated, speckled tablets are the multicolored Spacetabs of Sandoz. In general, the *mottled* term of the *type of coloring* category has been abandoned, and tablets initially described by that term were transferred either to those tablets classified as *type of coloring*—solid or speckled.

A laminated tablet consists of two or more dif-ferent colored tableting mixes compressed into one tablet. Such a tablet would have a top and a bot-tom of different colors such as the green- and yel-low-colored Zactirin tablets of Wyeth.

With soft and hard gelatin capsules, the out-side color equivalent to the *type of color* category for tablets has been designated simply as the *number of outside colors*—single or multiple. The same information is obtained indirectly by describ-ing the *type of coloring* of a tablet. When a tablet or capsule has more than one color, only one color term is selected. This selection is based on the ar-bitrary decision to always select the term with the lowest number in the particular category (Fig 6, 7, and 8). For example, an unmarked soft gelatin cap-sule with one half colored white and the other half red would be designated *number of outside colors*—multiple (2) and *outside color*—white (1) be-cause white has a lower outside color number, 1 vs 5 as indicated on the coding card for soft gelatin capsules. In most cases, however, there will be some characteristic of the dosage form which de-termines the selection of both the *inside* and *out-side color terms*.

The coding color of an unmarked and unscored laminated tablet will follow the usual lowest num-ber rule. If one side of the tablet is marked (with a firm name, symbol, etc), the color of that side takes precedence over the lowest number rule. If both sides are marked, eg, firm name on one side

and symbol on the other, the color of the side with the firm name is the code color because within the *markings* categories, as shown on the tablet code card, the term *firm name* (2) has a lower num-ber than symbol (4). Similarly, the scored side takes preference over the side with no marking or scoring.

When soft gelatin capsules have multiple outside colors, the coding color will be that color on which a marking of any type appears. If there is no mark-ing, the color with the lowest number will be used as the coding color.

The color of the cap of the hard gelatin capsule is used to determine the initial *outside color* cate-gory. For example, a capsule of Darvon Compound of Eli Lilly has a gray cap and pink-colored body, so the *outside color* category term would be gray.

*Inside Coloring.*—Although all sugar coated and film coated tablets necessarily have cores, until recently this was true of very few uncoated tablets. New tableting processes have made it possible to manufacture uncoated core-type tablets for many special purposes such as those designed for re-lease in the intestine (enteric coated) or for sus-tained release. The depth of the outside layer of a compressed powder, core-type tablet may be sig-nificantly greater than the comparable sugar or film coated tablet. With these core-type uncoated tablets, the terms selected for the *number of inside colors* and *inside color* categories are determined by the characteristics of the core.

The same general principle applies to film coated and sugar coated tablets. Sugar coated tablets will frequently have numerous subcoats of different types of material. Although each type of subcoating layer may have a different color or shade of the same color, the colors of these layers are not in-cluded in the *inside color* category. The *number of inside colors* is restricted to the colors of the core proper, which is usually an uncoated tablet or a compressed wax-like core.

With soft and hard gelatin capsules, the *number of inside colors* and the *inside color* categories refer to the contents within the gelatin-capsulating material. When the significantly greater portion of the capsule contents or tablet core is one color, this predominant color is the code color. With hard gelatin capsules containing pellets, it is usually difficult to determine the predominant color; thus, the color of the pellet which has the lowest code number is the *inside color*.

*Selection and Description of Color.*—The color of a tablet or capsule containing a drug, like the color of any product, is extremely useful in differ-entiating the product of one manufacturer from that of another or for differentiating the various products of the same manufacturer. It is, however, extremely difficult to describe or define the color of a particular sample so that another individual will be able to differentiate the described color from

other similar colors. In the identification guide, the color of a particular drug product is first defined in terms of ten broad color terms. Soft and hard gelatin capsules have an 11th term, colorless, to describe the gelatin-capsulating material to which no dye has been added. In some cases, this gelatin-capsulating material without added dye may be a very light yellow.

It is recognized that the decision as to which of the 10 or 11 color terms best describes a particular product may be difficult. However, in almost all situations, the particular product could be described by 2 or at the very most 3 of the 10 or 11 terms. When it is difficult to decide whether a particular product is, for example, green or blue, the product will be listed under both colors in the guide.

After this preliminary description of the inside and outside colors, the outside color of the product will be described in terms of 60 reference colors (plus black which is not illustrated) as shown in the Drug Identification Guide Standard Color Chart. These colors have been selected on the basis of the dyes available to the pharmaceutical industry for the coloration of pharmaceutical products. The particular dye combinations used in the preparation of these reference colors have been formulated to minimize the effect of lighting on comparisons of the reference and product colors.

The original selection of 60 color chips was made by Mr. Carl Foss. The 60 colors reproduced in the Drug Identification Guide Standard Color Chart were deposited by a special process using nitrocellulose lacquers to duplicate as nearly as possible the original colors selected by Mr. Foss.

Each of the 60 colors in the color chart is described by an arbitrary code number and by one of the ten broad color terms used initially to describe the inside and outside colors of tablets and capsules. This designation of the ten color terms can be used as an aid in deciding which one of the ten color terms best describes the color of a given dosage form, for this same procedure has been used by the individual who coded the products for the identification guide. Ordinarily this reference to a specific color is not necessary, but it may be useful.

*Markings.*—Many products will be imprinted with more than one type of marking listed in the *type of marking* category of the guide. For example, many tablets will have a firm name or an initial and a symbol. The application of the usual lowest number rule to such circumstances would mean that the firm-symbol and initial-symbol combinations would be termed *type of marking* (2) and (3), respectively. In this issue of the guide it was decided that the presence of a symbol would take precedence over all other markings. Thus, both of these markings, which have a symbol and some-

thing else, would be termed *type of marking* (4) referring to the presence of a symbol.

As a convenience, all the markings (imprints) of products coded have been catalogued according to the system of Widdifield and co-workers in the Guide to Symbols and Imprints. This catalogue is independent of the basic code number which was assigned to the particular product by the selection of the appropriate descriptive terms from the identification guide. Thus, it is much like the set of color chips which, as an adjunct to the guide, is used to describe more accurately the color of a particular product.

*Size Measurements.*—All measurements of tablets and soft gelatin capsules were made with a vernier calipers reading to 0.1 mm. For uncoated tablets, three dimensions in decreasing order are recorded in the guide. These dimensions are usually the diameter, total thickness, and thickness at the bevel, respectively. With certain tablets such as those with oblong shapes (Fig 1), there are four measurements recorded on the cards in our files; however, only the largest three of these appear in the guide. Sugar coated tablets and soft gelatin capsules normally have two discrete measurements. The exceptions are the spherical tablets and capsules which have only one discrete measurement. The uncoated tablets which have a core and have temporarily been grouped with the sugar coated tablets in the guide will have three discrete dimensions. In this way, these tablets (core, three dimensions given) can be differentiated from the sugar coated tablets (two dimensions given) in the same listing.

The size of a hard gelatin capsule was determined by comparison to a chart of standard capsule sizes (Fig 9). These capsule sizes are accepted throughout the pharmaceutical industry and represent the most convenient way to describe the size of a hard gelatin capsule. If a calipers or metric ruler is not available, a metric scale is illustrated in Figure 10.

### Use of the Guide

To illustrate the use of the guide and the coding procedure, there are illustrated in Figures 6, 7, and 8 the application of the system to three specific products. The top of each figure illustrates the selection of the appropriate term from each category which best describes the sample. This selection is followed by the dimensions of the sample and the number of the color reference from the 60 colors (plus black) which provides the best color match. The marking (imprint) on the tablet refers to the marking index system described in the Guide to Symbols and Imprints. The letter-number designation for each firm is that utilized by the *Red Book* and is given in the accompanying list of Manufacturers.

On the bottom half of each figure is the coding

card used to describe this product. This card again points out the importance of the code on the top line of the card. It is this number which provides an entry to the list of tabulated physical characteristics (Table 1).

### Table 1.—Tabulation of Physical Characteristics

The entries in tabulated list of physical characteristics for Tridel (Fig 6), Dilantin in Oil (Fig 7), and Co-Pyronil (Fig 8) appear as follows:

| Trade Name | Dosage | Firm | Size, Mm | Color | IMP |
|---|---|---|---|---|---|
| 11211-14113 Tridel ..................... | .. | LA 34 | 8.4, 3.9, 2.0 | 13 | BC-7 |
| 24111-4111 Dilantin in Oil ............. | 100.0 | PA 47K | 11.4, 7.9 | 8 | .. |
| 32212-41118 Co-Pyronil ................. | .. | LI 27 | 9 | 24 | .. |

The dosage is given in milligrams. The firm is identified by the code reference of the Red Book. (See list, Manufacturers.) The outside color or other color selected by the procedures of the guide is defined in terms of the color reference chip which provides the best available color match. The last column indicates the code reference to the specific markings of the product (Abbreviations Used in the Tabulation).

The table in Figure 6 illustrates the use of the guide. To properly code this tablet product, it is necessary to select from each of the 11 categories of the tablet division of the guide (Fig 6) the terms which best describe this tablet. In this case, these terms would be *coating—uncoated, top view—round, side view—biconvex, type of coloring—solid, outside color—white, markings—initials, number of inside colors—single, inside color—white (no color), scoring—unscored, dimensions—diameter 9.6 mm, total thickness 3.9 mm, bevel thickness 2.0 mm, and color notation—white.*

The use of the guide is further illustrated in the identification of the second and more difficult ex-



Fig 3.—Two sample tablets.





Fig 4.—Breakdown of 2,171 products.

ample shown at the right in Figure 3. In the previously selected example, the tablet was distinctively marked, making the probability of a complete duplication of its physical characteristics small and thus making tentative identification by the guide relatively simple. The tablet on the right in Figure 3 illustrates the use of the guide in the most difficult area of identification. The tablets in Figure 3 have the same physical characteristics except that the one on the right has no markings and is 0.2 mm thicker. The problem of identifying such an unmarked tablet under normal circumstances would be very difficult. Assuming that this product has been coded into the identification guide and is now one of the 2,171 products listed in the guide at the time the flow chart was prepared, it is possible to demonstrate the ability of the guide to separate the various coded products on the basis of their physical characteristics. Figure 4 is an abbreviated flow chart showing the flow of the sample (an uncoated, round, biconvex, solid colored, white, unmarked, and unscored tablet) through the categories of the scheme, which progressively decreases the number of possibilities from 1 of 2,171 down to 1 of 150. In this flow chart, some of the categories of Figure 1 such as *inside color* have been left out of the drawing, since they do not apply to the particular example.

At this point, 2,021 of the 2,171 possibilities have been eliminated, and any further narrowing of the possibilities has to be achieved by using the dimensions and more exact color notations. In Table 2, there are listed the 12 uncoated, round, bicon-

Table 2.—Tablets Among the 2,171 Products with Identical
Physical Characteristics and Similar Dimensions
to the Unmarked Tablet in Figure 3

| A | B | C | Drug |
|---|---|---|---|
| 10.3 | 4.0 | 2.5 | |
| 8.7 | 6.0 | 4.3 | Acetylsalicylic acid, phenacetin, and caffeine citrate preparation |
| 8.7 | 4.5 | 2.9 | Na Carboxymethylcell |
| 9.6 | 5.1 | 2.6 | Phenobarbital |
| 9.6 | 4.7 | 2.7 | Acetylsalicylic acid, phenacetin, and caffeine citrate preparation |
| —9.6 | 4.3 | 2.0 | Nicotinic acid— |
| 9.6 | 6.4 | 3.6 | Aminopyrine |
| 9.5 | 6.0 | 3.5 | Acetophenetidin |
| 9.5 | 6.0 | 3.3 | Acetophenetidin |
| 9.6 | 5.5 | 2.9 | Salol |
| 9.5 | 4.8 | 2.1 | Methenamine |
| 9.5 | 4.0 | 1.4 | Bismuth subnitrate |
| 9.5 | 5.9 | 3.6 | Triple bromides |
| 9.5 | 5.0 | 4.0 | |

A = diameter in millimeters; B = thickness in millimeters; C = thickness less bevel in millimeters.

vex, white, unmarked, and unscored tablets with diameters close to those of the tablet to the right in Figure 3. Careful examination of the dimensions of these tablets indicates that the illustrated sample, marked with a dash, is sufficiently different in size from the other tablets in the group to suggest that it is a good possibility for confirmatory tests. The sets of dimensions at the top and at the bottom of the figure (10.3, 4.0, 1.3 and 8.8, 5.8, 4.8) are those of the largest and smallest tablet products within this group of 150 products.

The uncoated, round, biconvex, white, unmarked, and unscored tablets such as the one on the right in Figure 3 are the most difficult group of products to identify. This group of tablets is, however, somewhat self-limiting. As the total number of tableted drug products with these physical characteristics (which are included in the guide) increases, the number of individual drugs increases at a much slower rate. Thus, such drugs as analgesics, antacids, barbiturates, and sulfas constitute the majority of the drugs marketed as tablets with these physical characteristics. In addition, the quantity of drug in the tablet determines to some extent the physical size of the tablet. Consequently, the tabulation of the tablets according to physical size in millimeters stratifies the particular types of drugs. These factors help to make the identification of these products easier than might be first anticipated and may also be helpful in the identification of a tablet not now in the guide.

#### Comment

The data reported for the dimensions of tablets and capsules are subject to three sources of variation. These are the variation due to manufacture, limitations of the measuring device, and precision of the measurements. The magnitude of these sources of variability will be dependent, in part, on the particular type of tablet or capsule.

Due to its method of manufacture, the size of an uncoated (pressed-powder) tablet is most readily reproduced within the same lot and between lots. The diameter of such a tablet is determined by the diameter of the die used in the compression of the tablet and is usually duplicated to within 0.1 mm. On the other hand, the total thickness is a less accurate dimension because of manufacturing variables such as granulation density and compression pressure. The duplication of this dimension, however, is usually within 0.3 mm, depending to some extent on the size of the tablet. The measurement at the bevel edge is related to and has the same variables as that of the total thickness, plus the added variable due to greater difficulty in obtaining as accurate a reading at the edge of tablet with a measuring device. Thus, the dimensions of uncoated tablets, in decreasing order of reproducibility, are diameter, total thickness, and bevel thickness.

The shape and curvature of the tablet are determined by the die, so that, while granulation and pressure effects may or may not exert an effect on the size, the dimensional relationships will remain. Thus, although it is important to compare the diameter or thickness of two tablets, it is more important to consider the relationship of all the measurements taken as a set, using the diameter as the key dimension.

In Figure 5, there are illustrated three tablets with the same diameter and relatively small thickness differences; however, it is apparent that the shape and size of each are quite different. To a large extent this is due to the difference in curvature of the products. An indication of the degree of curvature of a tablet or a comparison of the curvature of two tablets with the same diameter can be obtained from the two thickness measurements.

With film coated and sugar coated tablets and soft gelatin capsules, there is a wider range of di-



| | A | B | C |
|---|---|---|---|
| A | 9.5 | 4.0 | 1.4 |
| B | 9.5 | 4.1 | 2.0 |
| C | 9.5 | 5.5 | 3.9 |

Fig 5.—Effects of small differences in total and bevel thickness of tablets.

Case 1:04-cv-12725-MBB     Document 67-10     Filed 05/01/2006     Page 8 of 14

mensional variability than with uncoated tablets because of the very nature of the manufacturing methods. With the exception of film coated tablets, these products do not have a bevel measurement and, as a result, have one less discrete measurement than does the comparably shaped, uncoated tablet. Thus, the measurements of the dimensions of film and sugar coated tablets and soft gelatin capsules are somewhat less definitive than are those of an uncoated tablet; however, this is somewhat offset by the many colors and types of contents which these products usually have.

It should be recognized that the dyes used in coloring tablets and capsules, as well as a colored drug which may be responsible for the final product color, will undergo color changes depending on exposure to light, heat, and atmospheric conditions. Generally, these color changes are not significant for those drug products at the time of dispensing. The drug products subsequent to dispensing may be stored under somewhat less than ideal conditions and may be handled by the user. Thus, sugar coated tablets which normally have a high gloss may be dull due to handling, or a soft gelatin capsule may be misshapen due to storage in a hot place.

### Extensions of the Identification Guide

The physical characteristics and terminology (Fig 1) are the result of many discussions and compromises which were made to make the guide as useful as possible to a number of groups with different interests, training, and facilities. The physical characteristics of tablets and capsules utilized for identification are well defined and have been measured with a relatively high degree of accuracy. The end use of the guide will determine the attitude toward physical characteristics, such as color and size, and how accurately these particular characteristics should be measured. It is quite probable that a few individuals would prefer to make their measurements with a micrometer which is accurate to a hundredth of a millimeter, whereas a much larger group would obtain adequate information from measurements made with a good quality metric ruler.

Certain laboratories have, and others may want to obtain, more accurate descriptions of the color of the tablets and capsules. Standard color reference texts such as Munsel color books, with more than a thousand reference colors may be useful in this area. The spectrophotometric definition of color, using the tricoordinate system, offers still another approach to the more accurate definition of color.

Since uncoated tablets are compressed in steel punches or dies, the dimensional measurements of these tablets can approach a study in ballistics. Such measurements as the degree of curvature of the biconvex or other curving surfaces, the depth and angle of the scoring, marking, and the angle of

bevel are valuable measurements which can be made with a micrometer equipped with suitable accessories.

These more accurate definitions of color and size can be valuable in the identification of drug products that have very similar physical characteristics and that have no specific identifying markings. It should be recognized, however, that the accurate measurement of an individual physical characteristic, which is highly variable between individual samples of the same manufacturing lot, is of little value. Thus, all these measurements are limited to some extent by the variability of the individual type of product.

A guide for the identification of molded and tableted suppositories also has been developed. The same basic principles as well as many of the same categories and terms have been utilized, so that this type of dosage form might be incorporated at a later date into the general AMA identification guide for solid dosage forms.

Certain types of drug products may be of more particular interest to a specific area of activity. For example, a psychiatrist might be more interested in those drugs used in the care of patients with mental disease. Certain law enforcement agencies might be interested in those drugs which tend to move in illicit drug markets. Such breakdowns will be possible with the data on physical characteristics tabulated in a data processing system. Abstracts of certain areas of the guide will necessarily require the intact guide for basic reference.

### Other Systems

Almost every group or laboratory involved in the identification of drug products has for years maintained a limited library of most frequently encountered drug products. Many times this library takes the form of display boards, with mounted authentic samples of drugs. In 1956 and 1958 in the *Chemist and Druggist Journal*, there appeared one of the first publications of photographs and line drawings of markings of some of the drug products appearing in England. Recently, the *Physicians' Desk Reference* has introduced a section on product identification which includes color photographs of many tablets, capsules, and suppositories. Such charts of color photographs, together with similar charts published by individual firms of their products, are very useful in the identification of many products. Although such aids are especially useful in the identification of products which are well marked or have unusual physical characteristics, these charts are necessarily limited in scope.

