UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY C. CUTONE and
ANTHONY CUTONE,

                    Plaintiffs,

        v.                                      CIVIL ACTION No. 04-CV-12725 (JLT)

ELI LILLY AND COMPANY,

                    Defendant.

### DEFENDANT ELI LILLY AND COMPANY'S
### CONSENT MOTION FOR LEAVE TO FILE REPLY BRIEF

Defendant Eli Lilly and Company ("Lilly") moves this court for leave to file a Reply in support of its Motion for Summary Judgment. Lilly's Reply is filed concurrently herewith.

As grounds for this motion, Lilly states that the Reply is necessary to address arguments regarding product identification raised in Plaintiff's Opposition and additional statements submitted by Plaintiffs with their opposition that were not previously part of the record. Lilly believes the Reply will be of assistance to the Court in resolving the issues raised by Lilly's Motion for Summary Judgment.

WHEREFORE, Lilly requests the Court grant this motion for leave to file the Reply brief filed concurrently herewith.

B3222625.1

Respectfully submitted,

ELI LILLY AND COMPANY
by its attorneys

/s/ James J. Dillon
James J. Dillon (BBO# 124660)
Brian L. Henninger (BBO# 657926)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210-2600
June 27, 2006                    (617) 832-1000

## LOCAL RULE 7.1(A)(2) CONFERRAL CERTIFICATION

I, Lauren E. Dwyer certify that on June 27, 2006, I conferred with Plaintiffs' counsel regarding Lilly's Motion for Leave to File a Reply Brief. Plaintiffs' counsel consented to the Motion.

/s/ Lauren E. Dwyer

B3222625.1                       - 2 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY C. CUTONE and
ANTHONY CUTONE,

              Plaintiffs,

      v.

ELI LILLY AND COMPANY,

              Defendant.

CIVIL ACTION No. 04-CV-12725 (JLT)

## [PROPOSED] DEFENDANT ELI LILLY AND COMPANY'S
## REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Eli Lilly and Company ("Lilly") moved for summary judgment in this case because Plaintiffs cannot show that Lilly made the Diethylstilbestrol that allegedly caused their injuries. That motion was a straightforward attack on Plaintiffs' claims, pointing out that the pill description at issue -- round, white, pill with a cross and no other markings -- was insufficient to identify Lilly when (a) over 60 other companies made diethylstilbestrol available for sale in *national* publications in 1969/1970, and when (b) it is impossible to show that the above pill description was exclusive to Lilly.

In response, Plaintiffs filed a blizzard of materials to obscure the essential points. Some of the material so distorts plain words and unassailable facts that Lilly was compelled to file this Reply Brief to maintain an accurate record on summary judgment. Overall, Plaintiffs fail to prove-up the factual and legal assertions they make with respect to their product identification evidence. As a result, Lilly's Motion for Summary Judgment should be granted.

B3217324.2

A.    **Plaintiffs Provide No Proof for Their Assertion That Lilly was the Exclusive Manufacturer of a White Cross-Scored Pill in 1969/1970.**

Plaintiffs assert that "Lilly is, *to a 99% degree of certainty*, the only white cross-scored DES pill without any other markings available in Boston during 1969". *See* Plaintiffs' Opposition to Lilly's Motion for Summary Judgment ("Plaintiffs' Opposition"), at 4 (emphasis added). To support this assertion, Plaintiffs must produce evidence tending to show that no non-Lilly DES pills fitting Ms. Camporesi's description were on the Massachusetts market in 1969/1970.

Plaintiffs rely on a picture of Lilly's DES pill, the Statement of Harold Sparr ("Sparr Statement"), the Statement of Phillip Cafferty ("Cafferty Statement"), the Statement of Julie Zhang ("Zhang Statement), and the Statement of James DellaVolpe to prove that Ms. Camporesi's pill description was exclusive to Lilly. *Id.* at 2-3. None of these materials prove Plaintiffs' claim.

1.    Picture of Lilly's DES Pill

At best, Plaintiffs' picture of Lilly's DES pill does nothing more than prove what Lilly has already admitted, *i.e.* that it made a white cross-scored DES pill. Plaintiffs' pill picture provides no information regarding the appearance of the more than 60 other DES pills on the market in 1969/70.[1]

---

[1] Plaintiffs argue that the Red and Blue Books, listing over 60 DES manufacturers in 1969/1970, are irrelevant because they do not represent a national market and are indecipherable by an average juror. *See* Plaintiffs Opposition at 15-16. Plaintiffs' own expert admits that these publications list the drugs that were available in the national supply chain to be purchased. *See* Transcript of Deposition of Harold Sparr in *Bohlin v. Eli Lilly and Company*, 03-CV-11577 (MEL) ("Sparr Tr.") at 101-107 (Dwyer Ex. 1). In *Galvin*, the court ruled that the Red and Blue Books were competent to show which manufacturers were in the national DES market during the relevant time period. *See Galvin II*, Civ. Action No. 03-1797 at 7, n.3 & 4; *see also Galvin I*, Civ. Action No. 03-1797 (CCK)(appeal pending)(attached as Exhibit 8 and 9 to the Affidavit of Lauren Dwyer in Support of Eli Lilly and Company's Motion for Summary Judgment). Plaintiffs' real concern is not that an expert is required to interpret this information, but that a lay juror can read it and understand that many companies besides Lilly sold DES in 1969 and 1970.

2.    <u>Statement of Harold Sparr</u>

Mr. Sparr states that based on his personal experience and on a review of relevant literature, it is an "absolute certainty" that Lilly produced the only white cross-scored DES pill without any other imprint or logo. *See* Sparr Statement, Plaintiff's Opposition, App. 11, at 7. As discussed in Lilly's Motion to Strike, Mr. Sparr has no personal knowledge of the relevant pharmacy and his general conclusions are based on flawed evidence and unscientific method. Mr. Sparr never worked at Bayard Pharmacy in Allston, where Ms. Camporesi allegedly filed her prescriptions for DES, and has no personal knowledge of the stocking and dispensing practices of that store. *See* Transcript of Deposition of Harold Sparr in *Bohlin v. Eli Lilly and Company*, 03-CV-11577 (MEL) ("Sparr Tr.") at 7-8, 116-17 (attached as Exhibit 1 to the Affidavit of Lauren Dwyer in Support of Eli Lilly and Company's Reply Brief ("Dwyer Aff."). Moreover, Mr. Sparr previously testified that the only DES he personally observed between 1958 and 1971 was Lilly's. *See id.* Mr. Sparr admitted that he did not observe various non-Lilly DES pills that were on the market during the 1960's. *See id.* at 183-90. Mr. Sparr cannot say with *any* certainty that Lilly manufactured the only white cross-scored DES pill in 1969/1970 when he testified that the *only* DES pill he saw that year was Lilly's.

Plaintiffs also rely on Mr. Sparr's Statement for its general conclusion that Lilly had 94% of the Massachusetts DES market during the 1960's.[2] *See* Sparr Statement, Plaintiffs' Opposition, App. 11, at 6. As discussed in Lilly's Motion to Strike, Mr. Sparr's limited sampling and haphazard method provide no support for what the relevant market looked like in 1969/1970. Mr. Sparr has no experience or expertise in market research, but was employed by Plaintiffs'

---

[2] Neither Mr. Sparr's personal experience nor his "market research" qualify him as an expert witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Should this case proceed to trial, Lilly will submit a *Daubert* motion in limine to exclude Mr. Sparr.

counsel to conduct a "survey" designed by Plaintiffs counsel for the sole purpose of use in

litigation against Eli Lilly. *See* Sparr Tr. 5-7, 116-119, 126-128, 159-163; May 5, 2004 Letter

from Aaron M. Levine, Esq., to Harold B. Sparr, R.Ph., D.Ph., M.S. (attached as Exhibit 2 to

Dwyer Aff.). Moreover, Mr. Sparr sampled only 376 pharmacists for his "survey", simply on

the basis that they were *first licensed* in Massachusetts from 1963 through 1967 *and* were still

practicing in 2004. *See* Sparr Tr. at 141-144, 156. Mr. Sparr testified at deposition that

approximately 4500-5000 pharmacists were licensed from 1963 through the present. *See id.* at

156-157. The longevity of the selected individuals' licenses in no way reflects their knowledge

of the market in 1969/1970. The sampling of the unexamined, 40 year old recall of 7% of the

pharmacists in Massachusetts (by Mr. Sparr's account), with no cross-checking of any one's

memory, makes the survey unscientific and inadmissible. Consequently, Mr. Sparr's testimony

does nothing to make it more probable that Kimberly Cutone was exposed to Lilly's DES as

opposed to one of the more than 60 other DES manufacturers on the market in 1969/1970.

      3.    <u>Statement of Phillip Cafferty</u>

    Mr. Cafferty also asserts that Lilly manufactured the only white cross-scored DES tablet

without any other markings on the Massachusetts market during the 1960's. *See* Cafferty

Statement, Plaintiff's Opposition, App. 12, at 5. Here again, however, as further discussed in

Lilly's Motion to Strike, Mr. Cafferty's limited experience with DES and lack of personal

knowledge prevents his testimony from assisting Plaintiffs with their product identification

burden. Mr. Cafferty never worked at Bayard Pharmacy in Allston and, thus, has no personal

knowledge of the stocking and dispensing practices of this store. *See* Transcript of Deposition of

Phillip Cafferty in Dean v. Eli Lilly and Company, 02-CV-11078 (RGS) ("Cafferty Tr.") at 54

(attached as Exhibit 3 to Dwyer Aff.). Mr. Cafferty was not even licensed in Massachusetts in

1969/1970, and therefore never dispensed DES anywhere in Massachusetts during the relevant time period. *See id.* at 54-55, 91-92.

