IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIMBERLY C. CUTONE and, ANTHONY CUTONE<br><br>Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 04-CV-12725 (JLT)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT ELI LILLY'S
MOTION TO STRIKE THE STATEMENT OF HAROLD SPARR, R. Ph.**

**COMES NOW** the Plaintiffs and oppose Defendant Eli Lilly and Company's Motion To Strike the Statement or Testimony of Harold B. Sparr, R. Ph.

I.   **INTRODUCTION**

Harold Sparr's testimony is admissible because it is both reliable and relevant to the present case. Plaintiff Kimberly Cutone was injured by Eli Lilly and Company ("Lilly") when her mother ingested Lilly's diethylstilbestrol ("DES"). As a result, she suffers from uterine and cervical malformations, infertility, and several miscarriages. She and her husband Anthony Cutone have been denied the family they have always wanted.

As part of the Plaintiffs' burden in seeking compensation, Plaintiffs must identify the brand of DES ingested. Due to the passage of time, records have been destroyed. Thus, of necessity, Plaintiffs' burden of proof must be approached through a multifaceted and innovative inquiry. While no single document or testimony may be, of itself, sufficient to overcome Plaintiffs' burden of proof, the Sparr statement, when placed in the context of the mother's

testimony, the PDR evidence and other evidence the cumulative effect can reach the threshold of proof. See Statement of Harold Sparr, R.Ph ("Sparr Statement"), attached hereto as Exhibit 1.

> It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

Edward W. Clearly, et al., McCormick on Evidence § 185, at 542-43 (3rd ed. 1984). There are no books or articles written and no courses taught on the subject of 25 mg DES usage in Allston, Massachusetts 35 years ago. Plaintiffs must lay one brick after another to make the wall of proof they need to prove: "it is more likely than not that it was the Lilly brand."

Here, Mr. and Mrs. Cutone have pulled from every available source of information and put together a wall of the available clues, one of which Pharmacist Sparr is an integral part. The Sparr Statement indicates that the Lilly brand was provided in the overwhelming number of unspecified prescriptions in Massachusetts and therefore makes it much more likely than not that Kimberly Cutone's mother would have been given Lilly DES. By itself the Sparr Statement may not be enough for a prima facie case, but its value as an integral part of an evidentiary patchwork renders it relevant to Plaintiffs' claim.

Harold Sparr's expert opinion is based both upon his vast years of experience in the retail pharmacy industry and his own research. The study upon which his expert opinion is based was scientifically conducted, strictly adhering to survey guidelines in published scientific texts. See Report of Hannelore Vanderschmidt ("Vanderschmidt Report"), attached hereto as Exhibit 2. An eminent researcher and professor at the Boston University analyzed the results to ensure they

2

were free from bias and to ensure that the statistical tests were properly conducted. The questionnaires were approved, distributed and collected by disinterested, academic parties.

Defendant portrays the Sparr study and Statement as a ruse created by the Plaintiffs' counsel. This is simply untrue. Over the three decades during which DES victims have pursued DES manufacturers, Plaintiffs' law firm has sued not only Eli Lilly, but Squibb, Merck, Upjohn, Premo, and dozens of other DES manufacturers. Where it appeared that non-Lilly brands were involved, those particular manufacturers were pursued exclusively. Where the mother could not remember the pill that she took, or witnesses were dead and the particular jurisdiction did not allowed market share liability, cases were rejected. See Affidavit of Aaron M. Levine ("Levine Affidavit"), attached hereto as Exhibit 3. If in the hundreds of DES cases managed by its firm, Lilly could have discerned any pattern or strategy of chicanery, they would have exposed it.

Because Harold Sparr is a pharmacy expert and has based his opinions on an unbiased, scientific study, his observations and his opinions are reliable. Because his expert opinion helps establish that, more probably than not, Kimberly Cutone was exposed to DES manufactured by Lilly, it is relevant.

## II. DEFENDANT'S OBJECTIONS CONCERNING PHARMACIST SPARR'S RELIABILITY SHOULD BE PROPERLY BROUGHT AND EVALUATED BEFORE THIS COURT AT A FEDERAL RULES OF EVIDENCE 104(A) AND 104(C) HEARING

Federal Rules of Evidence 104(a) and 104(c) (hereinafter "Rule 104(a)" and "Rule 104(c)," respectively) provide for a hearing on a Daubert motion. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). It is Defendant's burden to request such a hearing before Mr. Sparr is disqualified from giving testimony in a case.