A number of authors in England have suggested that the identity of drug products be established by stamping or otherwise imprinting on every tablet and capsule product code letters and numbers indicating the firm and the identity of the drug products. Code books containing the identi-

**1154**                    IDENTIFICATION GUIDE—HEFFERREN                    *JAMA, Dec 22, 1962*

ties of all drugs so marked would be available to qualified individuals. There has been much debate about the feasibility of such an endeavor. Wurdack [12] suggests that the great majority of products are easily identified, and experience with the identification guide supports this position. There is little question that there is a definite trend to market many new drug preparations in tablet and capsule forms which are very distinctive and as a consequence readily identifiable.

Brooks, Widdifield, and Gupta of the Attorney-General's Laboratory of the Province of Ontario, Canada, have developed a reference library of pharmaceutical dosage forms utilizing the same basic system as the AMA identification guide. [13] This group has concentrated on the drugs distributed in Canada and has cooperated with the AMA staff. The pictorial supplement, utilized in the identification guide for markings, was developed by Widdifield and co-workers. [14] McArdle and Skew recently published a tablet identification system based on physical characteristics and utilizing a key-sort card system. [15]

**Present Status**

This issue of the AMA identification guide for solid dosage forms contains the description of the physical characteristics of about 5,000 tablets and capsules. In general, no new products have been catalogued since June, 1962. The publication of supplements and future issues will depend upon the utility of the guide to its users. You are encouraged to send your comments and suggestions to the Council on Drugs of the AMA.

It is hoped that firms will continue to send samples of their new products, as well as old products, which are not now in the guide.

**References**

1. Hefferren, J. J.: Identification Guide for Solid Dosage Forms, JAMA 169:479-484 (Jan 31) 1959.
2. Hefferren, J. J.: Identification Guide for Solid Dosage Forms, Drug Stand 27:125-131 (Sept-Oct) 1959.
3. Eisenberg, W. V., and Tillson, A. H.: Microscopic-Analytical Methods in Food and Drug Control, Food and Drug Technical Bulletin 1, US Dept of Health, Education, and Welfare, Food and Drug Administration, 1960, pp 221-255.
4. Hefferren, J. J.: Identification Guide for Solid Dosage Forms:- Suppositories, Drug Stand 28:88-94 (July-Aug) 1960.
5. Tablet and Capsule Identification Guide, 1956, Chem Drug (annual special issue) pp 603-606 (June 30) 1956.
6. Tablet Identification, 1958, Chem Drug (annual special issue) pp 698-703 (June 28) 1958.
7. Physicians' Desk Reference: 15th ed, Oradell, N. J.: Medical Economics, Inc., 1961, pp 1-18.
8. Physicians' Desk Reference: 16th ed, Oradell, N. J.: Medical Economics, Inc., 1962, sect 4.
9. Whitney, J.D.W.: Identification of Tablets, Brit Med J 1:50-51 (Jan 2) 1960.
10. Hastings, J. J. H.: Identification of Pharmaceutical Tablets, Pharm J 1:45-47 (Jan 16) 1960.
11. Collier, H. J.: Labelling of Pharmaceutical Preparations, Lancet 1:473-475 (March 3) 1962.
12. Wurdack, P. J.: Trade-Marked Dosage Forms, Amer Profess Pharm 26:758-760 (Dec) 1960.
13. Brooks, G. E.; Widdifield, W. H.; and Gupta, R .C.: Reference Library of Pharmaceutical Solid Dosage Forms, J Forensic Sci 7:238-248 (April) 1962.
14. Widdifield, W. H.; Brooks, G. E.; and Gupta, R. C.: Personal communication to the author.
15. McArdle, C., and Skew, E. A.: Scheme for Rapid Tablet Identification, Lancet 2:924 (Oct 21) 1961.

**ACKNOWLEDGEMENTS**

The development of the AMA solid dosage form identification guide is the result of the interest, support, and cooperation of many people. Walter Wolman, Gordon Schrotenboer, and James Kottemann, who were then part of the staff of the AMA Chemical Laboratory, were instrumental in the development of the form of the guide. Martha Burkart and Isobel Gordon of the AMA staff of the Council on Drugs did most of the coding of the individual tablets and capsule drug products. The original color reference chips used in the guide were selected and prepared with the assistance and advice of Mr. Carl Foss, Princeton, N.J.

Many drug samples were obtained through the cooperation of William Morse of Sargent Drug Stores, Inc., Howard Jensen of McKesson and Robbins, Inc., and Clement R. Balto of the Highland Prescription Laboratory, all of Chicago. Drug survey information supplied by Mr. David Stiles of Abbott Laboratories was very useful in the early development of the guide.

The cooperation of the many individual drug firms in supplying samples of their tablet and capsule products is gratefully acknowledged.

The Red Book coding system for the individual firms has been used with the permission of the publisher. The pictorial supplement for cataloguing the markings of products was developed by W. H. Widdifield, G. E. Brooks, and R. C. Gupta of the Attorney-General's Laboratory, Province of Ontario. A detailed description of this method for cataloguing markings will be published in the near future by these authors.

Acknowledgement is also made of the valuable technical advice and contributions of the staff of the American Medical Association in the preparation of the guide in its published format.

When the author left the American Medical Association in August of 1959, the direct supervision of the identification guide was assumed by Dr. Joseph B. Jerome.

NOTE: *Certain characteristics of some of the capsules and tablets shown on these pages constitute a registered trademark.*



Fig 6.—Selection of terms under each category and completed coding card for tablet of Tridal.

A-1    A-2    A-3    A-4    A-5

A-6    A-7    A-8    A-9    A-10

A-11    A-12    A-13    A-14    A-15

A-16    A-17    A-18    A-19    A-20

A-21    A-22    A-23    A-24    A-25

A-26    A-27    A-28    A-29    A-30



We have a limited number of extra copies of this special "Identification Guide for Solid Dosage Forms" issue. Write the Circulation and Records Department, American Medical Association, and enclose 45 cents for each copy, U.S., U.S. possessions and Canada. Other countries: 55 cents each.

Vol 182, No 12 **11321—12112 — 11321—13111** 1195

| TRADE NAME | DOSAGE | FIRM | SIZE IN mm | | | COLOR | IMP. |
|---|---|---|---|---|---|---|---|
| **11321—12112 (Continued)** | | | | | | | |
| Daricon | 10.0 | PF12 | 7.3 | 3.5 | 2.0 | 11 | AC-3,G-1 |
| Singoserp | 1.0 | CI10 | 7.1 | 3.5 | 1.9 | 11 | A-7,G-1 |
| Demerol HCL | 50.0 | WI59 | 6.4 | 3.5 | 1.8 | 11 | A-10,FG-2 |
| Veriloid | 1.0 | RI40E | 6.4 | 3.0 | 1.6 | 11 | A-4,G-1 |
| **11321—12113** | | | | | | | |
| Elkosin | 500.0 | CI10 | 12.9 | 5.1 | 3.1 | 11 | A-7,H-1 |
| Elipten | 250.0 | CI10 | 10.5 | 4.3 | 2.4 | 11 | A-7,H-1 |
| Stilbetin | 100.0 | SQ11 | 10.5 | 4.2 | 2.4 | 11 | A-6,H-1 |
| **11321—13111** | | | | | | | |
| R.D.X. | | WI38E | 16.1 | 7.4 | 4.7 | 11 | B-80 |
| Kodol | | DE64 | 16.0 | 6.1 | 3.2 | 11 | B-81 |
| Fensobel | | U24 | 12.9 | 5.5 | 3.1 | 11 | B-83 |
| Tricreamalate | | WI59 | 12.9 | 6.5 | 4.5 | 11 | B-11,B-11 |
| Cantaxin | 500.0 | WI59 | 12.8 | 5.0 | 3.0 | 11 | B-11 |
| Evicyl | | WI59 | 12.8 | 4.8 | 2.9 | 11 | B-11,C-33 |
| Iocapral | | WI59 | 12.8 | 4.5 | 2.6 | 11 | B-11,C-34 |
| Pape's Cold Compound | | ST63E | 12.8 | 6.0 | 3.0 | 11 | B-98 |
| Silaloid | | VA34 | 12.6 | 4.9 | 2.7 | 11 | B-59 |
| Aminodrox Forte | | MA85E | 12.0 | 5.7 | 3.6 | 11 | B-18 |
| Decholin | 250.0 | AM59H | 11.6 | 4.0 | 2.5 | 11 | C-19 |
| Cellothyl | 500.0 | WA57 | 11.4 | 6.3 | 4.4 | 11 | C-16 |
| Dolcin | | DO21 | 11.2 | 5.0 | 2.9 | 11 | B-93 |
| Pansulfa | | ME57 | 11.2 | 5.7 | 4.0 | 11 | B-88 |
| Ropad | | PI60 | 11.2 | 5.4 | 3.5 | 11 | BJ-3 |
| Taborea | | TA13 | 11.2 | 4.5 | 2.5 | 11 | B-91 |
| Thyroid | 300.0 | AR44 | 11.2 | 6.2 | 4.1 | 11 | BC-15 |
| Anadol | | PH48 | 11.1 | 4.9 | 2.9 | 11 | BC-20 |
| Bellaspro | | VA34 | 11.1 | 5.2 | 3.4 | 11 | B-59 |
| Bidrolin | | AR44 | 11.1 | 4.8 | 3.2 | 11 | BC-15 |
| Bufferin | | BR40 | 11.1 | 5.2 | 3.5 | 11 | B-86 |
| Deltamide | | AR44 | 11.1 | 5.8 | 4.3 | 11 | BC-15 |
| Excedrin | | BR39G | 11.1 | 5.4 | 3.8 | 11 | B-4 |
| Kens | 325.0 | KE38 | 11.1 | 4.1 | 2.4 | 11 | BC-19 |
| Salysal | | WH27 | 11.1 | 4.2 | 2.2 | 11 | B-96 |
| Titralac | | RI40E | 11.1 | 5.0 | 3.5 | 11 | C-10,C-10 |
| Trifonamide | | VA34 | 11.1 | 5.5 | 4.0 | 11 | B-59 |
| Milibis c Aralen Phos. | | WI59 | 10.6 | 4.1 | 2.4 | 11 | B-11,J-7 |
| Novaldin | 320.0 | WI59 | 10.5 | 5.1 | 3.4 | 11 | B-11,C-12 |
| Salophen | 320.0 | WI59 | 10.5 | 4.7 | 2.8 | 11 | B-11,B-57 |
| Abasin | 260.0 | WI59 | 10.4 | 4.2 | 2.6 | 11 | B-11,C-36 |
| Adalin | 320.0 | WI59 | 10.4 | 4.4 | 2.7 | 11 | B-11,C-32 |
| Articon | | WA28L | 10.4 | 6.4 | 5.0 | 11 | B-60 |
| Betaxin | 100.0 | WI59 | 10.4 | 4.6 | 3.0 | 11 | B-11 |
| Betaxin | 50.0 | WI59 | 10.4 | 4.4 | 2.8 | 11 | B-11,CF-3 |
| Choline Dihydrogen Citrate | 500.0 | WA28L | 10.4 | 6.2 | 4.6 | 11 | B-60 |
| Evidorn | | WI59 | 10.4 | 4.7 | 3.1 | 11 | B-11,B-74 |
| Inositol | 500.0 | WA28L | 10.4 | 5.8 | 3.8 | 11 | B-60 |
| Peritrate w/Aminophylline | | WA57 | 10.4 | 4.3 | 2.4 | 11 | C-20 |
| Sedarex | | SE28 | 10.4 | 5.0 | 3.4 | 11 | B-109 |
| Theobarb | | VA34 | 10.4 | 4.7 | 2.9 | 11 | B-59 |
| Theominal | | WI59 | 10.4 | 4.4 | 2.7 | 11 | B-11,B-78 |
| Theominal Ⓡ | | WI59 | 10.4 | 4.2 | 2.5 | 11 | B-11,BJ-1 |
| Aminodrox | | MA85E | 9.6 | 4.4 | 2.6 | 11 | B-18 |
| Listica | 200.0 | AR44 | 9.6 | 7.4 | 2.0 | 11 | B-3 |
| M-Minus 5 | | WH50E | 9.6 | 4.5 | 2.3 | 11 | B-76 |
| Thyroid | 120.0 | AR44 | 9.6 | 4.4 | 2.5 | 11 | BC-15 |

**EXHIBIT 8**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAULA J. GALVIN,

      Plaintiff,

    v.

ELI LILLY AND CO.,

      Defendant.

Civil Action No. 03-1797 (CKK)

## MEMORANDUM OPINION
(June 10, 2005)

Plaintiff Paula Galvin has filed suit against Defendant Eli Lilly and Company ("Lilly"), alleging that her mother ingested diethylstilbestrol ("DES") manufactured by Lilly while pregnant with Plaintiff, resulting in injuries to Plaintiff, including infertility. Defendant has now filed its Motion for Summary Judgment, arguing that Plaintiff cannot present evidence sufficient to show that she was exposed to Lilly's product, and that Plaintiff's suit is barred by the Kansas Statute of Repose, Kan. Stat. Ann. § 60-513(b).[1]

After careful consideration of Defendant's motion, the parties' briefs and exhibits, and the relevant law, the Court determines that Defendant's Motion for Summary Judgment shall be granted.

---

[1] Defendant has also filed a motion requesting that this Court certify the question of whether the Kansas Statute of Repose or the Kansas Products Liability Act, Kan. Stat. Ann. § 60-3303 *et seq.*, in fact governs cases involving prescription drugs. Because the Court is able to resolve this suit on the insufficiency of Plaintiff's evidence, the Court finds that this request is moot.

I.     **BACKGROUND**[2]

Plaintiff brought this suit against Lilly, a pharmaceutical company that has engaged in the manufacture, distribution and sale of DES. From November 1964 through August 1965, Elizabeth Keller was pregnant with Plaintiff. Def.'s Stmt. of Mat. Facts ("Def.'s Stmt.") ¶ 1. Mrs. Keller lived in Kansas at the time of her pregnancy. *Id.* Although Plaintiff was diagnosed as infertile in Oklahoma, Def.'s Mot. Ex. 1 (Galvin Interrog.) ¶ 13(a)-(b), Plaintiff and Mrs. Keller both currently live in Kansas, Def.'s Stmt. ¶ 1. During Mrs. Keller's pregnancy, her doctor prescribed DES to prevent miscarriage, which Mrs. Keller bought and ingested. *Id.* ¶¶ 1-2; Compl. ¶ 3; Pl.'s Resp. to Def.'s Stmt. ¶ 16, Ex. 1 (Labor and Delivery Records), 1A (Letter from doctor to Mrs. Keller, indicating that she had been exposed to DES while pregnant with Plaintiff and indicating possible effects of DES exposure).

Mrs. Keller testified at her deposition that the pill she was prescribed was a "round," "little white pill with a cross." Def.'s Reply Ex. 13 (Keller Dep.) at 57:4, 7:9-10; *see also* Def.'s Stmt. ¶ 2.[3] When asked whether she "remember[ed] any other marking on the pill," Mrs. Keller answered "no," and further indicated that she did not remember whether the pill had a coating, any details about the packaging or labeling, or the dosage she was prescribed. Def.'s Reply Ex. 13 (Keller Dep.) at 57:5-23; *see also* Def.'s Stmt. ¶ 2. Plaintiff has attempted to introduce an additional statement by Mrs. Keller addressing her prescription, that was signed on October 28, 2004, after Defendant's Motion for Summary Judgment was filed on October 1, 2004. *See* Pl.'s

---

[2]The following facts are undisputed, unless otherwise noted.

[3]Defendant relies on this testimony in its Statement of Material Facts, *see* Def.'s Stmt. ¶ 2, but appears to have mistakenly omitted these pages of testimony from its attached Exhibit 2 (Keller Dep.). Although Defendant included these pages with its Reply. Def.'s Reply Ex. 13 (Keller Dep.).

Opp. to Def.'s Mot. ("Pl.'s Opp.") Ex. 4. Defendant objects to this supplemental evidence. *See*

Def.'s Reply at 7-10. The Court will not consider Mrs. Keller's statement, because it was not

included in the discovery made available to Defendant. Plaintiff is not entitled to recharacterize

and modify to her advantage statements made in the course of depositions after Defendant has

relied on those depositions in drafting a dispositive motion. Plaintiff also attempts to introduce a

statement by Bill Waltrip, a pharmacist at the Crowell Ash Drug Store "[d]uring the 1960's," in

which Waltrip recalls that the pharmacy dispensed Lilly DES instead of other brands. Def.'s

Mot. Ex. 3 (Waltrip Stmt.). However, Waltrip did not graduate from pharmacy school until

1967, *see id.*, and consequently would not have been a pharmacist at the time Mrs. Keller filled

her prescription. As with Mrs. Keller, Plaintiff attempts to bolster Waltrip's statement in

response to Defendant's Motion for Summary Judgment by supplying a supplemental statement

from Waltrip along with Plaintiff's Opposition. *See* Pl.'s Opp. Ex. 6 (Supp. Waltrip Stmt.). For

the same reasons applied to the belated attempts to supplement Mrs. Keller's testimony, the

Court finds that Plaintiff's post hoc recalibration of its evidence is inappropriate and shall not be

considered.

   Before the instant suit was filed, Mrs. Keller did not know the manufacturer of the drug

she was prescribed to prevent miscarriage. Def.'s Stmt. ¶ 3. It is unclear precisely which

pharmacy filled Mrs. Keller's prescription, but Mrs. Keller indicated that it was either the

"Crowell-Ash Drug Store" on 4th and Broadway in Pittsburg, Kansas, or the "Ash Drug Store" at

605 North Broadway, also in Pittsburg. *Id.* ¶ 4. The owner of these two pharmacies during the

relevant time period worked as a pharmacist in the pharmacy on 4th and Broadway, and only

recalls dispensing red DES. *Id.* ¶ 7. He stated that "I simply do not remember what brand or

3

brands of diethylstilbestrol I carried at Crowell Drug Company in the 1960s." *Id.* Ex. 5 (Crowell Aff.) ¶ 5. Plaintiff has also attempted to introduce evidence from a pharmacist at the "Crowell Ash Drug Store" at 605 North Broadway discussing his recollection of the brand of DES dispensed at that pharmacy. *See* Pl.'s Resp. to Def.'s Stmt. ¶ 18; Pl.'s Opp. Ex. 6 (Waltrip Aff.); Def.'s Mot. at 10. However, that pharmacist was not licensed and did not work in that pharmacy until 1967, several years after Mrs. Keller was pregnant with Plaintiff. *See* Pl.'s Opp. Ex. 6 (Waltrip Aff.) ¶ 2. Consequently, the Court does not rely on his statement in making its determination.