Moreover, Mr. Cafferty admits in his own statement that "I have never seen or heard of a DES product not manufactured by Eli Lilly." *Id.* at 4. Mr. Cafferty was employed as a detailman for Lilly from 1965 until 1984, but he never detailed DES and his territory never included Allston, Massachusetts. *Id.* at 65, 82-84. Having never seen any of the non-Lilly DES products on the Massachusetts market in 1969/1070, and having never dispensed DES in Massachusetts during the 1960's, Mr. Cafferty has no basis for testifying that the DES pill description at issue applies exclusively to Lilly's pill.

### 4. Statement of Julie Zheng

Plaintiffs also submit the statement of a clerk in their attorney's office who states that she could find no other 25 mg DES product that was white, round, and cross-scored among photographs in Plaintiffs' attorney's "firm archives." *See* Statement of Julie Zheng, Plaintiff's Opp. at App. 9. Nothing suggests that the photographs examined represent a complete set of the DES products on the market in 1969 and 1970, or even that any of the photographs show a product marketed in these years. There is no basis from the affidavit to indicate that the photographs reviewed by Ms. Zheng show when the pills depicted were on the market. Moreover, based on prior experience with counsel for Plaintiffs, it is Lilly's belief that at least 41 of the over 60 DES manufacturers listed in the 1969 Red and Blue Books were <u>not</u> represented among the photographs Ms. Zheng reviewed.[3] *See* 1969 Red and Blue Books (attached as

---

[3] It is Lilly's belief that Ms. Zheng has not reviewed photographs of the following manufacturers' DES pills listed as available in the national market in the 1969 Red and Blue Books: ABA Pharmaceuticals, American Drug Products, American Quinine, Archer Taylor, Arcum, Atlas Pharmaceuticals, Barry-Martin, Bell Pharmaceuticals, Blue Cross, Bowman, Bundy, CMC, Columbia Medical, Daniels, Faraday, Fremont, Gotham, Hance Brothers & White, Harvey Laboratories, Kasar, Kenyon Drugs, King Laboratories, Klug Laboratories, Lit, Massengill, North American Pharmaceuticals, Pameco, Pharmex, Preston Franklin, Purepac Pharmaceuticals, Raway, Reiss Williams, Rondex,

Exhibits 3 and 5 to the Affidavit of Lauren Dwyer in Support of Eli Lilly and Company's Motion

for Summary Judgment).  Unless Plaintiffs can show what these manufacturers' DES pills

looked like during the relevant years, they cannot meet their burden.  Neither Plaintiffs nor Lilly

knows the descriptions of all of the DES pills on the market in 1969 and 1970.  Therefore, Ms.

Zheng's statement does not provide support for Plaintiffs' product identification burden.

**B.      Plaintiffs Provide No Proof that Bayard Pharmacy Used McKesson & Robbins as its Wholesaler.**

Plaintiffs have *no* evidence of which wholesaler or wholesalers the Bayard Pharmacy

used.  Plaintiffs have not identified a pharmacist or other employee who can testify to the

ordering, stocking, and dispensing practices of the Bayard Pharmacy in *any* year, much less

1969/1970.  Further, Plaintiffs have produced no prescription slips or pharmacy records capable

of shedding light on the Bayard Pharmacy's preferred wholesaler(s).  Plaintiffs' own "expert"

witnesses on product identification have testified that Massachusetts pharmacies could use any

one of several wholesalers, including Gilman Brothers, Daley, and McKesson.  *See* Sparr

Statement, Plaintiff's Opposition, App. 11, at 4; Cafferty Tr., at 68 (Dwyer Aff., Ex. 2).

Additionally, in their attempt to identify Lilly through McKesson, Plaintiffs blatantly

mischaracterize the wholesaler information that is on the record.  James DellaVolpe, a former

employee of McKesson and Robins Company, accurately states that McKesson "was *a* primary

distribution center for pharmaceuticals in the Boston area."  *See* Statement of James DellaVolpe,

Plaintiffs' Opposition, App. 26, ¶ 2 (emphasis added).  Plaintiffs spin this clear language into

testimony that McKesson "was *the* primary distribution center for pharmaceuticals in the Boston

area…"  *See* Plaintiffs' Opposition, at 16 (emphasis added).  Plaintiffs' own experts clearly

---

Strong Cobb American, Superior Pharmaceuticals, Supreme, TMCO, Torigian, Vita-Fore, Vista Pharmaceuticals, and Winsale.

recognize that McKesson was one of several major pharmaceutical wholesalers from which

Boston pharmacies had to choose in 1969 and 1970. There is no evidence on the record

indicating which, if any, of these major wholesalers was actually used by the Bayard Pharmacy.

Plaintiffs similarly mischaracterize the terms of Lilly's wholesale agreement.

Specifically, the Lilly wholesale agreement in place when Kimberly Cutone was born requires

the following of wholesalers:

> **C. Sales Effort.** To promote Lilly products, to give them full
> selling efforts, and not to --
>
> 1. Refuse or fail to supply Lilly products where specified, or
> 2. Give preference to any other brand of pharmaceuticals or
>    biologicals where no brand is specified.

*See* Wholesale Agreement, Plaintiff's Opposition, App. 15. Clause C.1 of the agreement

requires wholesalers to honor a pharmacy's specific request for Lilly product. Clause C.2

prevents wholesalers from maintaining a policy of distributing particular non-Lilly brand name

when a pharmacy's order fails to specify a brand. Plaintiffs not only misinterpret this language,

but misquote it, arguing that "Lilly required that wholesalers give 'preference' to the Lilly

product over all other competitors." Plaintiffs' Opposition, at 16. This is simply not true. Lilly

required wholesalers to maintain an equal playing field when filling unspecified orders, not to fill

all such orders with Lilly products.

## C.   PLAINTIFFS WRONGLY ATTEMPT TO FOIST THEIR PRODUCT IDENTIFICATION BURDEN ONTO LILLY

Plaintiffs argue that Lilly has not shown another manufacturer with a pill description

matching that of Ms. Camporesi because Squibb's Stilbetin cannot serve as an "alibi" for Lilly.

Plaintiffs' Opposition, at 12. The problem with this argument is that Plaintiffs do not date their

description of the Squibb pill. The appearance of pharmaceutical drugs can change, and

Plaintiffs have provided no evidence that Squibb's Stilbetin had an imprint on it *in 1969/1970*.

More fundamentally, Plaintiffs fail to comprehend the import of the existence of the Squibb DES pills. Lilly points to Squibb not as *the* manufacturers who made *the* DES Ms. Camporesi allegedly ingested, but rather as an example of the fact that many manufacturers may have made white, cross-scored pills in 1969/1970. There were over 60 manufacturers in the DES market that year. Neither Lilly nor Plaintiffs know what all those DES pills looked like. What the parties do know is that more than one DES manufacturer made a white, cross-scored DES pill. This undisputed fact makes it more likely than not that *other* DES manufacturers made pills fitting this description. Scoring generally is a practical rather than ornamental characteristic; all manufacturers had the ability to score their pills to make them easier to cut into smaller dosages, and numerous manufacturers did so. The cross-score is not a trademark or logo with some indicia of exclusivity.

Plaintiffs attempt to foist their product identification burden onto Lilly, relying on everything but Massachusetts authority for their arguments. Plaintiffs' rely on case law from Iowa, Illinois, Ohio, Michigan, and beyond. *See id.* at 7-10. As Lilly has already argued, *Massachusetts law* puts the burden on Plaintiffs to submit evidence showing that it is "more probable than not" that their injuries were caused by Lilly's product. *Spencer v. Baxter Int'l., Inc.*, 163 F.Supp.2d. 74, 78 (D. Mass. 2001). Rather than submitting evidence that would meet this burden, Plaintiffs argue that Lilly has not identified another manufacturer whose product might have caused their injuries. Setting aside the fact that Lilly has identified such manufacturer (and there may be others), Massachusetts law does not require defendants to identify alibi manufacturers to win summary judgment. *See Spencer*, 163 F.Supp.2d at 78 (granting summary judgment to defendants where plaintiffs could not identify which one of two available blood products caused their injuries). In this case, where the only competent evidence

of product identification is a pill description, it is *Plaintiffs'* burden to prove that Lilly

manufactured the only pill meeting that description. Plaintiffs have not and cannot come close to

meeting this burden.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Lilly's Memorandum in

Support of its Motion for Summary Judgment, Lilly respectfully requests that this Court enter

summary judgment in its favor on all claims.

Respectfully submitted,

FOLEY HOAG LLP

/s/ James J. Dillon
James J. Dillon (BBO # 124660)
Brian L. Henninger (BBO # 657926)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02111-2600
(617) 832-1000

Dated: June 27, 2006

**Certificate of Service**

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on June 27, 2006.

| | |
|---|---|
| Aaron M. Levine, Esq.<br>Aaron M. Levine & Associates<br>1320 19th Street, N.W.<br>Suite 500<br>Washington, D.C. 20036<br>**Attorney for Plaintiffs** | Sheila Mone<br>Kenneth M. Levine & Associates<br>370 Washington Street<br>Boston, MA 02445<br>**Attorney for Plaintiffs** |
| Juliet A. Davidson<br>Todd& Weld<br>28 State Street<br>Boston, MA 02109<br>**Attorney for Plaintiffs** | Erica Tennyson<br>Todd & Weld<br>28 State Street<br>Boston, MA 02109<br>**Attorney for Plaintiffs** |

   /s/ James J. Dillon
James J. Dillon (BBO # 124660)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KIMBERLY C. CUTONE and ANTHONY CUTONE, <br><br> Plaintiffs, <br><br> v. <br><br> ELI LILLY AND COMPANY, <br><br> Defendant. | CIVIL ACTION No. 04-CV-12725 (JLT) |

## AFFIDAVIT OF LAUREN E. DWYER
## IN SUPPORT OF ELI LILLY AND COMPANY'S
## REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

I, Lauren E. Dwyer, being first sworn on oath, say that the following is true and correct:

1.    I am an attorney at Foley Hoag LLP, counsel for Eli Lilly and Company ("Lilly") in this action.  I am duly admitted to practice in the District of Massachusetts.