A hearing is especially relevant in the summary judgment context, as courts have ruled that, in general, expert witnesses are not to be stricken on a motion for summary judgment except

in the most clear-cut of cases. As the First Circuit established in <u>Cortes-Irizarry v. Corporacion Insular</u>:

> A trial setting normally will provide the best operating environment for the triage which *Daubert* demands. *Voir dire* is an extremely helpful device in evaluating proffered expert testimony ..., and this device is **not readily available in the course of summary judgment** proceedings. Moreover, given the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clear-cut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the ***Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.**
>
> We conclude, therefore, that at the junction where *Daubert* intersects with **summary judgment practice,** *Daubert* **is accessible, but courts must be cautious**-- except when defects are obvious on the face of a proffer--not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.

111 F.3d 184, 188 (1st Cir. 1997) (emphasis added). Harold Sparr has 40 years of experience in retail pharmacy. He has conducted literature reviews, research, and surveyed pharmacists in Massachusetts on their stocking and prescription-filling habits. See Sparr Statement, Ex. 1. Plaintiffs should at least be allowed to present, in open court, the merits of Harold Sparr's qualifications and expertise.

### III. PHARMACIST HAROLD SPARR'S STATEMENT IS RELIABLE PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND <u>DAUBERT</u> AND ITS PROGENY

As stated in <u>Kumho Tire</u>, "the test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999). Given that the Rules are "flexible" and "liberal" in their application, heavily biased towards admitting relevant testimony, expert Pharmacist Harold Sparr's statement is admissible. See <u>Daubert</u>, 509 U.S. 579 (noting the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional

4

barriers to 'opinion' testimony"), citing <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 169 (1988); <u>see also</u> Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631 (1991).

### A. Mr. Sparr Is Qualified As an Expert

The Defendant grossly mischaracterizes Pharmacist Sparr's background. They attempt to picture him as some pill pusher who never left the back of the store. If anyone is familiar with the customs and practices of the Boston retail pharmacy milieu back then, and qualified to form expert opinions involving dispensation practices in retail pharmacy in the Boston area, Mr. Harold Sparr is the choice candidate. His education, training, experience, and data relied upon include:

- Serving as the President of Massachusetts Board of Registration of Pharmacy;

- Serving as the President of Massachusetts College of Pharmacy Alumni Association;

- Beginning his retail pharmacy career in 1944 as a clerk in his father's store;

- Working as a retail pharmacist "continuously and exclusively until the present," after graduating pharmacy school in 1951;

- Holding a Bachelor of Science from Massachusetts College of Pharmacy, becoming licensed in Massachusetts, New York, and California in Pharmacy, and holding a Masters Degree in Health Care Management;

- Conducting an extensive literature search of the pertinent retail pharmaceutical literature;

- Reviewing and personally observing Massachusetts retail drug store practices and the DES environment from 1954-1971;

- Visiting hundreds of Boston area pharmacies and talking to hundreds of pharmacists familiar with the drug stocking practices in the region;

- Teaching for five semesters as an Adjunct at the Massachusetts College of Pharmacy; and

5

- Teaching at Northeastern University for 13 years about Pharmacy Practice.

Sparr Statement, Ex. 1.

Who could be better than a retail pharmacist with decades of experience in and around the Boston area, who was also the president of local Boston pharmacist associations and who personally visited innumerable Massachusetts pharmacies and spoke with pharmacists throughout the Boston area, to help design and interpret the study? Pharmacist Sparr's conclusions were based on six research areas including: (1) Mr. Sparr's personal experience as a retail pharmacist and as the president of pharmacy associations, (2) a literature search of pertinent pharmacy and retail pharmaceutical literature, (3) a review of Massachusetts retail drug store practices and the DES marketing environment from 1954-1971, (4) the Boston University survey study, (5) Lilly's own records, and (6) the affidavits of hundreds of pharmacists in Boston. See Sparr Statement, Ex. 1.

Pharmacist Sparr need not be an expert market researcher. Fed. R. Evid. 702; see also Tuf Racing Prods., Inc. v. American Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000) (holding that "The Federal Rules of Evidence... do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" ... in character.") Mr. Sparr is not testifying to the general practice of market research. He is not testifying on the best practices of study design, nor is Mr. Sparr testifying as a statistician. He is testifying that, due to his training, knowledge, experience and survey data, the general practice of pharmacists in Massachusetts was to fill unspecified orders of DES with the Lilly brand, and that in fact over 90 percent of the time a Lilly product was supplied in these circumstances. As a retail pharmacist for 49 years who has done a literature search, talked to hundreds of pharmacists, reviewed data, been

6

President of local pharmacy associations and lectured on pharmacy practice, if he is not qualified to make this sort of statement, who is?