The parties dispute whether Plaintiff can sufficiently demonstrate that Mrs. Keller ingested Lilly DES, rather than DES produced by another manufacturer. The Court finds that the following facts are material to this inquiry, and are undisputed. In 1964 and 1965, a number of companies manufactured DES in various dosages. *See* Def.'s Stmt. ¶ 8; Def.'s Mot. Ex. 6 ("Blue Book" listing 32 manufacturers in 1964-65); *id.* Ex. 7 ("Red Book" listing 104 manufacturers in 1964 and 97 manufacturers in 1965). However, Plaintiff states, and Defendant does not dispute, that only the 5 milligram and 25 milligram pills were used to prevent miscarriage. Pl.'s Resp. to Def.'s Stmt. ¶ 8. Furthermore, the 1965 Physicians' Desk Reference ("PDR") lists only Lilly as a manufacturer of DES. *Id.*; *see also* Pl.'s Opp. Ex. 3 (1965 PDR).

Defendant states that two other manufacturers produced DES fitting Mrs. Keller's description. Def.'s Stmt. ¶ 9. Specifically, Defendant indicates that "Bristol-Myers Squibb Company made and sold diethylstilbestrol as a white, cross-scored pill under the brand name Stilbetin," and that "Marsh-Parker sold a diethylstilbestrol pill of the same description in a 25 mg. dose." *Id.* Plaintiff states that "Lilly's 25 mg. DES pill was small, round, white, cross-

scored, with no other markings." Pl.'s Resp. to Def.'s Stmt. ¶ 17, Ex. 5 (Photograph of Lilly

DES). Lilly DES was sold in the Pittsburg, Kansas area during the time of Mrs. Keller's

pregnancy with Plaintiff. *Id.* ¶ 18, Ex. 7 (Lilly Resp. to Interrog.). Plaintiff states that the

Bristol-Myers Squibb pill was white, round, and cross-scored, but that it also bore the imprint

"Squibb" on the pill. Pl.'s Resp. to Def.'s Stmt. ¶ 2, Ex. 12 (Photograph of Squibb DES).

Plaintiff also states that Squibb's white, cross scored pill was a 100 mg. strength pill, but that

Mrs. Keller's prescription was for a 25 mg. dosage. *Id.* Ex. 12 (Photograph of Squibb DES), Ex.

1 (Labor and Delivery Records). Defendant does not dispute Plaintiff's statement that the Squibb

pill was marked with the company name. However, Defendant reiterates that when asked if she

"remember[ed] any other markings on the pill," Mrs. Keller stated that she did not remember.

Def.'s Reply at 8-9, Ex. 13 (Keller Dep.) at 57:5-7; *see also* Def.'s Stmt. ¶ 2.

 With respect to the Marsh-Parker DES pill, Defendant supplies sworn testimony from

another lawsuit indicating that the Marsh-Parker pill matches the description given by Mrs.

Keller. Def.'s Mot. Ex. 9 (Anderson Dep.) at 15:7-16, 19:10-18 (indicating that the Marsh-

Parker generic 25 mg. DES pill was a white tablet scored in quarters). Plaintiff does not dispute

that the Marsh-Parker DES pill in the dosage prescribed to Mrs. Keller fit Mrs. Keller's

description. Rather, Plaintiff states that the Marsh-Parker pill was not on the market in 1965.[4]

Pl.'s Resp. to Def.'s Stmt. ¶ 22. Plaintiff attempts to substantiate the suggestion that Marsh-

---

 [4]In this portion of Plaintiff's briefing, Plaintiff's counsel apparently confuses the time
frame in which Plaintiff was exposed to DES, suggesting that Plaintiff was exposed in 1969
rather than 1964-65. *See* Pl.'s Resp. to Def.'s Stmt. ¶ 22 ("DES markets have been analyzed and
the Marsh Company was no longer in the market as of 1965, four years prior to the Plaintiff's
exposure."). Counsel makes similar errors of timing elsewhere in the brief. However, the Court
recognizes that there is no dispute of the fact that Plaintiff was exposed to DES in 1964-65, and
these errors do not substantively affect the Court's analysis.

Parker's pill was not on the market by 1965 by providing two documents indicating the market

shares of various DES producers for years including 1965 in New York and California. *See* Pl.'s

Opp. Ex. 13 (NY and CA Market Share documentation).

The Court finds, however, that the evidence does not support this statement. Plaintiff

rests her assertion that Marsh-Parker was out of the DES market by 1965 on the fact that neither

of these two market share "matrices" lists Marsh-Parker as a DES producer in New York or

California. Pl.'s Resp. to Def.'s Stmt. ¶ 22. As a general matter these two documents do not

address Kansas, where Mrs. Keller lived when pregnant with Plaintiff. More importantly,

however, Defendant has provided two undisputed exhibits that clearly indicate that Marsh-Parker

was indeed in the DES market in 1964-65. *See* Def.'s Mot. Ex. 7 (1964 and 1865 "Red Book").

These two excerpts from the 1964 and 1965 Drug Topics Red Book list the numerous

manufacturers of DES, and include Marsh-Parker as a manufacturer of DES in both 5 milligram

and 25 milligram dosages during the relevant time frame. *Id.*

## II.    LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff, in

6

response to Defendant's motion, must "go beyond the pleadings and by [her] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

7

## III.    DISCUSSION

Applying Kansas state law to Plaintiff's claims, the Court finds that Plaintiff cannot demonstrate that her injuries were caused by DES manufactured by Lilly. As a result, the Court finds that Defendant is entitled to summary judgment.

In considering which jurisdiction's law applies to Plaintiff's claims, "the District of Columbia follows the "substantial interest" position of the Restatement (Second) of Conflict of Laws (1971) § 145." *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004). The four relevant factors are: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business if the parties; and the place where the relationship is centered." *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995). In determining the jurisdiction whose policy would be most advanced, the Court considers "which jurisdiction has the most significant relationship to the dispute." *Id*. Indeed, "[w]hen the policy of one [jurisdiction] would be advanced by the application of its law, and [the policy of the other jurisdiction] would not be advanced by application of its law, a false conflict appears and the law of the interested [jurisdiction] prevails." *Id*. (quoting *Kaiser-Georgetown Comty. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985). "When both jurisdictions have an interest in applying their own laws to the facts of the case, the forum law will be applied unless the foreign [jurisdiction] has a greater interest in the controversy." *Id*. (citation omitted); *see also Jaffe*, 374 F.3d at 1227 (finding that, where an individual's death and preceding medical care occurred in Virginia, the United States District Court for the District of Columbia should apply Virginia tort law).

It is clear from the undisputed facts of this case that Kansas has the far greater interest in

8

the instant controversy. Mrs. Keller was prescribed DES by her Kansas doctor, she purchased and consumed the prescribed DES in Kansas, and she lived in Kansas during the entire time she took DES while pregnant with Plaintiff. Although Plaintiff's infertility was diagnosed in Oklahoma, Plaintiff was born in Kansas, and presently lives in Kansas. Indeed, the only connection between this case and the District of Columbia is the fact that Defendant does business in the District of Columbia. Compl. ¶ 2. As a result, it is clear that Kansas has the more substantial interest in the application of its laws to the facts of Plaintiff's case.[5]

Accepting that Kansas law governs, the Court looks to that law to determine what standard of proof Plaintiff must meet if she is to defeat Defendant's Motion for Summary Judgment. The United States District Court for the District of Kansas has found that "[c]ausation is an essential element of a products liability case under Kansas law. Traditionally, that means a plaintiff must prove that a particular defendant's product caused his injuries." *Lyons v. Garlock*, 12 F. Supp.2d 1226, 1228 (D. Kan. 1998) (citations omitted). After consideration of two Tenth Circuit decision, the district court in *Lyons* found that neither altered the standard of causation required of a plaintiff, which that court found was defined as an "obligation to show that [plaintiff was] exposed to the products of a particular defendant in order to recover from that

---

[5]Plaintiff makes only the most cursory, and ultimately inapplicable, argument that Oklahoma law should apply. In discussing the Kansas Statute of Repose, which the Court does not reach because this case can be resolved on the facts, Plaintiff merely states that Plaintiff was a resident of Oklahoma when she was diagnosed as infertile, and that "Under the District of Columbia Conflicts Law, Oklahoma has the most contacts and their Tort Law has no Statute of Repose." Pl.'s Opp. at 5. Plaintiff's counsel makes the same argument again later, mistakenly stating that Plaintiff does not presently live in Kansas, *see* Def.'s Mot. Ex. 1 (Galvin Interrog.) ¶ 2(a). Plaintiff does not cite to any relevant caselaw addressing the District of Columbia choice of law standards, or make any substantive argument in support of the contention that Oklahoma law might apply to this case.

9

defendant." *Id.* at 1128-29 (citation omitted); *see also Burton v. R.J. Reynolds Tobacco Co*, 181 F. Supp. 2d 1256, 1270 (D. Kan 2002) (explaining that in order to prevail in a products liability suit, "a plaintiff must prove that the product is the actual and proximate cause of the plaintiff's injury. According to Kansas case law, [a] product is the actual cause of the plaintiff's injury if the act or product is a substantial factor in bringing about the harm . . . ." (citations omitted)).

Applying these principles to the undisputed facts of this case, it is clear that Plaintiff cannot demonstrate that Lilly's DES product caused Plaintiff's injuries. Although Mrs. Keller's deposition testimony that she did not recall the markings on the pill at issue certainly leaves open the possibility that the pill marked with the Squibb name could have been dispensed, the fact that the Squibb pill came in 100 milligram size suggests that it was not the pill dispensed to Mrs. Keller.

However, Plaintiff has made no such persuasive showing with respect to the Marsh-Parker pill. Even if the Court considers Plaintiff's post hoc statement by Mrs. Keller that the pill she took had *no* additional markings other than a cross-score, Plaintiff has not disputed that the Marsh-Parker pill fits the description of the pill taken by Mrs. Keller during her pregnancy with Plaintiff. The Court also finds, crucially, that although Plaintiff claims that the Marsh-Parker company was no longer in the DES market at the time of Plaintiff's exposure, Defendant's Drug Topics Red Book exhibits clearly indicate that Marsh-Parker was making the dosage prescribed to Mrs. Keller in 1964-65. As a result, the evidence indicates no dispute that there was a 25 milligram pill on the market during the relevant years that matched the description given by Plaintiff's mother and yet was made by a company other than Lilly. In the absence of a factual

10

dispute on this matter, the Court finds that Defendant is entitled to summary judgment.[6]

## IV.   CONCLUSION

After careful consideration of the parties' arguments, the evidence, and the relevant law, the Court has determined that Plaintiff cannot demonstrate that she was injured by Lilly DES rather than DES produced by a different company.  Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claims.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[6]The Court notes that the parties briefed the question of whether the Kansas Statute of Repose, Kan. Stat. Ann. § 60-513, barred Plaintiff's claims.  Leaving aside the issue of whether this Court is in the best position to decide complex matters of statutory interpretation with respect to Kansas state law, the Court finds that this case can be resolved on the facts.  In light of the fact that Plaintiff cannot meet her burden of demonstrating that Mrs. Keller took Lilly DES, as opposed to another company's product, the Court need not reach these additional legal questions.

11

**EXHIBIT 9**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAULA J. GALVIN,

    Plaintiff,

    v.                                                    Civil Action No. 03-1797 (CKK)

ELI LILLY AND CO.,

    Defendant.

## MEMORANDUM OPINION
(September 12, 2005)

On June 10, 2005, the Court granted Defendant Eli Lilly's Motion for Summary Judgment in this case. Subsequently, Plaintiff Paula Galvin filed a Motion to Alter or Amend Judgment, in accordance with Federal Rule of Civil Procedure 59(e). After careful consideration of Plaintiff's motion, the parties' briefs and supporting documentation, as well as the relevant law, the Court finds that its original ruling shall remain unchanged. Accordingly, the Court shall deny Plaintiff's motion.

## I.    BACKGROUND

Plaintiff alleges that she was exposed to diethylstilbestrol while in utero in 1964 and 1965, which resulted in injuries to Plaintiff, including infertility. Defendant originally moved for summary judgment in this case, arguing that Plaintiff could not demonstrate that Defendant's DES product caused her injuries. *See generally Galvin v. Eli Lilly*, No. 03-1797 (D.D.C. June 10, 2005). Plaintiff has filed the instant Motion to Alter or Amend Judgment, disputing several of the Court's findings with respect to Plaintiff's evidence. Specifically, Plaintiff asserts that the Court should have credited Plaintiff's affidavits of Plaintiff's mother, Elizabeth Keller, and the

pharmacist, Bill Waltrip. *See* Pl.'s Mot. at 1-3. Plaintiff further argues that the Court was

mistaken in its finding that a generic Marsh-Parker version of DES matching Mrs. Keller's

description of a white cross-scored pill could have been dispensed to Plaintiff's mother. *See id.*

at 3-8.

## II.    LEGAL STANDARD

Pursuant to the Federal Rules of Civil Procedure, a party may petition a district court to

alter or amend a judgment no later than ten days after the entry thereof. Fed. R. Civ. P. 59(e).

Motions brought pursuant to Rule 59(e) "are disfavored and relief from judgment is granted only

when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Max*

*Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 1991). Such motions will be denied unless the district

court finds "that there is an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v.*

*Firestone*, 76 F.2d 1205, 1208 (D.C. Cir. 1996) (internal quotations omitted); *see also Mekuria v.*

*Washington Metropolitan Area Transit Authority*, 45 F. Supp. 2d 19, 31 n.10 (D.D.C. 1999). A

motion to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59(e) "is not

simply an opportunity to reargue facts and theories upon which a court has already ruled." *New*

*York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995) (three-judge panel) (per curiam); *see*

*also Harvey v. District of Columbia*, 949 F. Supp. 878, 879 (D.D.C. 1996) (holding that a motion

to reconsider pursuant to Rule 59(e) "is not routinely granted").

Even more so, a motion to reconsider is not "a means to bring the Court theories or

arguments that could have been advanced earlier." *W.C. & A.N. Miller Cos. v. United States*, 173

F.R.D. 1, 3 (D.D.C. 1997); *see also Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir.

1993) ("[T]his Court has recognized that a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously."); *Savers Fed. Sav. & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1508–09 (5th Cir. 1989) (finding no abuse of discretion in denying a Rule 59(e) motion that sought to raise new theories where facts were known to the movant in advance of summary judgment); *Natural Resources Def. Council, Inc. v. United States Envt'l Protection Agency*, 705 F. Supp. 698, 701 (D.D.C. 1989) ("Rule 59(e) motions are not vehicles for bringing before the court theories or arguments that were not advanced earlier."), *vacated on other grounds*, 707 F. Supp. 3 (D.D.C. 1989); *Harvey*, 949 F. Supp. at 879 (same). Instead, a district court properly exercises its discretion under Rule 59(e) to alter or amend its judgment where "the moving party presents new facts or a clear error of law which compel a change in the court's ruling." *New York*, 880 F. Supp. at 39; *see also Assassination Archives and Research Ctr. v. United States Dep't of Justice*, 828 F. Supp. 100, 102 (D.D.C. 1993). In considering the propriety of a Rule 59(e) motion, the Court possesses sufficient discretion to prevent injustice or unfairness.

## III.   DISCUSSION

The Court will address each of Plaintiff's arguments in turn. Plaintiff first argues that the Court improperly failed to consider Mrs. Keller's affidavit offered to supplement her deposition testimony. The Court declined to consider this affidavit, in which Mrs. Keller altered her earlier deposition testimony, because her affidavit and the statements it contained were not provided to Defendant during discovery, but were instead supplied in response to Defendant's arguments

3

made in Defendant's motion for summary judgment.[1]  *Galvin*, No. 03-1797 at 2-3.  The Court

viewed Mrs. Keller's additional affidavit as an attempt to "recharacterize and modify to her

advantage statements made in the course of depositions after Defendant has relied on those

depositions in drafting a dispositive motion."  *Id.* at 3.  Plaintiff argues that Mrs. Keller's

supplemental affidavit was not contradictory, and should have been admitted.  The Court finds

that its decision to exclude this evidence was proper; the supplemental affidavit fundamentally

changes the nature of Mrs. Keller's earlier deposition testimony.  More importantly, however,

Plaintiff overlooks the fact that the Court found that the ultimate result would be the same

whether it considered Mrs. Keller's additional statements or not.  *See Galvin*, 03-1797 at 10

("Even if the Court considers Plaintiff's post hoc statement by Mrs. Keller that the pill she took

had *no* additional markings other than a cross-score, Plaintiff has not disputed that the Marsh-

Parker pill fits the description of the pill taken by Mrs. Keller during her pregnancy with

Plaintiff.").

Second, Plaintiff argues that the Court should not have excluded the supplemental

affidavit offered by the pharmacist Bill Waltrip.[2]  Plaintiff suggests that his supplemental

statements did not contradict his earlier affidavit, and that the supplemental statements were

---

[1]In her original deposition testimony, Mrs. Keller was asked whether she "remember[ed] any other markings on the pill," other than a cross, and she replied "[n]o."  *Galvin*, No. 03-1797 at 2.  In her supplemental affidavit she stated instead that she remembered that the pill was "cross-scored without any writing on either side of the pill."  Pl.'s Opp. to Def.'s Mot. for Summ. J. Ex. 4 (Supp. Keller Aff.) ¶ 5.

[2]In his original affidavit, Waltrip did not state that he knew of his pharmacy's practices before he became a licensed pharmacist in 1967 and began working there.  *See* Def.'s Mot. for Summ. J. Ex. 3 (Waltrip Aff.).  In his supplemental affidavit offered by Plaintiff, he states that he was familiar with the pharmacy's stocking practices in the years before he was licensed and began working there.  *See* Pl.'s Opp. to Def.'s Mot. for Summ. J. Ex. 6 (Supp. Waltrip Aff.)

offered in response to issues raised "for the first time" by Defendant in the motion for summary judgment. Pl.'s Mot. at 2. Plaintiff argues that Waltrip's statement is a reliable indicator of the pharmacy's prior practices because "[t]his is not a movie theater where the bill of fare changes weekly." *Id.* The Court originally rejected the supplemental affidavit as a "post hoc recalibration" of Plaintiff's evidence, noting Plaintiff had failed to present Waltrip's statements to Defendant during discovery. *Galvin*, 03-1797 at 2-3. Plaintiff's movie theater comparison notwithstanding, the Court finds that its earlier ruling was correct. Plaintiff cannot receive Defendant's motion for summary judgment and then go in search of new evidence with which to attack Defendant's arguments. This contradicts the very notion of a discovery process in which the parties marshal their evidence and disclose it to the other side before making arguments based on the available evidence. Plaintiff has attempted to deny Defendant the opportunity to inquire during discovery concerning Waltrip's familiarity with his employer's practices in the years before he was even licensed as a pharmacist.