2.    Attached as Exhibit 1 are excerpts from a true copy of the Transcript of Deposition of Harold Sparr in *Bohlin v. Eli Lilly and Company*, 03-CV-11577 (MEL).

3.    Attached as Exhibit 2 is May 5, 2004 Letter from Aaron M. Levine, Esq., to Harold B. Sparr, R.Ph., D.Ph., M.S.

4.    Attached as Exhibit 3 are excerpts from a true copy of the Transcript of Deposition of Phillip Cafferty in *Dean v. Eli Lilly and Company*, 02-CV-11078 (RGS),

Dated:  June 27, 2006

Lauren E. Dwyer

Sworn before me this 27th day of June, 2006.

Notary Public
My commission expires: 12/21/2012

JESSICA LEIGH CUSHMAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 21, 2012

B3220806.1

**EXHIBIT 1**

1

1             VOLUME  I

2             PAGES   1 - 237

3             EXHIBITS  Per Index

4

5        UNITED STATES DISTRICT COURT

6        DISTRICT OF MASSACHUSETTS

7  ------------------------------x

8  NANCY A. BOHLIN, INDIVIDUALLY,

9  AND AS MOTHER AND NEXT FRIEND OF

10  SAMANTHA A. BOHLIN, A MINOR,    Civil Action

11    Plaintiff       No. 03-CV-11577

12    v.           (MEL)

13  ELI LILLY AND COMPANY,

14    Defendant

15  ------------------------------x

16

17      DEPOSITION OF HAROLD B. SPARR

18      Tuesday, December 7, 2004

19       Foley Hoag, LLP

20      155 Seaport Boulevard

21      Boston, Massachusetts

22

23    REPORTER:  Virginia L. Barry, RPR/CSR

24

**Sparr, Harold (12/7/04)**          **Page 1**

5

1  Attorney Patricia Stanford?

2    A.  About 11 months.

3        MR. LEVINE:  I think you mean

4  retained, as opposed to employed.  We don't take out

5  taxes.

6        THE WITNESS:  Right.

7    Q.  So Mr. Levine's interjection is that

8  you're an independent contractor employed by him; is

9  that correct?

10    A.  Correct.

11    Q.  And is that your only employment at

12  present, working for these two attorneys?

13    A.  Well, I'm an on call pharmacist at a

14  hospital in Brookline, but I haven't been called in

15  the past year.

16    Q.  I'm going to go back to your employment by

17  these two attorneys in a minute.  Let me go through

18  a little bit about my understanding about your

19  background.  Am I correct, sir, that you attended

20  and graduated from the Massachusetts College of

21  Pharmacy, graduating in 1955?

22    A.  That's correct.

23    Q.  Am I correct also in looking at an exhibit

24  to your report that following that graduation you (2/7/04)      **Page 5**

7

1   where you practiced pharmacy between 1958 and 1969?

2      A.  Yes.

3      Q.  And your resume also indicates that in

4   1970 you were at Robert's Pharmacy in Belmont; is

5   that correct?

6      A.  That's correct, I purchased it.

7      Q.  And you purchased it in 1970?

8      A.  In December, '69.

9      Q.  And after you made that purchase did you

10   practice as a pharmacist at the Robert's Pharmacy in

11   Belmont, Massachusetts?

12     A.  That's correct.

13     Q.  And for 1970 was that the only pharmacy

14   where you practiced pharmacy?

15     A.  Yes.

16     Q.  How long did you stay at the Robert's

17   Pharmacy?

18     A.  Until 1976.

19     Q.  Now, between 1958 and 1971, I'm going to

20   be, I realize that you have experience after that,

21   but between 1958 and 1971 is it accurate to say that

22   your experience as a practicing pharmacist was

23   limited to first the Sparr's Drugstore and then

24   Robert's Pharmacy?                **Sparr, Harold (12/7/04)**                **Page 7**

8

1    A.  My practice, yes.

2    Q.  Now, looking at your resume, Mr. Sparr, I

3  see that you have obtained a number of honors and

4  positions.  In between 1955, when you graduated from

5  the Mass. College of Pharmacy, and 1971 what, if

6  any, position did you have with the Massachusetts

7  Board of Registration of Pharmacy?

8    A.  None.

9    Q.  And between 1955 and 1971 what, if any,

10  position did you have with the Massachusetts College

11  of Pharmacy and Health Sciences Alumni Association?

12    A.  I was in the alumni association, and I was

13  a member of the Century Club, and on the Board of

14  Corporations.

15    Q.  And the Century Club has to do with

16  contributions; is that correct?

17    A.  Correct.

18    Q.  Mr. Sparr, attached to the report that you

19  gave, which we'll mark as an exhibit in a minute,

20  there is an attachment 10, which is your resume

21  listing of activities, publications, et cetera, and

22  employment, I can put it in front of you, if you

23  like.  But do you know, if, in fact, that Exhibit 10

24  is an accurate statement of your history of **old (12/7/04)**                **Page 8**

101

1    Q.  Did you make any effort to remind people

2  that they had to think back, and that they couldn't

3  just take their memories from 1972, from the '70s

4  and the '80s and the '90s, and the early part of

5  this century, and apply that back; did you do any --

6    A.  Absolutely not.

7    Q.  So you did nothing to try and help them to

8  focus their memory on the '50s and '60s; is that

9  correct?

10    A.  I asked them if they remembered what brand

11  of diethylstilbestrol they dispensed.

12    Q.  Do I recall, am I correct in my assumption

13  that a pharmacist would not know the purpose for

14  which a doctor wrote a script, the effect that the

15  doctor wanted to have, he would simply know that

16  this drug and strength was prescribed, and to fill

17  it; is that correct?

18    A.  That's correct.

19    Q.  Now, Mr. Sparr, in your report you made

20  mention of The Red Book and The Blue Book; do you

21  remember mentioning that in your report?

22    A.  Yes.

23    Q.  Could you tell us, please, what The Red

24  Book is, please?           **Sparr, Harold (12/7/04)**                **Page 101**

102

1    A.  It's a publication that includes all the

2  different brands of all the drugs that were

3  available with their cost.

4    Q.  And The Red Book, I take it, is called The

5  Drug Topics Red Book; is that correct?

6    A.  Yes.

7    Q.  And this is a publication that went to all

8  pharmacists; is that correct?

9    A.  As far as I know, yes.  We used to receive

10  it every year.

11    Q.  And this list was a list of drugs that

12  were available for purchase by any of those

13  pharmacists; is that correct?

14    A.  That's correct.

15    Q.  So these were drugs that were available in

16  the national supply chain to be purchased; is that

17  correct?

18    A.  That's correct.

19    Q.  And I believe you told me that The Drug

20  Topics Red Book came out every year; is that right?

21    A.  That's correct.

22    Q.  And there was also something called a Blue

23  Book; is that right?

24    A.  That's correct.    **Sparr, Harold (12/7/04)**    **Page 102**

103

1    Q.  And this is called, The American

2  Druggist's Blue Book; is that right?

3    A.  That's right, I'm assuming it is.

4    Q.  Let me show you a photocopy of this.

5    A.  Yes.

6    Q.  The American Druggist's Blue Book?

7    A.  Yes.

8    Q.  And was this also, sir, a publication that

9  went to all pharmacists?

10    A.  Yes.

11    Q.  And this was a publication that listed

12  drugs that were available to purchase on a national

13  basis; is that right?

14    A.  Yes.

15    Q.  So any pharmacist could buy any drug that

16  was listed in The Blue Book or The Red Book; is that

17  correct?

18    A.  Providing that the wholesaler had it.

19    Q.  But these were the ones that were

20  available; is that right?

21    A.  That's correct.  They wouldn't list drugs

22  that weren't available.

23    Q.  Right.

24    MR. LEVINE:  How do you know?**d (12/7/04)**                    **Page 103**

104

1    A.  Why would they?

2        MR. LEVINE:  Because they're out of

3  date.

4    Q.  Now --

5        (Phone interruption.)

6    Q.  Now, Mr. Sparr, some pharmacists could

7  purchase drugs directly and not use a wholesaler; is

8  that right?

9    A.  That is correct.

10   Q.  And am I correct that in The Blue Book and

11  Red Book some of these companies listed off phone

12  numbers where they could be reached to purchase

13  drugs without going through a wholesaler?

14   A.  We had catalogues from the various

15  companies that we would buy from, and it would have

16  the phone number in there or the business card of

17  the representative of that company.

18   Q.  Mr. Sparr, is it your understanding that

19  all of the drugs that were available in the country

20  and all the companies that made drugs listed them in

21  The Red Book and The Blue Book?

22   A.  I assume if they wanted to sell it, it

23  would be.

24   Q.  Were there any local companies that listed /7/04)          **Page 104**

105

1  drugs that might not decide to list them in a

2  national publication?

3      A.  It's possible.

4      Q.  Were you aware of any such companies?

5      A.  I knew some repackers, but I never bought

6  from them.

7      Q.  What repackers did you know in

8  Massachusetts?

9      A.  I believe there was a company called Alton

10 Products, and Chester Baker, and a gentleman by the

11 name of Argus, A R G U S.

12     Q.  I'll come back to those in a little bit,

13 Mr. Sparr, later on in my outline here.

14         I guess one thing I forgot to say

15 about the American Druggist, American Druggist Blue

16 Book, I take it that that came out every other year;

17 is that correct?

18     A.  I do remember receiving these two books

19 about six months apart, and we would use the later

20 one as far as the price was concerned.