**B.     The Survey Upon Which Mr. Sparr Relies is Reliable**

1. The Survey Meets the Factors Laid Out in <u>Daubert</u>

In <u>Daubert</u>, the Supreme Court determined that it was a trial judge's duty to serve as a "gatekeeper" to exclude evidence that was both unreliable and irrelevant from the courtroom. 509 U.S. at 589, n.7; <u>see also</u> <u>Prado Alvarez v. R.J. Reynolds Tobacco Co.</u>, 405 F.3d 36, 40 (1st Cir. 2005) (holding that the court must exercise a gatekeeping function to assess preferred expert testimony). The <u>Daubert</u> Court set out several factors that went to the reliability of scientific evidence, including: (1) whether the opinion can be or has been tested; (2) whether the theory of technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) "general acceptance." <u>Daubert</u>, 509 U.S. 579; <u>see also</u> <u>United States v. Mooney</u>, 315 F.3d 54 (1st Cir. 2002). The Boston University survey can be tested. Indeed, if another researcher chose to replicate the Boston University study, it certainly could. The study has been laid out in adequate detail, with the survey forms and statistical methods detailed in Dr. Vanderschmidt's report. <u>See</u> Vanderschmidt Report, Ex. 2. Surveys, as a technique of gaining scientific knowledge, are, of course, a generally accepted method of doing research. Survey error rates vary, but tend to be well within accepted limits. The statistical variation in this study had an error rate of +/- 6 percentage points. If Lilly thought the study flawed, they could have replicated it to show that there was a different result.

The study was crafted to maintain standards as to the survey's operation. The questions were designed to be non-leading, being open-ended so as not to falsely mislead pharmacists into

choosing an incorrect brand. The study was divided so as to have different researchers conducting the different phases of the study. No individual researcher could have impermissibly biased the study. The data was collected by an outside, disinterested survey agency and processed by a neutral third party, Dr. Vanderschmidt.

Defendant claims that the sample size was too small to adequately represent all pharmacists in Massachusetts. This is false. The sample was well within accepted limits, exceeding the sample sizes for other studies. See "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, 229-271 (Fern M. Smith ed., Federal Judicial Center 2d ed. 2000). Indeed, Eli Lilly itself considers breast cancer studies with no more than 54 participants, for the eventual benefit of the 21 *million* women who are affected by breast cancer! See A Phase II Study of a Combination of Pemetrexed and Gemcitabin in Patients with Metastic Breast Cancer: An NCCTG Study (59 participants, uncontrolled, non-randomized study when 1 in 7 women, or about 20,500,000 women are affected by breast cancer) available at http://www.lillytrials.com/results_files/alimta/alimta_summary_2245.pdf, attached hereto as Exhibit 4. Plaintiffs' 79 participants to represent 5,000 pharmacists carries greater statistical weight.

Defendant charges that the sample chosen was not random, which is only marginally true. While a completely random sample may be the ideal, it is often not possible, and designers need only be as random as they are able to ensure the validity of their findings. A qualified epidemiologist, who gave her stamp of approval, designed the Boston University study. Those who were asked to complete it would (a) have the relevant knowledge, (b) remember the relevant knowledge, (c) have contact information and (d) be representative of community pharmacists in Massachusetts. To ensure that the pharmacists had the relevant knowledge, it was necessary to

choose from pharmacists that had practiced at the relevant times: in the 1960s when the prescription of DES was at its highest point. The pharmacists had to be licensed in Massachusetts. To this end, the study's designers chose pharmacists who were initially licensed in the 1960s. Second, the study's design sought to ensure that the participants were both alive and able to remember the relevant time period.