Next Plaintiff suggests that the Court did not properly consider evidence that the pharmacy from which Mrs. Keller purchased her prescription received its drugs from a wholesaler that "was required to supply Lilly's DES exclusively in all unspecified orders." Pl.'s Mot. at 3. However, nowhere in its briefing on the motion for summary judgment does Plaintiff suggest that the pharmacy *only* ever placed "unspecified orders," and as a result, the Court does not find that this evidence counsels a different result. Furthermore, Plaintiff's proffered statement that the wholesaler would have provided Lilly DES in the years of Plaintiff's exposure is contained in Waltrip's supplemental affidavit as to the pharmacy's earlier practices, which, as explained *supra*, is not properly before the Court.

The bulk of Plaintiff's Motion to Alter or Amend Judgment objects to the Court's reliance on various exhibits presented by Defendant as part of its motion for summary judgment indicating that there was a DES pill made by Marsh-Parker on the market in the correct dosage, during the time period at issue, that matched the description given by Plaintiff's mother. *See* Pl.'s Mot. at 3-8. Plaintiff objects primarily to the Court's reliance on the "Red Book," a pharmaceutical reference text, and deposition testimony by Dr. Robert Anderson, originally offered in another case. *Id.* The Court finds that Plaintiff's objections to these exhibits are untimely, and have therefore been waived. Plaintiff did not move to strike these exhibits during the summary judgment briefing. As the Court of Appeals for the District of Columbia Circuit has stated, "Rule 56(e) defects are waived where, as here, no motion to strike is directed to them below." *Humane Soc'y of the United States v. Babbitt*, 46 F.3d 93, 96 n.5 (D.C. Cir. 1995) (quoting *DeCintio v, Westchester County Med. Ctr.*, 821 F.2d 111, 114 (2d Cir. 1987)). Furthermore, the Court reminds Plaintiff that a motion to alter or amend a judgment "is not simply an opportunity to reargue facts and theories upon which a court has already ruled," *see New York*, 880 F. Supp. at 38, nor is it "a means to bring the Court theories or arguments that could have been advanced earlier." *W.C. & A.N. Miller Cos.*, 173 F.R.D. at 3; *see also Kattan*, 995 F.2d at 276 ("[T]his Court has recognized that a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously."); *Savers Fed. Sav. & Loan Ass'n*, 888 F.2d at 1508–09 (finding no abuse of discretion in denying a Rule 59(e) motion that sought to raise new theories where facts were known to the movant in advance of summary judgment).

However, even considering Plaintiff's objections to the Red Book and the Anderson testimony, the Court shall not alter its earlier ruling. As the Court found in its original

6

Memorandum Opinion, the Red Book demonstrates that Marsh-Parker was a DES manufacturer in 1964 and 1965, and that it manufactured the drug in the relevant dosages.[3] *Galvin*, 03-1797 at 6. Plaintiff raises a bizarre argument that the affidavit authenticating Defendant's Red Book excerpts is deficient because the attorney is too young. *See* Pl.'s Mot. at 4. As Defendant explains, the Henninger affidavit is offered only to authenticate the Red Book excerpts, not provide any sort of substantive analysis. *See* Def.'s Opp. at 4. The Court agrees that the affidavit is sufficient for this purpose, and that the Red Book clearly indicates that Marsh-Parker was a manufacturer of DES during the relevant time frame.[4]

Plaintiff's arguments with respect to the Anderson testimony are similarly unavailing. As Defendant explains, the Anderson testimony from another case was "offered not to show that Marsh Parker's DES was actually stocked in the Crowell Ash Drug Store, but rather to show that Plaintiff cannot eliminate the possibility based on her mother's unexceptional pill description."

---

[3]Plaintiff also raises again the New York DES market share matrix which does not include Marsh-Parker. *See* Pl.'s Mot. at 3. Plaintiff suggests that this matrix indicates that Marsh-Parker did not supply DES in 1965. *Id.* Plaintiff's argument fails for two reasons. First, Plaintiff fails to address the fact that the Red Book clearly indicates that Marsh Parker *did* supply DES in 1965. Second, Plaintiff's matrices do not address 1964, when Mrs. Keller's pregnancy began. It is clear to the Court that the Red Book is a pharmaceutical reference text that was available to and used by pharmacists during the time period at issue, and as such carries more weight than the New York matrix, a document developed years later for the purposes of litigation.

[4]Plaintiff's only other argument with respect to the Red Book, raised belatedly in her Reply in support of her Motion to Alter or Amend Judgment, is that the Red Book does not represent the Kansas market. Pl.'s Reply at 3-4. Even if it were appropriate to challenge Defendant's proffer of the Red Book at this late stage of the proceedings, Plaintiff presents no evidence suggesting that the Marsh-Parker DES was not available in the Kansas market. Plaintiff simply states that the Red Book does not contain this information. *Id.* at 3. Plaintiff's argument, inappropriate at this stage in any event, does not advance Plaintiff's position. Defendant offered evidence of the Marsh-Parker pill to demonstrate that other pills were available matching Plaintiff's mother's description. Plaintiff has not undermined Defendant's argument or the Court's previous holding.

Def.'s Opp. at 4. The Court relied on Anderson's testimony only for this limited purpose,

finding that the testimony indicated that the Marsh-Parker 25 mg. DES pill matched Mrs.

Keller's description.[5] *Galvin*, 03-1797 at 5. As Defendant points out, the use of Anderson's

testimony from a separate legal proceeding was appropriate pursuant to Federal Rule of Civil

Procedure 32(a)(3)(B), which permits the use of outside depositions where the deponent is

located more than 100 miles from the place of the hearing. *See* Def.'s Opp. at 5 n.3.

The key reason that Plaintiff's Motion to Alter or Amend Judgment must fail, however, is

that Plaintiff cannot meet her burden of proof to demonstrate that her injuries were caused by

Lilly DES as opposed to DES manufactured by another company. Although Plaintiff discusses at

length various legal precedents from a variety of jurisdictions, *see* Pl.'s Mot. at 6-8, the Court

explained in its original Memorandum Opinion that Kansas law, applicable in this case, holds

that "[c]ausation is an essential element of a products liability case under Kansas law.

Traditionally, that means that a plaintiff must prove that a particular defendant's product caused

his injuries." Galvin, 03-1797 at 9 (quoting *Lyons v. Garlock*, 12 F. Supp. 2d 1226, 1228 (D.

Kan. 1998)). Plaintiff has failed to show the Court that she can demonstrate that her mother

ingested Lilly's DES, as opposed to DES manufactured by another company such as Marsh-

---

[5]Plaintiff, in her Reply, submits another new piece of evidence, an additional statement
from Anderson, in which he states that he does not recall a white, cross-scored pill made by
Marsh-Parker or another generic DES manufacturer. *See* Pl.'s Reply Ex. B (Anderson Stmt.). In
his earlier testimony in which he was asked whether the generic 25 mg. pill was scored in
quarters he stated "I think so." Def.'s Mot. for Summ. J. Ex. 9 at 15. In Plaintiff's additional
Anderson statement he states that "[w]hen I testified, 'I think so,' I meant to say that I was not
sure . . . ." Pl.'s Reply Ex. B. These two statements are clearly contradictory, and Plaintiff
cannot simply go in search of new, more favorable evidence at this stage of the proceedings. If
Plaintiff objected to Defendant's use of Anderson's testimony, or indeed the testimony itself,
Plaintiff should have raised those objections when Anderson's testimony was originally
presented.

8

Parker. As a result, Defendant is entitled to summary judgment.

## IV.    CONCLUSION

After careful consideration of Plaintiff's Motion to Alter or Amend Judgment, the Court finds that its original holding was correct. Accordingly, Plaintiff's motion shall be denied. An appropriate Order accompanies this Memorandum Opinion.

```
                                        /s/
_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge
```

9

**EXHIBIT 10**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LINDA L. BORTELL,                            :
                                             :
            Plaintiff,                       :
                                             :
      v.                                     :        Civil Action No. 04-0954
                                             :                (ESH)
ELI LILLY AND COMPANY, *et al.*,             :
                                             :
            Defendants.                      :
_____              :

## MEMORANDUM OPINION

Before the Court is defendant Eli Lilly and Company's ("Eli Lilly") Motion for Summary

Judgment ("Defs.' Mot."), joined by defendants Bristol-Myers Squibb Company ("Bristol-

Myers"), Dart Industries, Inc. ("Dart"), GlaxoSmithKline, Inc. ("GSK"), and Premo

Pharmaceutical Laboratories, Inc. ("Premo") (collectively "defendants"). Defendants argue that

Pennsylvania law governs under the District of Columbia's choice of law rules and, therefore,

plaintiff may not rely on market-share liability but must identify the manufacturer of the DES

that her mother ingested. (Defs.' Mot. at 5-8.) Defendants further argue that they are entitled to

summary judgment because plaintiff cannot produce sufficient evidence to meet her burden

under Pennsylvania law. (Defs.' Mot. at 8-14.) For the reasons set forth below, the Court agrees

and will grant defendants' motion.

## BACKGROUND

This case presents another chapter in the unfortunate history of diethylstilbestrol,

commonly known as DES, a drug frequently prescribed from the 1940's to the 1970's as both a

prophylactic and active remedy for pregnancy complications, particularly the prevention of

miscarriages. *See In re DES Cases*, 789 F. Supp. 552, 558 (E.D.N.Y. 1992). The consequences

for children whose mothers ingested DES during their pregnancies have been severe and well-

documented. *See generally* Cynthia Orenberg, <u>DES: The Complete Story</u>, (St. Martin's 1981).

These adverse effects include malformed reproductive organs, infertility, and rare forms of

vaginal and cervical cancer in women, *see* R.M. Guiusti, K. Iwamoto & E.E. Hatch,

*Diethystilbestrol Revisited: A Review of the Long-term Health Effects*, 122 Ann. Intern. Med.

778-88 (1995); E.E. Hatch et al., *Cancer Risk in Women Exposed to Diethylstilbestrol in Utero*,

280 JAMA 630-34 (1998); Arthur L. Herbst et al., *Adenocarcinoma of the Vagina: Association

of Maternal Stilbestrol Therapy With Tumor Appearance in Young Women*, 284 New Engl. J.

Med. 878 (1971), and genital malformation, reduced sperm counts and testicular disorders in

men. Jorma Toppari *et al.*, *Male Reproductive Health and Environmental Xenoestrogens*, 104

Envtl. Health Perspectives, Supp. 4, 741, 753-54 (1996).

Plaintiff was born in Pennsylvania in 1962 and grew up there, but has lived outside the

state since 1985 and is currently a resident of California. (Pl.'s Opposition to Defendant Eli

Lilly's Motion for Summary Judgment (Pl.'s Opp'n) at 6.) Plaintiff's mother, Ruth Bortell, took

DES during her pregnancy with plaintiff. (Defs.' Mot. at 2). Dr. Emerson Fackler, the physician

who prescribed the DES, used the term "diethylstibestrol" in writing the prescription without

specifying a particular brand. (Pl.'s Opp'n at 5.) Plaintiff's mother filled Dr. Fackler's

prescriptions at the Rea and Derrick Pharmacy in Lemoyne, Pennsylvania. (*Id.* at 2.) In 2001,

while a resident of California, plaintiff was diagnosed as infertile. (*Id.*) The following year, her

doctor diagnosed her with a T-shaped uterus and stenotic cervix -- classic manifestations of DES

exposure. (*Id.*) In December 2002, plaintiff suffered a spontaneous miscarriage. (*Id.*)

2

On May 7, 2004, plaintiff filed suit against defendants in the Superior Court for the District of Columbia seeking damages for injuries allegedly caused by *in utero* exposure to DES. On June 14, 2004, the case was removed by defendants to federal court under 28 U.S.C. §§ 1332 and 1441(b). Discovery closed on May 6, 2005, and defendants now move for summary judgment.

## ANALYSIS

### I.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the fact must be capable of affecting the outcome of the litigation; to be genuine, the issue must be supported by admissible evidence sufficient for a reasonable trier of fact to find in favor of the non-moving party. *Id.* at 247-48; *see also Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

To escape summary judgment the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham*, 813 F.2d at 1241. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations

3

omitted). Nevertheless, "because summary judgment is a drastic measure, courts should grant it

with caution so that no person will be deprived of his or her day in court to prove a disputed

material factual issue." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir.

1986). For this reason, in considering a motion for summary judgment, the "evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty

Lobby*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865

F.2d 320, 325 (D.C. Cir. 1989).

## II.    Choice of Law

A federal court sitting in diversity jurisdiction must apply the choice of law rules of the

forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see

also Gray v. Grain Dealers Mutual Ins. Co.*, 871 F.2d 1128, 1129 (D.C. Cir. 1989). The District

of Columbia has adopted the "substantial interest" approach to choice of law questions.

*Greycoat Hanover F Street Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767-68 (D.C.

1995). When faced with a choice of law in an action sounding in tort, a court in the District of

Columbia will "balance the competing interests of the two jurisdictions, and apply the law of the

jurisdiction with the more 'substantial interest' in the resolution of the issue." *Lamphier v.

Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987); *see also Jaffee v. Pallotta Teamworks*, 374

F.3d 1223, 1227 (D.C. Cir. 2004). To determine which state maintains a more substantial

interest, a court must apply the factors listed in Section 145 of the Restatement (Second) of

Conflict of Laws. *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002). These include:

(1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the

4

domicile, residence, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement § 145(2).

Plaintiff argues for application of California law, while defendants claim that Pennsylvania law should apply. Before undertaking a full choice of law analysis, under District of Columbia law a court must first determine whether both states have an interest in the application of its law to the dispute, otherwise a "false conflict" exists and the law of the interested state governs. *Biscoe v. Arlington Cty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984). There is no dispute that the District of Columbia has no interest strong enough to merit application of its law in this case. Because, however, the policies of both California (the state where plaintiff resides) and Pennsylvania (the state where the drug was sold and ingested) would be advanced by application of its law to this dispute, there is a true conflict and the law of the state that "has a greater interest in the controversy" will govern. *Id.*

Considering the first of the factors from Restatement § 145, the Court finds plaintiff's place of injury to be Pennsylvania. Plaintiff was exposed to DES *in utero* in Pennsylvania. The malformation of plaintiff's uterus and cervix occurred when plaintiff's reproductive system matured while she was still a resident of Pennsylvania. Though plaintiff's injuries were not discovered until she lived in California, the place of injury remains Pennsylvania.

Moreover, aside from the manufacture of the drug, most of the conduct causing plaintiff's injuries occurred in Pennsylvania. The drug was shipped from a wholesaler within Pennsylvania to the Rea and Derrick Pharmacy. The drug was prescribed by a doctor in Pennsylvania and dispensed by a Pennsylvania pharmacy. Further, the last act necessary to cause plaintiff's injuries -- her mother's ingestion of the drug -- occurred in Pennsylvania.

5

The third Restatement factor favors California, since plaintiff is a resident of and domiciled in California, and Eli Lilly is incorporated in Indiana and does business nationally, including in both California and Pennsylvania. Yet, like the first two factors, the fourth Restatement factor -- the center of gravity of the parties' relationship -- favors Pennsylvania. As discussed above, except for the manufacture of the drug and the diagnosis of the injury, all actions relevant to the injury occurred in Pennsylvania. Pennsylvania maintains a strong interest in adjudicating disputes arising from allegedly harmful actions occurring within its borders. Therefore, the Court finds the relationship between the parties to be centered in Pennsylvania.

Plaintiff notes that in a recent case, *Blitsch v. Eli Lilly & Co.*, No. 04-cv-0131 (C.D. Cal.), Eli Lilly advocated against applying the law of the place where plaintiff was born. While plaintiff may be correct that defendant has adopted conflicting litigation positions (Pl.'s Opp'n at 12, App. 15), the Court cannot determine from the pleading excerpt provided whether the two cases are identical. The excerpt fails to indicate where plaintiff's mother ingested the drug -- one of the critical elements in this Court's decision. (*Id.*) Moreover, the plaintiff in *Blitsch* moved away from her birthplace at a much younger age, strengthening the interest of her current domicile. Further, recent cases in this District have applied the law of the place of place of exposure, rather than manifestation. *See, e.g., Galvin v. Eli Lilly & Co.*, No. 03-cv-1797 (D.D.C. June 10, 2005) (Mem. Op.) (applying law of place of exposure and current domicile rather than place of manifestation); *Dunseth v. Eli Lilly & Co.*, No. 03-cv-2123 (D.D.C. Sept. 16, 2005) (Mem. Op.) (applying law of birthplace and place of exposure). Therefore, because three of the four factors from Restatement § 145 favor Pennsylvania as the most interested forum, the Court will apply Pennsylvania law in considering defendants' Motion for Summary Judgment.

6

### III.    Pennsylvania Law

DES cases often present problems of proof for a plaintiff. The length of time between exposure and discovery of the injury is often well in excess of 20 years, making it difficult for the plaintiff to locate witnesses and for those witnesses to recall facts with certainty. Often relevant documents have been destroyed or misplaced. Given the multitude of DES manufacturers marketing identical versions of DES during the mid-20th Century, isolating the specific manufacturer responsible for any individual plaintiff's injuries can be a daunting task. Consequently, some states have adopted a theory of market share liability for DES injuries. *See Sindell v. Abbott Labs.*, 607 P.2d 924 (Cal. 1980); *Collins v. Eli Lilly Co.*, 342 N.W.2d 37 (Wis. 1984); *Martin v. Abbott Labs.*, 689 P.2d 368 (Wash. 1984); *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069 (N.Y. 1989); *Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla. 1990); and *Smith v. Cutter Biological, Inc.*, 823 P.2d 717 (Haw. 1991). Market share liability holds that, under certain circumstances, a plaintiff need not prove which manufacturer of a fungible product specifically caused her injuries; instead liability is imposed based on each defendant's share of the marketplace at the time of the injury. *See, e.g., Sindell*, 607 P.2d at 937-38.

The Supreme Court of Pennsylvania has not taken up the question of how to apportion liability in a DES exposure case. It has, however, rejected the use of market share liability in lead poisoning cases. *Skipworth v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169 (Pa. 1997). In *Skipworth*, the court stated Pennsylvania's general rule of tort liability: "a plaintiff, in order to recover, must establish that a particular defendant's negligence was the proximate cause of her injuries." *Id.* at 172. *See also Cuthbert v. City of Philadelphia*, 209 A.2d 261, 263 (Pa. 1965). "Adoption of the market share liability theory," the court noted, "would result in a significant

7

departure from this rule." *Skipworth*, 690 A.2d at 172.  Nevertheless, the *Skipworth* decision is

not without ambiguity.  The Pennsylvania Supreme Court explained its rejection of market share

liability for lead paint manufacturers by comparing the circumstances of lead paint exposure with

those of DES.  *Id.* at 172-73.  It found that the factors justifying application of market share

liability in DES cases -- product fungibility and a known time of injury -- were not present with

respect to lead poisoning.  *Id.*  Thus, the court held that "application of market share liability *to

lead paint cases* would grotesquely distort liability."  *Id.* at 173 (emphasis added).