21     Q.  But your pharmacy received them both, both

22 The Red Book and The Blue Book?

23     A.  Yes.

24     Q.  As part of your survey, Mr. Sparr, did you**2/7/04)**          **Page 105**

106

1   make any effort to find out how many different

2   companies listed DES or diethylstilbestrol for sale

3   in these national publications, The Red Book or The

4   Blue Book?

5     A.  I had copies of one of the two books.

6     Q.  Yes.  Did you make any effort to find out

7   how many companies listed their DES products for

8   sale on a national basis?

9     A.  I didn't count them.

10     Q.  Was it your impression that there were

11   hundreds of such companies?

12     A.  Probably at least a hundred.

13     Q.  And was it your impression as you reviewed

14   this that those companies would list their products

15   in more than one year, in several years?

16     A.  Yes.

17     Q.  Did you form the view that those companies

18   were listing the products in these national

19   publications because they were, in fact, selling

20   some of those products?

21     A.  I would assume so.

22     Q.  And it wouldn't make sense for them to

23   continue to list it if they weren't selling any; is

24   that correct?     **Sparr, Harold (12/7/04)**     **Page 106**

107

1    A.  That's correct.

2    Q.  When you did your survey, did you factor

3  in at all the fact that there were in your view at

4  least a hundred, and I will represent to you

5  actually several hundred companies, that listed

6  their DES products for sale nationally in The Red

7  Book and The Blue Book?

8    A.  Did I know it?

9    Q.  Did you factor it in at all to your

10  investigation about --

11    A.  Yes, because the survey didn't direct

12  pharmacists to answer in a particular manner.

13    Q.  Okay.  Now, Mr. Sparr, from your

14  experience as a pharmacist and your conversations

15  with others, did you run across any pharmacists that

16  might use, let's take DES, one brand of DES for

17  filling unspecified prescriptions and another brand

18  available in case a doctor did specify?

19    A.  Yes.

20    Q.  And did you run across any of these

21  companies, any of these pharmacists who had a sort

22  of non famous name pharmaceutical company as the

23  brand that they dispensed in the course of dealing

24  and dispensing generic prescriptions? **Harold (12/7/04)**          **Page 107**

116

1    records about the prescriptions from individuals?

2        A.   Well, it was between me and the trash can.

3        Q.   Let's begin to turn to your personal

4    experience as a basis for this.  This is really in

5    paragraph one of your letter of October 12, 2004,

6    which is deposition Exhibit 1.

7             In what way, Mr. Sparr, did your

8    personal experience as a retail practicing

9    pharmacist bear on your ability to conclude that

10   Lilly, as you conclude, had 94 percent of DES sales

11   in Massachusetts?

12           MR. LEVINE:  Pregnancy sales.

13       A.   It was based on the, both on the surveys

14   and on the statements that I received.

15       Q.   I'm going to do the survey, and we've

16   talked about the statements you received.  But in

17   paragraph one of your letter you talk about your

18   personal experience --

19       A.   Yes.

20       Q.   -- as a retail practicing pharmacist as

21   one of the bases for your opinion.  And I'm asking

22   you, what is it about your experience as a

23   practicing retail pharmacist at the Sparr Drugstore?

24       A.   Sparr's Drugstores and Robert's Pharmacy  2/7/04)                **Page 116**

117

1    we only stocked Lilly brand.

2        Q.  So you can tell from that that for the

3    stores that you were the proprietor of, you only

4    stocked Lilly; is that correct?

5        A.  That's correct.

6        Q.  But from that experience at Sparr's and at

7    Robert's, you would not be able to tell anything

8    else about what any other store did; isn't that

9    right?

10       A.  Except from the statements that I received

11    from pharmacists that practiced in the '50s and

12    '60s.

13       Q.  So your personal experience as a retail

14    practicing pharmacist really gives your experience

15    at Sparr's Drugstore and at Robert's Pharmacy; is

16    that right?

17       A.  Correct.

18       Q.  Let me ask about being a teacher of

19    pharmacy over the past 49 years.  First of all, in

20    what sense were you a teacher of pharmacy over the

21    last 49 years?

22       A.  I was a preceptor for over 650 last year

23    pharmacy students from Mass. College of Pharmacy and

24    Northeastern.              **Sparr, Harold (12/7/04)**              **Page 117**

118

1    Q.  And what does being a preceptor mean?

2    A.  They had to do a five-week externship in a

3  hospital pharmacy, so the schools would send me

4  students on a regular basis.

5    Q.  So this would be while you were working at

6  the hospital pharmacies that we talked about after

7  the '70s; is that right?

8    A.  Correct.

9    Q.  So in that context, you were not involved

10  in seeing or dispensing prescriptions for DES for

11  the use in accidents of pregnancy; isn't that right?

12    A.  Pardon me?

13    Q.  In the hospital pharmacy context after the

14  1970s you would not have been involved in seeing or

15  filling any prescriptions for DES for the use in

16  accidents of pregnancy?

17    A.  That is correct.

18    Q.  Now, you mentioned being a preceptor for

19  students while you were working in the hospital

20  pharmacies.  Is there any other aspect of teaching

21  pharmacy that you want to call my attention to as a

22  basis for your opinions in this case?

23    A.  I worked for about five semesters as an

24  adjunct professor in the pharmacy practice lab at **2/7/04)**          **Page 118**

119

1   Mass. College of Pharmacy.

2      Q.  And about when was this, please?

3      A.  '90, '91, '92.

4      Q.  And, I take it, then, that at that period

5   of time in the '90s nothing about your teaching

6   would have had anything to do with seeing or filling

7   prescriptions for DES in relation to accidents of

8   pregnancy?

9      A.  That's correct.

10         MR. LEVINE:  You're entirely ignoring

11   the historical aspect of these positions.

12         MR. DILLON:  I'm just asking the

13   questions.

14         MR. LEVINE:  Okay, but you're asking

15   the wrong questions.  I get to ask the questions

16   when I'm qualifying him, and I will be able to show

17   that in this preceptorship and in the adjunct

18   professor he did come into contact with the

19   historical aspects of pharmacy and DES, but you

20   don't want to do it, it's your deposition.

21         MR. DILLON:  I think that that's

22   something that I'll let you worry about.

23         MR. LEVINE:  Okay.

24      Q.  Is there anything else that you want to **(12/7/04)**          **Page 119**

126

1    A.  Correct.

2    Q.  So in terms of designing a survey, I take

3    it that you had never before attempted or been

4    involved in designing a survey to develop market

5    share; is that right?

6    A.  No.

7    Q.  Am I incorrect, you have been involved in

8    designing a survey?

9    A.  No, I have not, I was not.

10   Q.  I take it that you haven't done any

11   publications on survey research; is that correct?

12   A.  That's correct.

13   Q.  And have you ever taken any course work in

14   survey design?

15   A.  No.

16   Q.  Have you ever taken any, received any

17   training in psychology?

18   A.  I believe I took a psychology class when I

19   was at Mass. College of Pharmacy.

20   Q.  Were you ever involved in a class involved

21   in psychology or sociology related to survey

22   research?

23   A.  No.

24   Q.  How about marketing, have you ever taken/7/04)          **Page 126**

127

1 any, ever received any training in marketing?

2     A. I went to Babson when I was working

3 towards an MBA degree, I went there for

4 three semesters, and several of the courses that I

5 took were in marketing.

6     Q. And I take it you did not decide to

7 complete that degree at Babson; is that right?

8     A. That's right, it interfered with my work

9 schedule.

10     Q. Have you had any formal training in

11 statistics?

12     A. No. I started a statistic course at

13 Babson, but that's when I dropped out.

14     Q. Before you got involved in this project

15 did you have any experience in sampling; in other

16 words, in deciding what sample out of a larger group

17 would accurately reflect the findings that you would

18 get in the larger group?

19     A. Yes.

20     Q. And in what way did you do that?

21     A. In the survey I, we decided what year that

22 we were going to determine to be the midline of

23 popularity.

24     Q. Okay. I really wanted to ask, I did not **(12/7/04)**          **Page 127**

128

1    ask the question clearly, before you got involved in

2    this survey for Mr. Levine had you ever been

3    involved in attempting to design a sampling

4    methodology?

5        A.  No.

6        Q.  Okay.  Now, you mentioned about sampling

7    in this one that you would attempt to define a

8    midpoint, as it were, for popularity; is that what

9    you tried to do?

10       A.  Yes.

11       Q.  And what did you determine the mid point

12   was?

13       A.  I looked at the matrixes of California and

14   New York.

15       Q.  And the matrixes, each of them give the

16   market share, as it were, for each of the companies

17   involved in those proceedings; is that correct?

18       A.  Yes.

19       Q.  And how did you use the matrices to decide

20   where the peak of demand was or peak of use?

21       A.  Well, I personally remembered it from

22   dispensing when it started to decline and when it

23   became really popular.

24       Q.  And what did you remember about -- so the **7/04)**                    **Page 128**

141

1        MR. LEVINE:  But was it a nurse?

2        THE WITNESS:  I don't know.

3     Q.  Whatever it was, this list of 370 is a

4  list that you got from Mr. Levine's office; is that

5  correct?

6     A.  Correct.

7     Q.  And what, if anything, did you do to find

8  out if that, in fact, represented the list, what it

9  said to be, those who got a license during those

10  years, '63 to '67, for the first time and were still

11  practicing in Massachusetts; what did you do to test

12  that?

13     A.  Well, I recognized the fact that the

14  licensees, I was able to go to the alumni directory

15  and look in there by year, and I saw the names, the

16  names popped up from Mass. College of Pharmacy, but

17  there were other schools of pharmacy where people

18  became registered.

19     Q.  What did you do to find out that the list

20  of names you got from Mr. Levine accurately

21  reflected that category of people who were first

22  licensed between 1963 and 1967 and who were also

23  still practicing in Massachusetts?