Third, the studies designer's chose pharmacists who were initially licensed to practice in Massachusetts between the years of 1963-1967 because they were accessible. The names and contact information for the pharmacists licensed in initial years was available from the Massachusetts government for those initially licensed. A survey is useless if one has no way to send it out. An imperfect sample does not make the study invalid, but rather is a factor when calculating the rate of error and assessing the relative weight the study should be given. Finally, the pharmacists chosen were meant to be representative of pharmacists generally in Massachusetts by having graduated from pharmacy school in each of three decades in the 1940's, 1950's and 1960's. The pharmacists were scattered all over the state of Massachusetts. As a final note, Dr. Vanderschmidt, an eminent researcher and author of several published survey studies, reviewed the sampling criteria established in this study and proclaimed it to be valid and sound:

> The number of possible responders was properly surveyed to obtain a representative sample..... The study and its results meet or surpass the assignment I undertook as contained in a letter to you from an attorney who I understand represents DES daughters seeking compensation from manufacturers.... However, neither this attorney, nor anyone else engaged in such litigation nor any of the claimants have played any role in the design or conduct of this survey or my conclusions... This study is adequately free from any bias that could invalidate the results.

Vanderschmidt Report at 4, Ex. 2 (emphasis added); see also Commission Letter, attached hereto at Exhibit 2. At this stage in the proceeding, Plaintiffs are entitled to every favorable inference, and so Dr. Vanderschmidt is entitled to be believed.

Furthermore, the study confirms generally accepted beliefs. It is generally accepted and believed by dozens of pharmacists that Lilly had a majority of the market share of DES in the 1960s. It is true that the results from the study have not been published. However, the availability of the diethylstilbestrol in the pharmaceutical market in Boston from 1955 to 1971 is such an obscure and unique topic that it would have been unlikely for such a study to emerge in academics, medicine or social sciences from independent sources. In fact the only entity that has this information is Defendant Lilly and they have refused to disclose it. Every study need not be published to be admissible in court. See Daubert, 509 U.S. at 593 (publication is not a *sine qua non* of admissibility). It is enough that the study satisfies the first four prongs of Daubert. There is no publication in print that would consider publishing a study of how many pharmacies in the 1960's prescribed the Lilly brand of DES.

2. Plaintiffs' Counsel Did Not Design the Study

Defendant seeks to characterize Mr. Sparr as the handmaiden of a lawyer, tainted by plaintiffs' counsel – but the survey was not designed by Plaintiffs' counsel. The study was designed by the Department of Epidemiology of Boston University. Plaintiffs' counsel merely formalized and organized their recommendations in a letter. Commission Letter, Ex. 2. A meeting was held at the Boston University with Dr. Vanderschmidt, Pharmacist Steere (from Remedy Pharmacy Management Services), Pharmacist Sparr and Plaintiffs' counsel to determine if DES brands' market share could be adequately established by a survey and, if so, what the design should be. Dr. Vanderschmidt, Mr. Sparr and Mr. Steer designed the study to ensure

10

objective standards. See Vanderschmidt Report, Ex. 2.

### 3. The Boston University Survey Answers the Question Mr. Sparr Asked

Defendant argues that the study is inadequate to aid Mr. Sparr in forming his expert opinion because the study asks a different question from that which Defendant seems to find relevant. Defendant suggests that the relevant question is "what brand of DES did each pharmacy stock?" See Def. Mem. at 8. However, Mr. Sparr was not interested in that question. The relevant question was: what brand would have been primarily dispensed to patients when the prescribing physician specified no brand? This is precisely the question asked by the survey. The study was not interested in those times in which the brand name was specified; of course the brand specified would have been dispensed in those circumstances, to do otherwise would have been contrary to the ethical practice of pharmacy. The designers of the Boston University study were entitled to choose their own question to answer in a valid and scientific way, rather than have the question be re-categorized or altered by a future defendant in litigation.

Secondly, the Defendant argues that the survey may have included not only DES dispensed specifically for pregnancy use, but any 5mg or 25mg prescriptions bearing "DES", "Stilbestrol", or "Diethylstilbestrol." See Def. Mem. at 8. If such oversight occurred, however, it would only mean the survey could have been over-inclusive rather than under-inclusive, which is an asset rather than a flaw. That is, if the responding pharmacist neglected to limit his answer to only DES for pregnancy use as specifically solicited by the survey, but included DES dispensed for whatever ailments, that means the results speak to all uses including pregnancy use. This does not change the fact that the predominant brand dispensed for non-designated prescription, for pregnancy and perhaps other problems, was still Lilly. Moreover, the survey result was based on careful statistical analysis to preclude error and determine statistical

11

significance. See Sparr Statement, Ex. 1; Vanderschmidt Report at 2, Ex. 2. Thus, the result of the survey question is more than adequate to cover the non-designated prescription, brand identification issue at bar.