     The *Skipworth* decision appears to leave open the question of whether Pennsylvania

might adopt market share liability with respect to DES cases.  (*Id.* at 172 (acknowledging "that

there may arise a situation which would compel us to depart from our time-tested general rule

[requiring proof of proximate cause]")).  Since *Skipworth*, however, no Pennsylvania court has

applied market share liability in a DES case.  Moreover, prior to *Skipworth*, the lower courts of

Pennsylvania were largely in agreement that market share liability was not permitted under

Pennsylvania law.  Market share liability has been specifically rejected in the context of asbestos

exposure, *Eckenrod v. GAF Corp.*, 544 A.2d 50 (Pa. Super. Ct. 1988), and where a defective tire

rim exploded.  *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963 (Pa. Super. Ct. 1985).

*See also Burnside v. Abbott Labs.*, 505 A.2d 973 (Pa. Super. Ct. 1986) (declining to decide

whether market share liability applied to DES exposure claim).  *But see Erlich v. Abbott Labs.*, 5

Phila. Co. Rptr. 249 (Pa. Com. Pl. 1981) (permitting alternative liability in DES case under

Section 433(B)(3) of the Restatement (Second) of Torts but using market share liability theory).

     In the absence of any post-*Skipworth* decision by a Pennsylvania court permitting

recovery under a theory of market share liability, it is not the place of a federal court sitting in

<div align="center">8</div>

diversity to do so. *See Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 274 (3d Cir. 1985) ("We leave to . . . the state legislatures and, where relevant, to the state courts the task of expanding or restricting liability."). "Our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed." *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993) (declining to apply market share liability under Pennsylvania law). Thus, "absent some authoritative signal from the legislature or the [state courts], we see no basis for even considering the pros and cons of innovative theories." *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir. 1984). In short, " '[w]e must apply the law of the forum as we infer it presently to be, not as it might come to be.' " *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) (quoting *Dayton*, 739 F.2d at 694-95). The application of this principle of jurisprudence admits of only one conclusion: at this time, market share liability is not a viable theory for recovery in a products liability suit under Pennsylvania law.

## IV.    The Evidence

Under Pennsylvania law, in order to survive summary judgment, plaintiff must create a genuine issue as to the identity of the specific manufacturer whose pills were ingested by her mother during her pregnancy. *See Mellon v. Barre-National Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) ("Proof of causation is a necessary element in a products liability action."); *City of Philadelphia*, 994 F.2d at 123 ("A plaintiff must establish that a particular product of a defendant manufacturer caused her injuries.").

As an initial matter, plaintiff has proffered no evidence that the pills ingested by plaintiff's mother were manufactured by any defendant other than Eli Lilly. She has, therefore, failed to create a genuine issue of material fact with respect to defendants Bristol-Myers, Dart,

9

GSK and Premo, and their motions for summary judgment must be granted. Plaintiff has, however, introduced evidence of Eli Lilly's responsibility, and the Court must now determine whether it is sufficient to permit a reasonable jury to find for plaintiff. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).

Plaintiff introduces several pieces of evidence to support her claim that Eli Lilly produced the DES that caused her injuries. First is the testimony of her mother. In her deposition, Ruth Bortell described the pills she took as white, round, uncoated, flat, and about the size of an asprin. (Pl.'s Opp'n at 4, App. 6.) She further testified that the name of the pill began with a "D" and had an "ethyl" in the middle. (*Id.*) The testimony of Ruth Bortell is corroborated by Dr. Fackler, who testified that he wrote prescriptions for DES as "diethystilbestrol" (Pl.'s Opp'n at 5, App. 18), and by photographic evidence that Lilly's pills were sold under the generic name diethylstilbestrol and generally conform to Ruth Bortell's description. (Pl.'s Opp'n at 5, App. 19; Defs.' Reply at 4 (admitting ¶ 12 of Pl.'s Opp'n).) Eli Lilly counters with evidence that over 90 different manufacturers were producing DES at that time (Defs.' Mot., Exs. 5 & 6), and that at least two other manufacturers made DES pills that match plaintiff's description. (Defs.' Mot. at 10). Moreover, at least one of those manufacturers, Hance Brothers and White, was located in Pennsylvania and distributed "the predominant amount of stilbestrol" in Philadelphia. (Defs.' Mot., Ex. 9 (Bialek Tr. at 13-14).)

In light of Eli Lilly's evidence that another manufacturer made similar looking pills that were distributed within Pennsylvania, plaintiff must produce sufficient evidence to convince a reasonable jury that the pills matching Ruth Bortell's description carried or distributed by the Rea and Derrick Pharmacy in Lemoyne were those of Eli Lilly. Without such evidence, plaintiff

cannot meet her burden to prove causation under Pennsylvania law. *Mellon*, 636 A.2d at 191.

Toward this end, plaintiff introduces affidavits from two pharmacists who worked at the Rea and

Derrick Pharmacy in 1962. (Pl.'s Opp'n, App. 7 (Bannan Aff.) & App. 8 (Krick Aff.).)  The

affidavits, copies of which are appended to this Memorandum Opinion, are identical form

affidavits, which indicate the time period during which each pharmacist worked at the pharmacy

and state that "in the 1960's, if a prescription for DES was brought into the pharmacy, the Lilly

brand would have been dispensed." (*Id.*)  Serious questions exist, however, regarding the

admissibility of these affidavits.

Ordinarily a court may grant summary judgment on the basis of sworn affidavits,

*Echostar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002), as long as they comply

with Fed. R. Civ. Pro. 56, which requires that affidavits "be made on personal knowledge, . . . set

forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is

competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).  A court may consider

affidavits submitted in compliance with Rule 56(e) as evidence, even though a sworn declaration

remains "technically hearsay." *Echostar*, 292 F.3d at 753.  Because summary judgment

substitutes for trial, however, affidavits under Rule 56 must "consist only of admissible

evidence." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).

There is little doubt that, were Krick and Bannan available to testify at trial, their

affidavits would meet the requirements of Rule 56(e).  Facially, at least, the affidavits are based

on personal knowledge and relate to admissible evidence.  Unfortunately for plaintiff, neither

Bannan nor Krick will be able to testify at trial.  Mr. Bannan died on June 10, 2005. (Defs.' Mot.

at 11.)  Mr. Krick suffers from dementia and is not expected to be competent to testify. (Pl.'s

11

Opp'n, App. 30 (Wilma Krick Aff.); Defs.' Mot. at 13-14, Gransky Aff. Ex. 14 (Michalek Supp.

Statement.).)[1/] Thus, plaintiff has not shown that the affiants are "competent to testify to the

matters contained" in their affidavits. Fed. R. Evid. 56(e). Without Mr. Krick's and Mr.

Bannan's availability to testify and undergo cross-examination either at trial or in a pre-trial

deposition, the Court cannot credit the affidavits as anything more than hearsay.

Plaintiff nonetheless argues that the affidavits are admissible under the Fed. R. Evid. 807,

which provides a catch-all exception to the general prohibition on the admissibility of hearsay

evidence found in Fed. R. Evid. 802. Rule 807 provides:

> a statement not specifically covered by [another hearsay exception]
> but having equivalent circumstantial guarantees of trustworthiness,
> is not excluded by the hearsay rule, if the court determines that (A)
> the statement is offered as evidence of a material fact; (B) the
> statement is more probative on the point for which it is offered
> than any other evidence which the proponent can procure through
> reasonable efforts; and (C) the general purposes of these rules and
> the interests of justice will best be served by admission of the
> statement into evidence.

---

[1/] According to his treating physician, Mr. Krick appears to suffer from Lewy's Body
Disease, the symptoms of which are similar to Alzheimer's Disease. (Michalek Supp.
Statement.) Both his treating physician and his wife believe his dementia to be so advanced as
to preclude testimony at trial. (Wilma Krick Aff.; Michalek Supp. Statement.) Plaintiff has
submitted a statement by one of her lawyers, Brandon Levine, attesting to his belief that Mr.
Krick is competent to testify. (Pl.'s Opp'n, App. 29.) While it is true that this evidence must be
viewed in the light most favorable to plaintiff, the Court will not credit a lawyer's testimony
regarding a matter about which he is not competent to testify, particularly when plaintiff's faith
in Mr. Krick's competence could have been tested by taking his deposition at any point during
the discovery period. Plaintiff moved to strike Dr. Michalek's Supplemental Statement on the
grounds that it lacks foundation as to her basis for her diagnosis and her qualifications to testify
to Mr. Krick's condition. (Pl.'s Mot. to Strike.) While Dr. Michalek's affidavit is lacking in
detail, it remains probative on the issue of Mr. Krick's competence. Plaintiff has introduced no
evidence, other than the lay opinion of plaintiff's counsel, that counters Dr. Michalek's medical
diagnosis. Moreover, as discussed *infra*, plaintiff's claim of Mr. Krick's competence is further
belied by her failure to depose him. Thus, plaintiff's Motion to Strike is denied.

Fed. R. Evid. 807. The residual exception of Rule 807 is "extremely narrow." *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997). A court must be "confident ... that the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *Lilly v. Virginia*, 527 U.S. 116, 136 (1999) (internal quotation marks omitted). Thus, proponents of an admission under Rule 807 bear "a heavy burden to come forward with indicia of both trustworthiness and probative force." *Washington.* 106 F.3d at 1002. Such indicia simply do not exist with respect to the Bannan and Krick affidavits.

For instance, the affidavits are pre-typed forms that require a declarant merely to "fill-in-the-blank" with facts regarding the manufacturer and practices of the pharmacy. (*See* Bannan Aff.; Krick Aff.) While it is not clear whether the forms were completely filled out before Mr. Bannan and Mr. Krick affixed their signatures, it is clear that the majority of the form was not filled out by either affiant. Alan Vogenberg, a investigator pharmacist paid by plaintiff's law firm interviewed Mr. Bannan and Mr. Krick and provided them "a prepared statement" for their signature. (Pl.'s Opp'n, App. 9 (Vogenberg Aff.).) The Bannan and Krick affidavits, moreover, appear to be facially inconsistent with the factual account provided by the Vogenberg affidavit. Mr. Vogenberg claims that "each told [him] that Hensel and Sons was the wholesaler that supplied Rea and Derrick Pharmacy" (*id.*), yet the Krick and Bannan Affidavits list two wholesalers -- Hensel & Sons and Drug House. (*See* Bannan Aff.; Krick Aff.) Such inconsistency immediately calls into question the trustworthiness and probity of these affidavits. Further, there is at least a serious question as to whether Mr. Bannan repudiated the content of his affidavit prior to his death. According to an affidavit filed by defense counsel Ericka Snyder, Mr.

13

Bannan stated during a telephone interview that he had no recollection of signing the affidavit

proffered by plaintiff. (Snyder Aff. ¶ 7.) Moreover, he recalled the Lilly DES tablets dispensed

at the Rea and Derrick Pharmacy to be red, coated tablets and that the small, white, uncoated

tablets were produced by a generic manufacturer. (Id. ¶ 4.) While the Snyder affidavit is itself

inadmissible hearsay, at a minimum it raises concern regarding the reliability of the Bannan

affidavit. With respect to Mr. Krick, the statement submitted by Dr. Michalek places the onset of

Krick's symptoms related to Lewy body disease at early 2004, pre-dating his signing of the

affidavit proffered by plaintiff. (Michalek Supp. Statement.) Despite counter-testimony by Mr.

Krick's wife (Wilma Krick Aff.) and a neighbor, Maryellen Simpson (Pl.'s Opp'n, App. 31

(Simpson Aff.)), that Mr. Krick was competent at the time he signed the affidavit, Dr. Michalek's

statement provides a reason to question whether Mr. Krick's illness compromised the

trustworthiness of his affidavit.[2]

Most importantly, the Bannan and Krick affidavits fail to comport with the terms of Fed.

R. Evid. 807(B): that "through reasonable efforts" the proponent could not have procured more

probative evidence. Mr. Krick signed his affidavit on May 24, 2004; Mr. Bannan, two days later.

By failing to depose either Mr. Bannan or Mr. Krick during the year after obtaining their

affidavits despite knowledge of the affiants' elderly age,[3] plaintiff failed to engage in "reasonable

---

[2] Even without Dr. Michalek's statement, the circumstances surrounding the signing of Mr. Krick's affidavit and the plaintiff's failure to depose him at any time since then cast sufficient doubt on the trustworthiness and probity of the affidavit to disqualify it from admission under Rule 807.

[3] Bannan was 85 when he signed the affidavit. (Defs.' Mot., Ex. 12.) Though the record does not indicate Mr. Krick's specific date of birth, he graduated from pharmacy school 11 years after Mr. Bannan (cf. Bannan Aff. & Krick Aff.) and thus was likely in his 70's when he signed the affidavit.

efforts" to preserve their testimony for trial. Even now, plaintiff claims that Mr. Krick is

competent to testify, yet she inexplicably cancelled his deposition that had been noticed for

July 15, 2005. (Defs.' Reply at 3.) Plaintiff's failure to pursue Mr. Krick's deposition makes it

impossible for the Court to credit her lawyer's affidavit attesting to Mr. Krick's competence.

Despite the Supreme Court's admonition in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), that

"Rule 56 does not require the non-moving party to depose her own witnesses," *id*. at 324, it

remains the obligation of the non-moving party to "designate specific facts showing that there is

a genuine issue for trial." *Id*. (internal quotation marks omitted). Plaintiff cannot fail to preserve

evidence critical to her case and then attempt to blame Eli Lilly for not deposing Mr. Krick and

Mr. Bannan. Thus, since plaintiff failed to expend reasonable efforts to obtain properly

admissible evidence, the Court finds that the Krick and Bannan affidavits are not admissible

under the residual exception of Fed. R. Evid. 807.[4]

     Plaintiff further argues that even if the affidavits will not constitute admissible evidence

at trial, the Court may still consider them at the summary judgment stage. In support, plaintiff

---

[4] Without the Krick and Bannan affidavits, plaintiff has no evidence regarding the identity
of the distributor who supplied the pharmacy with DES. Thus, the Court cannot consider the
import of the distribution contract that purportedly reflects the terms agreed to by Eli Lilly and its
distributor. (Pl.'s Opp'n, App. 14.) Even with the Krick and Bannan affidavits, plaintiff's
evidence regarding the distributor is shaky at best. Though the Vogenberg affidavit states that
Krick and Bannan identified Hensel & Sons as the pharmacy's distributor during Vogenberg's
interviews with them (Pl.'s Opp'n, App. 9 (Vogenberg Aff.)), the affidavits signed by Krick and
Bannan identify two distributors -- Hensel & Sons and Drug House, both out of Harrisburg,
Pennsylvania. (Krick Aff. & Bannan Aff.) Further, the copies of the distribution contract
attached to the plaintiff's Opposition and the defendants' Reply are not signed by either party and
therefore cannot be definitively linked to a particular distributor. Moreover, the language of the
contract -- that the distributor shall not "give preference to any other brand of products when no
brand is specified, " (Pl.'s Opp'n, App. 14) -- is not conclusive on the issue of whether the
pharmacy ever specified a brand other than Eli Lilly when ordering from the distributor.

cites *Celotex*, in which the Supreme Court observed that the non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Id.* at 324. Plaintiff interprets that language to mean that so long as the content of the affidavit consists of evidence that could be admissible in some form, a district court may consider the affidavit at the summary judgment stage, regardless of whether plaintiff has any vehicle for admitting the evidence at trial. (Pl.'s Opp'n at 18.) The weight of authority does not support this novel proposition, for the general rule is that "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994). Even after *Celotex*, it is "well-settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyenne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

The majority of circuits interpret *Celotex* to permit consideration of evidence submitted at summary judgment in non-admissible form only when "the content of the statements will be reduced to admissible form at trial." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996). *See also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[A]bsent a showing of admissibility -- and none was forthcoming here -- appellant may not rely on rank hearsay . . . to oppose proper motions for summary judgment."). Both the D.C. Circuit and the Third Circuit reject the notion that evidence that cannot be reduced to an admissible form may properly be considered at summary judgment. In *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365 (D.C. Cir. 2000), the D.C. Circuit held that any evidence considered by a court at the summary judgment stage "must be capable of being converted into admissible evidence." *Id.* at 1369. Similarly, the Third Circuit has ruled that "hearsay evidence produced in an affidavit

16

opposing summary judgment may be considered *if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial.*" *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (emphasis added) (internal quotation marks omitted).

Even the cases cited by plaintiff fail to support her argument. In *Reeder v. Harper*, 788 N.E.2d 1236 (Ind. 2003), the Indiana Supreme Court held that "an affidavit that would be inadmissible at trial may be considered at the summary judgment stage of the proceedings if the substance of the affidavit would be admissible in another form at trial." *Id.* at 1241-42. Notably, the Indiana Supreme Court viewed its opinion as largely consistent with that of most federal courts, which permit evidence presented in non-admissible form to be considered only "if that evidence can be rendered admissible at trial." *Reeder*, 788 N.E.2d at 1240. Though the Indiana Supreme Court permitted consideration of an affidavit by a doctor who died after providing an affidavit but before trial and before he could be deposed, it did so because another expert witness could easily testify to the same facts. *Id.* at 1242. Here, there is nothing in the record to indicate that anyone other than Mr. Bannan or Mr. Krick can testify as to the practices of the Rea and Derrick Pharmacy between 1962 and 1963. Plaintiff also relies on *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000), in which the Seventh Circuit held that to confuse the admissibility of an affidavit at trial with its use at the summary judgment stage would "require [the Court] to read a 'cross-examination' requirement into Rule 56 that is not there." *Id.* at 604. Yet in *Oto*, the objecting party not only had the opportunity to cross-examine the affiant regarding the contents of the contested affidavit, but in fact did so. *Id.* Thus, the Seventh Circuit's discussion of the admissibility of the affidavit in the absence of cross-examination is largely dicta. To the

17

extent that it is not dicta, it is inconsistent with the near-uniform approach to this issue by most federal circuits, including this circuit's jurisprudence.