24     A.  I would see absolutely no reason why they  2/7/04)              **Page 141**

142

1  would lie.

2  Q.  So you didn't do -- you didn't see the

3  need to do anything to test them?

4  A.  No.

5  Q.  So you were not actually trying to find

6  out about pharmacists who were simply licensed

7  between 1963 and 1967, you also had this additional

8  condition that to qualify for this study they had to

9  also still be practicing; is that right?

10  A.  That's correct, because the disk only has

11  those currently licensed.

12  Q.  So there were a number of pharmacists, I

13  take it -- so, I'm sorry, the disk only has those

14  currently licensed?

15  A.  That's correct.

16  Q.  I see.  So there were pharmacists who

17  were, in fact, licensed between 1963 and 1967 who

18  either stopped the practice of pharmacy or moved

19  somewhere else, but wouldn't show up in your group;

20  is that right?

21  A.  That's correct.

22  Q.  And how many were those?

23  A.  I have no idea.

24  Q.  Who was it who felt that this category --**12/7/04)**                **Page 142**

143

1  let me back up.  Who was it who decided that this

2  category of pharmacists who were first licensed in

3  1963 to 1967 and were still current was a group that

4  was an adequate sampling frame or survey population

5  for your study, who did that?

6     A.  I determined it.

7     Q.  You determined that?

8     A.  Yes.

9     Q.  And what were the criteria that you used

10  to determine that?

11     A.  I knew the popularity of the drug peaked

12  in 1965, around 1965, so I went back two years

13  before '65 to two years after '65.

14     Q.  And that is the only criteria you had; is

15  that correct?

16     A.  Yes.

17     Q.  Did you have any basis to decide that the

18  people that were still practicing accurately

19  reflected that cadre of pharmacists who were first

20  licensed between 1963 and 1967?

21     A.  It was a representation.

22     Q.  How do you know that?

23     A.  Because I do know some of them that are

24  still working.        **Sparr, Harold (12/7/04)**        **Page 143**

144

1    Q.  So --

2    A.  They're younger than I am.

3    Q.  What was the basis on which you decided

4  that this was a, you know, an adequate snapshot, an

5  accurate snapshot of what that group of newly

6  licensed pharmacists between '63 and '67 looked

7  like; how did you decide that?

8    A.  I decided that the peak period was 1965,

9  and I went two years on either side of that.

10   Q.  I understand that part, but now you've got

11  this extra thing, which is a dividing line that

12  you're now not dealing with everybody whose been

13  licensed between '63 and '67, but only that part of

14  that group that's still practicing in 2004.

15   A.  Correct.

16   Q.  All right.  How did you decide that those

17  who still were practicing in 2004, whatever that

18  group was, was representative of the group that was

19  first licensed in '63 and '67; how did you decide

20  that?

21   A.  Well, I felt that because they were still

22  licensed, that the majority of them were still

23  working, and they would have good knowledge of what

24  transpired back in the '60s.  **Sparr, Harold (12/7/04)**              **Page 144**

156

1    A.  My personal experience I know.

2    Q.  Okay.  I don't want your personal

3   experience to interfere with this question.  I

4   understand you have personal experience, and I

5   understand that you have other surveys and

6   interviews that you've done besides the survey.  But

7   with respect to the survey we've been talking about,

8   where the first entrant, okay, was licensed on

9   January 1, 1963, do you agree with me that that

10   survey standing alone, that survey alone cannot

11   supply you with any information about practices in

12   Massachusetts before January 1, 1963?

13    A.  It only gives me information from '63 to

14   '67.

15    Q.  Okay, thank you.  That's really all I

16   wanted.  Now, Mr. Sparr, if we take your assumption

17   that there were, approximately, between 4500 and

18   5000 pharmacists practicing in Massachusetts between

19   1963 and 1967, 370 is a pretty small percentage of

20   that; isn't it?

21    A.  You have to consider that pharmacists in

22   order to get licensed have to have 1500 hours of

23   explorational training, and they get that, they

24   usually start working in their first year at **rold (12/7/04)**                    **Page 156**

157

1   pharmacy school in a pharmacy, that's a requirement,

2   so they would know what went on prior to 1963.

3   Those people that got registered, licensed in 1963,

4   they would have known since '59.

5       Q.  Okay.  Now, Mr. Sparr, when you're a

6   student at the college --

7           MR. LEVINE:  You're arguing with him

8   now.

9       Q.  When you're a student at the College of

10  Pharmacy, Mr. Sparr, are you allowed to fill

11  prescriptions?

12      A.  Yes.

13      Q.  You can fill prescriptions from the first

14  year?

15      A.  Yes.

16      Q.  And are you allowed to purchase

17  prescriptions and buy them, order them?

18      A.  Yes.

19      Q.  And has that happened in your store, at

20  the Sparr Drugstore, did you let students from the

21  pharmacy school fill prescriptions in your store?

22      A.  I was the only student.  I didn't dispense

23  it, I filled it; there's a difference.

24      Q.  I see.  I'm sorry.  So dispensing the  **old (12/7/04)**          **Page 157**

159

1    made, and I'll come back to it, because I don't

2    think we're going to get done here.

3          MR. LEVINE:  On that respect let me

4    say that you do not have an unlimited amount of

5    time.  Now, six hours, I think, is plenty.

6          MR. DILLON:  Well, I'm on page --

7          MR. LEVINE:  You've got two hours.

8          MR. DILLON:  Mr. Levine, I'm going to

9    take the deposition that I'm going to take, and I

10   have a rather lengthy outline.  I have a lot of

11   questions to ask Mr. Sparr.

12         MR. LEVINE:  Now that you're paying

13   Mr. Sparr, and as soon as he provides you with his

14   rates for his testimony, you can go forward.

15   Q.  Mr. Sparr, let me go back to your

16   statement, which is Exhibit 1 to the deposition, and

17   Exhibit 4 to that is this letter of May 5th, 2004,

18   to you, from Mr. Levine.

19   A.  From me, to Mr. Levine?

20   Q.  No, from Mr. Levine, to you, May 5th.

21   A.  Correct.

22   Q.  Now, Mr. Sparr, in the second paragraph

23   there, this letter talks about the trustworthiness

24   of the survey depending on a well grounded sampling(04)          **Page 159**

160

1    and minimization of hearsay dangers; in your study

2    what did you do to minimize hearsay dangers?

3        A.  There's absolutely no mention --

4            MR. LEVINE:  It's not only his study,

5    but it's a study of three people.  It's not his

6    study.  The primary statistical brains behind it was

7    Doctor Vanderschmidt.  But go ahead.

8        Q.  Okay.  Well, you mentioned three people,

9    it's Doctor Vanderschmidt, Mr. Sparr, and

10    Mr. Levine; is that right?

11        A.  Mr. Steer.

12        Q.  Okay.  What, if anything, did you do to

13    minimize the hearsay dangers?

14        A.  Made sure that there weren't anything in

15    the questions that would lead them to answer it

16    incorrectly.

17        Q.  And what was it about the questions that

18    you put in there to avoid hearsay problems?

19        A.  They weren't leading questions.

20        Q.  Is there anything in this survey that you

21    did that would make sure that the pharmacist was

22    answering from their own personal experience, as

23    opposed to information that they may have gotten

24    from somebody else?    **Sparr, Harold (12/7/04)**            **Page 160**

161

1    A.  I didn't go to each one of their houses to

2  see if they filled it out without asking anybody

3  else.  I assumed they did it by themselves.  It's

4  really not a very tough questionnaire.

5    Q.  The next thing in that paragraph is about

6  protecting against the relative susceptibility of

7  the faulty memory.  Now, what, if anything, did you

8  do to guard against susceptibility of faulty memory?

9    A.  If they couldn't remember, they couldn't

10  fill it out.

11    Q.  Is there any other aspect of memory, I

12  think we talked about this before, about people who

13  have memories that, in fact, don't correspond to the

14  actual fact, is there anything you did to try and

15  find out if any of the respondents to this survey

16  had a flaw in their memory or were incorrect?

17    A.  No.

18    Q.  Why don't you tell me everything you can

19  tell me about the universe that you defined as

20  listed on there, on Mr. Levine's letter to you and

21  request, there is importance to have a properly

22  defined universe, and is there anything about the

23  universe that you wanted to define for me that you

24  haven't told me before?    **Sparr, Harold (12/7/04)**                    **Page 161**

162

1    A.  Well, in my travels for the National

2  Association of Boards of Pharmacy I have spoken to

3  pharmacists from East Coast to West Coast, from

4  north to south, and it all comes out the same.

5    Q.  Do you understand what Mr. Levine was

6  talking about in this letter of May 5th when he

7  talked about, "a properly defined universe"?  Well,

8  let me ask a different question, what do you

9  understand by the term, "a properly defined

10  universe"?

11    A.  I take it to understand that within the

12  confines of the United States the practice of

13  pharmacy was the same in all 48 states.

14    Q.  And that is your assumption; is that

15  correct?

16    A.  That's correct, that's my opinion.

17    Q.  Now, a representative sampling of that

18  universe, is there anything about the reasons why

19  you chose the sample that you did that you want to

20  tell me besides what you've said?  I mean, what

21  you've told me so far, to sum it up --

22    A.  No.

23    Q.  To sum it up to be clear, though, we're on

24  the right same page, you thought that the peak **(12/7/04)**        **Page 162**

163

1    period was, approximately, 1965 in terms of use of

2    the drug, and that you chose '63 to '67 to try and

3    go around that perception of peak use, and that's

4    what you did; is there anything else you want to

5    tell me about sampling besides that?

6        A.  No.

7        Q.  Now, were any of the people who appeared

8    on this list of 370 or so, were any of those people

9    who you had previously spoken to and gotten a

10   statement from?

11       A.  I don't know, because I didn't see the

12   labels.  I didn't see who it was until after they

13   returned them.