4. The Boston University Study was Designed to Elicit Accurate Memories

First, Defendant charges that no protections were put in place to protect against respondents' aged memories. This is untrue. The memory issue was specifically addressed here by choosing pharmacists still practicing, thus leading to the conclusion that they would still have good memories.

Second, the Defendant seems to argue that it is necessary to cross-examine every survey respondent, and canvas their long-gone pharmacy records from 40 years ago in order for the survey results to be valid. None of the statistics or survey sampling authorities support that view. See "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, 229-271 (Fern M. Smith ed., Federal Judicial Center 2d ed. 2000). Those conducting political surveys, for example, do not run around after people to see what they really think, or really do.

Defendant's proposed "memory test" standard is not only unreasonable and unrealistic, but also contrary to survey standards. Id. The only remaining records of actual sales of DES are held by defendant and held by the survey respondents' memories. Because Defendant has not seen fit to volunteer its hard records, the study's designers chose to question pharmacists instead. As Mr. Sparr simply put at his deposition, if the pharmacist cannot remember, he cannot answer the survey. See Excerpts from Dep. Tr. of Harold B. Sparr in Bohlin v. Eli Lilly and Co., 03-CV-11577 (MEL) (D. Mass. Dec. 7, 2004) ("Sparr Dep.") at 161:5-10, attached to Def.'s Mot. to Strike Sparr Statement as Ex. 1. Furthermore, to ensure a reliable response, the question asked by the survey was an open-ended one rather than filling in a simple blank or multiple-choice.

Thus, the respondent would have to search his memory and actually write down the brand he did dispense rather than circling an answer. Dr. Vanderschmidt particularly reviewed the issue of an incomplete or false memory when the study was designed and concluded at the end of the study that, "Hearsay and memory risks were satisfactorily minimized." See Vanderschmidt Report, Ex. 2.

### C.     Even If The Study Is Somewhat Unreliable, The Study Is Still Admissible

In Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134 (9th Cir. 1997), the defendants raised on summary judgment the same arguments as Lilly does here against the technical reliability of the plaintiff's survey. The Ninth Circuit held the defendants' objections, that the survey was only conducted in Southern California and asked leading questions, "go only to the weight, and not the admissibility, of the surveys." Southland, 108 F.3d at 1143 (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.")). Surveys conducted under accepted principles pass Daubert. U.S. v. Bighead, 128 F.3d 1329, 1335 (9th Cir. 1997). Lilly, as the defendants in Southland, has not demonstrated that the survey violated accepted principles. "Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." Southland, 108 F.3d at 1143, n. 8. Thus, in the present case, even if the study has some elements of unreliability – which it does not – this merely goes to the weight the jury may accord to the evidence, not to whether it is admissible.

### D.     The Survey is Relevant and Will Aid the Finder of Fact In Determining Which Brand of DES Was Dispensed Toward Plaintiffs

Lilly next claims that the Sparr study should be excluded as irrelevant. Defendant contends that since Mr. Sparr cannot identify the brand of DES the particular Allston Pharmacy

13

(where Plaintiff's mother purchased her DES) carried, his study is not probative. However, the Sparr study covers the "DES Market... dispensed in the Commonwealth of Massachusetts... from 1955 to 1971" and therefore includes the relevant pharmacy. See Sparr Statement at 1, Ex. 1. Allston is in Massachusetts. The key, relevant question in this case is: What brand or brands were most popular and by what percentage in the neighborhood where the Plaintiff's mother shopped that match the identification of the DES pill as testified to by the mother, i.e., small, white, round, cross-scored? The results of the study, i.e. 94% of the DES dispensed were the Lilly brand, go directly to the heart of this question. Bolstering this position, courts have ruled that the results of statistical surveys are regularly relevant and used in product liability and mass tort cases. Reich v. Southern Maryland Hospital, 43 F.3d 949 (4th Cir. 1995); In Re Estate of Marcos Human Rights Litigation, 910 F. Supp. 1460 (D. Haw. 1995). Furthermore, statistical summaries and what they represent go to the appropriate weight the court should give the evidence, not whether the evidence is admissible. Schering v. Pfizer, 189 F. 3d 218 (2nd Cir. 1999); Cox v. National Football League, 29 F. Supp. 2d 463, 468 (1998). Thus, Sparr's opinions are both relevant and admissible, even if it is found that the study had small technical defects.