Without the Bannan and Krick Affidavits, plaintiff's evidence on the issue of causation consists solely of her mother's description of the DES pill that she ingested -- a description that matches both Eli Lilly's pills and those of another manufacturer who distributed its product within Pennsylvania. Even viewed in the light most favorable to plaintiff, such slim evidence is insufficient to permit a reasonable jury to find that Eli Lilly is more likely than not the cause of plaintiff's injuries. The facts of this case are similar to those in *Galvin v. Eli Lilly and Co.*, No. 03-cv-1797 (D.D.C. June 10, 2005) (Mem. Op.), in which the Court held that testimony describing the product as a "round," "little white pill with a cross," was insufficient to defeat summary judgment where defendant introduced evidence of another manufacturer who distributed a pill that also matched plaintiff's description. *Id.*

As a counterweight to *Galvin*, plaintiff relies on *Dunseth v. Eli Lilly and Co.*, No. 03-cv-2123 (D.D.C. Sept. 16, 2005) (Mem. Op.), in which the Court denied summary judgment. One critical fact, however, separates *Dunseth* from both *Galvin* and this case -- an affidavit from a local pharmacist linking the mother's description of the DES pill she ingested with a single, specific manufacturer. *Id.* But absent the Bannan and Krick affidavits, plaintiff cannot provide the necessary evidentiary link that existed in *Dunseth*.[5] Plaintiff also points to *Kogen v. Eli Lilly*

---

[5] Even the Vogenberg affidavit (Pl.'s Opp'n, App. 9), which provides plaintiff's best evidence on pharmacy practices aside from the Krick and Bannan affidavits, is too general to meet plaintiff's burden. Vogenberg states merely that he is "familiar with the practices stocking and dispensing of DES in the 1960's" and that "everyone stocked Lilly's DES as the number one brand to be used." (*Id.*) The affidavit contains no geographic limitation, and thus is not probative on the issue of what DES was stocked and distributed in the relevant region of Pennsylvania.

and Co., No. 03-cv-962 (C.D. Ca. July 22, 2003) (Order); *Woolfolk v. Eli Lilly and Co., et al.*,

No. 03-cv-3577 (W.D. Wash. Mar. 15, 2005) (Order on Motion for Summary Judgment); and

*Brooks v. Eli Lilly and Co. et al.*, No. 03-cv-1796 (D.D.C.) (Minute Order, July 28, 2005)

(adopting rationale in *Woolfolk*), as cases in which the courts denied summary judgment based

merely on the mother's description of the pill. Yet each of these cases suffers from the same

fatal flaw: they appertain to jurisdictions (*i.e.*, California and Washington) that have adopted

market share liability for DES actions. In a market share liability jurisdiction, proof as to a

particular defendant's responsibility has zero relevance; the same can be said for the precedential

value to this action of an opinion from a market share liability jurisdiction. In fact, in *Woolfolk*

(which is the only case cited in *Brooks*) the court did not even address the issue of whether there

was sufficient evidence linking defendant to the pill ingested. Rather, the sole issue was whether

there was sufficient evidence that plaintiff's mother had ingested DES.

## CONCLUSION

For the foregoing reasons, defendants Bristol-Myers', Dart's, GSK's, Premo's and Eli

Lilly's Motions for Summary Judgment are granted. Plaintiff's Motion to Strike the

Supplemental Statement of Maria Michalek is denied. An appropriate Order accompanies this

Memorandum Opinion.

<div style="text-align:center">s/</div>

ELLEN SEGAL HUVELLE
United States District Judge

Date:   October 19, 2005

<div style="text-align:center">19</div>

EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STEPHANIE CLAYTON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 04–1363 (RMU) |
| | : | | |
| v. | : | Document No.: | 12 |
| | : | | |
| ELI LILLY AND COMPANY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the court on the defendant's motion for summary judgment. The plaintiff brings this products liability and personal injury action alleging *in utero* exposure to a synthetic estrogen manufactured by the defendant. The defendant moves for summary judgment, arguing that the plaintiff cannot prove that she was exposed to its product. Because the plaintiff's evidence establishes a genuine issue of material fact as to whether the defendant caused her injuries, the court denies the defendant's motion for summary judgment.

## II. BACKGROUND

### A. Factual Background

The defendant, Eli Lilly and Company ("Eli Lilly") is engaged in the manufacturing, marketing, sale, promotion and distribution of pharmaceuticals throughout the United States. Compl. ¶ 2. The defendant formerly sold and distributed the drug diethylstilbestrol ("DES"), a drug used by millions of women to prevent miscarriage. DES was subsequently banned by the

FDA and recalled by manufacturers. Answer ¶ 2; Pl's. Opp'n to Def.'s Mot. for Summ. J. ("Pl's.
Opp'n") at 1.

In 1964, the plaintiff's mother, Margaret White, was pregnant with the plaintiff in
Birmingham, Alabama, Compl. ¶ 3, and took DES during her pregnancy. *Id.* Consequently, the
plaintiff alleges she was exposed to DES *in utero*. *Id.* ¶ 4. The plaintiff claims that she has
suffered injuries, including uterine and cervical malformations with resulting infertility, incurred
medical expenses for care and treatment, and suffered physical and mental pain and suffering,
and that her injuries were caused by her exposure to DES *in utero*. *Id.*

White filed her prescription for DES at the P&S Apothecary's Five Points West branch
in Birmingham. Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 12. Although White did not
originally recall taking any medication during her pregnancy with the plaintiff, after reviewing
materials provided by her daughter's attorneys, White recalled taking white, cross-scored DES
tablets during her pregnancy. Pl's. Opp'n at 15; Def.'s Mot. at 11. The defendant manufactured
white, cross-scored DES pills during the relevant time period in Birmingham. Pl.'s Opp'n at 15.
Although nearly a hundred other companies also manufactured DES at that time, Def.'s Mot. at
5, the plaintiff contends that only the defendant manufactured a DES pill like the one the
plaintiff's mother described. Pl.'s Opp'n at 15.

### B. Procedural Background

On August 10, 2004, the plaintiff filed a complaint in the Superior Court of the District
of Columbia. The defendant answered the complaint, but it also filed a notice to remove the case
to this court pursuant on August 12, 2004. The case was subsequently removed to this court. On
August 25, 2005, the defendant moved for summary judgment, arguing that the plaintiff cannot
identify the defendant as the manufacturer of the synthetic estrogen that her mother took. Def.'s

2

Mot. at 1. The court now turns to the defendant's motion.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

3

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 334 U.S. App. D.C. 92, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B. Alabama Law Applies to the Instant Action

As a preliminary matter, the defendant argues that the court should apply Alabama substantive law to this matter because the plaintiff was born in Alabama, was exposed *in utero* to DES in Alabama, and her mother allegedly filled her prescription in Alabama.[1] Def.'s Mot. at 7. Applying the District of Columbia's choice of law rules, the court determines that Alabama's substantive law applies to this action.

"In a diversity action, this Court sitting in the District of Columbia is obligated under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), to apply the choice of law rules prevailing in this jurisdiction." *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984) (applying *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). For this analysis, the court looks to factors contained within the Restatement (Second) of Conflicts of Laws, including: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered." *Jaffe v. Pallotta TeamWorks,* 374 F.3d 1223, 1227 (D.C. Cir. 2004) (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145). In

---

[1]    The plaintiff does not oppose the defendant's argument.

making its choice of law, the court considers "which jurisdiction has the most significant relationship to the dispute." *Id.*

Alabama has the most significant relationship to this case. Although the injury was diagnosed in Puerto Rico, the operative events giving rise to the injury, including the filling of the prescription, use of the drug and the plaintiff's *in utero* exposure to DES, occurred in Alabama. Because neither the domicile of the plaintiff nor the place of business or place of incorporation of the defendant is in the District of Columbia, the third factor does not weigh against applying Alabama law. Indeed, the only limited connection that this action has to the District of Columbia is that the defendant conducts some business in the District of Columbia. Given the substantial connection between this matter and Alabama and the lack of connection this matter has to the District of Columbia, Alabama substantive law applies to the plaintiff's claims. *Jaffe*, 374 F.3d at 1227; *see also Galvin v. Eli Lilly and Company*, Civil Action No. 03-1797, slip op. at 8 (D.D.C. June 10, 2005) (applying Kansas law in a DES case to determine whether plaintiff met her product identification burden because Kansas was the place of plaintiff's birth, the place of exposure, and the place where the DES prescription was filled).

### C. The Court Denies Defendant's Motion for Summary Judgment

The defendant moves for summary judgment, alleging that the plaintiff cannot establish that the DES her mother took was manufactured by the defendant. Def.'s Mot. at 1. Alabama products liability law requires the plaintiff to establish that the defendant's product caused her injuries. *Sheffield v. Owens-Corning Fiberglass Corp.*, 595 So. 2d 443, 450 (Ala. 1992) (stating that the "threshold requirement of any products liability action is identification of the injury-causing product and its manufacturer") (citation omitted); *see also Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987) (holding that a plaintiff in Alabama "must prove that the

5

defendant manufactured and/or sold the allegedly defective product"). Although the plaintiff

must establish that the defendant's product caused her injuries by more than just speculation or

conjecture, the plaintiff may use circumstantial evidence to prove the identity of the

manufacturer. *Turner,* 508 So. 2d at 254; *see also Coca-Cola Bottling Co. v. Miller,* 249 So. 2d

630, 630 (Ala. Civ. App. 1971) (affirming the verdict for an individual who swallowed particles

of glass contained in a soft drink bottle because the manufacturer did not offer any evidence to

rebut the evidence showing it had manufactured, bottled, and distributed the soft drink at issue).

The defendant makes three main arguments to support its assertion that the plaintiff

cannot prove that the defendant manufactured the drug to which she was exposed. First, the

defendant argues that White's identification of the defendant as the manufacturer is not based on

personal knowledge. Def.'s Mot. at 10. Second, the defendant contends that even if White did

have personal knowledge, the plaintiff offers no proof that the defendant was the only

manufacturer of white, cross-scored DES pills. *Id.* at 11. Finally, the defendant alleges that Lee

Wade Sellers, a pharmacist at the P&S Apothecary's Five Points South branch and a witness for

the plaintiff, has no personal knowledge of the stocking and dispensing practices at the P&S

Apothecary Five Points West branch where White filled her prescription. *Id.* at 11-12. The

defendant claims that these factors support summary judgment in its favor because the plaintiff

cannot exclude the possibility she was exposed to another manufacturer's DES product. *Id.* at 6.

The court addresses each of the defendant's argument in turn below.

### 1. White's Personal Knowledge

The defendant first argues that the plaintiff's mother, White, does not have the personal

knowledge necessary to describe the tablet she took. Def.'s Mot. at 10. The defendant supports

this claim with testimony from White's deposition, in which White stated that she had no

recollection of the pills she took until the plaintiff's attorneys sent her pictures of assorted DES

pills. Def.'s Mot., Ex. 4 ("White Dep.") at 31:9-12. In ruling on a motion for summary

judgment, the court does not weigh the evidence, but rather determines whether there is an issue

for trial. *Anderson*, 477 U.S. at 249. White identified the pills she took as white and cross-

scored after looking at photographs containing pictures of many types of DES pills. Pl's. Opp'n,

Ex. 10 ("Lewis Aff.") ¶ 4, 5. Although the defendant implies that White's identification is not

reliable because it is based on the pictures her daughter's attorney gave her, Def.'s Mot. at 10,

the reliability of White's memory goes to the weight of the evidence. "[M]emory gaps and

doubts caused by the lapse of time go to the weight to be given the testimony," 27 FED. PRAC. &

PROC. § 6023, and accordingly constitute a matter for the jury to decide. Accordingly, White's

recollection, or lack thereof, is an issue for a jury to address.

### 2. White's Proof that Eli Lilly Manufactured the DES

The defendant also argues that even if White's description was based on personal

knowledge, White's description alone is insufficient to exclude all other DES manufacturers.

Def.'s Mot. at 11-12. While the defendant might be entitled to summary judgment if the

plaintiff's only evidence consisted of White's description of the DES pill, *see Turner,* 508 So. 2d

at 254, the plaintiff offers other evidence identifying the defendant as the manufacturer of the

alleged drug. First, the plaintiff offers evidence suggesting the defendant was the exclusive

manufacturer of the pill that White described – a small, round, white cross-scored 25mg DES

tablet. *Id.* at 15. To support this claim, the plaintiff submits an affidavit stating that a review of

nearly 300 DES photographs of 100 different brands of DES yielded no other DES pill with the

same description as the defendant's pill. *Id.*; Pl.'s Opp'n, Ex. 17 ("Zhang Aff."). Although this

evidence may not necessarily exclude every manufacturer's DES pill, this evidence is sufficient

7

to narrow the field of potential tortfeasors, which is all that is required under Alabama's product

liability law. *Sheffield*, 595 So. 2d at 451 (stating that the plaintiff "must make it appear that it is

more likely than not" that the defendant caused the plaintiff's injury) (quoting RESTATEMENT

(SECOND) OF TORTS § 433B)

### 3. Sellers's Personal Knowledge

Last, the defendant argues that one of the plaintiff's witness, Sellers, does not have the

personal knowledge necessary to describe the dispensing practices of the pharmacy where White

filled her prescription. Def.'s Mot. at 10.  Sellers worked at the P&S Apothecary Five Points

South branch and was the pharmaceuticals buyer for all the P&S Apothecary stores. Pl.'s Opp'n,

Ex. 12 ("Sellers Aff.") ¶¶ 2, 4.  Sellers states that based on his observation, if a woman came into

any P&S Apothecary store with a prescription for DES, the Eli Lilly brand would have been

dispensed. Pl's. Opp'n at 6-7; Pl.'s Opp'n, Ex. 14 ("Sellers Dep.") at 32:14-18.  The defendant

claims that Sellers's testimony should be disregarded because his testimony regarding the

inventory supply of the Five Points West branch of P&S Apothecary, the store where White

filled her prescription, is not based on personal knowledge. Def.'s Mot. at 11-12.  To the

contrary, however, Sellers has personal knowledge about orders placed in bulk quantity by the

P&S Apothecary stores. Sellers Dep. at 9:17-22; Sellers Aff. ¶ 4.  Furthermore, Sellers testified

that P&S Apothecary only purchased from four local wholesalers, all of which sold the

defendant's products. Sellers Aff. ¶ 7.

On a motion for summary judgment, the nonmoving party is entitled to every reasonable

inference. *Anderson*, 477 U.S. at 255.  Here, P&S Apothecary stores bought through the same

four wholesalers, Sellers had knowledge of all orders placed in bulk quantity and Sellers only

recalls seeing the defendant's brand of DES at his P&S Apothecary store. Sellers Aff. ¶¶ 6, 7.

Sellers, who acted as a buyer for all the P&S pharmacies, also states that any woman with a prescription for DES would have received the defendant's product. *Id.* ¶¶ 4, 6. For the purposes of this motion, the plaintiff is thus entitled to the reasonable inference that the stocking practices of the Five Points South branch corresponded to the stocking practices of the Five Points West branch.

In short, the evidence submitted by the plaintiff produces a genuine issue as to whether the plaintiff was exposed to the defendant's DES pill. FED. R. CIV. P. 56(c); *see also Celotex Corp.*, 477 U.S. at 322. Although the defendant argues that the plaintiff is required to exclude every DES manufacturer, Def's. Reply at 5, the summary judgment standard does not require the nonmoving party "to discredit every conceivable alternative theory of causation." *Shields v. Eli Lilly and Co.*, 895 F.2d 1464, 1465 (D.C. Cir. 1990). The nonmoving party only need to produce evidence that would allow a reasonable juror "to find that the party proved the element at issue." *Id.* Here, the plaintiff has met her burden because she submits evidence suggesting that: (1) the defendant is the only company that manufactured a 25 mg, white, cross-scored DES pill during the relevant time period and (2) the pharmacy where her mother filled her prescription dispensed the defendant's DES pills. The defendant, moreover, fails to point to any other manufacturers of 25 mg white, cross-scored DES pills who sold their products in the Birmingham area.[2] Accordingly, the court denies the defendant's motion for summary judgment.

---

[2]    The defendant cites to *Galvin v. Eli Lilly & Co.*, Civil Action No. 03-1797, slip op. (D.D.C. June 10, 2005) in support of its motion. Def.'s Reply at 3. In that case, however, the determinative factor for granting summary judgment was that the defendant offered into evidence a DES pill matching the same description as the pill identified by the plaintiff. *Id.* at 10. Here, the defendant has not offered such evidence. For this reason, the defendant's reliance on *Galvin* is misplaced.

9

## IV. CONCLUSION

For the foregoing reasons, the court denies the defendant's motion for summary

judgment. An order directing the parties consistent with this Memorandum Opinion is

separately and contemporaneously issued this 16th day of March, 2006.


RICARDO M. URBINA
United States District Judge

10

EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CYNTHIA LEE GASSMANN,

Plaintiff,

v.

ELI LILLY AND COMPANY, et al.,

Defendants.

Civil Action 03-02592  (HHK)

MEMORANDUM OPINION AND ORDER

Plaintiff, Cynthia Lee Gassman, brings this products liability action against Eli Lilly and

Company ("Eli Lilly") alleging she suffered injuries resulting from her embryonic exposure to

Diethylstilbestrol ("DES"), a pharmaceutical produced and sold by Eli Lilly.  Presently before the

court is Eli Lilly's motion for summary judgment [#11].  Upon consideration of the motion, the

opposition thereto, and the record of this case, the court concludes that the motion must be

denied.

I. BACKGROUND

A. Factual History

DES is a synthetic estrogen that was developed and prescribed in the mid-twentieth

century to prevent miscarriages and premature deliveries.  An estimated five to ten million

individuals in the United States were exposed to DES between 1938, the year it was first

prescribed, and 1971, the year that the FDA advised physicians to stop prescribing it to pregnant

women because of its links to a rare vaginal cancer in female children.[1]  According to the Center

for Disease Control, medical research over the past thirty years has confirmed that women who

were prescribed DES while pregnant have an increased risk of breast cancer and the women born

of DES patients have increased risks of vaginal and cervical cancer, reproductive tract structural

differences, pregnancy complications, and infertility.  *See* CDC, ABOUT DES,

http://www.cdc.gov/des/consumers/about/index.html.

In 1968, Gassman's mother, Lois Tholke, was prescribed DES by her treating obstetrician

while she was pregnant with Gassman.  Tholke remembers ingesting "a small white pill," but

does not recall any other identifying characteristics of the DES pills she ingested or any

information regarding the pills' manufacturer.  At that time, DES was produced by over 75

companies, many of whom produced DES in the form of a small white pill.  The current owner

of the pharmacist where Tholke filled her prescriptions in 1968 stated that, although he did not

own the store at the time, he personally observed that "the sole and exclusive brand of DES in the

store was the Eli Lilly Brand, from the late 60s through the time I actually bought the store" in

1975.  Pl.'s Opp'n, Exh. 25 ¶ 8.

On September 14, 1968, Gassman was born in Mineola, New York.  In her early teens,

she learned from her mother that she had been exposed to DES *in utero*.  In October 1990, almost

ten years after learning of her DES exposure, Gassman married her husband, Daniel Gassman.