14       Q.  Okay.  So do I take it, then, that you

15   never saw the list of 370 people who were mailed

16   this?

17       A.  That's correct.

18       Q.  I was going to ask, because I believe on

19   your report it says something about the list

20   attached, and I don't see a list within your report,

21   Exhibit 1 to this deposition, which tells me the 370

22   people who got this?

23       A.  No, these are the people that replied.

24       Q.  Do you have the list of the 370 people who/7/04)          **Page 163**

183

1    Q.  And they sold DES; didn't they?

2    A.  I really don't know.  I never bought from

3    them.

4    Q.  Did you ever hear of a man named David

5    Meyers of a pharmacy called Trackenberg and Meyers?

6    A.  Yes, I knew them.

7    Q.  Were you aware that his deposition was

8    taken in a case here in Massachusetts?

9    A.  No.

10    Q.  If Mr. Meyers said at his deposition that

11    they carried Berkeley DES, and if they had a

12    specification for Lilly, they would go get that,

13    would that fit with your image of practice in

14    Massachusetts or conflict with it?

15    A.  Conflict with it.

16    Q.  Do you think he was wrong about what he

17    did in his own store?

18    A.  That was his business.  I can't tell him

19    what to do.

20    Q.  Are you familiar with the Melvin Pharmacy

21    in Brighton, Massachusetts?

22    A.  Yes.

23    Q.  Do you know that the Melvin Pharmacy also

24    carried Berkeley Drug DES?**Sparr, Harold (12/7/04)**            **Page 183**

184

1    A.  No.

2        MR. LEVINE:  I'm sorry, carried who?

3        MR. DILLON:  Berkeley.

4    Q.  If you were to see information that

5    demonstrated to you that the Melvin Pharmacy in

6    Brighton did carry Berkeley, would that change any

7    of your views about the distribution of companies?

8    A.  Absolutely not.

9    Q.  You mentioned Argus, Argus Drug; do you

10   know if Argus Drug sold DES?

11   A.  I have no idea.

12   Q.  If --

13   A.  I wouldn't sell it.

14   Q.  If I told you that Argus Drug DES was used

15   at the Samoset Pharmacy in Quincy, would that,

16   assuming, I'm going to ask you to assume it's true,

17   if you assume that was true, would that change any

18   of your views about distribution?

19   A.  Absolutely not.

20   Q.  If I told you that Argus Drug was used at

21   the Clover Drug at Milton, Massachusetts, would that

22   change any of your views today?

23   A.  Absolutely not.

24   Q.  If you I told you that Argus Drugs was **(12/7/04)**                **Page 184**

185

1  used at the Ogar Pharmacy in Dorchester --

2        MR. LEVINE:  Are you going to give us

3  years or dosages or not?

4     Q.  I'm going to give you DES at Argus Drug

5  Company.  Argus at the Ogar Pharmacy, but if I asked

6  you to accept for a moment and assume that, in fact,

7  there is evidence that Argus' DES was at the Ogar

8  Pharmacy and asked you to assume that, would that

9  change any of your views about this?

10     A.  Absolutely not.

11     Q.  How about Brewer Pharmaceutical Company,

12  did you ever hear of them?

13     A.  Yes.

14     Q.  Did they make DES?

15     A.  I know they packaged it.

16     Q.  And they were based in Worcester,

17  Massachusetts; isn't that right?

18     A.  Correct.

19     Q.  So you think it's likely that pharmacies

20  around Worcester, Massachusetts, would have used

21  Brewer DES?

22     A.  No.

23     Q.  Why not?

24     A.  Because Lilly was the standard.  I don't **(12/7/04)**          **Page 185**

186

1    know where Brewer sold their DES.

2        Q.  Well, if I told that we could find Brewer

3    DES in Jones Pharmacy in Natick, and I asked you to

4    accept that, would that fact have any bearing on

5    your view about the distribution of companies in

6    Massachusetts?

7        A.  No.

8        Q.  How about Columbia Pharmacal, you ever

9    hear of them?

10       A.  No.

11       Q.  If I told you that the Columbia Pharmacal

12   was at the Clover Drug at Milton and asked you to

13   assume that as a fact, would that fact have any

14   bearing on your view about the distribution of

15   company DES in Massachusetts?

16       A.  No.

17       Q.  You mentioned Chester Baker when we were

18   talking before, do you remember you mentioned

19   Chester Baker?

20       A.  Yes.

21       Q.  They were a local company selling

22   pharmaceuticals; isn't that right?

23       A.  Yes.

24       Q.  And they made DES; didn't they? **rold (12/7/04)**                    **Page 186**

187

1    A.  I don't believe they made it.  They

2  probably repackaged.

3    Q.  They sold DES?

4    A.  Whatever.

5    Q.  Did they sell any DES in Massachusetts?

6    A.  I have no idea.

7    Q.  They were a Massachusetts company; weren't

8  they?

9    A.  True.

10    Q.  So don't you think it's likely that they

11  had distribution in Massachusetts?

12    A.  They might have.

13    Q.  And if I told you that Chester Baker DES

14  was found in Johnson's Pharmacy in Cochituate,

15  Massachusetts, and asked you to assume that for a

16  fact, would that have any bearing on your view about

17  the distribution?

18    A.  None whatsoever.

19    Q.  If I told you that it was found in

20  Billings & Stover Pharmacy in Cambridge,

21  Massachusetts, would that have any bearing at all on

22  your view of it?

23    A.  No.

24    THE REPORTER:  I'm sorry, you have to/**7/04**)    **Page 187**

188

1  let him finish.  It's getting late, and I can't take

2  the end when you're talking.  So I would like to ask

3  you to repeat it.

4       (Record read as requested.)

5    Q.  Billings & Stover Pharmacy at Cambridge,

6  Massachusetts, Chester Baker DES?

7       MR. LEVINE:  Where are you going with

8  all this?  He admits that there's a small percentage

9  of other companies, it's in his report.

10   A.  No.

11       MR. DILLON:  I'm --

12   Q.  Well, Mr. Sparr, you answered "no" to the

13  question I asked; is that right?

14   A.  Correct.

15   Q.  Mr. Sparr, what account at all did you

16  take of, say, the Chester Baker sale, a local

17  company, or the Argus sales, which is a local

18  company, or the Brewer sales, which is a local

19  company, what account did you take in your view when

20  you ascribed market share as to different companies

21  in Massachusetts?

22   A.  My view was that in those years I

23  personally did not trust generics, and I know that

24  was the view of many of the pharmacists that I knew/**(04)**       **Page 188**

189

1    Q.  The fact that these companies exist do

2   suggest that some pharmacists trusted their

3   products; doesn't it?

4    A.  That may be.

5    Q.  How about CD Smith?

6    A.  Never heard of it.

7    Q.  Never heard of CD Smith?

8    A.  No.

9    Q.  You don't know if they made DES, then?

10    A.  No.

11    Q.  And you don't know if they sold it to the

12   Rosemont Pharmacy in Brighton, Massachusetts?

13    A.  No.

14    Q.  How about Supreme Pharmacy?

15    A.  I've heard of it.

16    Q.  And assume that they made DES, and that it

17   was found in the Wellesley Pharmacy in Wellesley,

18   Massachusetts, would that fact added to the other

19   facts that I've told you have any bearing on your

20   views?

21    A.  No.

22    Q.  If I told that you that Supreme was also

23   found at the Clover Drugstore in Milton, which had

24   Columbia Pharmacal, as well, if I told you that, and7/04)            **Page 189**

190

1  asked you to assume that to be true, would that have

2  any bearing on your opinions?

3    A.  No.

4    Q.  How about Waban Pharmacal?

5    A.  Never heard of it.

6    Q.  Well, do you know -- you've never heard of

7  it, I take it you don't know that they made any DES;

8  is that right?

9    A.  No.

10    Q.  So you have no room for them in your

11  calculation about your market share?

12    A.  No.

13    Q.  Another thing you said, I'm trying to move

14  through this quickly, you said in your statement,

15  which is Exhibit 1, if you'd look in your statement,

16  you said some things about the rejected Lilly's view

17  of market share?

18    A.  The what?

19    Q.  Rejected Lilly's view of market share; I

20  believe it's on page 5 of your letter?

21    A.  What are you referring to?

22    Q.  I'm referring to the middle paragraph

23  there.  You're reviewed the expected testimony, all

24  right?                **Sparr, Harold (12/7/04)**              **Page 190**

236

1         C E R T I F I C A T E

2              I, HAROLD B. SPARR, do hereby

3    certify that I have read the foregoing transcript of

4    my testimony, and further certify that said

5    transcript is a true and accurate record of said

6    testimony (with the exception of the following

7    corrections listed below):

8    Page  Line           Corrections

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19

20   Signed under the pains and penalties of perjury this

21   _____ day of _____, 2004.

22              _____

23              HAROLD B. SPARR

24              **Sparr, Harold (12/7/04)**              **Page 236**

237

1          CERTIFICATE

2

3   Commonwealth of Massachusetts

4   Suffolk, ss

5

6       I, Virginia L. Barry, a Notary Public in and

7   for the Commonwealth of Massachusetts, do hereby

8   certify:

9       That HAROLD B. SPARR, the witness whose

10   deposition is hereinbefore set forth, has been

11   satisfactorily identified and duly sworn by me, and

12   that the deposition is a true record of the

13   testimony given by the witness to the best of my

14   skill and ability.

15       IN WITNESS WHEREOF, I have hereunto set my hand

16   this 20th day of December, 2004.