E. **Pharmacist Sparr's Expertise Is Also Based On Extensive Interviews with Pharmacists Both in Boston and Around the State of Massachusetts**

Mr. Sparr has other relevant experience and knowledge upon which to testify that Lilly DES was predominantly prescribed in the Commonwealth of Massachusetts. Mr. Sparr conducted hundreds of interviews with pharmacists across the state and across the country doing research as to the prevalence of Lilly DES in the marketplace. See Ex. 2. Mr. Sparr's research did not involve solely pharmacists directly involved in specific cases pending before courts. In point of fact, Mr. Sparr has taken many statements from pharmacists across the state, many of

whom he was acquainted with through professional and alumni organizations. See Sparr Dep. at 87: 9-10.

Defendant seeks to undermine the credibility of these interviews by noting that Plaintiffs' counsel requested the research. This just further underscores Defendant's confusion between admissibility and credibility. Credibility goes to the weight a court will accord such evidence, not whether it is admissible in the first instance. See Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 73 (1st Cir. 2002) (holding that expert testimony was admissible and its strength should hinge on the jury's credibility findings).

### F. The Sparr Opinion Gibes With Other Evidence Which Points to Eli Lilly as the Proper Defendant

The Sparr opinion is an integral part of a patchwork of facts, which, in the aggregate, implicate Eli Lilly and Company as the proper defendant. Plaintiffs have presented other evidence which supports the proposition that Lilly DES was more likely than not the DES to which Kimberly Cutone was exposed. First, Plaintiff Kimberly Cutone's mother described the DES she ingested as a small, white, cross-scored pill – a description which matches the Lilly $25_{mg}$ pill exactly. See Deposition of Virginia Camporesi, attached hereto as Exhibit 5. Second, the Physician's Desk Reference (PDR) found in every physician's office only named Lilly as a retailer of DES; no other brand name was listed. See 1969 Physician's Desk Reference, attached in relevant part at Exhibit 6. Thus, a doctor would be more likely to prescribe the brand listed in the PDR than to take a chance on an unknown and unlisted brand.

Third, Lilly utilized a wholesaler agreement whereby any wholesaler who wanted to carry Lilly products must fill any unspecified orders (prescriptions without brand names) with a Lilly drug. See Wholesaler Agreement, attached hereto as Exhibit 7. Most pharmacies did not carry DES in the store, but rather ordered the drug one bottle at a time from a wholesaler.

Therefore, if a doctor prescribed "DES" without a brand name specification, the pharmacy was likely to order the DES from the wholesaler unspecified and be supplied with a Lilly product. Finally, Sparr found that, in fact, over 90 percent of orders for DES were for Lilly products, which is bolstered by the Cafferty statement that Lilly had "the lion's share" of the DES market in the 1960s. See Sparr Statement, Ex. 1. Each fact, each brick mentioned above, is carefully laid to create a solid wall of proof, implicating Lilly as the supplier of DES in this case.

## IV. CONCLUSION

One would think that with Lilly's thousands of employees and salespeople out in the field, *someone* could come up with evidence of a non-Lilly product somewhere in the pipeline. Lilly's silence confirms their responsibility.

**WHEREFORE**, Plaintiffs pray the court to deny the Defendant's Motion to Strike Statement of Harold Sparr, or alternatively to hold a F.R.E 104(a) hearing to take testimony and evaluate Sparr's study, opinion, and credibility.

Respectfully submitted,

KIMBERLY C. CUTONE and
ANTHONY CUTONE

By their attorneys,

/s/ Erica Tennyson
Juliet A. Davison (BBO #562289)
Erica Tennyson (BBO #660707)
TODD & WELD LLP
28 State Street
Boston, MA 02109
(617) 720-2626
etennyson@toddweld.com

|  |  |
|---|---|
|  | /s/ Aaron M. Levine |
|  | Aaron M. Levine, #7864 |
|  | AARON M. LEVINE & ASSOCIATES |
|  | 1320 19th Street, N.W., Suite 500 |
|  | Washington, D.C. 20036 |
|  | (202) 833-8040 |
| Dated: July 11, 2006 | aaronlevinelaw@aol.com |

## CERTIFICATE OF SERVICE

I, Erica Tennyson, hereby certify that this Plaintiff's Opposition to Defendant Eli Lilly's Motion to Strike the Statement of Harold Sparr, R.Ph., filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 11, 2006.

/s/ Erica Tennyson
Erica Tennyson