Less than a year later, Mr. Gassman was diagnosed with Hodgkin's disease, a cancer that starts in

lymphatic tissue.  As a result of this diagnosis, Mr. Gassman was required to undergo

---

[1]  This estimate includes the women who were prescribed DES while pregnant as well as
the female and male children born of these pregnancies.

chemotherapy treatments that would ultimately leave him sterile. Prior to the beginning of his

treatment, Mr. Gassman had samples of his sperm frozen so that he and his wife could attempt

artificial insemination at a later date.

Between July 1997 and June 1998, Gassman underwent three Intra-Uterine Inseminations

with her husband's frozen sperm. Ultimately, none of the three inseminations resulted in

pregnancy. Prior to these procedures, in May 1997, Gassman met with Dr. Serena Chen for an

initial fertility consultation. Dr. Chen's notes from that consultation indicate that she

"[r]eviewed with patients [the Gassmans] concerns about DES exposure, such as increased risk

for poor pregnancy outcome, such as ectopic pregnancy, pre-term labor, cervical incompetence,

etc." Def.'s Mot, Exh. 5. Gassman denies that she was told in any definitive manner that DES

caused her infertility or even that she was infertile.

In or about June 1999, Dr. Chen told Gassman that she "had a T-shaped uterus from DES

exposure." *Id.*, Exh. 3 ("Gassman Dep."), at 69. Dr. Chen's medical records from July 5, 1999,

indicate that she "reviewed DES" and its "effect on fertility." *Id.*, Exh. 6. Gassman denies that

Dr. Chen ever indicated that Gassman's T-shaped uterus or her DES exposure were related to her

problems becoming pregnant. In fact, Gassman alleges that her doctors informed her that her

chances of becoming pregnant using her husband's sperm were still good. She states that, at

least until September 2000, she believed that her difficulties becoming pregnant were not a result

of her *in utero* DES exposure, but rather were "due to [her husband's] chemotherapy." Pl.'s

Opp'n, Exh. 20 ("Gassman Statement") ¶ 3.

3

Gassman claims that it was not until 2002, "at the earliest," that she ever "had the slightest idea or suspicion that [her] injuries or infertility were caused by the wrongful conduct of the company that made the DES [her] mother took while pregnant with [her], or that anyone was suing over DES injuries, or that the manufacturer had done anything wrong." *Id.* ¶ 4. Gassman indicates that she did not attempt to educate herself about the effects of DES "because there was nothing I knew to investigate. . . . I knew I was affected by DES, but there was still very positive a chance to become pregnant. There was nothing to investigate, it was a side effect of being born." Gassman Dep. at 26. She also suggests that she did not investigate the possibility of a lawsuit because she "thought the company had tested the drug before they put it on the market," and because she "believed the drug saved [her] life." Gassman Statement ¶ 5. She states that she first learned about DES lawsuits in 2002. Prior to that date, she alleges that she never researched DES on the internet, never read legal or medical magazines about DES, never watched any television program about DES, never listened to any radio show about DES, and never joined any DES support group. *Id.* ¶¶ 6–10.

**B. Procedural History**

Gassman filed suit in D.C. Superior Court on February 19, 2003, naming five pharmaceutical companies—Eli Lilly, GlaxoSmithKline, Bristol-Myers Squibb Co. ("Bristol-Myers"), Pharmacia and Upjohn Company ("Pharmacia"), and Dart Industries Inc. ("Dart")—as co-defendants. Her complaint alleges that Gassman suffered injuries including cervical and uterine malformations resulting in infertility as a result of her embryonic exposure to DES. She seeks compensatory and punitive damages against the pharmaceutical companies under theories of negligence, strict liability, breach of warranty, and misrepresentation.

4

Because both Gassman and Bristol-Myers were citizens of New York, the case as originally filed was not removable. On December 2, 2003, a Praecipe of Dismissal was filed in D.C. Superior Court, dismissing Bristol-Myers and Pharmacia with prejudice. Less than a week later, GlaxoSmithKline was also dismissed from the case. Soon thereafter, on December 19, 2003, Eli Lilly removed the case to federal court. Dart was eventually dismissed with prejudice on January 14, 2004, leaving Eli Lilly as the sole defendant.

Eli Lilly filed the present motion for summary judgment on December 1, 2004, arguing that all of Gassman's claims should be dismissed because they are barred by the applicable statute of limitations and because Gassman cannot identify Eli Lilly as the manufacturer of the drug at issue in this case.

## II. ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24

(1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

## A. Statute of Limitations

Eli Lilly asserts that summary judgment is appropriate because Gassman's claims are time-barred. Eli Lilly also asserts that New York statute of limitations, rather than District of Columbia law, may govern Gassman's claims. Both the District of Columbia and the state of New York have a three-year statute of limitations applicable in cases like this one. *See* D.C. Code § 12-301(8); N.Y. C.P.L.R. 214(5). New York, however, offers plaintiffs an alternate limitations period if they are unable to learn the cause of their injury within three years of discovering it. In such cases, a plaintiff has five years from discovering her injury to determine its cause, and then one year from determining its cause to file suit. N.Y. C.P.L.R. 214-c(4); *Ruffing v. Union Carbide Corp.*, 746 N.Y.S.2d 798, 804–05 (N.Y. Sup. Ct. 2002). The District of Columbia applies a more fact-based discovery rule to determine when a cause of action accrues, discussed *infra*, which in many situations is more beneficial to plaintiffs.

### 1. Choice of Law

Eli Lilly suggests that Gassman's claims are time-barred under either the New York or District of Columbia statute, but suggests application of the New York statute is more appropriate. Def.'s Mot. at 16–18. To determine which jurisdiction's laws should apply, the court must apply choice of law principles. Because the court's subject matter jurisdiction in this

6

case is derived from the diversity of citizenship between the parties, the choice of law rules of the

forum "state" are applied. *National Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 953 (D.C. Cir.

2001); *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 843 (D.C. Cir. 1998). In the District of

Columbia, the forum "state" here, limitations arguments have long been considered procedural,

thereby mandating application of the filing forum's statute of limitations. *Namerdy v.*

*Generalcar*, 217 A.2d 109, 113 (D.C. 1966); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,

62 F.3d 1454, 1458 (D.C. Cir. 1995).

Eli Lilly seeks to have this court apply the revised Restatement (Second) of Conflicts of

Law § 142 to this matter, under which statutes of limitations are treated as a matter of substantive

law in certain instances. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 cmt. e

(1998). Were the court to agree and consider Eli Lilly's statute of limitations argument as a

substantive matter rather than a procedural one, the court would be required to apply the law of

the jurisdiction with the greatest interest in the litigation. *Greycoat Hanover F Street Ltd P'ship*

*v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767–68 (D.C. 1995). The jurisdiction with the greatest

interest, according to Eli Lilly, is New York.

Eli Lilly has made similar arguments before other courts in this jurisdiction. *See, e.g.,*

*Reeves v. Eli Lilly & Co.*, 368 F. Supp. 2d 11, 26–27 (D.D.C. 2005); *Epstein v. Eli Lilly & Co.*,

Civ. No. 03-236, slip op. at *4 (Sup. Ct. March 3, 2003). In rejecting Eli Lilly's argument that a

D.C. federal district court should adopt the revised Restatement, Judge Lamberth wrote:

> While defendant asks this court to pioneer a path towards a more narrow choice of
> law analysis to the forum's statute of limitations approach, that is not the role for this
> federal court. This court must faithfully apply the same law the District of Columbia
> courts would apply if this case were presently before them. This court takes "the law

of the appropriate jurisdiction as [found]; and we leave it undisturbed." *Tidler v. Eli Lilly and Co.*, 851 F.2d 418, 425 (D.C. Cir. 1998). . . . The decision to approach a forum choice of law statute of limitation analysis as a substantive matter—applying a different forum's statute of limitations time limit—is best left to the District of Columbia Court of Appeals.

*Reeves*, 368 F. Supp. 2d at 26–27. This court agrees with Judge Lamberth and concludes that, until the D.C. Court of Appeals instructs otherwise, statute of limitations analysis in the District of Columbia is to be treated as a procedural matter requiring reference to the filing forum's applicable statute. As such, the District's statute of limitations will apply to Gassman's claims.

　　*2. The Discovery Rule*

　　Applying District of Columbia law, product liability claims must be filed within three years "from the time the right to maintain the action accrues." D.C. Code § 12-301; *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998). In most cases, a cause of action will accrue at the time the injury actually occurs. *Mullin v. Washington Free Weekly*, 785 A.2d 296, 298 (D.C. 2001); *Diamond v. Davis*, 680 A.2d 364, 379 (D.C. 1996). However, in cases "where the relationship between the fact of injury and the alleged tortious conduct is obscure" when the injury occurs, a three-pronged "discovery rule" is applied to determine when the action accrues. *Diamond*, 680 A.2d at 379; *Williams v. Mordkofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990). Under the discovery rule, a plaintiff's claim does not accrue, and the statute of limitations does not begin to run, until the plaintiff know[s] (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of some evidence

8

of wrongdoing." *Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).[2]

Importantly, when discussing what "quantum of knowledge is required to commence the running of the statute of limitations," the D.C. Court of Appeals has made clear that both actual notice and inquiry notice will suffice. *Diamond*, 680 A.2d at 372 ("There are two types of notice: 'actual notice' is that notice which a plaintiff actually possesses; 'inquiry notice' is that notice which a plaintiff would have possessed after due investigation."). A plaintiff is deemed to be on inquiry notice when, "if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *Id.* Whether a plaintiff has either actual or inquiry notice of his or her claim is a question of fact. *Id.*

Here, the parties agree that the discovery rule applies in this case, but dispute when Gassman "discovered" her cause of action, thereby starting the statutory clock. Eli Lilly argues that Gassman was placed on inquiry notice in 1999 when she "acknowledged her awareness of her reproductive injuries and their cause." Def.'s Mot. at 11. At this point, according to Eli Lilly, Gassman was under an obligation to investigate whether her injuries were the result of some wrongdoing. *Id.* Eli Lilly also contends that, had Gassman "pursued reasonable avenues of investigation"—including researching medical literature, reading newspaper reports, searching

---

[2] The D.C. Court of Appeals has cited two considerations when holding that the third prong of the discovery rule—evidence of wrongdoing—must be present before a cause of action can accrue: (1) it would be inconsistent with notions of justice to allow a statute of limitations to begin to run before the plaintiff "would reasonably know of any wrongdoing," *Diamond*, 680 A.2d at 379; and (2) an accrual rule that does not require the plaintiff to know of any wrongdoing "would encourage the filing of unfounded claims by plaintiffs seeking to protect their unknown rights." *Id.*

the Internet, or speaking with her doctors—"there is no question that she could have, and would

have, . . . learned about alleged wrongdoing by DES manufacturers." *Id.* at 14.

Gassman responds by disputing that she was placed on inquiry notice in 1999 when she

learned of her fertility problems and her T-shaped uterus. She begins by noting that fifteen

percent of the population suffers from unexplained infertility, with many more suffering

infertility as a result of endometrioses, dysmenorrhea, sexually transmitted diseases, and a host of

other non-DES causes. Pl.'s Opp'n at 14. For this reason, Gassman argues that a problem

pregnancy should not be "tantamount to notice of a lawsuit." *Id.*

More specific to her particular situation, Gassman also denies that her doctors ever

informed her that her problems becoming pregnant were caused by her *in utero* DES exposure,

despite the fact that the notes from her medical record indicate that she was so informed. She

states that she believed that the fertility issues were the result of her husband's chemotherapy, not

DES or her T-shaped uterus. To support this claim, Gassman asserts that her doctors were

optimistic that, despite her T-shaped uterus, she could still become pregnant.

Gassman also asserts that, despite being aware that she was exposed to DES, she did not

investigate Eli Lilly or other DES manufacturers because she trusted that pharmaceutical

companies produced and sold safe drugs. She argues that "[t]here is not a single fact put forth by

the Defendant that the doctors who treated [Gassman], her mother who took the drug, her friends,

or anyone else in her milieu ever raised a hint suggesting wrongful conduct, failure to test, over

promotion, negligence, failure to warn, failure to test or lawsuits, or even [that] DES causes

infertility." *Id.* at 16. She also introduces the declaration of the co-founder of a national, not-for-

10

profit consumer organization dedicated to informing the public about DES, who states that "DES exposed individuals generally do not relate their exposure to any wrongdoing." *See* Affidavit of Patricia H. Cody, Pl.'s Opp'n, Exh. 7, ¶ 8 ("[DES exposed individuals] simply do not make the connection between their injury from a drug taken perhaps 35 to 40 years earlier by their mothers and wrongdoing by the drug's manufacturer.").

Further, Gassman asserts that, had she conducted an investigation into possible wrongdoing by DES manufacturers, reasonable avenues of investigation would not have placed her on actual notice of wrongdoing. To support this argument, she cites the fact that the overwhelming majority of articles discussing DES involved its effects on risks of cancer, not on fertility. She also argues that no DES manufacturer has ever admitted to liability or fault in any manner and that there is only one instance where a DES manufacturer settled a lawsuit without requiring an agreement of confidentiality from the plaintiff. Pl.'s Opp'n, Exh. 8. Gassman notes that, because of the asserted dearth of information about the ill effects of DES, the CDC, just this year, launched a comprehensive national program of DES education.

Ultimately, the court is left with a genuine dispute as to whether, in these circumstances, Gassman was, as a matter of law, on inquiry notice of her claim against Eli Lilly prior to February 19, 2000—three years before she filed her complaint in this case. As stated before, the issue of inquiry notice is a question of fact. At this stage of the proceedings, the court is required to believe the evidence of the non-movant and to draw all reasonable inferences in her favor. Doing so, the court must accept that Gassman was unaware of DES litigation prior to 2002, that she believed that her fertility was due to nothing other than her husband's impotency, and that she never suspected that Eli Lilly was guilty of any wrongdoing. In these circumstances, the

11

court cannot find as a matter of law that Gassman was on inquiry notice of her claims against Eli Lilly such that her claims are time-barred. *Dawson v. Eli Lilly & Co.*, 543 F. Supp. 1330, 1335 (D.D.C. 1982) (Even when "strong inference might be drawn as to [the plaintiff's] state of knowledge, such inferences should be left to the trier of fact."); *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 946 (D.C. 2003) ("[S]ummary judgment is improper when there is a disputed question about plaintiff's diligence in investigating a possible cause of action."); *Braune v. Abbott Labs.*, 895 F. Supp. 530, 551 (E.D.N.Y. 1995) ("[T]he law does not build upon it to demand that ill people assume that every medical problem that they suffer resulted from the intervention of a malefactor. The public may reasonably assume the best rather than the worst

about the pharmaceutical industry.").[3]  Because there are genuine disputes as to material facts in

this case, Eli Lilly is not entitled to summary judgment.[4]

## B. Identification of Manufacturer

Eli Lilly also argues that Gassman cannot identify Eli Lilly as the manufacturer of the

DES to which she was allegedly exposed. Def.'s Mot. at 18–23. Under New York law, which

governs the substantive matters in this case,[5] a plaintiff can seek relief under one of two different

---

[3] To support a contrary result, Eli Lilly cites two DES cases in which summary judgment was entered against the plaintiff on statute of limitations grounds: *Albers v. Eli Lilly & Co.*, 354 F.3d 644 (7th Cir. 2003), and *Roberge v. Eli Lilly & Co.*, 2005 U.S. Dist. LEXIS 3956 (D.D.C. Mar. 11, 2005). Eli Lilly's reliance on these cases is misplaced. At the outset the court observes that neither opinion is binding on this court. More importantly, both cases are distinguishable, thereby undermining their persuasive reach.

The plaintiff in *Albers* stipulated that she was on actual notice of both her injuries and the cause in fact of those injuries for longer than the D.C. limitations period. *Albers*, 354 F.3d at 645. This fact prompted the court to conclude that a "reasonable person would have commenced an inquiry . . . and swiftly would have found some evidence of wrongdoing." *Id.* Here, however, Gassman testified that she was unaware until at least 2002 that her DES exposure caused her injuries, believing instead that her husband's chemotherapy was the culprit. Gassman Statement ¶ 4. The presence of this factual dispute is sufficient to distinguish *Albers*.

In *Roberge*, the plaintiff worked for an obstetrics and gynecology practice for many years, where she had "unfettered access to records documenting numerous cases of women with health problems resulting from DES exposure." *Roberge v. Eli Lilly & Co.*, 393 F. Supp. 2d 49, 52 (D.D.C. 2005) (denying motion to alter judgment). From this important fact, the court concluded that there was "ample evidence in the record that plaintiff had continual access to resources that would have allowed her to investigate the possibility of filing a law suit based on DES exposure," such that the plaintiff was held to be on inquiry notice of her claims. *Id.* Gassman, however, did not have such extensive access to medical information about DES and its effects on fertility. As such, this court cannot conclude that Gassman was, as a matter of law, on inquiry notice of her claims against Eli Lilly.

[4] To quote Judge Green in the oft-cited *Dawson* decision, "[o]f course, the factfinder may always conclude that plaintiff did or through the exercise of due diligence should have made that discovery sooner than the plaintiff claims was the case." 543 F. Supp. at 1335.

[5] Eli Lilly contends that New York is the only forum with any conceivable interest in this litigation under District of Columbia choice of law principles, and therefore its substantive law applies here. *See Greycoat*, 657 A.2d at 767–68 ("Courts must apply the law of the forum with

13

theories of liability. The first—traditional product liability principles—requires that the plaintiff

identify the specific product that actually caused the alleged injury in order for the plaintiff to

meet his or her burden of proving causation. *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069,

1073 (N.Y. 1989) (burden of proof on proximate causation lies with plaintiffs, which typically

includes "identification of the exact defendant whose product injured the plaintiff.").

Alternately, in response to the difficulty inherent in identifying the exact manufacturer of

the DES ingested by a plaintiff's mother many years prior to the lawsuit, the New York Court of

Appeals allows DES plaintiffs to rely on market share liability, under which product

identification is removed from the plaintiff's causation burden in exchange for relegating

plaintiff to a recovery equal to the named defendants' share of the national DES market. *Id.* at

1078. In market share cases, unlike traditional product liability cases, some plaintiffs may be

prevented from "recovering 100% of their damages." *Id.*

Market share liability is the "default" causation standard in New York DES cases. *In re*

*DES cases*, 789 F. Supp. 552, 564 (E.D.N.Y. 1992). However, a DES plaintiff who believes that

she can meet the traditional market product identification burden is free to attempt to do so. *Id.*;

*Hymowitz*, 539 N.E.2d at 1073 ("In DES cases in which [product] identification is possible,

actions may proceed under established principles of product liability.").