17

18       _____

19       VIRGINIA L. BARRY

20       RPR/CSR#101193

21

22

23   My Commission Expires:

24   June 20, 2008          **Sparr, Harold (12/7/04)**          **Page 237**

**EXHIBIT 2**

May 5, 2004

Harold B. Sparr, R.Ph., D.Ph., M.S.
210 Nahanton Street, Unit 121
Newton, MA 02459

Re: Massachusetts Marketshare Study

Dear Harold:

This will authorize you to proceed with the organization and execution of a survey to determine, as best you can, the nature and extent of the share of the DES market (Stilbestrol/Diethylstilbestrol) available in the drug stores, in the State of Massachusetts, for a decade, centered in 1965.

The trustworthiness of the survey will depend on a well grounded sampling and minimilization of hearsay dangers, such as (1) the relative susceptibility to faulty memory (2) the dangers of insincerity, (3) faulty perception and (4) faulty reporting.

In order to guard against this, the following must be ensured:

• Properly defined universe
• Representative sample
• Questions that are "clear, precise, and non-leading"
• Interviewers have NO knowledge of litigation or purpose of survey
• Accurate reporting
• Proper statistical analysis
• Objectivity and impartiality

Ultimately you will be required to defend and explain your selection of approach, target population rationale, definition of universe, precision of the questions, interview procedures, perception analysis and guarantees of trustworthiness.

We are in possession of your initial Statement of November 17, 2003, which outlines the popularity of the Eli Lilly brand of DES in the greater Boston Area. Now we ask you to further explore the recollections of pharmacists and the practices, customs and procedures as they existed, to elaborate and give greater validity to that Statement, by looking at the entire market and not just Lilly. You should conduct professional,

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Two
May 5, 2005

statistical analysis, seeking to avoid any possible bias or faulty perceptions. I ask you to conduct this second stage of your research, without any preconceptions and avoid singling out any particular company. Your goal should be: "who else besides Lilly had any share of the DES market in Massachusetts."

In order that the survey and your ultimate opinions be valid, you should strive for the following:

1. Establish a methodology for the survey generally accepted by surveyors in the field, seeking to obtain an accurate picture and answer to the question: If customers walked into random retail pharmacies, in Massachusetts, with a prescription for "Stilbestrol" "Diethylstilbestrol" or "DES" in the Boston area in the decade of the 1960's, estimate as scientifically as you can, what brand or brands (in the pregnancy sizes $5_{mg}$ or $25_{mg}$) of DES would they have received and in what ratios?

2. The survey conclusions must be testable and verifiable with an acceptable error rate for the results.

3. You should consult accepted texts in the field and design the study in accordance with accepted survey principles. Alreck and Settle "The Survey Research Handbook", published by McGraw-Hill may be used for guidance, information and design of the study and process the information received therefrom.

4. You must adjust and test for bias, faulty memory or failure to observe.

5. You have advised me of the initial design consisting of a questionnaire survey of 390 pharmacists, whose names are attached, who were selected from the Massachusetts State Board of Pharmacies, as having been licensed in 1965, which is the center-point of the time

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Three
May 5, 2004

span between 1958 and 1971.   You have advised me that most
practicable manner to sample this population is as follows:

        a)      A cover letter and questionnaire, attached will be sent to
the 390 pharmacists by an independent pharmaceutical
firm, Peter Steere, R.Ph., M.B.A., Principal, Remedy
Pharmacy Management Services, P.O. Box 726, Norfolk,
MA 02056, who will be responsible for the mailing,
receiving and securing the questionnaires and responses
and be responsible for processing and follow-up to obtain
maximum response.

        b)      The raw data will be forwarded by Dr. Steere to Dr. Laura
Vanderschmidt, PhD., Co-Director of the Center for
Education Development and Health, Adjunct Professor of
Public Health, Boston University, CEDH, 53 Bay State
Road, Boston, MA 02215. for tabulation, correlation and
evaluation of questionnaire responses to determine whether
the response insures a reliable sample size, as well as a
viable sample frame.  She must expect and evaluate an
error and confidence rate and take steps to determine that it
does not disqualify the final survey results.

6.    You will then correlate and merge the findings of the survey with the
other information you have and will in the future obtain, as set forth
below, regarding the nature and extent of the DES marketshare in the
Massachusetts area, in the time period under focus, for the $5_{mg}$ and $25_{mg}$
sizes.

7.    The final result of the study will be in the form of a representative
matrix, as the enclosed New York and California matrix.  These matrices
were the product of questionable research and a settlement between the
lawyers representing injured women and the drug companies over ten
years ago.  You should not consider them as binding but only an attempt,
in those limited geographical areas, to create such a matrix between
lawyers anxious to settle litigation.

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Four
May 5, 2005

8. The survey will be a mailed, self administered questionnaire. After three weeks, non-respondents will receive follow-up telephone call to encourage their completion.

9. You must use your own independent judgment and refuse any attempts by this office to bias the survey.

10. You must not solicit any of the survey respondents or in any manner attempting to obtain slanted information.

11. You must not attempt to persuade or assist the recall of any survey respondent.

12. In the event you believe that there exists other information relevant to the appraisal of the question at hand, you may proceed in any independent direction and at your discretion other than that advised in this letter. In that respect, you may resort to any library or other data bank, for other information which you deem relevant.

13. You should be prepared to defend your choice of questionnaire subjects and the questionnaire itself, as you will probably be cross-examined as to the validity of the methodology you use and the results.

14. Although the questionnaire survey will be a significant portion of your data bank, it should complement your other sources of information, specifically personal experience, testimonial statements, and telephone investigation, as set forth below.

15. You must decide in your own mind and in consultation with Dr. Vanderschmidt, that the survey/questionnaire and the questions contained therein are the best available methods to gain the information sought and provide sufficient strength. The questionnaire and survey design should be with Dr. Vanderschmidt approval.

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Five
May 5, 2005

16. You must maintain security of the data and keep it insulated from any
attempts by any person, including this office, to distort the sampling
design the data processing, collection, or interpretation.

17. You shall oversee the mailing, receipt of questionnaires, follow-ups,
telephone verifications, interpretations, telephone interviewing and all
other forms of data processing and data collection, performed by others
with no attempts to influence or affect the final outcome of the study.

18. You shall take all steps necessary so that the study is randomized and all
practicable steps have been taken to reach out to as many potential
respondents as possible.

19. All statistical analysis shall be conducted, by verified and qualified
persons, with sufficient academic credentials for that task.

20. You shall take all necessary steps to insure that the population surveyed
actually possesses the information sought by the survey in order to
insure the viability of the survey.

21. You shall insure that an independent bio-statistician determines a
sampling error and provides an opinion as to the reliability of the
sampling data, perimeters and size.

22. You shall take all steps to avoid sampling selection bias and have such
decision approved by Dr. Vanderschmidt.

23. The survey shall be free of any leading or loaded questions which could
lead to response bias. The questions should be free from confusion,
simple and strive for clarity.

24. A Confidence level shall be established by a bio-statistician, who shall
assess the statistical significance and outstanding deviations and perform
whatever regression analysis and statistical interpretation they deem
advisable. The survey should have a sufficient number of responses for
the survey to carry an accepted confidence level and confidence interval.

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Six
May 5, 2005

25. You will report the findings of this survey in a manner similar to the
matrices supplied. You need not find all of the manufacturers available,
nor need you assign a particular number to any particular manufacturer.

26. You should read the statement and deposition of Phillip Cafferty and
take into considerations those objections the Lilly lawyer voiced to Mr.
Cafferty's survey and opinion and conform your study to overcome those
objections.

In addition to the survey, you should review:

1. All available statements and depositions of Massachusetts
pharmacists who were active in that period of time, to gain the
benefit of their knowledge, as it was elucidated by a drug
manufactures' attorney. You will determine if the pharmacists
deposed were accurate and objective in their remembrance of
the DES market during the time under observation.

2. The advertising, promotional and informational practices of
the DES manufacturers at that time, as it concerned detailing
of pharmaceutical representatives, product brochures, product
cards, physician's desk references, and other labeling issues
and practices regarding DES.

You should additionally attempt to gain information by investigating and
reviewing the following peripheral information and areas:

a)    Wholesaler or jobber practices, popularity and access, as
well as any statements written, or otherwise, from
wholesalers regarding prescribing practices;
b)    Pharmacy deals and promotions;
c)    Pricing of DES;
d)    Shipping procedures existing at the time;
e)    Drop ship practices;

Harold B. Sparr, R.Ph., D.Ph., M.S.
Page Seven
March 5, 2005

      f)      Pricing and costs;

      g)      The Red and Blue Books and any other catalogues of
              available pharmaceuticals;

      h)      Relevant Physician Desk Reference (PDR)

      i)      The actual prescriptions from physicians we have been able
              to reclaim and find to observe what, if any, markings they
              carry to denote the brand of DES dispensed for that
              prescription.

      j)      Any other sources of information available.

    Basically your study results should be rendered as the New York and California matrices amended and conformed to recreate the Massachusetts experience.

    You must maintain a fiduciary relationship with this office and treat all survey information, including the processes and results as the sole property of this office on behalf of our clients. You must obtain prior permission before releasing or using any survey, information or data. You shall return all data, reports or other materials which you create in furtherance of this project to our office.

    You are authorized to expend such funds as are reasonable to accomplish this project, including printing postage tabulation follow up, statistical review and reporting. I ask that you provide me with an estimated budget prior to embarking on the project to include your expected involvement. Neither your compensation, nor any future financial arrangements with this firm will have any impact from the results or even failure of the study.

                     Very sincerely,

                     Aaron M. Levine

AML:hm
Enclosures:    List of Pharmacists
            New York Matrix
            California Matrix
            Cover Letter
            Questionnaire

**EXHIBIT 3**

00001

1          Volume: 1

2          Pages: 1 - 110

3          Exhibits: 1-2

4     IN THE UNITED STATES DISTRICT COURT

5      FOR THE DISTRICT OF MASSACHUSETTS

6  C.A. No. 02-CV-11078-RGS

7  -----------------------------x

8  ELLEN J. DEAN,

9      Plaintiff

10

11  v.