In this case, Gassman seeks recovery under traditional product liability principles and

assert that Eli Lilly is the manufacturer of the DES that caused her injury. Eli Lilly argues that

Gassman has not met her burden of proving "that it is reasonably probable, not merely possible

---

the more substantial interest in the litigation"). Gassman never disputes Eli Lilly's assertion that
New York substantive law governs.

14

or even balanced, that the defendant was the source of the offending product." *Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901, 903 (N.Y. 1996). As such, Eli Lilly asserts that "no reasonable jury could find that Lilly's pill was more likely than not the one that caused Plaintiff's injuries," thereby entitling it to summary judgment under the traditional product liability theories and forcing Gassman to rely on market share liability for any recovery to which she might be entitled. Def.'s Mot. at 20.

Gassman responds by arguing that she has "submitted ample product identification evidence to create a genuine issue of fact for jury submission." Pl.'s Opp'n at 36. First, her mother testified that she took a "small white pill" to help sustain her pregnancy, a description that applies to the DES pill manufactured by Eli Lilly. Eli Lilly makes much of the fact that Gassman's mother cannot remember any other identifying characteristics, including dosage or markings. Def.'s Mot. at 21. Because many DES manufacturers other than Eli Lilly produce a small white DES pill, Eli Lilly argues that Gassman fails to meet her burden of establishing causation. *Id.* at 22; *Healy*, 663 N.E.2d at 903 (granting summary judgment on product identification grounds where plaintiff's description of a tire rim only narrowed the field of potential manufacturers to seven).

This argument would be more convincing had Gassman relied solely upon her mother's memory of the shape and color of the DES pill she ingested to identify the product that allegedly injured her. Such is not the case. Gassman also notes that it is undisputed that the DES in this case was purchased at Phoster Pharmacy in Hempstead, New York. To establish that Phoster Pharmacy sold DES manufactured by Eli Lilly, and only Eli Lilly, during the relevant time period, Gassman introduces an affidavit of Herbert Mindlin, who purchased Phoster's in 1975,

seven years after Gassman's birth.  Mindlin testifies that he and the previous owner of Phoster's,

Isaac Piel, were close friends.  He claims that, beginning in 1968, he visited Piel at the pharmacy

on numerous occasions.  During these visits, Mindlin assertedly "had the opportunity to observe

[Piel's] store, his practice, and the manner and method of the stocking of drugs in general and

DES in particular, from the time of the late 60s until [Mindlin] actually bought [Piel's] store in

1975."  Pl.'s Opp'n, Exh. 25 ¶ 7.  Based on these observations, as well as "the usual customs and

ordinary practice of the Phoster Pharmacy," Mindlin concludes that "the sole and exclusive brand

of DES in the store was the Eli Lilly Brand, from the late 60s through the time [he] actually

bought the store."  *Id.* ¶ 8.

Eli Lilly argues that Mindlin's statements should be ignored because they do nothing

more than confirm that Mindlin has no personal knowledge relevant to this case.  Specifically,

Eli Lilly notes that Mindlin does not state when in 1968 he began visiting Phoster Pharmacy, nor

does he state the frequency of his visits.  Def.'s Reply at 5.  Without these details, Eli Lilly

contends that Gassman "still has not established that Mindlin has any personal knowledge about

the stocking and dispensing practices of Phoster's during the relevant time frame."  *Id.* at 5–6.

While Eli Lilly's arguments may appeal to a jury, they are of no moment to this court for

purposes of resolving the pending motion.  The court is not only required to believe the

competent evidence of Gassman, but must also grant all reasonable inferences in her favor.

Accordingly, this court is satisfied that a jury question exists as to whether Gassman's injuries

were caused by Eli Lilly's drugs.  *Cf. McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 832–34 (7th

Cir. 1985) (affirming a directed verdict in favor of plaintiff when relevant pharmacy could not

remember particular brand, but "to the best of his knowledge," the wholesaler thought that the store bought DES manufactured by Eli Lilly).

## III. CONCLUSION

For the aforementioned reasons, it is this 29th day of December, 2005, hereby

**ORDERED** that defendant's motion for summary judgment [#11] is **DENIED**.


Henry H. Kennedy, Jr.
United States District Judge

**EXHIBIT 13**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                               )
NICOLE LEE DUNSETH,            )
                               )
        Plaintiff,             )
                               )
    v.                         )     Civil Action No. 03-CV-02123 (RBW)
                               )
ELI LILLY AND COMPANY,         )
                               )
        Defendant.             )
                               )
```

## MEMORANDUM OPINION

Currently before the Court is Defendant Eli Lilly and Company's Motion for Summary

Judgment [D.E.# 13] ("Def.'s Mot."). The defendant argues in its motion that this Court should

grant summary judgment in its favor because the plaintiff, Nicole Lee Dunseth, has not and

cannot produce evidence to identify Eli Lilly and Company ("Eli Lilly") as the manufacturer of

the drug that allegedly caused her harm. Def.'s Mot. at 1. For the reasons set forth below, the

defendants' motion will be denied.

### I. Background

The plaintiff initially filed a five-count complaint in the Superior Court of the District of

Columbia and the case was subsequently removed to this Court on October 17, 2003. See Notice

of Removal. The plaintiff alleges that she suffered injuries as a result of "embryonic exposure"

to DES. Compl.¶ 4. According to the plaintiff, her mother was prescribed and took DES while

pregnant with the plaintiff in 1969. Id. ¶ 3. The Plaintiff alleges that the DES her mother

ingested, the same DES which allegedly caused her injuries, was manufactured by the defendant.

Id. ¶¶ 3-5. The defendant argues that the plaintiff has failed to prove that it was the defendant's

product that caused her harm.  Defendant Eli Lilly and Company's Memorandum of Points and

Authorities in Support of its Motion for Summary Judgment ("Def.'s Mem.") at 1.  The

defendant asserts that the plaintiff has provided no medical or pharmacy records indicating that

the defendant produced the DES in question here.  Id.  The defendant also contends that at least

sixty other manufacturers produced the same drug that allegedly caused the plaintiff's injuries.

Id.  The defendant argues that the description provided by the plaintiff's mother of a small, white

pill with a cross score on it fails to distinguish a DES pill made by the defendant from other DES

products whose physical appearance fits the same description.  Id.  The defendant further argues

that even if one of the defendant's products, in some dosage, matches the description given by

the plaintiff's mother, it would be impermissible to allow a jury to find for the plaintiff.  Id. at 2.

Thus, the defendant contends that the plaintiff's claims fail as a matter of law if she cannot

identify the brand of DES her mother ingested while pregnant to the exclusion of other DES

products on the market at that time.  Id.

## II. Summary Judgment Standard

This Court may grant a motion for summary judgment under Rule 56(c) "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  A genuine issue of material fact

exists if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge . . . ."  Id. at 255.  The entry of summary judgment is appropriate after there has been an

2

"adequate time for discovery . . . [and the] party [against whom the motion has been filed] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment, however, "is a drastic remedy, [and therefore] courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." Greenberg v. Food & Drug Admin., 803 F.2d 1213, 1216 (D.C. Cir. 1986). Summary judgment is, accordingly, not appropriate where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance . . . ." Id. (citations omitted). Moreover, when reviewing the evidence, the Court must draw "all inferences . . . in favor of the nonmoving party[.]" Coward v. ADT Sec. Sys., Inc., 194 F.3d 155, 158 (D.C. Cir. 1999); Aka v. Wash. Hosp. Ctr, 156 F.3d 1284, 1295 (D.C. Cir. 1998). The party opposing a motion for summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. And, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "any factual assertions in the movant's affidavits will be accepted . . . as being true unless [the opposing party] submits [her] own affidavits or other documentary evidence contradicting the assertion." Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir.1992) (quoting Lewis v. Faulkner, 689 F.2d 100, 102 (7th Cir. 1982)).

The mere existence of a factual dispute by itself, however, is not enough to bar summary

3

judgment.  Rather, the party opposing the motion must show that there is a genuine issue of

material fact.  See Anderson, 477 U.S. at 247-48.  To be material, the fact must be capable of

affecting the outcome of the litigation; to be genuine, the issue must be supported by admissible

evidence sufficient for a reasonable trier of fact to find in favor of the nonmoving party.  Id.; see

also Laningham v. United States Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

### III.  Analysis

#### A.  Choice of Law

As an initial matter, the defendant contends that the "substantive law of Illinois governs

[the] plaintiff's claims."  Def.'s Mem. at 5.  The plaintiff does not appear to necessarily contest

the application of Illinois law, stating that she "does not dispute that under Illinois, Nevada, and

District of Columbia law, [the plaintiff] must identify the DES maker in question."  Plaintiff

Nicole Lee Dunseth's Memorandum of Points and Authorities in Support of her Opposition to

Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 12.  However, because the

plaintiff indicates that the laws of Nevada and District of Columbia may also apply, the Court

must assess which state's laws applies in this case.  In resolving this question, the Court must

perform a "governmental interests" analysis.  Herbert v. District of Columbia, 808 A.2d 776, 779

(D.C. 2002).  As part of this analysis, the Court will consider the four factors set forth in the

Restatement (Second) of Conflict of Laws (1971) § 145, Comment d, as has the District of

Columbia Court of Appeals.  These factors are: (a) the place where the injury occurred; (b) the

place where the conduct causing the injury occurred; (c)) the domicile, residence, nationality,

place of incorporation and place of business of the parties; and (d) the place where the

relationship is centered.  Herbert, 808 A.2d at 779 (citations omitted).

4

As to the first factor – the place where the injury allegedly occurred – the plaintiff's mother was prescribed, bought, and ingested the DES that allegedly caused the plaintiff's injuries while living in Illinois.  The plaintiff was also born in Illinois.  There is no evidence that the plaintiff's mother lived in the District of Columbia while she was taking DES, nor is there any evidence that the plaintiff's mother, or the plaintiff, ever lived in the District of Columbia.  Consequently, any injury suffered by the plaintiff did not occur in the District of Columbia.  An analysis of this factor does not favor applying District of Columbia law, and therefore, because the injury occurred in Illinois, the first factor favors applying the law of Illinois.

The second Restatement factor – the place where the conduct causing the injury allegedly occurred – also does not favor applying District of Columbia law.  The plaintiff alleges that "the [d]efendant met with and conspired with numerous pharmaceutical manufactures in the District of Columbia, prior to obtaining governmental approval for DES." Compl. ¶ 2.  Additionally, the plaintiff contends that the "[d]efendant spearheaded industry-wide conferences in the District of Columbia to seek approval of DES by Joint Submission, withholding from the Food and Drug Administration ("FDA") reports questioning the efficacy of DES and studies raising serious questions of safety." Id.  The plaintiff asserts that these meetings, conferences, and agreements occurred in the District of Columbia. Id.  The defendant admits that it has sold and distributed its product in the District of Columbia and that the FDA, which is located in the District of Columbia, approved the sale of the product. See Answer ¶ 2.  And, while the defendant has admitted that it sold DES in the District of Columbia, it notes that there is no evidence that the DES bought or ingested by the plaintiff's mother ever passed though the District of Columbia. Def.'s Mem. at 5.  As such, although the defendant has some affiliation with the District of

5

Columbia, this second factor nonetheless does not favor applying District of Columbia law because the place where the location of the conduct that purportedly caused the injury is Illinois. Accordingly, the second Restatement factor also favors the application of Illinois law.

The third factor for the Court to consider under the Restatement is the domicile, residence, nationality, place of incorporation and place of business of the parties. The plaintiff is currently domiciled in Nevada, see Notice of Removal ¶ 2 and the defendant is incorporated in Indiana with its principle place of business in Indianapolis, Indiana. Id. Because neither party is domiciled in, resides in, is incorporated in, or has a principle place of business in the District of Columbia, this third factor also does not favor applying District of Columbia law. Neither does this factor support the application of Illinois law. However, residency and place of business are not dispositive in this choice of laws analysis because they are the only factors that do not favor applying Illinois law, while the other factors of the government interests analysis do. See Herbert, 808 A.2d 780. Moreover, "when the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails." Id. at 779 (citation omitted). Thus, this Court concludes that because the injury allegedly occurred in Illinois, the conduct causing the injury allegedly occurred in Illinois, and, as discussed immediately below, the relationship of the parties was clearly centered in Illinois, the state of Illinois has the strongest policy interest in this matter.

The fourth Restatement factor also favors applying Illinois law because the relationship between the parties was clearly centered in Illinois. In Lakie v. Smithkline Beecham, 965 F. Supp. 49, 59 (D.D.C. 1997), also a products liability case, a former member of this Court found

6

that Virginia law applied there because the plaintiff purchased and used the product in question in Virginia. The court noted that "a state's interest in the application of its law is strongest when both the place of the injury and the domicile of the plaintiff are within its territory." Id. (citations omitted). While the plaintiff here is currently domiciled in Nevada, Illinois is the state where the plaintiff's mother was prescribed, bought, and ingested the DES that allegedly caused the plaintiff's injuries. Compl. ¶ 3. These facts, as well as the fact that the plaintiff was born in Illinois, id., weigh heavily in the Court's decision here. Moreover, as noted already, the plaintiff does not appear to contest the application of Illinois law. Pl.'s Opp'n at 12. Consequently, based on the four Restatement factors, the Court concludes that Illinois law is the law that should govern the resolution of this matter.

### B. Is there a Genuine Issue of Material Fact as to Whether the Plaintiff can Identify Defendant as the Manufacturer of the DES that Allegedly Caused Her Injury?

The defendant's summary judgment motion raises the question of whether, under Illinois law, the plaintiff can sufficiently identify the defendant's DES as the product that caused her injuries. Under Illinois law, a plaintiff has the burden of proving "that the defendant produced, manufactured, sold, or was in some way responsible for the product." Meshes v. Warren & Sweat Mfg. Co., No. 98 C 50064, 2001 WL 1002410 at *3 (N.D. Ill. 2001) (quoting Smith v. Eli Lilly & Co., 560 N.E.2d 324, 328 (Ill. 1990) (citations omitted)). To prevail under the theories of either strict liability or negligence, "the plaintiff must establish some causal relationship between the defendant and the injury-producing agent." Smith, 560 N.E.2d at 328. Proof of this causal relationship "may come in the form of direct or circumstantial evidence, but mere speculation, guess, or conjecture is not enough." Meshes, 2001 WL 1002410 at *3 (citing Smith, 560 N.E.2d

7

at 328; Sutton v. Wash. Rubber Parts & Supply Co., 530 N.E.2d 1055, 1097 (1988)). "[W]here

circumstantial evidence is relied upon, the circumstances must justify an inference of probability

as distinguished from mere possibility." Zimmer v. Celotex Corp., 549 N.E.2d 881, 883 (Ill.

App. Ct. 1989).

The Court finds that the description of the DES pills ingested by the plaintiff's mother,

coupled with the affidavit of Eugene L. Belczak, create "an inference of probability" that the

DES in question here was manufactured by the defendant. Id. The plaintiff's mother testified

during her deposition that the Diethylstilbestrol (a type of DES) she ingested was "a small white

pill that had a cross on it, not very big, no writing on it or anything like that. It just had a, it was

marked with a cross." Pl.'s Opp'n, Appendix ("App.") 2 (June 7, 2004 Deposition of Diana

Barrett ("Barrett Dep.")) at 19-20. The plaintiff's mother further testified that she was able to

remember these details "because it was a very significant time in my life. I mean, I was afraid of

having a miscarriage. So when I was taking that pill every day, it just is embedded in my mind.

It was important, I was in the process of possibly losing my child. . . ." Id. at 61. While this

description alone would not suffice to identify the defendant's product, the plaintiff also

submitted the sworn statement of Eugene L. Belczak, a pharmacist from the Chicago area. Mr.

Belczak is a 1957 graduate of the University of Illinois School of Pharmacy. Pl.'s Opp'n, App. 6

(Statement of Eugene L. Belczak ("Belczak Stmt.")) ¶¶ 1-2. Beginning in 1954 when he was an

intern, Mr. Belczak worked continuously for forty years as a retail pharmacist in the Chicago

area. Id. Mr. Belczak's statement attests that he is familiar not only with the general pharmacy

practices in the Chicago area, but specifically with "those pharmaceuticals commonly used for

the care and treatment of pregnant women in the mid-to-late 1960's in the greater Chicago area."

8

Id. ¶ 5-6. Mr. Belczak unequivocally states that "[i]f a DES mother described a white, cross-scored tablet without any other markings or writing on it . . . , it had to be a Lilly product as no other brand of DES fitting that description was available in Southwest Chicago in 1969." Id. at ¶ 9.  Given Mr. Belczak's statement and the plaintiff's mother's testimony, the Court finds that there is a genuine issue of material fact as to whether the plaintiff's mother ingested the defendant's DES.  This finding precludes the Court from entering summary judgment for the defendant.  See Anderson, 477 U.S. at 248.

Summary judgment is not appropriate where evidence "is subject to conflicting interpretations, or reasonable persons might differ as to its significance." Greenberg, 803 F.2d at 1216.  Assuming the plaintiff's mother and Mr. Belczak will be called as witnesses at trial, it will be for the jury, as the trier of fact, to evaluate their credibility and the credibility of their statements.  Id.  The statements made by the plaintiff's mother and Mr. Belczak have shown there is more than simply some "metaphysical doubt as to the material facts." See Matsushita Elec. Co., 475 U.S. at 586.  Here, the description of the DES given by the plaintiff's mother, when considered with the sworn statement of Mr. Belczak, create a genuine issue of material fact.  This factual issue – whether or not the plaintiff has identified the defendant as the manufacturer of the DES in question – is material because it is capable of affecting the outcome of the litigation.  See Anderson; 477 U.S. at 247-48; Laningham, 813 F.2d at 1242-43.  The Court also finds that this factual dispute is genuine because it is supported by admissible evidence – the likely testimony of Mr. Belczak and the plaintiff's mother.  See id.  Accordingly, this Court cannot conclude from the evidence before it, that a reasonable juror could not find that the DES ingested by the plaintiff's mother was, in fact, manufactured by the defendant.

9

## IV. Conclusion

The only issue before the Court at this time is whether the plaintiff has met her burden to sufficiently identify the defendant's product as the product used by her mother, that summary judgment would be inappropriate. Given the statement of Mr. Belczak and the plaintiff's mother's testimony, the Court finds that there is a genuine issue of material fact which precludes the Court from entering summary judgment for the defendant. Accordingly, the defendant's motion for summary judgment is denied.

**SO ORDERED** on this 16th day of September, 2005.[1]

REGGIE B. WALTON
United States District Judge

_____

[1]An Order consistent with this Memorandum Opinion is being issues contemporaneously herewith.

10