12

13  ELI LILLY AND COMPANY,

14      Defendant

15  -----------------------------x

16

17          DEPOSITION OF PHILIP J. CAFFERTY

18      Friday, August 22, 2003, 11:04 a.m.

19          Foley Hoag LLP

20     155 Seaport Boulevard, Boston, Massachusetts

21

22

23

24      Reporter: Caroline T. Renault, CSR/RPR

**Cafferty, Philip (8/22/03)**          **Page 1**

00054

1   A. Yeah.

2   Q. Now, up until 1965 I take it from what you

3   said that you had no experience in any pharmacies

4   outside of the Thorpe Pharmacy and part time at the

5   Ivey Pharmacy, is that right?

6   A. Correct.

7   Q. And you had no experience in any pharmacies

8   in Massachusetts at that point, is that correct?

9   A. Correct.  I was not licensed in Massachusetts

10  at that time.

11  Q. Did you become licensed in Massachusetts?

12  A. Yes, I did.  I would say probably about 1978

13  when I came back from Florida, the reason being

14  while I was employed by Eli Lilly, even though I was

15  a pharmacist, I did not work part time in the

16  pharmacy.  I probably got licensed in Massachusetts

17  in -- 1984 is when I left Lilly, so 1984 is when I

18  became licensed.  I could not work part time.

19  Q. I'm sorry.  What you are saying is while you

20  worked for Lilly, you worked for Lilly and didn't do

21  any pharmacy work, is that right?

22  A. Correct.  It was against company policy.

23  Q. And you believe you were licensed in

24  Massachusetts in about 1984?

**Cafferty, Philip (8/22/03)**                    **Page 54**

00055

1    A. That's right.  The license was reciprocated.

2    Q. How did you come to apply to Eli Lilly and

3 Company in 1965?

4    A. All right.  When Walter Thorpe owned Thorpe's

5 Pharmacy, he had the four stores and he kept telling

6 me, "Phil, once you become a pharmacist, you will be

7 a pharmacy manager in one of my stores."  The sons

8 took over and slowly but surely he started to sell

9 off all of the stores but East Greenwich, which was

10 the newest store.

11        I said, "Gil, your father always told me

12 I would be a pharmacy manager, but the only store

13 you have left is this one.  What are my chances of

14 becoming a pharmacy manager here?"

15        He said, "Not too good."

16        I said, "Thank you."

17        Actually, Lilly -- I applied to

18 Lilly -- it was kind of strange.  I had -- Jim

19 Noonan, a Lilly representative, he would call on me

20 at Ivey Apothecary every other Friday when I was

21 working and asked me to apply to Lilly.

22        I said, "Jim, I'm with Lilly."  I'm

23 sorry.  "I'm with Thorpe and work here part time.

24 I'm happy."

**Cafferty, Philip (8/22/03)**            **Page 55**

00065

1  new drug came out, we would ship a bottle to the

2  pharmacy or whatever a new drug shipment or

3  something like that. Most pharmacies would sign it.

4  If the drug didn't move the first three months, we

5  told them we would take it back, so they had very

6  little invested.

7     Q. Okay. Now, with respect to -- this is 1965

8  when you first started. I take it that you were not

9  detailing DES or diethylstilbestrol --

10    A. No.

11    Q. -- is that right?

12    A. No.

13    Q. Did you have any information about DES or

14  diethylstilbestrol?

15    A. No. I knew Lilly made it. I knew what it

16  was used for, but we never detailed it.

17    Q. Okay.

18    A. I never discussed it with the physician.

19    Q. And in fact, the doctors that you were seeing

20  were not likely OB/GYNs?

21    A. Some were OB/GYNs, but for the most part they

22  were general practitioners and internal medicine.

23    Q. But you didn't discuss DES with them?

24    A. No.

00068

1    A. Correct.

2    Q. And to whom did you call the order in?

3    A. Back then McKesson was the only one.

4  McKesson was the only one in Rhode Island, and in

5  Massachusetts you had Gilman Brothers, Daley.  It

6  was Gilman Brothers in Massachusetts, McKesson.

7    Q. So you are saying that those are wholesalers

8  that dealt with Lilly products, is that correct?

9    A. Correct.

10    Q. There were many other wholesalers, were there

11  not?

12    A. Yes.  For example, in Rhode Island there was

13  McKesson and Providence Wholesale.  Providence

14  Wholesale could not carry the Lilly line because

15  they were a cooperative wholesaler, and Lilly has in

16  their bylaws that they could not sell to a

17  cooperative wholesaler.

18    Q. If a pharmacy in Rhode Island was dealing

19  with Providence Wholesale Drug, they wouldn't be

20  able to get a Lilly product?

21    A. Not until about 1968 or '69, I think, for

22  Providence Wholesale.

23       MR. LEVINE:  When you say they ordered

24  their DES from Providence --

00082

1  lot of time with the residents.

2      Q. And your focus was the drugs that Lilly was

3  then detailing --

4      A. Yes.

5      Q. -- which did not include DES?

6      A. No.

7      Q. And you didn't deal with any pharmacies,

8  retail pharmacies at this time?

9      A. No, I did not.

10     Q. I know you have other roles, but let's take

11  now through -- you were in that job until the

12  middle of 1972, is that right?

13     A. I was only there for about three months.

14     Q. In the middle of 1972 that's when you went to

15  Indianapolis?

16     A. In January of '72 and went back on permanent

17  assignment in April of '72. I first went on what

18  they call a switch program where I was in

19  Indianapolis for three months for a switch

20  assignment. If you do well, they invite you back on

21  permanent assignment, which I did.

22     Q. So I am going to -- while I want to ask you

23  questions about these things, I am up now to 1972,

24  and I just would like to go back over some of the

**Cafferty, Philip (8/22/03)**                    **Page 82**

00083

1  things.  I have about 20 minutes to go because of

2  the restriction that is being put on this.

3      MR. LEVINE:  I will object.  It's not a

4  restriction.  It's an agreement.

5      MR. DILLON:  It was an agreement that I

6  could get a part of this deposition.

7      Q. So let me just be clear.  That by 1972 -- you

8  had spent the time from 1961 to 1965 in the Thorpe

9  store in Rhode Island, right?

10     A. Right.

11     Q. And in 1965 to 1967 you had the Fall River,

12  Newport and surrounding towns, right?

13     A. Right.

14     Q. And that's an area where you did call on

15  pharmacies, is that right?

16     A. That's correct.

17     Q. And in 1967 to '68 I think you were north of

18  Boston, correct?

19     A. Correct.

20     Q. And you were dealing with specialists in

21  internal medicine, is that correct?

22     A. Yes.

23     Q. And in 1968 to '71 you were in Syracuse, is

24  that correct?

**Cafferty, Philip (8/22/03)**              **Page 83**

00084
1   A. Yes.

2   Q. And not dealing with any retail pharmacies?

3   A. Right.

4   Q. And in 1971 to '72 you were in Boston not

5   dealing with any retail pharmacies, is that right?

6   A. Correct.

7   Q. I do have a number of questions to ask about

8   this, but I do need to go through some parts of your

9   statement that we marked as Exhibit 1. Having gone

10  through -- I'm sorry. We were summing up about

11  where you have been. Through all of this time up

12  until 1972 you didn't make any notes or observations

13  about, written observations -- I'm sorry -- written

14  observations or notes about diethylstilbestrol?

15  A. Correct.

16  Q. And that was not a focus of your interest, is

17  that right?

18  A. No.

19  Q. In fact, it's something you didn't pay any

20  attention to at all, is that correct?

21  A. Correct. We were not detailing it.

22  Q. So let's turn to your statement, Exhibit 1.

23  Now, first of all, would you say that this statement

24  of Philip Cafferty, would you say these are in your

00091

1    Q. Take Exhibit 1, and if you would take this

2   pen -- and on Exhibit 3 why don't you mark out the

3   change that you want to make there, "600" to "200."

4    A. (Witness complies.)

5        THE WITNESS: That was one of the

6   changes I made, Aaron, but it never came out.

7        MR. LEVINE: On the original copy that

8   you received, that has that change on it.

9        MR. DILLON: No.

10       THE WITNESS: 600 was there.

11       MR. DILLON: The one that I got is the

12  one that Mr. Cafferty has that has been marked with

13  his handwriting.

14       THE WITNESS: 200.

15       MR. LEVINE: I hope so.

16       THE WITNESS: That was a change that

17  came.

18   Q. Let's stay on Paragraph 3 for a while. You

19  are talking about experience over the last half

20  century in dozens of drugstores. Up until 1972 you

21  worked in the Thorpe Drugstore?

22   A. Up until 1965.

23   Q. But carrying on to 1972, your experience in

24  drugstores is the Thorpe Drugstore?

**Cafferty, Philip (8/22/03)**            **Page 91**

00092

1    A. Thorpe and Ivey Apothecary.

2    Q. Where you worked part time?

3    A. Yeah.

4    Q. If there was any drugstore that was after,

5    more than those two, they happened after 1972,

6    right?

7    A. I don't follow what you mean.

8    Q. What do you mean by, "In my experience over

9    the last half century in dozens of drugstores"?

10    A. As a pharmaceutical representative.

11    Q. So in "dozens" you mean -- why did you say

12    "dozens" rather than 200, the 200 that you had

13    before?

14        MR. LEVINE: We will change it.

15        MR. DILLON: Are you -- I'm trying to

16    find out what Mr. Cafferty means by his statement.

17    Let me turn to the back of this thing.

18    Q. Mr. Cafferty, at the back of the statement,

19    Exhibit 1, do you see you signed this under the

20    penalty of perjury --

21    A. Yes.

22    Q. -- based on your personal knowledge --

23    A. Yes.

24    Q. -- that it's true and correct?

**Cafferty, Philip (8/22/03)**                **Page 92**